## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RMH FRANCHISE HOLDINGS, INC., *et al.*,[3] | Case No. 18-11092 (BLS) |
| Debtors. | (Jointly Administered) |
| DINE BRANDS GLOBAL, INC., APPLEBEE'S RESTAURANTS LLC, and APPLEBEE'S FRANCHISOR LLC | |
| Plaintiffs, | Adv. Pro. No. 18-50481 (BLS) |
| v. | |
| RMH FRANCHISE HOLDINGS, INC., NULNK, INC., RMH ILLINOIS, LLC, RMH FRANCHISE CORP., and CONTEX RESTAURANTS, INC., | **DEBTORS' ANSWER AND COUNTERCLAIMS TO APPLEBEE'S COMPLAINT** |
| Defendants. | |
| RMH FRANCHISE HOLDINGS, INC., NULNK, INC., RMH ILLINOIS, LLC, RMH FRANCHISE CORP., and CONTEX RESTAURANTS, INC., | |
| Counterclaim Plaintiffs, | |
| v. | |
| DINE BRANDS GLOBAL, INC., APPLEBEE'S RESTAURANTS LLC, and APPLEBEE'S FRANCHISOR LLC | |
| Counterclaim Defendants. | |

---

[3]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: RMH Franchise Holdings, Inc. (7150); NuLnk, Inc. (7381); RMH Illinois, LLC (0696); RMH Franchise Corporation (1807); and Contex Restaurants, Inc. (0710). The headquarters for the above-captioned Debtors is located at One Concourse Parkway, N.E. Suite 600, Atlanta, GA 30328.

RMH Franchise Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), by their undersigned attorneys, hereby answer the *Complaint* [Adv. Docket No. 1] (the "Complaint") filed by Dine Brands Global, Inc. ("Dine Brands"), Applebee's Restaurants LLC, and Applebee's Franchisor LLC (collectively, the "Franchisor")[4] as follows:

## PRELIMINARY STATEMENT

The heart of the Applebee's brand is its unique "System."  Indeed, the very first Recital in an Applebee's Franchise Agreement emphasizes the importance of "the System," defined as Applebee's "designs, decor and color schemes for restaurant premises, signs, equipment, procedures and formulae for preparing food and beverage products, specifications for certain food and beverage products, inventory methods, operating methods, financial control concepts, training facilities and teaching techniques."  The System was the very foundation of the bargain between the Franchisor and its franchisees.

The Debtors became Applebee's franchisees beginning in 2012 because they believed in the Applebee's System, which had an established track record of success and profitability, earning Applebee's pride of place among bar-and-grill franchises.  Over the following years, the Debtors, with the full support of the Franchisor, doubled down on their belief in the Applebee's System, investing substantial capital to expand their operations to become the second-largest Applebee's franchisee in the world.  Specifically, the Debtors made additional acquisitions in 2013 and 2015 to help consolidate and improve Dine Brands' performance, with express assurances from Steven R. Layt, Applebee's President at the time, that certain of the stores

---

[4] For ease of reference, and due to the difficulty differentiating between the web of entities associated with Dine Brands and/or Applebee's that interacted with RMH, the plaintiffs-counterclaim defendants often are referred to herein, collectively, as "Franchisor."  Where possible, the Debtors have attempted to differentiate between the entities, but the use of the term "Franchisor" should not be construed as an admission by the Debtors as to the activities of one entity or another or otherwise used against the Debtors for any purpose.

acquired in the 2015 acquisition could be closed without penalty if performance did not improve. As it turned out, Dine Brands' CEO, Julia Stewart, later reneged on those assurances.

After decades of success under the System, the foundations of Applebee's success (and, in turn, that of its franchisees) began to crumble in 2014 as a result of the Franchisor's mismanagement.  In November 2014, after Jeff Neumann, the Debtors' founder and CEO (at the time), was elected to Applebee's Franchise Brand Council (the "FBC"), the Debtors became concerned that the defining characteristics of Ms. Stewart's tenure would be chaos and a clear lack of leadership.  Among other things, her decision to move the Applebee's headquarters from its Kansas City home to Dine Brands' California location had significant deleterious effects, resulting in the departure of large swaths of the personnel who had made Applebee's what it was. As a result of this exodus, resulting in a massive loss of institutional knowledge, and Ms. Stewart's misguided leadership, the Franchisor quickly lost touch with the Applebee's brand, with key positions either left unfilled for years or filled by newcomers without relevant restaurant industry experience or a clear sense of Applebee's roots.

The Franchisor's mismanagement under Ms. Stewart reached its crescendo in the fall of 2015 with the announcement that the Franchisor would be abandoning the proven and unique System that was at the heart of its relationship with its franchisees—and the Debtors' decision to become Applebee's franchisees in the first place—in an attempt to win over "millennials" (the "System Change").  In announcing its System Change, the Franchisor explicitly stated its intention to make Applebee's into a "different place than [its customers] remember[ed]."

Before it was even rolled out, the Franchisor had every indication that the System Change would be a failure.  Indeed, the Franchisor's testing, which was results-oriented and selectively disclosed to its franchisees, foretold that the System Change was destined to fail.  Likewise,

franchisees made their displeasure with the System Change known to the Franchisor, both directly and through the FBC, an advisory group for Applebee's franchisees.  Yet the Franchisor ignored its franchisees' reasoned positions criticizing the changes.

Instead, without any other ideas, the Franchisor plowed forward with the System Change, foisting all of the burdens, costs and risks onto its franchisees.  Indeed, in another break with the manner in which Applebee's traditionally had been run, the Franchisor had sold all of the Franchisor-owned locations by the time of the System Change, and thus, it was all too aware that 100% of the capital investment and risk associated with the System Change would be borne by the franchisees, as well as that 100% of the advertising fund used to roll out the System Change would be paid by the franchisees.  The Franchisor was not concerned that the System Change would require huge capital expenditures and increased food costs—franchisees' profits would decrease but not the royalty fees due to the Franchisor, which were based on gross revenues, not profit.  The Franchisor exploited this disparity, forcing the System Change on the franchisees without due regard for the overall best interests of the System or for the financial burden that would be borne by the franchisees, in direct contravention of the Franchise Agreements.

Predictably, the System Change was a colossal failure.  Independent assessments by the consultant hired by the Franchisor concluded that the Franchisor's decision-making process was fundamentally flawed and that the Franchisor had failed to adequately test its proposed System Change or understand its impact before causing franchisees to implement it.  In the aftermath, the Franchisor itself acknowledged "tactical missteps" with its current President conceding its negligence, stating that, "[c]andidly, I think we've taken our eye off our core value proposition over time" and that it was "very clear from the data" that Applebee's had "alienated some core guests" with its System Change (to say nothing of its devoted franchisees).  Of course, the

destruction that the Franchisor wrought could have been avoided if it had properly tested the System Change and listened to its franchisees.

The impact of the System Change on the Debtors was catastrophic.  All told, the System Change cost the Debtors approximately $2.9 million to implement, with $1.6 million attributable to capital expenditures and $1.3 million attributable to labor costs—to say nothing of the Debtors' lost traffic and profits, which had a multiplier effect on the Debtors' enterprise value. By way of illustration, the System Change caused the Debtors' revenue to fall 8.8%, and their EBITDA to fall 22%, in the year after the implementation of the System Change.  The damage wrought on the broader franchise network was also significant.  One measure of just how destructive the Franchisor's actions have been not just to the Debtors but to the entire franchise network is the seven-fold increase in Dine Brands' bad-debt reserve and its write-off of $358.2 million for Applebee's goodwill and $173.4 million for Applebee's tradename in fiscal year 2017.

The Franchisors' indifference to the franchisees, including Debtors, is further evidenced by the Franchisor's unilateral decision to devote nearly the entire franchisee-funded advertising budget (to the tune of approximately $75 million borne by the franchisees) to the System Change, leaving the Applebee's brand unable to pivot after the System Change failed and resulting in a 72% drop in the number of commercials Applebee's was able to air in the two months following launch of the System Change.  As the *New York Daily News* put it at the time, "[n]ever has one company spent so much on so little."  Indeed, the Franchisor depleted its advertising budget on the doomed System Change, and was forced to reduce its advertising by at least 50% in the wake of the System Change's destruction.  In the end, the System Change not only caused the closure of a number of franchises, including franchises owned by the Debtors, it

also caused the Applebee's brand to fall far behind comparable bar-and-grill peers.  Dine

Brands' board, meanwhile, appeared to merely sit back and watch as Applebee's unraveled,

effectively taking no action at all until the FBC finally demanded that the board get involved.

     In sum, the System Change from the outset confounded reasonable business judgment,

was a material breach of the Franchise Agreements, and violated the covenants of good faith, fair

dealing, and competence implicit in those agreements.

     Yet the harm inflicted on the Debtors by the Franchisor did not stop there.  The harm was

further compounded by the Franchisor's purported termination of the Franchise Agreements,

which itself constituted a breach of those agreements and of the implied covenants, and was

improper and ineffective for numerous reasons.  Section 19.1 of the Franchise Agreements states

that the "Franchisor shall have the right to terminate this Agreement immediately upon written

notice to Franchisee stating the reason for such termination . . . ."  On September 20, 2017, the

Franchisor sent a letter declaring a default and stating that, unless the Debtors paid the overdue

royalty fees within 90 days, the Franchise Agreements would terminate without the notice

required under those agreements.  This "Notice of Default" (as the Franchisor characterizes the

letter in its Complaint) advised the Debtors of the potential for termination of the various

Franchise Agreements but was not itself the notice of termination required under those

agreements.  When the Franchisor later sent another letter stating the Franchise Agreements for

the Debtors' Arizona and Texas locations were terminated, the Franchisor purported to rely on

its earlier Notice of Default as a basis for retroactive termination of those agreements.  Even

assuming for the sake of argument that this purported notice of termination would have been

effective as to the various Franchise Agreements, it was not delivered until after the Petition Date

and was void *ab initio* as a violation of the automatic stay.  But the fact that Franchisor sent a

letter specifically purporting to terminate the Franchise Agreements for the Debtors' Arizona and Texas locations belies its current contention that the Notice of Default was the termination notice required under the various Franchise Agreements and was itself sufficient to terminate the Franchise Agreements for the remainder of the Debtors' locations.  Moreover, the Franchisor sent the purported termination notice abruptly, as soon as it became clear that the Applebee's brand was starting to recover and only after stringing the Debtors along in workout negotiations for 16 months, all of which demonstrates that the Franchisor's attempt to terminate those Franchise Agreements was nothing more than a pretext for its ultimate goal of recapturing certain high-performing locations close to its California headquarters, as new management sought to return to a paradigm involving company-owned franchises.  Therefore, in addition to the damages for the Franchisor's bad-faith breach of the Franchise Agreements (and any attorneys' fees incurred in connection herewith), the Debtors are thus further entitled to a declaratory judgment that the Franchise Agreements were not terminated prior to the Petition Date but are property of the Debtors' estates.

Finally, adding insult to the injury, the Franchisor announced on June 11, 2018, that it intended to rebrand IHOP to become "IHOb"—the "b" standing for "burgers."  Yet much of the recent Applebee's advertising campaign—for which Dine Brands asked Applebee's franchisees to pay for an increased portion of the bill—is focused on advertising burgers.  Indeed, in a recent Dine Brands' earnings call, Dine Brands' CEO Steve Joyce promised to continue to position Applebee's with its traditional customers and touted the new burger menu's popularity with millennial consumers.  Thus, the Franchisor's "IHOb" maneuver only served to exacerbate the challenges facing the Applebee's brand.  Moreover, Dine Brands unveiled its ballyhooed rebranding of IHOP at the same time that Applebee's was debuting an innovative new

technology that allows customers to order ahead so that their food is ready upon their arrival at the restaurant.  Dine Brand's promotion of the IHOb rebranding overshadowed Applebee's own initiative.  While Dine Brands clearly is indifferent to the IHOb's direct competition with Applebee's franchises, the Debtors are not.

Dine Brands' actions demonstrate its complete lack of concern for the Applebee's franchisee community.  The decision to abruptly abandon confidential, good-faith negotiations with the Debtors and to make their disputes public has put the Applebee's brand in a bad light and created a tremendous distraction for franchisees and other stakeholders at a time when the brand was starting to recover but still in need of direction.

For all of the foregoing reasons, and as further set forth herein, the Debtors should be recompensed for the enterprise value that the Franchisor has destroyed and should be permitted the opportunity to pursue a chapter 11 plan of reorganization to maximize the value of their assets free from the Franchisor's improper and unwarranted attempts to exercise control over those assets.

## Jurisdiction and Venue

1.      This Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  The above-captioned bankruptcy cases (the "Cases") are currently pending before this Court.

**ANSWER:**    Admitted.

2.      Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1408 and 1409(a).

**ANSWER:**    Admitted.

3.      Certain aspects of this adversary proceeding are core matters pursuant to 28 U.S.C. § 157 or Bankruptcy Rule 7001 and other aspects are non-core matters.  This action arises under the Bankruptcy Code, involves alleged property of the applicable Debtors' estates, and arises in and is related to the applicable Debtor's chapter 11 case.  Applebee's reserves all rights as to non-core matters including any non-core matters which may be raised in response to this Adversary Complaint or otherwise.

**ANSWER:**    The allegations in Paragraph 3 constitute legal conclusions to which no response is required.  To the extent that a response is required, the allegations in Paragraph 3 are denied.

## Parties

4.    Plaintiff Dine Brands Global Inc. ("Dine Brands") is a Delaware corporation with its principal place of business in Glendale, California.

**ANSWER:**    Admitted upon information and belief.

5.    Applebee's Restaurants LLC ("Applebee's Restaurants") is a Delaware limited liability company with its principal place of business in Glendale, California.

**ANSWER:**    Admitted upon information and belief.

6.    Applebee's Franchisor LLC ("Applebee's Franchisor") is a Delaware limited liability company with its principal place of business in Glendale, California.

**ANSWER:**    Admitted upon information and belief.

7.    The ultimate parent company of Applebee's Restaurants and Applebee's Franchisor is Dine Brands.

**ANSWER:**    Admitted upon information and belief.

8.    Defendants RMH Franchise Holdings, Inc., NuLnk, Inc. and RMH Illinois, LLC are Delaware corporations.  Defendant RMH Franchise Corp. is a Kansas corporation. Defendant Contex Restaurants, Inc. is a Texas corporation.  The headquarters of all Defendants is located at One Concourse Parkway, N.E., Suite 600, Atlanta, GA 30328.

**ANSWER:**    Admitted.

9.    Some of the Defendants were either franchisees, or guarantors of the financial obligations of franchisees, for the Applebee's restaurants as listed and noted in **Exhibit 1** hereto (the "RMH Restaurants").

**ANSWER:**    The Debtors admit that some of the Debtors are either franchisees, or guarantors of the financial obligations of franchisees, for the Applebee's restaurants as listed and noted in Exhibit 1 to the Complaint.  The remaining allegations in Paragraph 9 are denied.

10.    Applebee's is a franchisor of a nationally recognized chain of restaurants, and Applebee's brand and image are key to the overall value and success of the Applebee's franchise

system. Applebee's brand and image are based principally on the use of certain trademarks (the "Marks") that Applebee's owns and licenses to authorized franchisees.

      **ANSWER:**    The Debtors admit that the Franchisor is a franchisor of a chain of

restaurants and that the Franchisor owns and licenses the Marks to franchisees.  The remaining

allegations in Paragraph 10 are denied.

      11.    Applebee's spends substantial sums for advertising and promotion of the Marks. The Marks are distinctive, widely recognized, and engender a substantial amount of goodwill and consumer association.

      **ANSWER:**    The Debtors are without knowledge or information sufficient to form a

belief as to the truth or falsity of the allegations in Paragraph 11, and on that basis deny them.

## Factual Allegations Applicable To All Counts For Relief

### The Franchise Agreements

      12.    The Defendants' license to use the Marks and right to operate the RMH Restaurants was governed by individual franchise agreements (the "Franchise Agreements") with Applebee's for each of the RMH Restaurants.  A Form Franchise Agreement is attached hereto as **Exhibit 2**.  The Franchise Agreements required the Defendants to, among other things, pay certain royalties and other fees to Applebee's as consideration for the use of the Marks.  A failure to pay such fees and royalties was expressly considered a material breach under the Franchise Agreements and entitled Applebee's to terminate the Franchise Agreements "immediately upon written notice to [the Defendants]."  (Exhibit 2, Form Franchise Agreement, Section 19.1(a).)

      **ANSWER:**    The Debtors admit that a Form Franchise Agreement is attached to the

Complaint as Exhibit 2.  By way of further answer, the Debtors state that the various Franchise

Agreements are not identical and that each Franchise Agreement is the best evidence of its

respective contents.  The remaining allegations in Paragraph 12 constitute legal conclusions to

which no response is required.  To the extent a response is required, the remaining allegations in

Paragraph 12 are denied.

      13.    In addition to outlining Applebee's right to terminate for non-payment of royalties and other fees, the Franchise Agreements also outlined in detail the Defendants' duties and obligations upon termination and the post-termination rights of Applebee's.  Specifically, the Franchise Agreements provided for the following upon termination:

- Ceasing Use of the Marks:  "[The Defendants] shall immediately discontinue use of the System and its use of the Marks and other identifying characteristics."

- De-Identification of the RMH Restaurants:  "[I]f the Restaurant premises are owned by [the Defendants] or leased from a third party, [the Defendants] shall, upon demand by [Applebee's], remove (at [the Defendants'] expense) the Marks, sign facia, and other identifying characteristics from all premises, and paint all premises and other improvements maintained pursuant to this Agreement a design and color which is basically different from [Applebee's] authorized design and color."

- Ceasing Operation of the RMH Restaurants:  "[The Defendants] shall not thereafter use the Marks or any other trademark, trade name, service mark, logo, insignia, slogan, emblem, symbol, design or other identifying characteristic that is in any way associated with [Applebee's], or use any food or proprietary menu item, recipe or method of food preparation or operate or do business under any name or in any manner that might tend to give the public the impression that [the Defendants are] or [were] a licensee or franchisee of, or otherwise associated with, [Applebee's] or its affiliated companies."

(See Exhibit 2, Form Franchise Agreement, Section 19.2(a)-(c).)

**ANSWER:**    The Debtors admit that the Form Franchise Agreement contains the language quoted in Paragraph 13.  The remaining allegations in Paragraph 13 constitute legal conclusions to which no response is required.  To the extent a response is required, the remaining allegations in Paragraph 13 are denied.  By way of further answer, the Debtors state that the various Franchise Agreements are the best evidence of their respective contents.

14.    In the event of termination of the Franchise Agreements where the Defendants leased the real-estate for the restaurants—which was the situation for nearly all of the RMH Restaurants—the Franchise Agreements afforded Applebee's important rights wherein Applebee's could step into the shoes of the Defendants on the leases and purchase the RMH Restaurants' equipment, furnishings, supplies, and other products. Specifically, the Franchise Agreements provided as follows:

- Requirement that leases be assignable to Applebee's:  "If the Restaurant premises are leased by [the Defendants] from a third party, such lease must allow [the Defendants] to assign the lease to [Applebee's]."

- Right to Assignment of the Leases and Surrender of the Premises:  "Upon termination of this Agreement for any reason, [Applebee's] has the right, exercisable upon written notice to [the Defendants] within thirty (30) days after termination is effective, to require [the Defendants] to assign all [the Defendants'] rights and obligations under

the lease to [Applebee's] and to immediately surrender possession of the premises, including all fixtures and leasehold improvements, to [Applebee's]."

- Right to Purchase Equipment, Furnishings, and Supplies:  "If [Applebee's] exercises that right [of assignment and surrender of the premises], it has an additional right, to be exercised within thirty (30) days after taking possession of the premises, to purchase all of [the Defendants] equipment, signs, decor items, furnishings, supplies and other products and materials at their then-fair market value.  If the parties cannot agree on the price, the price will be determined in the matter set forth in connection with Franchisee-owned Restaurant premises [i.e., by a panel of three appraisers with each party choosing one appraiser and the two appraisers choosing the third.]"

(See Exhibit 2, Form Franchise Agreement, Section 19.4(f).)

**ANSWER:**    The Debtors admit that the Form Franchise Agreement contains the language quoted in Paragraph 14.  The remaining allegations in Paragraph 14 constitute legal conclusions to which no response is required.  To the extent a response is required, the remaining allegations in Paragraph 14 are denied.  By way of further answer, the Debtors state that the various Franchise Agreements are the best evidence of their respective contents.

15.    Further, pursuant to Applebee's right under the Franchise Agreements to require assignment of any real-estate lease for the RMH Restaurants, there is a form rider which is attached to and made a part of the Defendants' real estate leases that acknowledges and provides for RMH's right to sublet or assign the premises specifically to Applebee's or its affiliates.  (*See* Form of Applebee's Restaurant Franchisee Lease Rider, attached as **Exhibit 3** hereto.)  In the rider, the Defendants and the landlords for the RMH Restaurants specifically agreed that Applebee's is an intended third-party beneficiary of the rider and has the right to enforce the terms of the rider as if it was a party to it.  (*See* Exhibit 3, Form of Applebee's Restaurant Franchisee Lease Rider, ¶ 10.)

**ANSWER:**    The Debtors admit that the Form of Applebee's Restaurant Franchisee Lease Rider is attached as Exhibit 3 to the Complaint.  The remaining allegations in Paragraph 15 constitute legal conclusions to which no response is required.  To the extent a response is required, the remaining allegations in Paragraph 15 are denied.  By way of further answer, the Debtors state that the various Franchise Agreements and/or Form of Applebee's Restaurant Franchisee Lease Rider are the best evidence of their respective contents.

16.      The Franchise Agreements afford Applebee's with near-absolute discretion in its operation of the franchise system and foreclose any claim by or liability to the Defendants based on Applebee's exercise of that discretion:

- Franchise Agreement and the parties' relationship "grants [Applebee's] the discretion to make decisions, take actions and/or refrain from taking actions not inconsistent with Franchisee's explicit rights and obligations hereunder that may affect favorably or adversely Franchisee's interests";

- "[Applebee's] will use its business judgment in exercising such discretion based on [Applebee's] assessment of its interests and the System, balancing those interests with or against the interests of the operators of Restaurants generally (including Franchisor, its affiliates and other franchisees) and specifically without considering the individual interests of any particular franchisee";

- "[Applebee's] will have no liability to Franchisee for the exercise of its discretion in this manner";

- "even if [Applebee's] has numerous motives for a particular action or decision, so long as at least one motive is a reasonable business justification for such action or decision, no trier of fact in any legal action shall substitute its judgment for [Applebee's] judgment so exercised, and such action or decision will not be subject to challenge for abuse of discretion."

(See Exhibit 2, Form Franchise Agreement, Section 25.7 (emphasis added).)

**ANSWER:**    The Debtors admit that the Form Franchise Agreement contains the language quoted in Paragraph 16.  The remaining allegations in Paragraph 16 constitute legal conclusions to which no response is required.  To the extent a response is required, the remaining allegations in Paragraph 16 are denied.  By way of further answer, the Debtors state that the various Franchise Agreements are the best evidence of their respective contents.

17.      The Franchise Agreements "and the documents referred to [therein] constitute the entire agreement between the parties, superseding and canceling any and all prior and contemporaneous agreements, understandings, representations, inducements and statements, oral or written, of the parties in connection with the subject matter [thereof]."  (*See* Exhibit 2, Form Franchise Agreement, Section 25.5.)

**ANSWER:**    The Debtors deny the allegations set forth in paragraph 17.  By way of further answer, the Debtors state that the Franchise Agreements are the best evidence of their respective contents.

18.     The Franchise Agreement shall not be amended or modified in the future unless such amendment or modification is "executed in writing both by Franchisor and by Franchisee and Principal Shareholders."  (*See* Exhibit 2, Form Franchise Agreement, Section 25.6.)

**ANSWER:**     The Debtors admit that the Form Franchise Agreement contains the language quoted in Paragraph 18.  The remaining allegations in Paragraph 18 constitute legal conclusions to which no response is required.  To the extent a response is required, the remaining allegations in Paragraph 18 are denied.  By way of further answer, the Debtors state that the various Franchise Agreements are the best evidence of their respective contents.

19.     The Franchise Agreements are governed by Kansas law.  (*See* Exhibit 2, Form Franchise Agreement, Section 21.2.)

**ANSWER:**     The allegations in Paragraph 19 constitute legal conclusions to which no response is required.  By way of further answer, the Debtors state that the various Franchise Agreements are the best evidence of their respective contents.

### The Defendants' Breach of the Franchise Agreements

20.     Beginning in June 2017, the Defendants stopped paying royalties due under the Franchise Agreements.  (*See* Exhibit 2, Form Franchise Agreement, Section 9.1(b) (requiring payment of royalties).)

**ANSWER:**     The allegations in Paragraph 20 constitute legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 20 are denied.  By way of further answer, the Debtors state that the various Franchise Agreements are the best evidence of their respective contents.

21.     In January 2018, the Defendants stopped paying advertising and other fees due under the Franchise Agreements on a majority of the franchises and, eventually, stopped paying on all of them.  (*See* Exhibit 2, Form Franchise Agreement, Section 9.1(a) and (c) (requiring payment of advertising and other fees).)

**ANSWER:**     The allegations in Paragraph 21 constitute legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 21 are

denied.  By way of further answer, the Debtors state that the various Franchise Agreements are

the best evidence of their respective contents.

22.     Despite their non-payment of royalties and advertising and other fees, the
Defendants continued to operate the franchises using the Applebee's Marks.

**ANSWER:**     The Debtors admit that they are operating certain franchises using the

Franchisor's Marks.  The remaining allegations in Paragraph 22 are denied.

## Applebee's Notice of Default to the Defendants and Extensions of the Cure Period

23.     On or about September 20, 2017, Applebee's provided notice to the Defendants of
their material breaches of the Franchise Agreements stemming from their nonpayment of
royalties (the "Notice of Default," attached hereto as **Exhibit 4**).  The Notice of Default
informed the Defendants that they were required to cure each default of the Franchise
Agreements by paying "the Overdue Amount within 90 days of receipt of this letter."  The
Notice of Default also specifically stated that "[f]or the restaurants for which RMH does not cure
the default, the franchise agreements for the restaurants will terminate on the 91st day *without
further notice*, and RMH will be expected to fully comply with its post-termination obligations
under the relevant franchise agreement(s)."  (*See* Exhibit 4, Notice of Default (emphasis added).)

**ANSWER:**     The Debtors admit that the document attached to the Complaint as Exhibit

4 was sent to the address listed therein on or about September 20, 2017.  The remaining

allegations in Paragraph 23 constitute legal conclusions to which no response is required.  To the

extent that a response is required, the remaining allegations in Paragraph 23 are denied.  By way

of further answer, the Debtors state that the Notice of Default is the best evidence of its contents.

24.     The Defendants did not cure any of the defaults with regard to the Franchise
Agreements within the initial 90-day period specified in the Notice of Default.

**ANSWER:**     The allegations in Paragraph 24 constitute legal conclusions to which no

response is required.  To the extent that a response is required, the allegations in Paragraph 24

are denied.

25.     On December 18, 2017, shortly before the initial cure period expired under the
Notice of Default, Applebee's extended it for another 30 days in the hope an amicable resolution
could be achieved.  Specifically, Applebee's notified the Defendants in the December 2017 letter
that "without waiver of our rights and remedies, we are amenable to extend your cure period

from the restaurants listed on the attached schedule by an additional 30 days to **January 22, 2018**." (*See* December 18, 2017 Extension Letter (emphasis in original), attached hereto as **Exhibit 5**.)

**ANSWER:**   The Debtors admit that the document attached to the Complaint as Exhibit 5 was sent to the address listed therein on or about December 18, 2017.  The remaining allegations in Paragraph 25 constitute legal conclusions to which no response is required.  To the extent that a response is required, the remaining allegations in Paragraph 25 are denied.  By way of further answer, the Debtors state that the December 18, 2017 Extension Letter is the best evidence of its contents.

26.     Rather than cure the defaults, the Defendants, as noted above, compounded the defaults in January 2018 when the Defendants stopped paying advertising and other fees due under the Franchise Agreements.

**ANSWER:**   The allegations in Paragraph 26 constitute legal conclusions to which no response is required.  To the extent that a response is required, the allegations in Paragraph 26 are denied.

27.     The time to cure the Defendants' defaults were extended again by Applebee's on January 19, 2018, February 8, 2018, February 26, 2018, March 12, 2018 and April 9, 2018 ("Additional Extension Letters," attached hereto as **Exhibits 6-10**).  Each of the Additional Extension Letters extended the time to cure the defaults using the same language as the December 2017 letter.  Each of the extension letters tied back to the September 2017 original Notice of Default so that at the end of the extended cure period - which had never been interrupted or previously lapsed - the Franchise Agreements would expire automatically and without further notice at the end of the extended cure period.

**ANSWER:**   The Debtors admit that the documents attached to the Complaint as Exhibits 6-10 were sent to the addresses listed therein on or about the dates listed in Paragraph 27.  The remaining allegations in Paragraph 27 constitute legal conclusions to which no response is required.  To the extent a response is required, the remaining allegations in Paragraph 27 are denied.  By way of further answer, the Debtors state that the Additional Extension Letters are the best evidence of their respective contents.

28.     On April 16, 2018, after Applebee's attempted numerous times to resolve the situation, Applebee's reminded the Defendants by letter of their failure to respond to Applebee's latest counter-proposal in March 2018 and stressed the urgency of the matter and the possibility of litigation.  (*See* April 16, 2018 Letter, attached hereto as **Exhibit 11**.)  Specifically, Applebee's letter provided that Defendants' "past assurances that RMH and ACON intend to move forward expeditiously appear questionable at this point.  We have no choice but to interpret any further delay as an indication that RMH and ACON do not consider this matter to be a priority.  At this point, we are considering all of our legal options in the resolution of this matter, including, without limitation, litigation."

**ANSWER:**     The Debtors deny the allegations contained in Paragraph 28.  By way of

further answer, the Debtors state that the April 16, 2018 Letter is the best evidence of its

respective contents.

29.     Also on April 16, 2018, Applebee's sent the Defendants a separate notice that provided for the last extension of the cure period, setting April 26, 2018, as the deadline for cure ("Last Extension Letter," attached hereto as **Exhibit 12**.)

**ANSWER:**     The Debtors admit that the document attached to the Complaint as Exhibit

12 was sent to the address listed therein on or about April 16, 2018 (the "April 16 Letter").  The

remaining allegations in Paragraph 29 are denied.  By way of further answer, the Debtors state

that the April 16 Letter is the best evidence of its contents.

**Pre-Petition Termination of the Franchise Agreements**

30.     The Defendants did not cure any of the defaults by April 26, 2018.  Accordingly, the Franchise Agreements terminated the next day, April 27, 2018, pursuant to their own terms and the previously issued Notice of Default, which satisfies the written notice requirement in Section 19.1(a) of the Franchise Agreements.

**ANSWER:**     The allegations in Paragraph 30 constitute legal conclusions to which no

response is required.  To the extent a response is required, the allegations in Paragraph 30 are

denied.

31.     Through April 2018, the Defendants owe Applebee's at least $12,161,823 in unpaid royalties and fees with regard to all franchises and there are payment defaults as to each Franchise Agreement.

**ANSWER:**     The allegations in Paragraph 31 constitute legal conclusions to which no response is required.  To the extent a response is required, the allegations in Paragraph 31 are denied.

32.     The Defendants filed its *List of 30 Largest Unsecured Claims* [Dkt. No. 28] in the Cases. Defendants list Applebee's as having an unsecured claim of $14,276,476.40.  Further, Defendants have not made or offered to escrow any payments to Applebee's related to the post-petition benefits they are receiving from continued use of the market and benefit and profits therefrom.

**ANSWER:**     The Debtors admit that they filed the *List of 30 Largest Unsecured Claims* [Docket No. 28] in the Cases.  The remaining allegations in Paragraph 32 are denied.

33.     Although the Defendants repeatedly ignored their fundamental obligation under the Franchise Agreements to pay basic royalties and advertising and other fees to Applebee's, on April 25, 2018, Applebee's notified the Defendants that Applebee's agreed to forbear from taking any further enforcement actions against the Defendants until May 8, 2018 ("Forbearance Notice," attached hereto as **Exhibit 13**.)  This Forbearance Notice specifically provided that "Applebee's agrees that it will forbear from taking any further actions against you or the Franchise Restaurants, whether at law or in equity, to enforce our rights and remedies against you or the Franchise Restaurants, under or in connection with the franchise agreements, until May 8, 2018."

**ANSWER:**     The Debtors admit that the document attached to the Complaint as Exhibit 13 was sent to the address listed therein on or about April 25, 2018.  The remaining allegations in Paragraph 33 constitute legal conclusions to which no response is required.  To the extent that a response is required, the remaining allegations in Paragraph 33 are denied.  By way of further answer, the Debtors state that the Forbearance Notice is the best evidence of its contents.

34.     The Forbearance Notice was necessary to allow Applebee's to prepare to potentially take over RMH Restaurants.  However, the Forbearance Notice also specifically notified the Defendants that "**[t]his agreement to forbear is not an extension of the cure periods referred to in prior Notices, which have already expired.**"

**ANSWER:**    The Debtors deny the allegations set forth in Paragraph 34.  By way of further answer, the Debtors state that the Forbearance Notice is the best evidence of its contents.

35.    The forbearance regarding taking action against the Defendants, which was effective on April 27, 2018 (the day the Franchise Agreements terminated), expired on May 7, 2018, pursuant to the terms of the Forbearance Notice.  As a result, as of 12:01 a.m. on May 8, 2018, the Defendants were required to comply with certain post-termination obligations under the Franchise Agreements, including ceasing operation of the RMH Restaurants, ceasing the use of Applebee's Marks, and either de-identifying the RMH Restaurants or complying with Applebee's right, if exercised under the Franchise Agreements, to assign any real-estate leases for and surrender the premises of any leased RMH Restaurants.

**ANSWER:**    The Debtors deny the allegations set forth in Paragraph 35.  By way of further answer, the Debtors state that the Franchise Agreements are the best evidence of their respective contents.

**The Defendants' Failure to Comply with their Post-Termination Obligations and Applebee's Damages**

36.    The Defendants have failed to comply with their post-termination obligations under each of the Franchise Agreements and, without limitation, have not ceased operation of the franchises, ceased use of Applebee's Marks, or de-identified the operating restaurants.

**ANSWER:**    The allegations in Paragraph 36 constitute legal conclusions to which no response is required.  To the extent that a response is required, allegations in Paragraph 36 are denied.  By way of further answer, the Debtors state that the Franchise Agreements are the best evidence of their respective contents.  Further, the Debtors deny that the Franchise Agreements have been terminated.

37.    In addition to the non-payment of royalties and advertising and other fees, between about June 2017 and April 2018, the Defendants unilaterally closed 15 RMH Restaurants across several states (the "Closed franchises") without Applebee's consent, and prior to the end of the term of the relevant Franchise Agreements.  The Defendants stopped paying, or had already stopped paying, royalties and/or advertising and other fees due under the Franchise Agreements for the Closed franchises.

**ANSWER:**    Denied.

38.      At no point did Applebee's waive or otherwise consent to the Defendants' unilateral closure of any of the Closed franchises, or the non-payment of royalties and advertising and other fees under the Franchise Agreements.

**ANSWER:**    Denied.

39.      As a result of the Defendants' improper closure of the Closed franchises, the Defendants breached the Franchise Agreements for the Closed franchises and have deprived Applebee's of the royalties and other fees it would have received for the balance of the term of the Franchise Agreements.

**ANSWER:**    Denied.

40.      As a result of the Defendants' improper closure of the Closed franchises, Applebee's has been damaged and suffered lost royalties and advertising fees, and is continuing to suffer, and will suffer, lost future royalties and advertising fees of approximately $10,209,000. The Defendants are liable for these damages and Applebee's reserves all rights to file a proof of claim for these amounts and other rights.

**ANSWER:**    The Debtors deny that the Closed Franchises were improperly closed.  The

Debtors are without knowledge or information sufficient to form a belief as to the truth or falsity

of the allegations in Paragraph 40 concerning the alleged damages "suffered" by the Franchisor,

and on that basis deny them.  The remaining allegations in Paragraph 40 constitute legal

conclusions to which no response is required.  To the extent a response is required, the remaining

allegations in Paragraph 40 are denied.

41.      The total damages suffered by Applebee's, as a result of the Defendants' improper closure of the Closed franchises and unpaid royalties, advertising and other fees, are as follows:

| Damage | Amount |
|---|---|
| Unpaid Royalties and Fees (All RMH Restaurants) | $12,161,823 |
| Lost Future Royalties and Fees (Closed franchises) | $10,209,000 |
|  |  |
| **TOTAL** | **$23,370,823** |

Applebee's reserves all rights to assert a proof of claim for these damages and other

rights.

**ANSWER:**    Denied.

**Applebee's Exercise of its Post-Termination Rights**

42.     On May 7, 2018, Applebee's, as a courtesy to Defendants, made a telephone call to Defendants and advised them of Applebee's intention to take back the RMH Restaurants in Texas and Arizona.

**ANSWER:**     The Debtors admit that representatives of Dine Brands and the Debtors participated in a conference call on May 7, 2018.  The remaining allegations in Paragraph 42 are denied.

43.     On May 8, 2018, after receiving the telephone call from Applebee's on May 7, 2018, the Defendants commenced the Cases under chapter 11 of the United States Bankruptcy Code (the "Petition Date").

**ANSWER:**     The Debtors admit that they filed their Cases on May 8, 2018.  The remaining allegations in Paragraph 43 are denied.

44.     Also on May 8, 2018, Applebee's delivered a letter to the Defendants to reconfirm and make clear that the time to cure the defaults with respect to the Franchise Agreements expired on April 26, 2018 and the Franchise Agreements were automatically terminated on April 27, 2018 pursuant to the Notice of Default previously sent to the Defendants on September 20, 2017.  (*See* Termination Confirmation Letter, attached hereto as **Exhibit 14**.)  The letter further provided that, with respect to the RMH Restaurants in Arizona and Texas, Applebee's exercised all of its post-termination rights under Section 19.4(f) of the Franchise Agreements, including requiring the underlying leases be assigned to Applebee's so that Applebee's can take control of those restaurants.

**ANSWER:**     The Debtors admit that the document attached to the Complaint as Exhibit 14 was sent to the address listed therein on or about May 8, 2018, but after the Debtors filed for bankruptcy protection.  The remaining allegations in Paragraph 44 constitute legal conclusions to which no response is required.  To the extent that a response is required, the remaining allegations in Paragraph 44 are denied.

45.     Applebee's delivered a separate letter to the Defendants on May 8, 2018, wherein Applebee's agreed to forbear from enforcing its termination rights with the RMH Restaurants, other than the Arizona and Texas RMH Restaurants, until May 20, 2018 ("May Forbearance Notice," attached hereto as **Exhibit 15**).  This letter, like the previously issued Forbearance Notice, provided that "[t]his agreement to forbear is not an extension or a restarting of the prior cure period referred to in prior Notices, which has already expired, nor is it a new cure period."  Like the Forbearance Notice, this forbearance was issued, for logistical reasons, to allow

Applebee's to prepare to take over the remaining RMH Restaurants over time. That forbearance period has now expired and has not been further extended.

**ANSWER:**    The Debtors admit that the document attached to the Complaint as Exhibit 15 was sent to the address listed thereon in or about May 8, 2018, but after the Debtors filed for bankruptcy protection.  The remaining allegations in Paragraph 45 constitute legal conclusions to which no response is required.  To the extent that a response is required, the remaining allegations in Paragraph 45 are denied.

46.    On May 16, 2018, Applebee's filed its Motion to Modify the Automatic Stay [Dkt. No. 91] (the "Stay Relief Motion"). The Stay Relief Motion remains pending and is incorporated by reference herein.

**ANSWER:**    The Debtors admit that the Franchisor filed the Stay Relief Motion on May 16, 2018.  The remaining allegations in Paragraph 46 are denied.

47.    On May 23, 2018, the Court held a telephonic hearing to address scheduling of Applebee's Stay Relief Motion. At the hearing, the Court orally ordered Applebee's to commence an adversary proceeding to seek the relief requested in the Stay Relief Motion. However, the Court did not require Applebee's to withdraw its Stay Relief Motion and Applebee's reserves all rights as to its pending Stay Relief Motion.

**ANSWER:**    The Debtors admit that, on May 23, 2018, the Court held a telephonic hearing to address scheduling of the Stay Relief Motion and that the Court orally ordered the Franchisor to commence an adversary proceeding to seek the relief requested in the Stay Relief Motion.  The Debtors further admit that at that time, the Court did not require the Franchisor to withdraw the Stay Relief Motion.  The remaining allegations in Paragraph 47 constitute legal conclusions to which no response is required.  To the extent that a response is required, the remaining allegations in Paragraph 47 are denied.

## COUNT I - DECLARATORY JUDGMENT THAT THE FRANCHISE AGREEMENTS ARE NOT PROPERTY OF THE ESTATES BASED ON THEIR TERMINATION AS OF APRIL 27, 2018

48.     Applebee's repeats and restates the allegations set forth in the foregoing paragraphs of this Complaint as if set forth fully herein.

**ANSWER:**     The Debtors repeat and reallege their responses to each and every

allegation contained in Paragraphs 1 through 47 as if fully set forth herein.

49.     Pursuant to the Notice of Default and the Last Extension Letter sent to the Defendants, the deadline for the Defendants to cure their monetary defaults under the Franchise Agreements expired on April 26, 2018.  No extended or new cure period was granted.

**ANSWER:**     Denied.

50.     Applebee's provision of a short-term forbearance to allow for an orderly transition of the RMH Restaurants to corporate operations to make sure customers have access to the Applebee's dining experience uninterrupted at their local location is not a further cure period.

**ANSWER:**     Denied.

51.     Defendants did not cure their monetary defaults by April 26, 2018.

**ANSWER:**     Denied.

52.     As a result, all of the Franchise Agreements for the Defendants' restaurants terminated the day after the cure period expired, on April 27, 2018, by their own terms and pursuant to the Notice of Default, which satisfies the written notice requirement in Section 19.1(a) of the Franchise Agreements.

**ANSWER:**     Denied.

53.     Thus, Defendants' rights to operate as a franchisee at each and every RMH Restaurant expired with the termination of the Franchise Agreements on April 27, 2018.

**ANSWER:**     Denied.

54.     Accordingly, on the Petition Date, the Defendants' did not have a legal or equitable interest in the Franchise Agreements, and, thus, the Franchise Agreements are not property of the estates pursuant to 11 U.S.C. § 541.

**ANSWER:**     Denied.

55.     Any complaints of the Defendants regarding the Applebee's system or other disputes are no excuse to the Defendants' willful non-payment and other defaults under the

Franchise Agreements and applicable law nor are they are valid defense to the termination or a grounds for ongoing infringement of Applebee's Marks.

**ANSWER:**    Denied.

56.    Any complaints of the Defendants about any ongoing discussions or communications before or after the termination was effective are not a valid defense to the termination or a grounds for ongoing infringement of Applebee's Marks.

**ANSWER:**    Denied.

THEREFORE, this Court should find and declare that the Franchise Agreements were

terminated as of April 27, 2018 and, thus, are not property of the Defendants' bankruptcy estates.

**ANSWER:**    The allegations in the THEREFORE portion of Count I are legal

conclusions to which no response is required.

## COUNT II - DECLARATORY JUDGMENT AS TO APPLEBEE'S TIMELY EXERCISED RIGHT TO TAKE CONTROL OF THE TEXAS AND ARIZONA RMH RESTAURANTS

57.    Applebee's repeats and restates the allegations set forth in the foregoing paragraphs of this Complaint as if set forth fully herein.

**ANSWER:**    The Debtors repeat and reallege their responses to each and every

allegation contained in Paragraphs 1 through 57 as if fully set forth herein.

58.    Section 19.4(f) of the Franchise Agreements provide Applebee's with the right, upon written notice to the Defendants within 30 days of the termination of the Franchise Agreements, to require the Defendants to assign the leases of the RMH Restaurants to Applebee's and immediately surrender possession of the RMH Restaurants to Applebee's.

**ANSWER:**    Denied.

59.    On May 7, 2018, Applebee's advised the Defendants by telephone call of Applebee's election to take back RMH Restaurants in Texas and Arizona.

**ANSWER:**    Denied as an incomplete statement of the discussions during the alleged

call.

60.    Also, on May 8, 2018, Applebee's also provided Defendants written confirmation notice in the Termination Confirmation Letter of its intention to take control of the RMH Restaurants in Texas and Arizona.

**ANSWER:**    Denied.

61.    Further, by filing this Complaint, Applebee's hereby advises Defendants of Applebee's election to take back the specified RMH Restaurants located in Arizona and Texas, as attached in **<u>Exhibit 16</u>** hereto, including having Defendants assign the leases for the RMH Restaurants to Applebee's and surrender the premises and restaurant contents for those RMH Restaurants.

**ANSWER:**    Denied.

62.    Applebee's is prepared to pay for the fair value of the equipment, food stuffs and other personal property at the RMH Restaurants pursuant to the procedures set forth in the Franchise Agreements.

**ANSWER:**    Denied.

THEREFORE, the Court should find and declare that Applebee's properly and timely exercised its right to take control of the Arizona and Texas RMH Restaurants pursuant to Section 19.4(f) of the Franchise Agreements.[5]

**ANSWER:**    The allegations in the THEREFORE portion of Count II are legal conclusions to which no response is required.

## <u>COUNT III - DECLARATORY JUDGMENT AS TO APPLEBEE'S TIMELY EXERCISED RIGHT TO TAKE CONTROL OF THE REMAINING RMH RESTAURANTS</u>

63.    Applebee's repeats and restates the allegations set forth in the foregoing paragraphs of this Complaint as if set forth fully herein.

**ANSWER:**    The Debtors repeat and reallege their responses to each and every allegation contained in Paragraphs 1 through 63 as if fully set forth herein.

---

[5] Applebee's seeks stay relief in its pending Stay Relief Motion to enforce this exercised right against the Defendants in another forum.

**ANSWER:** In response to this footnote, the Debtors state that they lack sufficient information to admit or deny the allegations and therefore deny them.

64.    Section 19.4(f) of the Franchise Agreements provide Applebee's with the right, upon written notice to the Defendants within 30 days of the termination of the Franchise Agreements, to require the Defendants to assign the leases of the RMH Restaurants to Applebee's and immediately surrender possession of the RMH Restaurants to Applebee's.

**ANSWER:**    Denied.

65.    By filing this Complaint, Applebee's hereby advises Defendants Applebee's election to take back the RMH Restaurants listed on **Exhibit 17** hereto (the "Remaining RMH Restaurants"), including having Defendants assign the leases for the Remaining RMH Restaurants to Applebee's and surrender the premises for the Remaining RMH Restaurants.

**ANSWER:**    Denied.

66.    Applebee's is prepared to pay for the fair value of the equipment, food stuffs and other personal property at the RMH Restaurants pursuant to the procedures set forth in the Franchise Agreements.

**ANSWER:**    Denied.

67.    Applebee's has elected to not exercise its post-termination right to take control over the Defendants' Closed franchises.

**ANSWER:**    Denied.

68.    Applebee's has also elected to not exercise its post-termination right to take control over the currently operating RMH Restaurants set forth on **Exhibit 18** hereto and, therefore, those restaurants need to immediately de-affiliate from using the Applebee's Marks.

**ANSWER:**    Denied.

THEREFORE, the Court should find and declare that Applebee's properly and timely exercised its right to take control of the Remaining RMH Restaurants pursuant to Section 19.4 and other application provisions of the Franchise Agreements.[6]

**ANSWER:**    The allegations in the THEREFORE portion of Count III are legal conclusions to which no response is required.

---

[6] Applebee's seeks stay relief in its pending Stay Relief Motion to enforce this exercised right against the Defendants in another forum.

**ANSWER:** In response to this footnote, the Debtors state that they lack sufficient information to admit or deny the allegations and therefore deny them.

## COUNT IV - DECLARATORY JUDGMENT AS TO APPLEBEE'S POST-TERMINATION RIGHTS

69.     Applebee's repeats and restates the allegations set forth in the foregoing paragraphs of this Complaint as if set forth fully herein.

**ANSWER:**     The Debtors repeat and reallege their responses to each and every

allegation contained in Paragraphs 1 through 69 as if fully set forth herein.

70.     Section 19 of the Franchise Agreements provide Applebee's with certain rights following termination of the Franchise Agreements, including requiring the Defendants to de-affiliate the RMH Restaurants, requiring assignment of the leases of the RMH Restaurants to Applebee's and compelling the Defendants to sell their inventory, equipment and fixtures to Applebee's.

**ANSWER:**     Denied.

71.     Given that the Franchise Agreements terminated on April 27, 2018, Applebee's currently has a right to enforce its post-termination rights under the Franchise Agreements.

**ANSWER:**     Denied.

72.     To the extent that Bank of America as Administrative Agent may have a lien on the leases of the RMH Restaurants or the Defendants' inventory, equipment or fixtures, those rights will pass-through the Cases and any dispute between the Administrative Agent and Applebee's regarding their respective rights in the leases, inventory, equipment and fixtures may be resolved in another forum or settled.

**ANSWER:**     Denied.

THEREFORE, the Court should find and declare that Applebee's currently has a right to

enforce its post-termination rights pursuant Section 19 of the Franchise Agreements, including

requiring the Defendants to de-affiliate the RMH Restaurants, requiring assignment of the leases

of the RMH Restaurants to Applebee's and compelling the Defendants to sell their inventory,

equipment and fixtures to Applebee's.[7]

---

[7] Applebee's seeks stay relief in its pending Stay Relief Motion to enforce these post-termination rights against the Defendants in another forum.

**ANSWER:** In response to this footnote, the Debtors state that they lack sufficient information to admit or deny the allegations and therefore deny them.

**ANSWER:**     The allegations in the THEREFORE portion of Count IV are legal conclusions to which no response is required.

## PRAYER FOR RELIEF

The Debtors deny that the Franchisor is entitled to any of the relief set forth in the "Prayer for Relief" section of the Complaint and deny all allegations contained therein.

## AFFIRMATIVE DEFENSES

In addition to the foregoing responses to the numbered paragraphs of the Complaint, the Debtors state the following additional or affirmative defenses. In asserting the following additional or affirmative defenses, the Debtors do not admit that they bear the burden of persuasion with respect to any matter or defense set forth below, nor do they concede that such matter (or the negation of the same) is not part of the Franchisor's *prima facie* case for some or all of the claims asserted by the Franchisor in the Complaint.

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The relief sought in the Complaint should be denied under the doctrines of estoppel and unclean hands.

### Third Affirmative Defense

The Franchisor's claims are barred, in whole or in part, due to the Franchisor's own material breach and failure to substantially perform under the Franchise Agreements.

### Fourth Affirmative Defense

The Franchisor's claims are barred, in whole or in part, due to the Franchisor's failure to act consistent with the covenant of good faith and fair dealing implicit in the Franchise Agreements.

01:23292973.14

### Fifth Affirmative Defense

The relief sought in the Complaint should be denied to the extent permitted under principles of waiver and/or release.

### Sixth Affirmative Defense

The Franchisor's damages, if any, were caused by their own acts, negligence and/or omissions.

### Seventh Affirmative Defense

The Franchisor's claims are barred in whole or in part by the parties' course of dealing.

### Eighth Affirmative Defense

The relief sought in the Complaint should be denied because the purported notice of termination of the Franchise Agreements was ineffective to the extent that such notice was not delivered to the address set forth in Franchise Agreements for giving notice thereunder.

## RESERVATION OF DEFENSES

The Debtors expressly reserve, and do not waive, any additional defenses that may be disclosed or become apparent during discovery and further investigation of the relevant facts in this matter.

## COUNTERCLAIMS

The Debtors and Counter-Plaintiffs, for their Counterclaims against Counter-Defendants Franchisor, hereby allege as follows:

1.      The Debtors incorporate by reference all above responses as if fully set forth herein, and assert the following counterclaims against the Franchisor and Dine Brands.

## PARTIES

2.      Counter-Plaintiffs RMH Franchise Holdings, Inc., NuLnk, Inc. and RMH Illinois, LLC are Delaware corporations.

3.      Counter-Plaintiff RMH Franchise Corp. is a Kansas corporation.

4.      Counter-Plaintiff Contex Restaurants, Inc. is a Texas corporation.

5.      Counter-Plaintiffs (i) RMH Franchise Corporation, (ii) NuLnk, Inc. and (iii) RMH Illinois, LLC are each 100% owned by Counter-Plaintiff RMH Franchise Holdings, Inc., which is itself 100% owned by ACON Franchise Holdings, LLC ("AFH").  The final Counter-Plaintiff, Contex Restaurants, Inc., is 100% owned by Counter-Plaintiff RMH Franchise Corporation.

6.      The headquarters of all Counter-Plaintiffs is located at One Concourse Parkway, N.E., Suite 600, Atlanta, GA 30328.

7.      On information and belief, Counter-Defendant Dine Brands Global Inc. ("Dine Brands") is a Delaware corporation with its principal place of business in Glendale, California.

8.      On information and belief, Counter-Defendant Applebee's Restaurants LLC ("Applebee's Restaurants") is a Delaware limited liability company with its principal place of business in Glendale, California.

9.      On information and belief, Counter-Defendant Applebee's Franchisor LLC ("Applebee's Franchisor" and, together with Applebee's Restaurants, the "Dine Subsidiaries") is a Delaware limited liability company with its principal place of business in Glendale, California.

10.     On information and belief, the ultimate parent company of Applebee's Restaurants and Applebee's Franchisor is Dine Brands.

## Jurisdiction and Venue

11.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).  Certain aspects of this adversary proceeding are core matters pursuant to 28 U.S.C. § 157(b)(2), and other aspects are non-core matters.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1409.

13.     The Counterclaims are brought pursuant to Rule 13 of the Federal Rules of Civil

Procedure and Rule 7013 of the Federal Rules of Bankruptcy Procedure.

### Factual Allegations

**A.  The Debtors Become the Second-Largest Applebee's Franchisee Operator in
Reliance on the Proven and Unique Applebee's System.**

14.     Jeff Neumann founded the Debtors in 2012 with an equity investment from non-

Debtor AFH and debt financing led by Bank of America, N.A. with participation interests held

by other major banks (collectively with Bank of America, the "Senior Lenders").

15.     The Debtors are in the business of operating Applebee's Neighborhood Grill &

Bar restaurants pursuant to individual franchise agreements (the "Franchise Agreements").

16.     As of May 8, 2018 (the "Petition Date"), the Debtors formed what is believed to

be the second-largest franchisee operator of Applebee's restaurants, operating 159 restaurants

across 15 geographically diverse states: Alabama, Arizona, Florida, Illinois, Indiana, Kansas,

Kentucky, Missouri, Mississippi, Nebraska, Ohio, Oklahoma, Pennsylvania, Texas and

Wyoming.  All told, the Debtors represented slightly less than 9 percent of all Applebee's

locations.

17.     The Debtors' business operations were built primarily through a series of

acquisitions of existing franchises, including some franchise locations acquired out of

bankruptcy, beginning with an acquisition of 45 franchise locations in December 2012.

Thereafter, the Debtors made several other large franchise acquisitions over the course of 2013–

2015, including the addition of 15 Chicago-area locations in June 2013; 78 Arizona, Kentucky,

and Ohio area locations in December 2013; and 33 Indiana and Ohio locations in August 2015.

Additionally, the Debtors opened eight new franchise locations.

18.     The Debtors' acquisitions in 2013 and 2015 demonstrated their commitment to the Applebee's brand and belief in the System as a foundation for success.  Indeed, the Debtors' 2013 and 2015 acquisitions helped to consolidate and improve Dine Brands' performance and were done with the express consent of the Franchisor and with express assurances from Steven R. Layt, Applebee's President at the time, that certain individual stores could be closed if their performance did not improve.  After the acquisitions closed, however, Ms. Stewart reneged on Applebee's commitment and refused to support the closure of the Debtors' underperforming restaurants.

19.     All told, the Debtors made capital expenditures, inclusive of acquisitions, of $196 million between December 2012 and December 2015 in reliance on the System.  Dine Brands approved of, and benefited from, all of the Debtors' acquisitions because the Debtors implemented operational improvements that generated greater royalties for the Franchisor.

20.     As the Franchisor must recognize, the Debtors operate well-run franchises with a strong management team..  Indeed, that is exactly why the Franchisor supported and expressly consented to Debtors' additional acquisitions in 2013 and 2015.  The Franchisor understood that Debtors would implement—and, in fact, did implement—operational improvements that inured to the Franchisor's benefit in the form of enhanced royalties.

21.     Most recently, according to the rolling four-week average for the week of the Petition Date, the Franchisor ranked the Debtors' operations better than the system average.  Upon information and belief, most of the restaurants currently operated by the Debtors were previously owned by substandard operators that the Franchisor wanted out of the system.

## B.  The System Was the Core of the Bargain in the Franchise Agreements.

22.     The Applebee's unique "System" is at the heart of the Franchise Agreements. The very first Recital of the Franchise Agreements defines "the System" as Applebee's "designs, decor and color schemes for restaurant premises, signs, equipment, procedures and formulae for preparing food and beverage products, specifications for certain food and beverage products, inventory methods, operating methods, financial control concepts, training facilities and teaching techniques."  Franchise Agreement, Recital A.  Nothing in the Franchise Agreements permits the Franchisor to abandon the System that was the core of the bargain between the Franchisor and the Debtors.

23.     The Franchise Agreements are emphatic that "strict adherence by all franchisees to all aspects of the System is required at all times."  Franchise Agreement §2.1; *see also id.* § 5.6 ("Franchisee understands, acknowledges and agrees that strict conformity with the System . . . is vitally important . . . ."); § 3 ("Franchisee acknowledges that every component of the System is important to Franchisor . . . .  Accordingly, Franchisee agrees to and shall comply with all aspects of the System (as it now exists and as it may be modified from time to time)."); § 4.3 ("Franchisee shall comply with all menu changes which generally occur every six (6) months."); § 7.1 ("Franchisee shall, at Franchisee's sole cost and expense, maintain the Restaurant in conformity with the standards, specifications and requirements of the System, as the same may be designated by Franchisor from time to time.").

24.     The Franchisor is permitted to make revisions or amendments to the System; provided, however, that such changes must be made in a good faith exercise of reasonable business judgment that is consistent with the "the overall best interests of the System generally," and with "due regard for the financial burden which may be placed upon its franchisees":

> Franchisor shall have the right, at any time and from time to time, in the good
> faith exercise of its reasonable business judgment, consistent with the overall best
> interests of the System generally, having due regard for the financial burden
> which may be placed upon its franchisees, to revise, amend, delete from and add
> to the System and the material contained in the Manuals.  Franchisee expressly
> agrees to comply with all such revisions, amendments, deletions and additions.

Franchise Agreement § 5.7.

25.     At the time of their execution, the Franchise Agreements also provided, in relevant part, that the franchisees must contribute 3.25% of their gross sales to an "advertising account" established by the Franchisor for the benefit of all franchisees.  Franchise Agreement § 8.2.  Under amendments to the various Franchise Agreements, the Debtors are currently obligated to contribute 3.5% of their gross sales to advertising, with a further rate hike up to 4.25% scheduled for July 2018.  The Franchisor has "final and binding" decision-making authority in all phases of advertising and promotion.  Franchise Agreement § 8.1.

26.     Beyond the advertising fee, the Franchise Agreement also requires franchisees to pay a monthly royalty fee as determined by the Franchisor, not to exceed 5% of the monthly gross sales.  Franchise Agreement § 9.1.  In practice, the Franchisor charges the Debtors a monthly royalty fee of 4% of gross sales.  Under the Franchise Agreement, unpaid fees bear interest at the lesser of 18% or the highest rate permitted by applicable law.  Franchise Agreement § 9.2.  The Franchise Agreement provides that the Franchisor may withdraw funds from the franchisee's designated bank account in the amount of any royalties or other fees payable to the Franchisor under the agreement.  Franchise Agreement §§ 9.4, 9.5.

27.     Section 19.1 of the Franchise Agreements provides that the Franchisor may terminate the agreement for failure to pay royalty fees only upon providing the franchisee with written notice of termination:  "Franchisor shall have the right to terminate this Agreement immediately upon written notice to Franchisee stating the reason for such termination . . . in the

event of any breach or default of any of the provisions of Section 9.1 . . . ."  Franchise

Agreement § 19.1.

28.     Section 19.3 of the Franchise Agreement provides that the prevailing party is

entitled to reasonable attorneys' fees in connection with any legal proceeding to construe or

enforce the terms of the agreement.  Franchise Agreement § 19.3.

**C.  The Franchisor Abandons Applebee's Core Brand and Implements a Commercially Unreasonable System Change Without Due Regard for the Best Interests of the Franchisees and the Financial Burden It Imposed on Them.**

29.     The financial difficulty that drove the Debtors into chapter 11 stems from the

Franchisor's mismanagement and decision to abandon the Applebee's System that had motivated

the Debtors to enter into the Franchise Agreements in the first place.  The Franchisor's ill-

advised and value-destroying decision to abandon the System deprived the Debtors of the benefit

of their bargain.  Dine Brands' board, meanwhile, appeared to merely sit back and watch as

Applebee's unraveled, effectively taking no action at all until the FBC finally demanded that the

board get involved.

30.     Beginning in 2014, after Jeff Neumann, the Debtors' founder and CEO (at the

time), was elected to Applebee's Franchise Brand Council in November 2014, it became clear

that the Franchisor's new management, under the leadership of then-Chief Executive Officer

Julia Stewart, was ill equipped and quickly losing sight of Applebee's core values.  The

Franchisor's misguided leadership, for example, is amply illustrated by the decision in or around

September 2015 to close Applebee's Kansas City office—the location of the Applebee's

franchise since its founding in 1988—in an effort to move Applebee's operations to Dine

Brands' headquarters in Glendale, California.

31.     Numerous Applebee's personnel, many of them longstanding employees, opposed the relocation and declined to transfer.  Indeed, Applebee's president, Steven R. Layt, refused the move and resigned in protest.

32.     The loss of longstanding personnel and key executives was compounded by the mismanagement under Ms. Stewart's helm and her leadership style, which made it difficult for the Franchisor to attract talent.  Among other things, Ms. Stewart refused to let other executives have C-level titles, allowing them to have only "Senior Vice President" positions.

33.     Thus, after the Kansas City office closure, Applebee's operated with numerous key positions unfilled.  Applebee's did not even have a president, head of marketing, or a head of technology/IT for lengthy periods of time.

34.     The Debtors and other franchisees suffered as a result of these key positions being unfilled.  Although franchisees were expected to continue making their royalty payments, the Franchisor was not providing its franchisees with reasonable marketing, training, or operational support, as required by the Franchise Agreements.

35.     Shortly thereafter, in the fall of 2015, the Franchisor's mismanagement reached its crescendo with the announcement that the Franchisor would be abandoning the System and implementing a commercially unreasonable System Change that abandoned the Applebee's brand's core identity and imposed massive costs and capital expenditures on the franchisees.

36.     "We're in the midst of a transformation at Applebee's," Julia Stewart, Dine Brands' CEO, said in a statement.  "No matter how you slice it, it is a big bold move," Stewart said.  This transformation set out to change the taste and flavor profile of fully 40% of the items on Applebee's the existing menu.  Executives said that it was the most significant change in the brand's 36-year history.

37.     As the Franchisor explained in its press release, it was consciously attempting to "transform[] the guest experience," boasting to its customers that Applebee's was "a different place than you remember."

38.     The System Change included converting traditional gas grills that had become an industry standard to new wood-fired grill platforms in all restaurants.  This conversion was a significant undertaking even beyond the grills themselves, causing franchisees, including the Debtors, to replace their existing fire prevention systems and to install hood and ventilation systems designed to ventilate wood smoke.  The new "wood fired" grills themselves were not higher quality than the original gas grills.  Indeed, the new grills still cooked with gas—it was just that they allowed wood to be burned alongside the gas cooking.  Installation of the grills and related equipment cost the Debtors nearly $1.6 million.

39.     The change to "wood fired" grills also imposed a number of ancillary costs on the Debtors, such as the cost associated with purchasing the wood that would burn while customers' food was cooking.  The conversion also caused franchisees, including the Debtors, to bring each of their locations into compliance with the particular local and municipal rules and regulations concerning the production and ventilation of wood smoke, which entailed significant costs for permits, variances, inspections, and legal fees.  These compliance efforts alone cost the Debtors nearly $600,000.

40.     The Franchisor also insisted on using more expensive USDA Choice steaks.  The Franchisor further caused these steaks to be hand-cut daily, which was labor-intensive and expensive, requiring extensive training for kitchen personnel and increasing the amount of more expensive cuts of steak, which restaurants were forced to discard as waste.  Indeed, the Debtors spent nearly $250,000 on additional training and nearly $180,000 on wasted steak.  Yet it was

well known in the industry that many actual steakhouses had long since stopped hand-cutting steaks because it was too expensive.

41.     Even though USDA Choice, hand-cut steaks were more expensive for the Debtors and other franchisees, the menu prices set by the Franchisor were no higher, and thus, the profitability of the Debtors and other franchisees declined precipitously.  Because the Franchisor's royalty fees are based on sales, it was indifferent to the pricing discrepancy.

42.     Indeed, when the Franchisor implemented the System Change, it was well aware that 100% of the risk and burden of the changes to the System would be borne by the franchisees in general and by the Debtors in particular.  In fact, as of December 31, 2015, the Franchisor no longer owned or operated any company locations, thus ensuring that it did not share in any of the risk.

43.     The System Change thus had a disproportionately adverse impact on the Debtors and other franchisees.  By way of illustration, the Debtors' last-twelve-months EBITDA (the driver of profitability and enterprise value for franchisees) declined by 59.9% for the period from March 2016 to March 2018, whereas the royalty fees that the Debtors paid or accrued to the Franchisor declined by just 12.8% over the same period.

44.     The Franchisor was also indifferent to the fact that, even as it caused the Debtors to make significant capital expenditures and incur significant labor costs and other expenses, the Debtors' debt levels were not mitigated by the Debtors' decrease in sales in the same way that royalty fees were.

45.     The Franchisor's System Change further caused franchisees, including the Debtors, to make increased advertising contributions at a time when individual franchisees were experiencing 9 straight quarters of steadily diminishing sales.  On February 12, 2016, Ms.

Stewart notified franchisees that the Franchisor had decided to institute an incremental franchisee investment of $8 million in national media to support the System Change. This amount was explicitly "over and above [franchisees'] 2016 contribution[s] to the National Advertising Fund."

46.    In sum, as the Franchisor's own press release touted, the System Change required the "[p]urchase and installation of the grills, a combined 60,000 hours of training for meat cutters and the marketing campaign to support the introduction represent[ed] an investment of more than $75 million by Applebee's franchisees." As the *New York Daily News* put it at the time, "[n]ever has one company spent so much on so little."[8]

**D. The Franchisor Knew from the Start That the System Change Would Be a Failure.**

47.    The problems with the Franchisor's System Change were obvious from the start. As the Franchisor's then-CEO Julia Stewart conceded to *Fortune* magazine at the time, she was not sure that it would be feasible for Applebee's to change how it prepared steaks across all roughly 1,800 restaurants. "I remember saying, 'Come on guys. You are in the test kitchen and everything is perfection,'" Stewart told *Fortune*. She recalled asking: "How am I going to duplicate this?"

48.    The Debtors and other franchisees had concerns from the beginning that the franchisor's proposed System Change was ill conceived and poorly tested.

49.    Upon information and belief, the Franchisor's tests of the System Change raised serious questions about its viability. The complete results were not shared with the Debtors or other franchisees. The Franchisor recklessly ignored these warning signs and did not take any action to scale back, amend, or adjust its plan to radically change the Applebee's System as a result of these negative indications.

---

[8] Applebee's starts serving real steaks on a wood-fired grill — but gets same result, *N.Y. Daily News* (May 16, 2016), available at http://www.nydailynews.com/life-style/eats/applebee-starts-serving-real-steaks-wood-fired-grill-article-1.2638797.

50.     The Franchisor did not consult with its franchisees meaningfully or in good faith regarding the System Change and, proceeding with that change nonetheless, failed to give due consideration to the financial burden and risk to, and other interests of, franchisees in general and the Debtors in particular.

51.     Because the Franchisor had no alternative strategy, the Debtors and other franchisees went along with the System Change reluctantly.  As explained in a June 20, 2016, report by the FBC:

- "The testing of [the System Change] was non collaborative, there was no deviation allowed and virtually no sharing of real information, cutting procedures etc"

- "Expert meat cutter's opinions were ignored and the financials were flawed"

- The[franchisees], "despite being highly skeptical about the validity of the results, as well as having no Plan B, all agreed to follow the brand and roll out the platform, furthermore agreeing to invest a further $8,000,000."

52.     The Debtors and other franchisees made their concerns known to the Franchisor, directly and through the FBC.  The Franchisor did not listen to their reasoned complaints, however, and instead pushed forward with its "transformation," ignoring their objections.

**E.  As Predicted, the System Change Was a Massive Failure from the Outset, Borne Entirely by the Franchisees.**

53.     The Debtors' sales decline was apparent almost immediately after the System Change took effect.  Just a month after rollout of the System Change, the FBC was able to report that the System Change "**has been a disaster.**"

54.     On June 10, 2016, the FBC emailed Ms. Stewart noting that franchisees were "in a crisis situation" and "seriously concerned by [her] general lack of communication and

leadership during this crisis."  The FBC felt "strongly" that Applebee's advertising should focus

on programs other than the hand-cut, wood-fired transformation "effective immediately."

55.     On June 20, 2016, the FBC met with Ms. Stewart to discuss the "imminent threat

to the survival of franchisees and the franchisor."  According to the FBC, "[y]ears of DineEquity

leadership, mismanagement and bad decision making are threatening the very existence of a

great brand," and the "[d]eterioration has accelerated" with the System Change.

56.     Prior to the June 2016 meeting, the FBC's membership was split regarding

whether Ms. Stewart had to be replaced.  After that meeting, however, the FBC was unanimous

that she had to go but was thereafter denied access to the Dine Brands board to make its views

known.

57.     On November 15, 2016, the Franchisor notified franchisees that it had fired its

advertising agency and was beginning the search for a replacement.  The new advertising agency

did not debut until May 2017.

58.     The Franchisor pushed forward with its System Change for approximately 6 to 8

months with messaging initiatives, even providing its franchisees with new guidelines for hand-

cutting to make the steaks look bigger, before admitting that the System Change was a mistake

and ordering its franchisees to return to the original System.  But the damage was done.  As the

FBC reported, the System Change had already "caused sales and traffic to decline precipitously."

59.     On or about December 21, 2016, the franchisees requested that the Franchisor

remove all mention of the System Change from the March 2017 menu and that the Franchisor's

promotional efforts move away from promotion of the System Change.

60.     The Franchisor responded that the hand-cut steaks change would stay on the

March and May 2017 menus but that the wood-fired grill change would be removed from the

March menu, subject to franchisees burning through their inventories of wood.  The Franchisor further responded that it would revisit the focus of its promotions.

61.     The Franchisor had devoted nearly its entire advertising budget to the System Change, however, leaving the Applebee's brand unable to pivot after the System Change failed and resulting in a 72% drop in the number of commercials Applebee's was able to air in the two months following launch of the System Change.

62.     Unwinding the System Change was no small feat, however.  The Debtors were contractually obligated to use a certain quantity of the more expensive USDA Choice steak, and it took fully another year for the Debtors to run through the quantity of steak they were contractually obligated to purchase, resulting in significant additional costs to the Debtors.

63.     The lost profits attributable to the Franchisor's mismanagement had a multiplier effect on the enterprise value of every franchisee, including the Debtors.  For the trailing twelve months ending March 31, 2018, the Debtors generated approximately $375.9 million in gross revenue, and $12.6 million of EBITDA, on a consolidated basis, a drop of 59.9%—in just two years—from the Debtors' peak of $431.1 million and $31.4 million, respectively, in the twelve months ending March 31, 2016.  Utilizing an industry multiple of 7.5 times EBITDA, the enterprise value of the Debtors alone was reduced by more than $141 million.



64.     As demonstrated in the chart above, Applebee's experienced ordinary variances in same-restaurant sales, with positive growth in 2014 and the first two quarters of 2015 (though the rate of growth was decelerating in 2015).  After the Franchisor shuttered Applebee's Kansas City headquarters in September 2015, however, stripping franchisees of their support system and leaving key marketing, training, and operational positions unfilled, same-restaurant sales declined precipitously the next quarter—and continued declining for the next 7 quarters (with the rate of decline accelerating over that period).  During this period, Applebee's same-restaurant sales figures fell far below those of its peers in the casual-dining segment.

65.     Dine Brands' board appeared to simply continue to watch Applebee's sales deteriorate without intervention until, finally, the FBC demanded that it take action.

**F.  The Aftermath: Bain & Company's Post-Mortem Confirms That the System Change Was an Ill-Advised, Unmitigated Disaster.**

66.     In or around the fourth quarter of 2016, the Franchisor commissioned Bain & Company, a preeminent business consulting firm, to prepare an analysis of Applebee's Brand

and Business Strategy, diagnosing some of the missteps made by the Franchisor that caused Applebee's to underperform its category by such a wide margin in 2016–2017.

67.     Bain concluded, among other things, that guests were unsatisfied with portion sizes, along with the lack of unique crave-able quality food items, and that Applebee's failed to capitalize on the takeout/delivery opportunities that its competitors seized.  These shortcomings were institutional failures.  According to Bain's assessment, the Franchisor had a "[s]mall innovation pipeline [,] offering fewer alternatives and options to test from than ideal."

68.     Moreover, the "relationship and ways of working between management and franchisees [was] unsustainable; lacking both trust and a sense of aligned incentives – leading to slow decision making and inconsistent execution/offering of promotions."

69.     In particular, Bain traced the widening of the traffic gap between Applebee's and its competitors to the roll-out of the System Change.  The Franchisor "zigged," focusing on quality, while its competitors "zagged," doubling down on value.  According to Bain's analysis, even if the steak quality may have improved, Applebee's customers did not know and did not care.

70.     Bain also diagnosed that the Franchisor's decision-making process was fundamentally flawed.  It was "[u]nclear who is accountable and responsible for final decision at each stage and/or how that decision should be made"; "[p]rocesses tend[ed] to be inefficient (frequent and time-consuming meetings)"; the "[l]ack of trust from franchisees raise[d] hurdle[s] on even minor changes[,] extending time-to-market significantly."

71.     Moreover, Bain also found that the Franchisor failed to test its proposed System Change effectively or understand its impact before rolling it out, stating that the "mechanics" of the Franchisor's tests "introduce[d] challenges in interpretation of results."  More specifically,

"[t]esting franchisee by franchisee limit[ed] [the Franchisor's] ability to build a rep[resentative] sample (e.g., St. Louis selected for [buy-one-get-one] test but not representative of US market) . . . ."  And the Franchisor's "[i]nability to work directly with restaurant GMs limit[ed] [its] ability to ensure tests are deployed as intended, and franchisees setting own pricing during testing can challenge ability to effectively read results."  According to Bain, the Franchisor's failure to perform multi-variable tests led "to challenges in understanding [the] impact of [the] different concept elements tested (e.g., [hand-cut] vs. [wood-fired] vs. USDA Choice) but also against other alternatives (e.g., vs. cast-iron)."  The franchisees, for example, had specifically requested that the Franchisor run control tests comparing the hand-cut change to the wood-fired change.  The Franchisor refused to do so.

72.    Compounding these failures, according to Bain, was that "[a]fter launch," the Franchisor had "no feedback loop system that [would have] enable[d] continuous improvement over time."

73.    In a letter to Ms. Stewart dated December 19, 2016, the FBC stated the franchisee community's desire to have access to the Dine Brands board of directors.  Ms. Stewart ignored this request, which the FBC repeated on January 3, 2017.

74.    On January 19, 2017, Richard Dahl, the lead director of Dine Brands, met with a representative of the franchisees who expressed that the franchisees did not believe they could trust Ms. Stewart and that she needed to be replaced.

75.    On February 17, 2017, the Franchisor announced to its franchisees that Ms. Stewart would be resigning effective March 1, 2017.

**G. The Franchisor Confesses, but Accepts No Responsibility for the Damage It Caused.**

76.     On or about March 3, 2017, the Franchisor's acting CEO Richard Dahl, who had served on the Dine Brands board since 2004, admitted in a call to investors that new products introduced during 2015 and 2016, like its hand-cut grilled meat, did not resonate well with customers and were "off target with value-focused trends in the industry."

77.     On April 27, 2017, the Franchisor's President John Cywinksi provided a brand overview, stating that "Applebee's drifted from core guest and failed to enhance relevance" and that this was "[c]ompounded by 2016 tactical missteps."

78.     Mr. Cywinksi further asserted that Applebee's had "[s]elf-inflicted wounds on multiple fronts":

- Guest: Targeted more aspirational demographic while alienating the core

- Operations: Widening variability of restaurant-level guest satisfaction

- Menu: Aggressive item deletions, portion size reductions and diminished innovation pipeline

- Marketing: Inconsistent positioning/messaging, absence of lead-time and compromised testing discipline

- Franchisees: Absence of leadership/partnership … strained relationship

79.     Mr. Cywinksi further conceded that the Franchisor's "[b]rand messaging ha[d] been uninspired and inconsistent."

80.     On a May 2, 2017, earnings call, Mr. Cywinski said it's his job to work with franchisees to repair the brand.  He said some of the chain's recent sales erosion has been self-inflicted, and it will take time to fully implement a plan to win back the support of former customers.

81.     When asked about the missteps that drove customers away from this iconic brand, Mr. Cywinski mentioned the primary mistakes made over the last 18 months:

ON BRAND IDENTITY: "There was an attempt to kind of reposition the brand in a somewhat aspirational manner around a modern bar and grill, and it's very clear from the data that we may have alienated some core guests in the process."

ON PRICE: "This is a brand that's always had a strong heritage around value. We are an affordable indulgence, plain and simple — and a pretty accessible and approachable one. Candidly, I think we've taken our eye off our core value proposition over time."

82.    Despite repeatedly conceding its missteps, the Franchisor never offered help to the franchisee network, such as reducing royalty rates, providing a royalty vacation, or doing anything else to help offset the financial damage it had caused the franchise network.

83.    The Dine Brands' board witnessed all of these missteps firsthand and effectively took no action to correct them until the FBC demanded action.

**H.  The Debtors Cut Costs to Survive While Attempting to Negotiate a Reasonable Solution with the Franchisor.**

84.    To better navigate the challenging business environment, improve liquidity and ensure the continued viability of their franchised locations, over the past year the Debtors have engaged in considerable efforts to reduce cash expenditures.

85.    Among other things, the Debtors put off scheduled store refreshes/remodels, focusing its capital expenditures instead on maintenance and critical deferred maintenance items, and went through several reductions in force to compensate for their declining EBITDA.

86.    The Debtors also closed a number of their underperforming locations without objection from any representative of the Franchisor.  The Franchise Agreements do not support the Franchisor's assertion that the Debtors lacked authority to do so or that the Franchisor is entitled to "phantom" royalties for closed restaurants.  The Franchisor never asserted a claim for such amounts prior to its Complaint, and in fact, franchisees were specifically told that there would be no penalties for closing certain stores.

87.     As John Cywinski stated in an email dated August 11, 2017, reassuring franchisees about restaurant closures, "some franchisees are simply taking steps to ensure future success and long-term health. . . .  Bottom line, you are best positioned to address any concerns as you are the decision-maker with respect to your markets and restaurants.  You know your plans for closures and can reassure team members as to restaurants that are not closing (93% of restaurants nationally)."

88.     In the ordinary course of business, the Franchisor sends the Debtors two invoices at month end—one for royalty payments and one for contributions to the advertising fund.  Historically, the Debtors paid both invoices with a single wire transfer.

89.     In June of 2017, after wasting significant funds on the Franchisor's System Change and weathering 9 straight quarters of declining sales, the Debtors, confronted with the immutability of their debt payments, were unable to pay their monthly royalty fees.

90.     The Franchisor reached out to the Debtors and asked them to make the royalty payment for June because it was an earnings quarter for the publicly held Dine Brands.  The Debtors made that June payment, albeit a month late, because of their longstanding relationship with the Franchisor, but were unable to make any further monthly royalty payments as of July 2017.

91.     Other franchisees similarly paid only what they could, when they could.  The Franchisor suggested that their franchisees should stop paying their Senior Lenders rather than stop the payments to the Franchisor.

92.     Upon information and belief, the Franchisor discriminated against the Debtors, giving more favorable treatment to other franchisees that were similarly unable to pay their monthly franchise fees.

93.     After June 2017, the Debtors were unable to pay their royalty fees and maintain operational liquidity.  However, the Debtors continued to pay the advertising invoice and to make timely contributions to the advertising fund to ensure the continued strength of the Applebee's brand and associated goodwill.  The Debtors gave the Franchisor advance notice that they were unable to pay royalties but would continue to make advertising contributions.

94.     At the time, the Debtors maintained a $3.5 million letter of credit to provide royalty support for the benefit of the Franchisor.

95.     In July 2017, the Debtors engaged Hilco Real Estate, LLC to approach the Debtors' landlords in an effort to renegotiate and amend leases with lower rents, or negotiate lease terminations where appropriate.  In an effort to conserve cash, the Debtors also withheld rent payments to select landlords where the Debtors' management was negotiating lease amendments or terminations.  Ultimately, the Debtors and Hilco reached agreements on improved terms for a number of locations, including entering into a global amended agreement with its largest landlord STORE Capital.

96.     As disclosed in Dine Brand's 10-K for 2017, at least three other franchisees were similarly unable to make timely payment of their monthly royalty fees.  Upon information and belief, Dine Brands loaned certain other franchisees experiencing financial difficulty money to allow those franchisees to make their monthly royalty payments, which had the effect of manufacturing higher earnings for Dine Brands.  Upon information and belief, Dine Brands pressured franchisees whose payment obligations were secured by personal guaranties to get the franchisees to accept the loans.  Dine Brands offered such a loan to the Debtors, but the Debtors declined.

97.     Given their financial straits and limited liquidity, the Debtors were similarly unable to make the principal payments due to their Senior Lenders for October, November, and December 2017.  In December 2017, the Debtors paid the Senior Lenders current and past due interest at a reduced default rate.

98.     On January 12, 2018, the Debtors made a payment in the amount $1,148,788.38 to the Franchisor for the invoiced advertising contribution for December 2017.  However, the Franchisor applied the advertising contribution to the Debtors' unpaid November royalties in the amount of $973,189.61, with the remainder split between December advertising ($162,766.39) and royalties ($12,732.78).  Simultaneously, the Franchisor was telling other franchisees that the Debtors were not contributing their fair share to the communal advertising fund.

99.     There is no provision in the Franchise Agreements that gives the Franchisor the right to unilaterally allocate payments designated by the Debtors for one obligation to a different obligation.

100.    Upon information and belief, the Franchisor diverted the Debtors' advertising contributions for the purpose of publicly shaming the Debtors and damaging their relationships with other franchisees.

101.    With liquidity concerns mounting, the Debtors discontinued their contributions to the advertising fund starting in February 2018.

102.    The Debtors were at all times upfront with the Franchisor and their other stakeholders about their financial straits and the need to maintain sufficient liquidity to allow the franchises to continue operating in a manner consistent with Applebee's reputation for quality and value.

**I.   The Debtors' Best Efforts at Prepetition Negotiations Are Met with Bad Faith.**

103.    On or about September 1, 2016, the Debtors provided the Franchisor with a report on their finances, notifying the Franchisor of the Debtors' impending financial crisis.  Among other things, the Debtors' report noted that, the Debtors' trailing twelve-month EBITDA had declined by $2.8 million from the first quarter of 2016 to the second (that is, during the course of the Franchisor's rollout of the System Change).

104.    In or around January 2017, with a majority of its franchisees having suffered financial decline, the Franchisor hired Trinity Capital Investment Banking ("<u>Trinity</u>") purportedly on behalf of all Applebee's stakeholders to try to stave off collapse of the entire enterprise.  Indeed, at a lenders symposium held on April 27, 2017, a presentation by Trinity argued for a "[s]hared vision by **all constituents** that all parties will fare better in a consensual transaction versus bankruptcy."  Trinity's retention, in and of itself, demonstrates the substantial harm inflicted by the Franchisor across the entire franchise network.

105.    Thus, at the outset of Trinity's engagement, the Debtors believed that the Franchisor was committed to working collaboratively with the Debtors, their Senior Lenders, and equity-holders to return Applebee's to historical profitability levels.  The Debtors began good-faith discussions with Trinity to negotiate a workout that would be mutually beneficial to the Debtors, their Senior Lenders, the Franchisors, and the other Applebee's franchisees.

106.    On September 12, 2017, Dine Brands appointed Stephen Joyce, a Dine Brands board member since 2012 and the former CEO of Choice Hotels, as its new CEO.  In his first earnings call as Dine Brands' CEO, Mr. Joyce stated that he was "looking forward to working further with [his] talented senior management team to strengthen the efforts already underway to build on the partnership with our franchisees."

107.    Instead, just days after Mr. Joyce's appointment, on September 20, 2017, the Franchisor sent a notice of default (the "Notice of Default") for failure to pay monthly royalty fees.  The Franchisor demanded that the Debtors pay the overdue amount within 90 days of receipt of the letter and stated that the Franchise Agreements would thereafter expire automatically despite the requirement for written notice of termination under the Franchise Agreements:  "For restaurants for which RMH does not cure the default, the franchise agreements for the restaurants will terminate on the 91st day *without further notice . . . .*"  Notice of Default (emphasis added).

108.    Although the Debtors continued to negotiate a workout with Trinity throughout this period, as time went on, it became clear to the Debtors that Trinity was working to advance the Franchisor's agenda without regard for other stakeholders.  For instance, Trinity at one point drafted a proposed term sheet under which AFH would contribute further funds to the Debtors' enterprise, even though AFH had been explicit that it was not willing to do so.  Trinity in fact circulated that term sheet to the Senior Lenders and the Franchisor despite the fact that AFH specifically instructed Trinity not to do so.

109.    In October 2017, frustrated with Trinity and dissatisfied with the lack of progress in negotiating a workout, the Debtors retained Mastodon Ventures Inc. ("Mastodon") to represent them in discussions with the Franchisor.  Mastodon is a well-known financial advisor that focuses its work on providing strategic advisory services to restaurant companies with enterprise values of $20 million to $400 million.

110.    Over the next several months, the Debtors' representatives and the Franchisor's representatives were in constant contact negotiating the terms of a workout.

111.    On December 18, 2017, the Franchisor sent a letter purporting to extend the Debtors' cure period to January 22, 2018:  "In light of our scheduled call this week with respect to the restaurants in your portfolio, and without waiver of any of our rights and remedies, we are amenable to extend your cure period for the restaurants listed on the attached schedule by an additional 30 days to **January 22, 2018**.  We reserve our right to revisit the extension at any time."  All of the Debtors' restaurants were listed on the schedule attached to the Franchisor's letter.

112.    On December 20, 2017, the Debtors provided the Franchisor with an initial restructuring proposal in advance of the teleconference scheduled for later that morning.

113.    On January 17, 2018, the Franchisor circulated its workout counterproposal in advance of a teleconference between the parties scheduled for that afternoon.

114.    Also on January 17, 2018, the Franchisor sent a "Notice of Termination of Development Agreements."  Referring back to the Notice of Default, the Franchisor's Notice of Termination of Development Agreements stated: "To date, RMH has not cured any of the arrearages, and has not paid royalties and/or advertising fees since receiving that Notice.  Each Development Agreement as well as all related amendments, supplements, and other ancillary agreements, including, without limitation, those listed on the attached list, has terminated."

115.    On January 18, 2018, the Franchisor sent a letter purporting to further extend the Debtors' cure period to February 18, 2018:  "Without waiver of any of our rights and remedies, we are extending your cure period for the restaurants listed on the attached schedule to February 18, 2018.  We reserve our right to revisit the extension at any time."

116.    On or around January 22, 2018, without notice to the Debtors, the Franchisor drew on the Debtors' letters of credit in the full amount of $3.5 million, resulting in the Debtors

having to immediately replace the letter-of-credit draw to the banks with cash, which further reduced the Debtors' liquidity.  In light of the draw, Robert Hersch, a Senior Managing Director at Mastodon, emailed his counterparts at Trinity, canceling a call scheduled for later that day to discuss the Franchisor's workout proposal and stating that the Franchisor's draw was "really bad faith action."

117.     Mr. Hersch also sought a face-to-face meeting with the Franchisor's general counsel and wrote him an "Urgent" email stating that the Debtors could not repay the letter of credit and remain sustainable with regard to operating capital.  Mr. Hersch urged the Franchisor to call him immediately to avoid any "unintended consequences."

118.     On January 24, 2018, representatives from the Debtors and the Franchisor spoke by phone, with Mr. Hersch stating that the parties "made some progress" and would "likely find the correct path" soon.  Mr. Hersch further warned, however, that the Debtors were "dangerously close to insufficient working capital."

119.     The parties had a "productive" meeting on January 26, 2018, after which the Debtors indicated that they were "hard at work preparing a proposal" that reflected the parties' discussions.

120.     The Debtors had repaid approximately $2.5 million of the letter of credit to the banks and requested the Franchisor to contribute the remaining $1 million, which the Franchisor declined to do absent a global agreement.

121.     On February 8, 2018, the Franchisor sent a letter purporting to extend the Debtors' cure period to March 1, 2018.

122.     On February 21, 2018, the parties met in New York as scheduled, and the Debtors made a comprehensive new proposal to resolve the parties' dispute (the "February Proposal").

The Franchisor's representatives indicated that the February Proposal was constructive and would provide a path forward.

123.    On February 26, 2018, the Franchisor sent a letter purporting to extend the Debtors' cure period to March 15, 2018.

124.    Mr. Hersch conferred with the Franchisor's representatives on March 1, 2018, and began incorporating their comments and the Senior Lenders' feedback, proposing that the parties "try to wrap this up in [M]arch so that the company can resume royalty and marketing payments according to the new agreement effective April 1."

125.    On March 12, 2018, the Debtors informed the Franchisor that they were "getting close to a plan that should be workable for all."

126.    Also on March 12, 2018, the Franchisor sent a letter purporting to extend the Debtors' cure period to April 12, 2018.

127.    On March 15, 2018, Mr. Hersch received some verbal comments to the February Proposal from the Franchisor.  On March 19, 2018, he responded to the Franchisor's information request and stated that he needed the Franchisor's comments to the list of store closures, as that was a "gating issue" to incorporating the Franchisor's other comments to the February Proposal.

128.    On March 27, 2018, the Franchisor sent its written response to the Debtors' February Proposal.  This proposal (the "March Proposal") rejected substantially all of the items from the February meeting in New York and was completely at odds with the parties' conversations at the February meeting and on the Franchisor's verbal comments from March 15.

129.    On April 11, 2018, and April 16, 2018, the Debtors informed the Franchisor that they had not yet received the Senior Lenders' reaction to the March Proposal and were unable to respond to that proposal until they did.

130. On April 16, 2018, the Franchisor sent a letter asserting that the Debtors were delinquent in responding to the March Proposal. The Franchisor also sent a letter purporting to extend the Debtors' cure period to April 26, 2018.

131. On April 17, 2018, Mr. Hersch emailed Messrs. Adel and Barr as follows: "We just finished a call with the bank- I am hoping [sic] on a flight and have early meetings – will provide response tomorrow."

132. During a teleconference with the Franchisor's general counsel on April 18, 2018, Mr. Hersch asserted that the terms of Franchisor's March 27 Proposal were not consistent with the parties' prior discussions. Mr. Hersch further asserted that the Debtors had been timely responding to the Franchisors' proposals and that the parties should come to agreement on the economics of a resolution even if certain details still needed to be resolved.

133. On April 23, 2018, Mr. Hersch sent the Franchisor the latest proposal (the "April Proposal"), noting that it was still subject to final approval from the Debtbors but that he wanted to provide the latest proposal in advance of the parties' call that afternoon.

134. On April 25, 2018, Ms. Cheong sent a letter claiming that the Debtors' cure period had expired, notwithstanding its April 16 letter extending the cure period to April 26, and that the Franchisor was now forbearing "from taking any further actions . . . to enforce [its] rights and remedies" under the Franchise Agreements:

> Without waiver of any of our rights and remedies under the applicable franchise agreements for the Applebee's restaurants listed on the attached schedule (the "Franchise Restaurants"), Applebee's agrees that it will forbear from taking any further actions against you or the Franchise Restaurants, whether at law or in equity, to enforce our rights and remedies against you or the Franchise Restaurants, under or in connection with the franchise agreements, until May 8, 2018. This agreement to forbear is not an extension of the cure periods referred to in prior Notices, which have already expired.

135.    The Debtors and the Franchisor continued to work together on an operational level in the ordinary course of business.  From April 30, 2018, through May 3, 2018, the Debtors held their annual General Manager Conference, with every restaurant general manager, director of operations, regional vice president, and department head in attendance.  The Franchisor had six representatives in attendance.  Five of the Franchisor's field operators attended the entire event, and four participated in the Debtors' training breakout sessions in front of every general manager and director of operations.  Kevin Carroll, the Franchisor's Chief Operations Officer, attended for two days and presented in a general session for approximately 50 minutes on May 2, 2018.  In his presentation, Mr. Carroll acknowledged the Franchisor's missteps but made multiple references to working with the Debtors in the future—even leading some 230 of the Debtors' key leaders in chanting the company's "we are RMH" slogan.

136.    On May 1, 2018, Mr. Hersch emailed the Franchisor's general counsel as follows: "Do you have any feedback for me.  I am trying hard to wrap this up."

137.    The response of the Franchisor's general counsel, Bryan Adel, also dated May 1, 2018, gave no indication that he believed the Franchise Agreements had terminated five days previously.  Rather, Mr. Adel responded that the April Proposal was not agreeable and accused the Debtors of attempting to make the Franchisor responsible for "a bad loan that Acon entered into with Bank of Montreal."

138.    On May 2, 2018, Mr. Hersch responded to the Franchisor as follows:

We have a meeting with our lenders May 9th. You are invited to join.

However, we would like to try and make headway with [the Franchisor] prior to that date.

. . . .

I feel the absolute need to point out that RMH is not attempting to make [the Franchisor] responsible for a bad loan that Acon entered into with Bank of

Montreal. On the contrary, [the Franchisor] is responsible for the fact that the RMH cash flow declined by over 50% between 2015 and 2017 (similar to most other franchisees in the system). Absent the brand failings the loan with BMO is actually a great loan for RMH because RMH does not have to consume any cash for interest or amortization – there's no better loan than that. Acon has acted as benefactor to [the Franchisor] in that a strong operator took over stores from a weaker operator. Further Acon's capital structure has saved both RMH and [the Franchisor] [from] disaster. Imagine if there was no guarantee and all the debt was senior and amortizing, is there any scenario where this company with that structure would not be in bankruptcy? Acon is not asking [the Franchisor] to save RMH from any mistakes, other than the mistakes made at the brand level. The issue is not [the Franchisor's] responsibility for the loan, but rather the loss of 50% of the EBITDA. Given that both perspectives have now been aired, can we move forward ahead of May 9th to complete an agreement that will ensure the continued operation of more than 150 stores paying millions in royalties. The Agreement we offered allows all parties to focus on the future [while] recognizing that the past has been painful to all.

Please let me know when you would next like to speak.

139.    On May 4, 2018, the chairman of AFH's board, Daniel Jinich, and the Franchisor's CEO, Stephen Joyce, arranged a call for May 7, 2018.  Mr. Joyce gave no indication that he believed the Franchise Agreements had terminated 8 days previously.

140.    During that call on May 7, 2018, none of the Franchisor's representatives gave any indication that they believed the Franchise Agreements had terminated 11 days previously. To the contrary, the Franchisor expressly stated it would terminate the Arizona and Texas franchise agreements unless the Debtors paid $12 million by the end of the day.

141.    These actions demonstrate Dine Brands' complete lack of concern for the Applebee's franchisee community.  The decision to abruptly abandon confidential, good-faith negotiations with the Debtors and to make the parties' disputes public has cast a dark cloud over the Applebee's brand and strained the franchisee network at a time when Applebee's was only just recovering from the harms inflicted on the Debtors and other franchisees under Dine Brands' watch.

01:23292973.14

**J.    The Franchisor's Improper Attempt to Terminate Postpetition.**

142.    On May 8, 2018, at approximately 3:30 a.m. (ET), the Debtors filed their chapter 11 bankruptcy cases—halting, and rendering void *ab initio*, any efforts by the Franchisor to exercise its right to terminate the Franchise Agreements.  At approximately 5:59 AM on May 8, 2018, Mr. Hersch emailed the Franchisor's representatives, informing them of the bankruptcy filing.

143.    At approximately 8:02 a.m. on May 8, 2018—approximately 4.5 hours after the Debtors filed bankruptcy—the Franchisor hand-delivered a letter, to the address indicated therein, with subject line "Re: Termination of Franchise Agreements for Restaurants in Arizona and Texas," stating that the Franchisor was purporting to terminate the Franchise Agreements for the Debtors' 41 restaurants located in Arizona and Texas, with such termination supposedly retroactive to April 27, 2018.

144.    The Franchisor attempted to cherry-pick the Debtors' best-performing stores by targeting the Arizona and Texas markets, which, through April 2018, were generating 2018 store-level EBITDA margins of 11.2%, as compared to store-level EBITDA margins of 9.3% for the remaining markets.  In addition, the Franchisor specifically excluded two underperforming stores in Arizona and Texas, which it tried to leave for the Debtors to de-image and close.

145.    The Franchisor generally has the ability to obtain the Debtors' sales figures on a daily basis.  After dragging out the workout negotiations for 16 months, the Franchisor attempted to grab the Debtors' restaurants at nearly the precise moment that the Debtors' business was starting to improve—which it did in the first quarter of 2018.

146.    Concurrently with the letter purporting to terminate the Franchise Agreements for the Debtors' 41 Arizona and Texas locations, the Franchisor sent the Debtors a further letter

stating that the Franchisor agreed that it would "forbear from enforcing its termination rights . . .

until May 20, 2018" for the Debtors' 133 franchises not located in Arizona or Texas.  The

Franchisor's letter further stated:  "This agreement to forbear is not an extension or a restarting

of the cure period referred to in prior Notice, which has already expired, nor is it a new cure

period."

147.    In addition, also on May 8, 2018, the Franchisor filed its *Complaint for Damages,*

*a Temporary-Restraining Order, and Preliminary and Permanent Injunctive Relief* in the United

States District Court for the District of Kansas in violation of the automatic stay.  *See Applebee's*

*Restaurants LLC v. RMH Franchise Corp.*, Case No. 18-cv-02226-JAR-GLR (D. Kan. May 8,

2018) (the "Kansas Complaint").

148.    In the Kansas Complaint, the Franchisor asserted the following facts:

- "On May 7, 2018, during a telephone call among multiple representatives of Applebee's and RMH, Applebee's notified RMH that Applebee's *would be exercising certain termination rights on May 8, 2018* with respect to the Arizona and Texas franchises . . . ." Kansas Complaint ¶ 9 (emphasis added).

- "[O]n April 25, 2018, Applebee's notified RMH that Applebee's agreed to forebear from taking any further actions against RMH until May 8, 2018, *to allow the parties time to see if an amicable resolution was possible*." Kansas Complaint ¶ 56 (emphasis added).

- "In the afternoon of May 7, 2018, Applebee's representatives called RMH and informed RMH that Applebee's *intended to exercise its termination rights on May 8, 2018* for the Arizona and Texas franchises . . . ." Kansas Complaint ¶ 58 (emphasis added).

- "Based on RMH's stated position on the May 7, 2018 telephone call, *by letter dated May 8, 2018, Applebee's notified RMH that the Franchise Agreements for the Arizona and Texas franchises terminated* on April 27, 2018 . . . ." Kansas Complaint ¶ 59 (emphasis added).

149.    After the Debtors' bankruptcy filing, the Franchisor's President John Cywinksi

called Jeff Neumann, the Debtors' founder and currently board member of AFH, to state that

Dine Brands would continue to support the Debtors as it always had and expected the same from

the Debtors.

150.    On June 5, 2018, the Franchisor announced that Bryan Marks, who formerly served in operations leadership roles with several franchisees, would be joining the Franchisor as Vice President of Operations, effective July 16, 2018.  Upon information and belief, the Franchisor hired Mr. Marks with the intention of having him take over operation of the Debtors' restaurants.

### K. Dine Brands Engages in Further Postpetition Misconduct, Announcing Its Competing "IHOb" Rebrand.

151.    On June 11, 2018, Dine Brands announced that its IHOP franchise would be rebranding as IHOb—with the "b" standing for "burgers"—bringing IHOb into direct competition with the Debtors and other Applebee's franchisees.

152.    Dine Brands franchised 1,671 IHOb restaurants across the United States.

153.    In the press release announcing the rebranding, Brad Haley, Chief Marketing Officer for IHOb restaurants, asserted that "when you try them, I think you'll agree with me that IHOb's new line of Ultimate Steakburgers are so good that I'd put them up against anyone's . . . ."

154.    In 2017, approximately 16% of the Debtors' entrée sales were in the burger category.

155.    Much of the recent Applebee's advertising campaign—for which Dine Brands asked Applebee's franchisees to pay for an increased portion of the bill—is focused on advertising burgers.

156.    In addition, in a recent Dine Brands' earnings call, Dine Brands' CEO Steve Joyce promised to continue to position Applebee's with its traditional customers and touted the new burger menu's popularity with millennial consumers.

157.     Dine Brands unveiled its ballyhooed rebranding of IHOP at the same time that

Applebee's was debuting an innovative new technology that allows customers to order ahead so

that their food is ready upon arrival at the restaurant.  Dine Brand's promotion of the IHOb

rebranding overshadowed Applebee's own initiative.  While Dine Brands is indifferent to the

IHOb's competition with Applebee's franchises, the Debtors are not.

## COUNT I
## (BREACH OF CONTRACT)
### (Against the Dine Subsidiaries)

158.     The Debtors repeat and reallege each and every allegation in the foregoing

paragraphs as if fully set forth herein.

159.     The Debtors and the Dine Subsidiaries entered into franchise agreements under

which both parties have contractual rights and obligations.  The Franchise Agreements are valid

and binding contracts.

160.     The Applebee's unique "System" is at the heart of the Franchise Agreements.

The very first Recital of the Franchise Agreements defines "the System" as Applebee's "designs,

decor and color schemes for restaurant premises, signs, equipment, procedures and formulae for

preparing food and beverage products, specifications for certain food and beverage products,

inventory methods, operating methods, financial control concepts, training facilities and teaching

techniques."  Franchise Agreement, Recital A.

161.     The Applebee's System had an established track record of success and

profitability, and has earned Applebee's pride of place among bar-and-grill franchises.

162.     The Debtors agreed to enter into the Franchise Agreements and become

Applebee's franchisees because of, and in reliance on, the Applebee's System.

163.    The System is fundamental to the Franchise Agreements, and the Debtors would not have entered into those agreements absent the Applebee's system.

164.    The Dine Subsidiaries abandoned the System contemplated under the Franchise Agreements by, among other things:

    a.  Operating with numerous key positions, including president, head of marketing, and head of technology/IT, unfilled for lengthy periods of time and then hiring executives without relevant restaurant industry experience;

    b.  Failing to provide franchisees with reasonable marketing, training, or operational support;

    c.  Performing inadequate testing of the System Change, failing to share test results with the Debtors, suppressing unfavorable test results, and failing to amend or adjust course in light of unfavorable test results;

    d.  Causing the Debtors to abandon the traditional gas grills, which had become an industry standard, and install new wood-fired grill platforms in all restaurants, imposing immense costs on the Debtors;

    e.  Causing the Debtors to use more expensive USDA Choice steaks and to hand-cut those steaks daily, which came at enormous cost to the Debtors as it required extensive training for kitchen personnel and increased the amount of steak that the Debtors' restaurants were forced to discard as waste;

    f.  Transforming the taste and flavor profile of fully 40% of the items on Applebee's then-existing menu;

g.    Abandoning the Applebee's core customers in favor of "millennials"

whose interests and outlook were diametrically opposed to those of

Applebee's core customers; and

h.    Threatening the Debtors with termination of the Franchise Agreements if

the Debtors did not agree to pay $12 million by the end of the day on May

7, 2018.

165.    The Dine Subsidiaries' wholesale abandonment of the System contemplated

under the Franchise Agreements is a material violation of those agreements and has deprived the

Debtors of the benefit of their bargain.

166.    Nothing in the Franchise Agreements permits the Dine Subsidiaries to make such

wholesale changes to the System that the Debtors had agreed to implement under the Franchise

Agreements.  Moreover, the Franchise Agreements require that any revision or amendment to the

System must be "in the good faith exercise of [the Franchisor's] reasonable business judgment,

consistent with the overall best interests of the System generally, [and] having due regard for the

financial burden which may be placed upon its franchisees[,]" none of which can be said with

respect to the System Change.

167.    As a result of the Dine Subsidiaries' abandonment of the System that the Debtors

had agreed to implement under the Franchise Agreements, which was a fundamental term of

those Franchise Agreements, and failure to implement the System Change consistent with

reasonable business judgment and the overall best interests of the System generally, without due

regard for the financial burden placed on the franchisees, the Dine Subsidiaries have materially

breached those agreements.

168.     The Dine Subsidiaries' breach of the Franchise Agreements excused the Debtors from performance thereunder.

169.     The Debtors have suffered, and will continue to suffer, a material reduction in enterprise value and other damages as a result of this breach of the Franchise Agreements, including, but not limited to, financial injury and lost business opportunities.

170.     In addition, the Debtors are entitled to reasonable attorneys' fees in connection with this proceeding pursuant to section 19.3 of the Franchise Agreement.

**COUNT II**
**(BREACH OF CONTRACT—IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING)**
**(Against the Dine Subsidiaries)**

171.     The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

172.     The Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties have contractual rights and obligations.  The Franchise Agreements are valid and binding contracts.

173.     Inherent to the Franchise Agreements is an implied covenant that the parties will act in good faith and deal fairly with each other in the performance of their respective covenants and obligations under the contract and will not take any action that will injure the other party or compromise their benefit of the contract.

174.     The implied covenant of good faith and fair dealing applies to the Franchise Agreements.

175.     The Dine Subsidiaries have violated the implied covenant of good faith and fair dealing and denied the Debtors the ability to achieve their reasonable expectations in entering into the franchise relationship by, among other things:

a.  Operating with numerous key positions, including president, head of marketing, and head of technology/IT, unfilled for lengthy periods of time and then hiring executives without relevant restaurant industry experience;

b.  Failing to provide franchisees with reasonable marketing, training, or operational support;

c.  Performing inadequate testing of the System Change, failing to share test results with the Debtors, suppressing unfavorable test results, and failing to amend or adjust course in light of unfavorable test results;

d.  Imposing commercially unreasonable system changes on the Debtors that served to materially and negatively change the nature of the Debtors' franchisee business, disregarded the best interests of the franchisees and the financial burden placed on them, detrimentally affected profit margins, and caused previously profitable franchise locations to be rendered near-inoperable due to unnecessary financial strain;

e.  Disregarding the reasonable expectation that the Dine Subsidiaries would not unilaterally terminate their franchise agreements after the Debtors spent significant time, resources, and capital investment on required system updates and devoted significant time and effort on negotiating a consensual, mutually beneficial workout; and

f.  Threatening the Debtors with termination of the Franchise Agreements if the Debtors did not agree to pay $12 million by the end of the day on May 7, 2018.

176.     The Dine Subsidiaries caused the Debtors to abandon the traditional gas grills that had become an industry standard and install new wood-fired grill platforms in all restaurants, imposing immense costs on the Debtors at a time when Debtors were experiencing 9 straight quarters of steadily diminishing sales.

177.     The Dine Subsidiaries caused the Debtors to use more expensive USDA Choice steaks and to hand-cut those steaks daily, which came at enormous cost to the Debtors as it required extensive training for kitchen personnel and increased the amount of steak that the Debtors' restaurants were forced to discard as waste.

178.     On top of the significant capital expenditures, the Dine Subsidiaries caused the Debtors to make unprecedented contributions to the advertising funds to market and promote Applebee's "transformation."

179.     The Dine Subsidiaries failed to exercise reasonable care or business judgment in testing or evaluating their "transformation" of Applebee's before causing the Debtors to implement that System Change.

180.     The Dine Subsidiaries ignored the reasoned objections that had been made to their proposed "transformation" by the Debtors, the FBC, and other franchisees.

181.     After causing the Debtors to incur huge expense in its proposed "transformation" of the Applebee's brand and causing the Debtors to suffer financial decline quarter after quarter, the Dine Subsidiaries coaxed the Debtors into false restructuring negotiations and sought to steal the Debtors' franchises as soon as the Debtors had bottomed out and were poised to rebound.

182.     The Dine Subsidiaries led the Debtors on during the purported workout negotiations, regularly extending the Debtors' cure period, before abruptly refusing further negotiations and purporting to terminate the Debtors' franchises unilaterally.

183.     The Dine Subsidiaries' abrupt, unilateral attempt to terminate the Franchise

Agreements was contrary to the parties' course of dealing and to reasonable business

expectations and practice, and was made in bad faith.

184.     As a result of the Dine Subsidiaries' ongoing actions and/or omissions during the

parties' franchise relationship, the Debtors have suffered, and will continue to suffer, a material

reduction in enterprise value and other damages as a result of the Dine Subsidiaries' breach of

the implied covenant of good faith and fair dealing contained in the franchise agreements,

including, but not limited to, financial injury and lost business opportunities.

185.     In addition, the Debtors are entitled to reasonable attorneys' fees in connection

with this proceeding pursuant to section 19.3 of the Franchise Agreement.

**COUNT III**
**(BREACH OF IMPLIED WARRANTY OF COMPETENCE)**
**(Against the Dine Subsidiaries)**

186.     The Debtors repeat and reallege each and every allegation in the foregoing

paragraphs as if fully set forth herein.

187.     The Debtors and the Dine Subsidiaries entered into franchise agreements under

which both parties have contractual rights and obligations.  The Franchise Agreements are valid

and binding contracts.

188.     The implied warranty of competence and workmanlike performance is imposed

upon the parties by operation of law.

189.     The Franchise Agreements involve the performance of work and delivery of

services by the Dine Subsidiaries.

190.     The Debtors entered into the Franchise Agreements based in part on the Dine

Subsidiaries' claimed "know-how."

191.   The implied warranty of competence and workmanlike performance arises because of the parties' agreement under the Franchise Agreements.

192.   The Dine Subsidiaries have violated the implied warranty of competence and workmanlike performance and denied the Debtors the ability to achieve their reasonable expectations in entering into the franchise relationship by, among other things:

   a.   Operating with numerous key positions, including president, head of marketing, and head of technology/IT, unfilled for lengthy periods of time and then hiring executives without relevant restaurant industry experience;

   b.   Failing to provide franchisees with reasonable marketing, training, or operational support;

   c.   Performing inadequate testing of the System Change, failing to share test results with the Debtors, suppressing unfavorable test results, and failing to amend or adjust course in light of unfavorable test results; and

   d.   Imposing commercially unreasonable system changes on the Debtors that served to materially and negatively change the nature of the Debtors' franchisee business, detrimentally affect profit margins, and cause previously profitable franchise locations to be rendered near-inoperable due to unnecessary financial strain.

193.   The Dine Subsidiaries caused the Debtors to abandon the traditional gas grills that had become an industry standard and install new wood-fired grill platforms in all restaurants, imposing immense costs on the Debtors at a time when Debtors were experiencing 9 straight quarters of diminishing sales.

194.    The Dine Subsidiaries caused the Debtors to use more expensive USDA Choice steaks and to hand-cut those steaks daily, which came at enormous cost to the Debtors as it required extensive training for kitchen personnel and increased the amount of steak that the Debtors' restaurants were forced to discard as waste.

195.    On top of the significant capital expenditures, the Dine Subsidiaries caused the Debtors to make unprecedented contributions to the advertising funds to market and promote Applebee's "transformation."

196.    The Dine Subsidiaries failed to exercise reasonable care or business judgment in testing or evaluating the transformative System Change before causing the Debtors to implement it.

197.    The System Change that the Dine Subsidiaries caused the Debtors to implement was not tested, prepared, or planned with reasonable care or business judgment.

198.    The Dine Subsidiaries withheld test results from the Debtors, suppressed unfavorable test results, and proceeded with the System Change without amendment or adjustment despite unfavorable test results.

199.    The Dine Subsidiaries ignored the reasoned objections that had been made to their proposed "transformation" by the Debtors, the FBC, and other franchisees.

200.    After causing the Debtors to incur huge expense in its ill-fated "transformation" of the Applebee's brand and causing the Debtors to suffer financial decline quarter after quarter, the Dine Subsidiaries coaxed the Debtors into bad faith restructuring negotiations and sought to steal the Debtors' franchises as soon as the Debtors had bottomed out and were poised to rebound.

201.     The Dine Subsidiaries led the Debtors on during the purported workout negotiations, regularly extending the Debtors' cure period, before abruptly refusing further negotiations and purporting to terminate the Debtors' franchises unilaterally and seize them for themselves once the franchises were regaining their footing.

202.     The Dine Subsidiaries' abrupt, unilateral attempt to terminate the Franchise Agreements was contrary to the parties' course of dealing and to reasonable business expectations and practice, and was made in bad faith.

203.     As a result of the Dine Subsidiaries' ongoing actions and/or omissions during the parties' franchise relationship, the Debtors have suffered, and will continue to suffer, a material reduction in enterprise value and other damages as a result of the Dine Subsidiaries' breach of the implied warranty of competence and workmanlike performance, including, but not limited to, financial injury and lost business opportunities.

**COUNT IV**
**(TORTIOUS INTERFERENCE WITH CONTRACTUAL**
**RELATIONSHIPS—SYSTEM CHANGE)**
**(Against Dine Brands)**

204.     The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

205.     The Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties have contractual rights and obligations.  The Franchise Agreements are valid and binding contracts.

206.     The Debtors have contractual rights to use the Applebee's Marks and System.

207.     Dine Brands is the ultimate parent company of the Dine Subsidiaries.

208.     Dine Brands has full and actual knowledge of the Debtors' contractual relationship with the Dine Subsidiaries.

209.    Dine Brands closed Applebee's Kansas City headquarters and moved Applebee's to its own headquarters in Glendale, California.

210.    Numerous Applebee's personnel, many of them longstanding employees, opposed the relocation and declined to transfer.  Thereafter, Dine Brands intentionally induced the Dine Subsidiaries to operate with numerous key positions unfilled for lengthy periods of time.

211.    The Debtors and other franchisees suffered from having these key position unfilled.  Dine Brands intentionally induced the Dine Subsidiaries to fail to provide their franchisees with reasonable marketing, training, or operational support.

212.    Dine Brands intentionally induced the Dine Subsidiaries to cause the Debtors to make significant capital expenditures in a commercially unreasonable attempt to transform the Applebee's brand:

  a. Dine Brands intentionally induced the Dine Subsidiaries to cause the Debtors to abandon the traditional gas grills that had become an industry standard in favor of new wood-fired grill platforms in all restaurants.

  b. Dine Brands intentionally induced the Dine Subsidiaries to cause the Debtors to use more expensive USDA Choice steaks.

  c. Dine Brands intentionally induced the Dine Subsidiaries to cause the Debtors to hand-cut its steaks daily, requiring extensive training for kitchen personnel and increasing the amount of steak that restaurants were forced to discard as waste.

  d. Dine Brands intentionally induced the Dine Subsidiaries to cause the Debtors to make unprecedented contributions to the advertising funds at a

time when the Debtors were experiencing 9 straight quarters of steadily diminishing sales.

213.    The System Change that Dine Brands intentionally induced the Dine Subsidiaries to implement was not tested, prepared, or planned with reasonable care or business judgment.

214.    Dine Brands intentionally induced the Dine Subsidiaries to withhold test results from the Debtors, suppress unfavorable test results, and proceed with the System Change without amendment or adjustment despite unfavorable test results.

215.    Dine Brands threatened to intentionally induce the Dine Subsidiaries to terminate of the Franchise Agreements if the Debtors did not agree to pay $12 million by the end of the day on May 7, 2018.

216.    On June 11, 2018, Dine Brands announced that it was rebranding its IHOP franchise as IHOb—with the "b" standing for "burgers"—exacerbating the deterioration of Applebee's brand.

217.    Dine Brands franchised 1,671 IHOb restaurants across the United States.

218.    In the press release announcing the rebranding, Brad Haley, Chief Marketing Officer for IHOb restaurants, asserted that "when you try them, I think you'll agree with me that IHOb's new line of Ultimate Steakburgers are so good that I'd put them up against anyone's . . . ."

219.    In 2017, approximately 16% of the Debtors' entrée sales were in the burger category.

220.    Much of the recent Applebee's advertising campaign—for which Dine Brands asked Applebee's franchisees to pay for an increased portion of the bill—is focused on advertising burgers.

221.     In addition, in a recent Dine Brands' earnings call, Dine Brands' CEO Steve
Joyce promised to continue to position Applebee's with its traditional customers and touted the
new burger menu's popularity with millennial consumers.

222.     Dine Brands unveiled its ballyhooed rebranding of IHOP at the same time that
Applebee's was debuting an innovative new technology that allows customers to order ahead so
that their food is ready upon arrival at the restaurant.  Dine Brand's promotion of the IHOb
rebranding overshadowed Applebee's own initiative.

223.     Dine Brands knew, or should have known, that such actions and/or omissions
would naturally and probably result in damages to the Debtors, but Dine Brands continued such
conduct and/or omissions with reckless disregard of the consequences and Dine Brands
intentionally pursued a course of conduct the purpose of which was causing damage to the
Debtors.

224.     Dine Brands had and has no lawful justification for its tortious interference with
the Debtors' contracts and prospective economic advantage with the Dine Subsidiaries.

225.     As a result of Dine Brands' tortious interference with the Debtors' contractual
relationship with the Dine Subsidiaries, the Debtors have incurred economic damages in an
amount to be proven at trial.

**COUNT V**
**(TORTIOUS INTERFERENCE WITH CONTRACTUAL**
**RELATIONSHIPS—IMPROPER TERMINATION)**
**(Against Dine Brands)**

226.     The Debtors repeat and reallege each and every allegation in the foregoing
paragraphs as if fully set forth herein.

01:23292973.14

227.    The Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties have contractual rights and obligations.  The Franchise Agreements are valid and binding contracts.

228.    The Debtors have contractual rights to use the Applebee's Marks and System.

229.    Dine Brands is the ultimate parent company of the Dine Subsidiaries.

230.    Dine Brands has full and actual knowledge of the Debtors' contractual relationship with the Dine Subsidiaries.

231.    The Franchise Agreements require the designated franchisor under the contract to provide written notice of termination.

232.    Dine Brands intentionally induced the Dine Subsidiaries to purport to terminate its contracts with the Debtors automatically after 90 days without the written notice of termination required under the Franchise Agreements.

233.    Dine Brands threatened to intentionally induce the Dine Subsidiaries to terminate of the Franchise Agreements if the Debtors did not agree to pay $12 million by the end of the day on May 7, 2018.

234.    Dine Brands knew, or should have known, that such actions and/or omissions would naturally and probably result in damages to the Debtors, but Dine Brands continued such conduct and/or omissions with reckless disregard of the consequences and Dine Brands intentionally pursued a course of conduct the purpose of which was causing damage to the Debtors.

235.    Dine Brands had and has no lawful justification for its tortious interference with the Debtors' contracts and prospective economic advantage with the Dine Subsidiaries.

236.     As a result of Dine Brands' tortious interference with the Debtors' contractual relationship with the Dine Subsidiaries, the Debtors have incurred economic damages in an amount to be proven at trial.

## COUNT VI
## (DECLARATORY JUDGMENT THAT THE FRANCHISE AGREEMENTS WERE NOT TERMINATED PREPETITION AND ARE PROPERTY OF THE ESTATES)
### (Against the Franchisor)

237.     The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

238.     Section 19.1 of the various Franchise Agreements states that the "Franchisor shall have the right to terminate this Agreement immediately upon written notice to Franchisor stating the reason for such termination[.]"

239.     A notice of cancellation of contract must be clear and unambiguous to be effective.

240.     Non-compliance with termination provisions of a contract are grounds for voiding the terminations thereof as ineffective.

241.     On September 20, 2017, the Franchisor sent a letter declaring a default and stating that, unless the Debtors paid the overdue royalty fees within 90 days, the Franchise Agreements would terminate without further notice.

242.     For many of the Franchise Agreements, the Franchisor failed to deliver its letter dated September 20, 2017, to the addresses set forth in the Franchise Agreements for giving proper notice thereunder.

243.     On December 18, 2017, the Franchisor sent a letter purporting to extend the deadline to cure the defaults under the Franchise Agreements to January 22, 2018.

244.    On January 17, 2018, the Franchisor sent a "Notice of Termination of Development Agreements."  Referring back to the Notice of Default, the Franchisor's Notice of Termination of Development Agreements stated: "To date, RMH has not cured any of the arrearages, and has not paid royalties and/or advertising fees since receiving that Notice.  Each Development Agreement as well as all related amendments, supplements, and other ancillary agreements, including, without limitation, those listed on the attached list, has terminated."

245.    On January 18, 2018, the Franchisor sent a letter purporting to further extend the cure period for the Franchise Agreements to February 18, 2018.

246.    On February 8, 2018, the Franchisor sent a further letter purporting to extend the cure period to March 1, 2018.

247.    On February 26, 2018, the Franchisor sent a letter purporting to further extend the cure period to March 15, 2018.

248.    On March 12, 2018, the Franchisor sent a further letter purporting to extend the cure period to April 12, 2018.

249.    On April 9, 2018, the Franchisor sent a letter purporting to further extend the Debtors' cure period to April 19, 2018.

250.    On April 16, 2018, the Franchisor sent a further letter purporting to extend the Debtors' cure period to April 26, 2018.

251.    On April 25, 2018, the Franchisor sent a letter stating that the Franchisor agreed that it would "forbear from taking any further actions against you or the Franchise Restaurants, whether at law or in equity, to enforce our rights and remedies against you or the Franchise Restaurants, under or in connection with the franchise agreements, until May 8, 2018."  Despite the fact that the Franchisor had previously extended the Debtors' cure period to April 26, 2018,

the Franchisor's April 25 letter stated: "This agreement to forbear is not an extension of the cure periods referred to in prior Notice, which have already expired."

252. The Franchisor's letter dated April 25, 2018, makes plain that the Franchisor was required to take "further action" to exercise its right to terminate under the Franchise Agreements.

253. On May 7, 2018, the Franchisor threatened to terminate of the Franchise Agreements if the Debtors did not agree to pay $12 million by the end of the day.

254. When the Franchisor sought to terminate the Development Agreements with the Debtors, it sent a formal "Notice of Termination of Development Agreements" stating unequivocally that "[e]ach Development Agreement . . . has terminated."

255. Similarly, when the Franchisor sought to terminate the Franchise Agreements for the Debtors' 41 restaurants located in Arizona and Texas, the Franchisor sent a letter with the subject line "Re: Termination of Franchise Agreements for Restaurants in Arizona and Texas," stating that the Franchisor was purporting to terminate the Franchise Agreements for the Arizona and Texas restaurants, with such termination supposedly retroactive to April 27, 2018.

256. The Franchisor hand-delivered a letter, to the address indicated therein, at approximately 8:02 a.m. on May 8, 2018, approximately 4.5 hours after the filing of their bankruptcy petitions.

257. Concurrently with the letter purporting to terminate the Franchise Agreements for the Debtors' 41 Arizona and Texas locations, the Franchisor sent a further letter stating that the Franchisor agreed that it would "forbear from enforcing its termination rights . . . until May 20, 2018" for the Debtors' 133 franchises not located in Arizona or Texas.  The Franchisor's letter

Case 18-50481-BLS    Doc 7    Filed 06/19/18    Page 79 of 84

further stated: "This agreement to forbear is not an extension or a restarting of the cure period referred to in prior Notice, which has already expired, nor is it a new cure period."

258.     The Franchisor did not provide written notice of termination of the Franchise Agreements for the 41 Arizona and Texas restaurants, as required under the Franchise Agreements, until after the filing of the Debtors' bankruptcy petitions.

259.     The Franchisor's notice of termination of the Franchise Agreements for the 41 Arizona and Texas restaurants was void *ab initio* as a violation of the automatic stay.

260.     To date, the Franchisor has not provided any written notice of termination of the Franchise Agreements for the Debtors' 133 franchises not located in Arizona or Texas, as would be required under the Franchise Agreements.

261.     By virtue of the foregoing allegations, a real and justiciable controversy exists concerning the purported termination with respect to the Franchise Agreements.

262.     The Court should find and declare that the purported termination notice was invalid, the Franchise Agreements were not terminated rendering them property of the Debtors' estates, and any attempt to obtain possession of or exercise control over any of the Debtors' property is void *ab initio*.

## COUNT VII
### (DECLARATORY RELIEF AS TO FRANCHISOR'S WILLFUL VIOLATION OF AUTOMATIC STAY)
#### (Against the Franchisor)

263.     The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

264.     At approximately 3:30 a.m. (ET) on May 8, 2018, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

01:23292973.14

265.    At approximately 5:59 a.m. (ET) on May 8, 2018, Robert Hersch, a Senior Managing Director at Mastodon, emailed Stephen Joyce (the Franchisor's CEO), Bryan Adel (the Franchisor's General Counsel), and Lucy Cheong (the Franchisor's Vice President, Finance) informing them of the bankruptcy filing.

266.    At approximately 8:02 a.m. on May 8, 2018—approximately 4.5 hours after the Debtors filed bankruptcy—the Franchisor hand-delivered a letter, to the address indicated therein, with subject line "Re: Termination of Franchise Agreements for Restaurants in Arizona and Texas," stating that the Franchisor was purporting to terminate the Franchise Agreements for the Debtors' 41 restaurants located in Arizona and Texas, with such termination supposedly retroactive to April 27, 2018.

267.    In addition, also subsequent to the Debtors' bankruptcy filing on May 8, 2018, the Franchisor filed its *Complaint for Damages, a Temporary-Restraining Order, and Preliminary and Permanent Injunctive Relief* in the United States District Court for the District of Kansas. *See Applebee's Restaurants LLC v. RMH Franchise Corp.*, Case No. 18-cv-02226-JAR-GLR (D. Kan. May 8, 2018).

268.    Section 362(a) of the Bankruptcy Code prohibits the Franchisor from taking any action to obtain possession of, or exercise control over, property of the Debtors' estate.

269.    Upon information and belief, the Franchisor was aware of the Debtors' bankruptcy filing on the morning of May 8, 2018, prior to sending its purported termination notice, and was further aware that it had not validly terminated the Franchise Agreements prepetition.

270.    The purported notice of termination of the Franchise Agreements that the Franchisor sent on May 8, 2018, was void *ab initio* as a violation of the automatic stay.

271.    Upon information and belief, the Franchisor was aware of the Debtors' bankruptcy filing on the morning of May 8, 2018, prior to commencing the Kansas action, and was further aware that it had not validly terminated the Franchise Agreements prepetition.

272.    The filing of the Kansas action was void *ab initio* as a violation of the automatic stay.

273.    By virtue of the foregoing allegations, a real and justiciable controversy exists concerning the application of the automatic stay to the Franchisor's actions postpetition.

274.    The Court should find and declare that the purported termination notice and the filing of the Kansas action were void ab initio as willful attempts to obtain possession of or exercise control over any of the Debtors' property in violation of the automatic stay.

## COUNT VIII
### (DECLARATORY RELIEF AS TO FRANCHISOR'S NON-EXISTENT POST-TERMINATION RIGHTS)
#### (Against the Franchisor)

275.    The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

276.    Section 19 of the Franchise Agreements require the Debtors to refrain from taking certain actions post-termination and provide the Franchisor with certain options with respect to acquiring the franchised locations.

277.    Even assuming that the Franchise Agreements were validly terminated pre-petition (which they were not), contractual obligations cease upon the termination of the contract.

278.    By virtue of the foregoing allegations, a real and justiciable controversy exists concerning the existence of the Franchise Agreements (or contractual obligations thereunder) after a purported termination.

01:23292973.14

80

279.    The Court should find and declare that if any Franchise Agreements were validly terminated pre-petition (which they were not), the Debtors' contractual obligations under those agreements ceased upon their termination.

### PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, the Counter-Plaintiffs demand judgment against the Counter-Defendants as follows:

A.    An award of damages against the Dine Subsidiaries in an amount to be determined at trial as a result of their breaches of the Franchise Agreements, and such additional amount as is determined by the Court in order to sufficiently and fully compensate the Debtors for the lost profits, diminished enterprise value and other damages and losses suffered as a result of the Dine Subsidiaries' actions and/or omissions.

B.    An award of damages against the Dine Subsidiaries in an amount to be determined at trial as a result of their breaches of the implied covenant and fair dealing, and such additional amount as is determined by the Court in order to sufficiently and fully compensate the Debtors for the lost profits, diminished enterprise value and other damages and losses suffered as a result of the Dine Subsidiaries' actions and/or omissions.

C.    An award of damages against the Dine Subsidiaries in an amount to be determined at trial as a result of their breaches of the implied warranty of competence, and such additional amount as is determined by the Court in order to sufficiently and fully compensate the Debtors for the lost profits, diminished enterprise value and other damages and losses suffered as a result of the Dine Subsidiaries' actions and/or omissions.

D.    An award of damages against Dine Brands in an amount to be determined at trial as a result of its tortious interference with the contractual relationships among the Debtors and

the Dine Subsidiaries, and such additional amount as is determined by the Court in order to sufficiently and fully compensate the Debtors for the lost profits, diminished enterprise value and other damages and losses suffered as a result of Dine Brands' actions.

E.      An order declaring that the Franchise Agreements were not terminated prepetition and thus constitute property of the Debtors' estates.

F.      An order declaring that the purported termination notice and the filing of the Kansas action were void *ab initio* as willful violations of the automatic stay and awarding damages incurred by the Debtors as a result of such violations in an amount to be determined at trial.

G.      In the event that the Court finds and declares certain Franchise Agreements were validly terminated prepetition, an order declaring that the Debtors' contractual obligations under any such Franchise Agreements ceased upon their termination.

H.      Payment of the Debtors' attorneys' fees and expenses incurred in connection with this adversary proceeding.

I.      Such other or further relief as the Court finds just or proper.

## RULE 7012(b) STATEMENT

Pursuant to Bankruptcy Rule 7012(b), and Local Rule 7012-1, the Debtors hereby give notice that they consent to entry of final orders or judgment by the Bankruptcy Court with respect to their Counterclaims and the claims asserted against them in the Complaint.

Dated:  June 19, 2018          YOUNG CONAWAY STARGATT & TAYLOR, LLP
        Wilmington, Delaware

                               */s/ M. Blake Cleary*
                               John T. Dorsey (No. 2988)
                               M. Blake Cleary (No. 3614)
                               Sharon M. Zieg (No. 4196)
                               Erin D. Edwards (No. 4392)
                               Rodney Square
                               1000 North King Street
                               Wilmington, Delaware 19801
                               Telephone:    (302) 571-6600
                               Facsimile:    (302) 571-1256

                               *Counsel for the Debtors and Debtors in Possession*

01:23292973.14

83