# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RMH Franchise Holdings, Inc., *et al.*,[1] | ) | Case No. 18-11092 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| _____ | ) | |
| | ) | |
| DINE BRANDS GLOBAL, INC., | ) | |
| APPLEBEE'S RESTAURANTS LLC, | ) | |
| and APPLEBEE'S FRANCHISOR LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Pro. No. 18-50481 (BLS) |
| v. | ) | |
| | ) | |
| RMH FRANCHISE HOLDINGS, INC., | ) | |
| NULNK, INC., RMH ILLINOIS, LLC, | ) | |
| RMH FRANCHISE CORP., and | ) | |
| CONTEX RESTAURANTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## COUNTER-DEFENDANTS' ANSWER TO COUNTER-PLAINTIFFS' COUNTERCLAIMS

The above-named plaintiffs (collectively, "Applebee's") hereby answer the *Debtors' Answer and Counterclaims to Applebee's Complaint* [Dkt. No. 7] (the "Counter-Complaint") filed by the above-named defendants (collectively, the "Defendants" or the "Debtors")[2] as follows:

---

[1] The Defendants and the last four digits of their respective taxpayer identification numbers are as follows: RMH Franchise Holdings, Inc. (7150); NuLnk, Inc. (7381); RMH Illinois, LLC (0696); RMH Franchise Corp. (1807); Contex Restaurants, Inc. (0710). The headquarters for the above-captioned Defendants is located at One Concourse Parkway, N.E., Suite 600, Atlanta, GA 30328.

[2] Applebee's reserves its rights to assert any monetary claims and/or other rights at a later date. This includes claims and rights against the non-debtor guarantor, ACON Franchise Holdings, LLC. Applebee's also continues to accrue an administrative priority claim based on the Defendants' continued willful post-petition

# PRELIMINARY STATEMENT

The heart of the Applebee's brand is its unique "System." Indeed, the very first Recital in an Applebee's Franchise Agreement emphasizes the importance of "the System," defined as Applebee's "designs, decor and color schemes for restaurant premises, signs, equipment, procedures and formulae for preparing food and beverage products, specifications for certain food and beverage products, inventory methods, operating methods, financial control concepts, training facilities and teaching techniques." The System was the very foundation of the bargain between the Franchisor and its franchisees.

The Debtors became Applebee's franchisees beginning in 2012 because they believed in the Applebee's System, which had an established track record of success and profitability, earning Applebee's pride of place among bar-and-grill franchises. Over the following years, the Debtors, with the full support of the Franchisor, doubled down on their belief in the Applebee's System, investing substantial capital to expand their operations to become the second-largest Applebee's franchisee in the world. Specifically, the Debtors made additional acquisitions in 2013 and 2015 to help consolidate and improve Dine Brands' performance, with express assurances from Steven R. Layt, Applebee's President at the time, that certain of the stores acquired in the 2015 acquisition could be closed without penalty if performance did not improve. As it turned out, Dine Brands' CEO, Julia Stewart, later reneged on those assurances.

After decades of success under the System, the foundations of Applebee's success (and, in turn, that of its franchisees) began to crumble in 2014 as a result of the Franchisor's mismanagement. In November 2014, after Jeff Neumann, the Debtors' founder and CEO (at the time), was elected to Applebee's Franchise Brand Council (the "FBC"), the Debtors became concerned that the defining characteristics of Ms. Stewart's tenure would be chaos and a clear lack of leadership. Among other things, her decision to move the Applebee's headquarters from its Kansas City home to Dine Brands' California location had significant deleterious effects, resulting in the departure of large swaths of the personnel who had made Applebee's what it was. As a result of this exodus, resulting in a massive loss of institutional knowledge, and Ms. Stewart's misguided leadership, the Franchisor quickly lost touch with the Applebee's brand, with key positions either left unfilled for years or filled by newcomers without relevant restaurant industry experience or a clear sense of Applebee's roots.

The Franchisor's mismanagement under Ms. Stewart reached its crescendo in the fall of 2015 with the announcement that the Franchisor would be abandoning the proven and unique System that was at the heart of its relationship with its franchisees—and the Debtors' decision to become Applebee's franchisees in the first place—in an attempt to win over "millennials" (the "System Change"). In announcing its System Change, the Franchisor explicitly stated its intention to make Applebee's into a "different place than [its customers] remember[ed]."

Before it was even rolled out, the Franchisor had every indication that the System Change would be a failure. Indeed, the Franchisor's testing, which was results-oriented and selectively

---

infringement of Applebee's trademarks. Applebee's further reserves its right to assert an administrative claim under 11 U.S.C. § 503 based on the Defendants' post-petition trademark infringement and other post-petition grounds and benefits.

disclosed to its franchisees, foretold that the System Change was destined to fail. Likewise, franchisees made their displeasure with the System Change known to the Franchisor, both directly and through the FBC, an advisory group for Applebee's franchisees. Yet the Franchisor ignored its franchisees' reasoned positions criticizing the changes.

Instead, without any other ideas, the Franchisor plowed forward with the System Change, foisting all of the burdens, costs and risks onto its franchisees. Indeed, in another break with the manner in which Applebee's traditionally had been run, the Franchisor had sold all of the Franchisor-owned locations by the time of the System Change, and thus, it was all too aware that 100% of the capital investment and risk associated with the System Change would be borne by the franchisees, as well as that 100% of the advertising fund used to roll out the System Change would be paid by the franchisees. The Franchisor was not concerned that the System Change would require huge capital expenditures and increased food costs—franchisees' profits would decrease but not the royalty fees due to the Franchisor, which were based on gross revenues, not profit. The Franchisor exploited this disparity, forcing the System Change on the franchisees without due regard for the overall best interests of the System or for the financial burden that would be borne by the franchisees, in direct contravention of the Franchise Agreements.

Predictably, the System Change was a colossal failure. Independent assessments by the consultant hired by the Franchisor concluded that the Franchisor's decision-making process was fundamentally flawed and that the Franchisor had failed to adequately test its proposed System Change or understand its impact before causing franchisees to implement it. In the aftermath, the Franchisor itself acknowledged "tactical missteps" with its current President conceding its negligence, stating that, "[c]andidly, I think we've taken our eye off our core value proposition over time" and that it was "very clear from the data" that Applebee's had "alienated some core guests" with its System Change (to say nothing of its devoted franchisees). Of course, the destruction that the Franchisor wrought could have been avoided if it had properly tested the System Change and listened to its franchisees.

The impact of the System Change on the Debtors was catastrophic. All told, the System Change cost the Debtors approximately $2.9 million to implement, with $1.6 million attributable to capital expenditures and $1.3 million attributable to labor costs—to say nothing of the Debtors' lost traffic and profits, which had a multiplier effect on the Debtors' enterprise value. By way of illustration, the System Change caused the Debtors' revenue to fall 8.8%, and their EBITDA to fall 22%, in the year after the implementation of the System Change. The damage wrought on the broader franchise network was also significant. One measure of just how destructive the Franchisor's actions have been not just to the Debtors but to the entire franchise network is the seven-fold increase in Dine Brands' bad-debt reserve and its write-off of $358.2 million for Applebee's goodwill and $173.4 million for Applebee's tradename in fiscal year 2017.

The Franchisors' indifference to the franchisees, including Debtors, is further evidenced by the Franchisor's unilateral decision to devote nearly the entire franchisee-funded advertising budget (to the tune of approximately $75 million borne by the franchisees) to the System Change, leaving the Applebee's brand unable to pivot after the System Change failed and resulting in a 72% drop in the number of commercials Applebee's was able to air in the two months following launch of the System Change. As the *New York Daily News* put it at the time,

"[n]ever has one company spent so much on so little." Indeed, the Franchisor depleted its advertising budget on the doomed System Change, and was forced to reduce its advertising by at least 50% in the wake of the System Change's destruction. In the end, the System Change not only caused the closure of a number of franchises, including franchises owned by the Debtors, it also caused the Applebee's brand to fall far behind comparable bar-and-grill peers. Dine Brands' board, meanwhile, appeared to merely sit back and watch as Applebee's unraveled, effectively taking no action at all until the FBC finally demanded that the board get involved.

In sum, the System Change from the outset confounded reasonable business judgment, was a material breach of the Franchise Agreements, and violated the covenants of good faith, fair dealing, and competence implicit in those agreements.

Yet the harm inflicted on the Debtors by the Franchisor did not stop there. The harm was further compounded by the Franchisor's purported termination of the Franchise Agreements, which itself constituted a breach of those agreements and of the implied covenants, and was improper and ineffective for numerous reasons. Section 19.1 of the Franchise Agreements states that the "Franchisor shall have the right to terminate this Agreement immediately upon written notice to Franchisee stating the reason for such termination . . . ." On September 20, 2017, the Franchisor sent a letter declaring a default and stating that, unless the Debtors paid the overdue royalty fees within 90 days, the Franchise Agreements would terminate without the notice required under those agreements. This "Notice of Default" (as the Franchisor characterizes the letter in its Complaint) advised the Debtors of the potential for termination of the various Franchise Agreements but was not itself the notice of termination required under those agreements. When the Franchisor later sent another letter stating the Franchise Agreements for the Debtors' Arizona and Texas locations were terminated, the Franchisor purported to rely on its earlier Notice of Default as a basis for retroactive termination of those agreements. Even assuming for the sake of argument that this purported notice of termination would have been effective as to the various Franchise Agreements, it was not delivered until after the Petition Date and was void *ab initio* as a violation of the automatic stay. But the fact that Franchisor sent a letter specifically purporting to terminate the Franchise Agreements for the Debtors' Arizona and Texas locations belies its current contention that the Notice of Default was the termination notice required under the various Franchise Agreements and was itself sufficient to terminate the Franchise Agreements for the remainder of the Debtors' locations. Moreover, the Franchisor sent the purported termination notice abruptly, as soon as it became clear that the Applebee's brand was starting to recover and only after stringing the Debtors along in workout negotiations for 16 months, all of which demonstrates that the Franchisor's attempt to terminate those Franchise Agreements was nothing more than a pretext for its ultimate goal of recapturing certain high-performing locations close to its California headquarters, as new management sought to return to a paradigm involving company-owned franchises. Therefore, in addition to the damages for the Franchisor's bad-faith breach of the Franchise Agreements (and any attorneys' fees incurred in connection herewith), the Debtors are thus further entitled to a declaratory judgment that the Franchise Agreements were not terminated prior to the Petition Date but are property of the Debtors' estates.

Finally, adding insult to the injury, the Franchisor announced on June 11, 2018, that it intended to rebrand IHOP to become "IHOb"—the "b" standing for "burgers." Yet much of the recent Applebee's advertising campaign—for which Dine Brands asked Applebee's franchisees

to pay for an increased portion of the bill—is focused on advertising burgers. Indeed, in a recent Dine Brands' earnings call, Dine Brands' CEO Steve Joyce promised to continue to position Applebee's with its traditional customers and touted the new burger menu's popularity with millennial consumers. Thus, the Franchisor's "IHOb" maneuver only served to exacerbate the challenges facing the Applebee's brand. Moreover, Dine Brands unveiled its ballyhooed rebranding of IHOP at the same time that Applebee's was debuting an innovative new technology that allows customers to order ahead so that their food is ready upon their arrival at the restaurant. Dine Brand's promotion of the IHOb rebranding overshadowed Applebee's own initiative. While Dine Brands clearly is indifferent to the IHOb's direct competition with Applebee's franchises, the Debtors are not.

Dine Brands' actions demonstrate its complete lack of concern for the Applebee's franchisee community. The decision to abruptly abandon confidential, good-faith negotiations with the Debtors and to make their disputes public has put the Applebee's brand in a bad light and created a tremendous distraction for franchisees and other stakeholders at a time when the brand was starting to recover but still in need of direction.

For all of the foregoing reasons, and as further set forth herein, the Debtors should be recompensed for the enterprise value that the Franchisor has destroyed and should be permitted the opportunity to pursue a chapter 11 plan of reorganization to maximize the value of their of their assets free from the Franchisor's improper and unwarranted attempts to exercise control over those assets.

**ANSWER:** RMH's "Preliminary Statement" constitutes a narrative argument in violation of the Federal Rules of Civil Procedure and is not susceptible to answer under the Federal Rules of Civil Procedure and requires no response. Except as so responded to below, Applebee's denies the allegations of the "Preliminary Statement."

1. The Debtors incorporate by reference all above responses as if fully set forth herein, and assert the following counterclaims against the Franchisor and Dine Brands.

**ANSWER:** Applebee's repeats and realleges by reference its allegations in its Complaint, as though fully set forth herein, and denies that Debtors are entitled to any relief under their counterclaims.

## PARTIES

2. Counter-Plaintiffs RMH Franchise Holdings, Inc., NuLnk, Inc. and RMH Illinois, LLC are Delaware corporations.

**ANSWER:** Applebee's admits the allegations of paragraph 2.

3. Counter-Plaintiff RMH Franchise Corp. is a Kansas corporation.

**ANSWER:** Applebee's admits the allegations of paragraph 3.

4. Counter-Plaintiff Contex Restaurants, Inc. is a Texas corporation.

**ANSWER:** Applebee's admits the allegations of paragraph 4.

5. Counter-Plaintiffs (i) RMH Franchise Corporation, (ii) NuLnk, Inc. and (iii) RMH Illinois, LLC are each 100% owned by Counter-Plaintiff RMH Franchise Holdings, Inc., which is itself 100% owned by ACON Franchise Holdings, LLC ("AFH"). The final Counter-Plaintiff, Contex Restaurants, Inc., is 100% owned by Counter Plaintiff RMH Franchise Corporation.

**ANSWER:** Applebee's admits the allegations of paragraph 5.

6. The headquarters of all Counter-Plaintiffs is located at One Concourse Parkway, N.E., Suite 600, Atlanta, GA 30328.

**ANSWER:** Applebee's admits the allegations of paragraph 6.

7. On information and belief, Counter-Defendant Dine Brands Global Inc. ("Dine Brands") is a Delaware corporation with its principal place of business in Glendale, California.

**ANSWER:** Applebee's admits the allegations of paragraph 7.

8. On information and belief, Counter-Defendant Applebee's Restaurants LLC ("Applebee's Restaurants") is a Delaware limited liability company with its principal place of business in Glendale, California.

**ANSWER:** Applebee's admits the allegations of paragraph 8.

9. On information and belief, Counter-Defendant Applebee's Franchisor LLC ("Applebee's Franchisor" and, together with Applebee's Restaurants, the "Dine Subsidiaries") is a Delaware limited liability company with its principal place of business in Glendale, California.

**ANSWER:** Applebee's admits the allegations of paragraph 9.

10. On information and belief, the ultimate parent company of Applebee's Restaurants and Applebee's Franchisor is Dine Brands.

**ANSWER:** Applebee's admits the allegations of paragraph 10.

## Jurisdiction and Venue

11. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). Certain aspects of this adversary proceeding are core matters pursuant to 28 U.S.C.§ 157(b)(2), and other aspects are non-core matters.

**ANSWER:** Applebee's states that the allegations of paragraph 11 constitute legal conclusions to which no response is required. To the extent a response is required, Applebee's admits the allegations of paragraph 11.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

**ANSWER:** Applebee's states that the allegations of paragraph 12 constitute legal conclusions to which no response is required. To the extent a response is required, Applebee's admits the allegations of paragraph 12.

13. The Counterclaims are brought pursuant to Rule 13 of the Federal Rules of Civil Procedure and Rule 7013 of the Federal Rules of Bankruptcy Procedure.

**ANSWER:** Applebee's admits the allegations of paragraph 13.

## Factual Allegations

**A. The Debtors Become the Second-Largest Applebee's Franchisee Operator in Reliance on the Proven and Unique Applebee's System.**

14. Jeff Neumann founded the Debtors in 2012 with an equity investment from non-Debtor AFH and debt financing led by Bank of America, N.A. with participation interests held by other major banks (collectively with Bank of America, the "Senior Lenders").

**ANSWER:** Applebee's is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 14.

15. The Debtors are in the business of operating Applebee's Neighborhood Grill & Bar restaurants pursuant to individual franchise agreements (the "Franchise Agreements").

**ANSWER:** Applebee's admits the allegations of paragraph 15.

16. As of May 8, 2018 (the "Petition Date"), the Debtors formed what is believed to be the second-largest franchisee operator of Applebee's restaurants, operating 159 restaurants across 15 geographically diverse states: Alabama, Arizona, Florida, Illinois, Indiana, Kansas, Kentucky, Missouri, Mississippi, Nebraska, Ohio, Oklahoma, Pennsylvania, Texas and Wyoming. All told, the Debtors represented slightly less than 9 percent of all Applebee's locations.

**ANSWER:** Applebee's admits the allegations of paragraph 16.

17. The Debtors' business operations were built primarily through a series of acquisitions of existing franchises, including some franchise locations acquired out of

bankruptcy, beginning with an acquisition of 45 franchise locations in December 2012. Thereafter, the Debtors made several other large franchise acquisitions over the course of 2013–2015, including the addition of 15 Chicago-area locations in June 2013; 78 Arizona, Kentucky, and Ohio area locations in December 2013; and 33 Indiana and Ohio locations in August 2015. Additionally, the Debtors opened eight new franchise locations.

**ANSWER:** Applebee's admits the allegations of paragraph 17.

18. The Debtors' acquisitions in 2013 and 2015 demonstrated their commitment to the Applebee's brand and belief in the System as a foundation for success. Indeed, the Debtors' 2013 and 2015 acquisitions helped to consolidate and improve Dine Brands' performance and were done with the express consent of the Franchisor and with express assurances from Steven R. Layt, Applebee's President at the time, that certain individual stores could be closed if their performance did not improve. After the acquisitions closed, however, Ms. Stewart reneged on Applebee's commitment and refused to support the closure of the Debtors' underperforming restaurants.

**ANSWER:** Applebee's admits that the Debtors' acquired certain franchises in 2013 and 2015 with the consent of Applebee's. Applebee's denies all allegations not expressly admitted herein.

19. All told, the Debtors made capital expenditures, inclusive of acquisitions, of $196 million between December 2012 and December 2015 in reliance on the System. Dine Brands approved of, and benefited from, all of the Debtors' acquisitions because the Debtors implemented operational improvements that generated greater royalties for the Franchisor.

**ANSWER:** Applebee's admits it approved the Debtors' acquisitions. Applebee's is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations regarding the Debtors' capital expenditures and therefore denies those allegations. Applebee's denies all allegations not expressly admitted herein.

20. As the Franchisor must recognize, the Debtors operate well-run franchises with a strong management team. Indeed, that is exactly why the Franchisor supported and expressly consented to Debtors' additional acquisitions in 2013 and 2015. The Franchisor understood that Debtors would implement—and, in fact, did implement—operational improvements that inured to the Franchisor's benefit in the form of enhanced royalties.

**ANSWER:** Applebee's denies the allegations of paragraph 20.

21. Most recently, according to the rolling four-week average for the week of the Petition Date, the Franchisor ranked the Debtors' operations better than the system average. Upon information and belief, most of the restaurants currently operated by the Debtors were previously owned by substandard operators that the Franchisor wanted out of the system.

**ANSWER:** Applebee' states that the allegations of paragraph 21 concerning "the rolling four-week average for the week of the Petition Date" or the ranking of Debtors' operations are too vague and ambiguous and/or are unintelligible to allow Applebee's to form a belief as to the truth of the allegations, and Applebee's therefore denies those allegations. Applebee's denies all allegations not expressly admitted herein.

**B. The System Was the Core of the Bargain in the Franchise Agreements.**

22. The Applebee's unique "System" is at the heart of the Franchise Agreements. The very first Recital of the Franchise Agreements defines "the System" as Applebee's "designs, decor and color schemes for restaurant premises, signs, equipment, procedures and formulae for preparing food and beverage products, specifications for certain food and beverage products, inventory methods, operating methods, financial control concepts, training facilities and teaching techniques." Franchise Agreement, Recital A. Nothing in the Franchise Agreements permits the Franchisor to abandon the System that was the core of the bargain between the Franchisor and the Debtors.

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to the role and definition of the System and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

23. The Franchise Agreements are emphatic that "strict adherence by all franchisees to all aspects of the System is required at all times." Franchise Agreement §2.1; *see also id.* § 5.6 ("Franchisee understands, acknowledges and agrees that strict conformity with the System . . . is vitally important . . . ."); § 3 ("Franchisee acknowledges that every component of the System is important to Franchisor . . . . Accordingly, Franchisee agrees to and shall comply with all aspects of the System (as it now exists and as it may be modified from time to time)."); § 4.3 ("Franchisee shall comply with all menu changes which generally occur every six (6) months."); § 7.1 ("Franchisee shall, at Franchisee's sole cost and expense, maintain the Restaurant in conformity with the standards, specifications and requirements of the System, as the same may be designated by Franchisor from time to time.").

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

24. The Franchisor is permitted to make revisions or amendments to the System; provided, however, that such changes must be made in a good faith exercise of reasonable business judgment that is consistent with the "the overall best interests of the System generally," and with "due regard for the financial burden which may be placed upon its franchisees":

Franchisor shall have the right, at any time and from time to time, in the good faith exercise of its reasonable business judgment, consistent with the overall best interests of the System generally, having due regard for the financial burden which may be placed upon its franchisees, to revise, amend, delete from and add to the System and the material contained in the Manuals. Franchisee expressly agrees to comply with all such revisions, amendments, deletions and additions.

Franchise Agreement § 5.7.

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith.

Applebee's denies all allegations not expressly admitted herein.

25. At the time of their execution, the Franchise Agreements also provided, in relevant part, that the franchisees must contribute 3.25% of their gross sales to an "advertising account" established by the Franchisor for the benefit of all franchisees. Franchise Agreement § 8.2. Under amendments to the various Franchise Agreements, the Debtors are currently obligated to contribute 3.5% of their gross sales to advertising, with a further rate hike up to 4.25% scheduled for July 2018. The Franchisor has "final and binding" decision-making authority in all phases of advertising and promotion. Franchise Agreement § 8.1.

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith.

Applebee's denies all allegations not expressly admitted herein.

26. Beyond the advertising fee, the Franchise Agreement also requires franchisees to pay a monthly royalty fee as determined by the Franchisor, not to exceed 5% of the monthly gross sales. Franchise Agreement § 9.1. In practice, the Franchisor charges the Debtors a monthly royalty fee of 4% of gross sales. Under the Franchise Agreement, unpaid fees bear interest at the lesser of 18% or the highest rate permitted by applicable law. Franchise Agreement § 9.2. The Franchise Agreement provides that the Franchisor may withdraw funds from the franchisee's designated bank account in the amount of any royalties or other fees payable to the Franchisor under the agreement. Franchise Agreement §§ 9.4, 9.5.

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith.

Applebee's denies all allegations not expressly admitted herein.

27. Section 19.1 of the Franchise Agreements provides that the Franchisor may terminate the agreement for failure to pay royalty fees only upon providing the franchisee with written notice of termination: "Franchisor shall have the right to terminate this Agreement immediately upon written notice to Franchisee stating the reason for such termination . . . in the

- 10 -

event of any breach or default of any of the provisions of Section 9.1 . . . ." Franchise Agreement § 19.1.

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

28. Section 19.3 of the Franchise Agreement provides that the prevailing party is entitled to reasonable attorneys' fees in connection with any legal proceeding to construe or enforce the terms of the agreement. Franchise Agreement § 19.3.

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

### C. The Franchisor Abandons Applebee's Core Brand and Implements a Commercially Unreasonable System Change Without Due Regard for the Best Interests of the Franchisees and the Financial Burden It Imposed on Them.

29. The financial difficulty that drove the Debtors into chapter 11 stems from the Franchisor's mismanagement and decision to abandon the Applebee's System that had motivated the Debtors to enter into the Franchise Agreements in the first place. The Franchisor's ill-advised and value-destroying decision to abandon the System deprived the Debtors of the benefit of their bargain. Dine Brands' board, meanwhile, appeared to merely sit back and watch as Applebee's unraveled, effectively taking no action at all until the FBC finally demanded that the board get involved.

**ANSWER:** Applebee's denies the allegations of paragraph 29.

30. Beginning in 2014, after Jeff Neumann, the Debtors' founder and CEO (at the time), was elected to Applebee's Franchise Brand Council in November 2014, it became clear that the Franchisor's new management, under the leadership of then-Chief Executive Officer Julia Stewart, was ill equipped and quickly losing sight of Applebee's core values. The Franchisor's misguided leadership, for example, is amply illustrated by the decision in or around September 2015 to close Applebee's Kansas City office—the location of the Applebee's franchise since its founding in 1988—in an effort to move Applebee's operations to Dine Brands' headquarters in Glendale, California.

**ANSWER:** Applebee's denies the allegations of paragraph 30.

31. Numerous Applebee's personnel, many of them longstanding employees, opposed the relocation and declined to transfer. Indeed, Applebee's president, Steven R. Layt, refused the move and resigned in protest.

**ANSWER:** Applebee's admits that some personnel and Steven R. Layt did not transfer to Applebee's headquarters in Glendale, California. Applebee's denies all allegations not expressly admitted herein.

32. The loss of longstanding personnel and key executives was compounded by the mismanagement under Ms. Stewart's helm and her leadership style, which made it difficult for the Franchisor to attract talent. Among other things, Ms. Stewart refused to let other executives have C-level titles, allowing them to have only "Senior Vice President" positions.

**ANSWER:** Applebee's denies the allegations of paragraph 32.

33. Thus, after the Kansas City office closure, Applebee's operated with numerous key positions unfilled. Applebee's did not even have a president, head of marketing, or a head of technology/IT for lengthy periods of time.

**ANSWER:** Applebee's admits that at times it operated with certain positions unfilled. Applebee's denies all allegations not expressly admitted herein.

34. The Debtors and other franchisees suffered as a result of these key positions being unfilled. Although franchisees were expected to continue making their royalty payments, the Franchisor was not providing its franchisees with reasonable marketing, training, or operational support, as required by the Franchise Agreements.

**ANSWER:** Applebee's denies the allegations of paragraph 34.

35. Shortly thereafter, in the fall of 2015, the Franchisor's mismanagement reached its crescendo with the announcement that the Franchisor would be abandoning the System and implementing a commercially unreasonable System Change that abandoned the Applebee's brand's core identity and imposed massive costs and capital expenditures on the franchisees.

**ANSWER:** Applebee's denies the allegations of paragraph 35.

36. "We're in the midst of a transformation at Applebee's," Julia Stewart, Dine Brands' CEO, said in a statement. "No matter how you slice it, it is a big bold move," Stewart said. This transformation set out to change the taste and flavor profile of fully 40% of the items on Applebee's the existing menu. Executives said that it was the most significant change in the brand's 36-year history.

**ANSWER:** Applebee's states that the quoted press release speaks for itself as to its contents, Ms. Stewart's statements, and Applebee's public announcement. Because the allegations in paragraph 36 selectively quote, interpret, or construe the press release, Applebee's

denies any and all allegations contained in paragraph 36. Applebee's denies all allegations not expressly admitted herein.

37. As the Franchisor explained in its press release, it was consciously attempting to "transform[] the guest experience," boasting to its customers that Applebee's was "a different place than you remember."

**ANSWER:** Applebee's states that the quoted press release speaks for itself as to its contents, Ms. Stewart's statements, and Applebee's public announcement. Because the allegations in paragraph 37 selectively quote, interpret, or construe the press release, Applebee's denies any and all allegations contained in paragraph 37. Applebee's denies all allegations not expressly admitted herein.

38. The System Change included converting traditional gas grills that had become an industry standard to new wood-fired grill platforms in all restaurants. This conversion was a significant undertaking even beyond the grills themselves, causing franchisees, including the Debtors, to replace their existing fire prevention systems and to install hood and ventilation systems designed to ventilate wood smoke. The new "wood fired" grills themselves were not higher quality than the original gas grills. Indeed, the new grills still cooked with gas—it was just that they allowed wood to be burned alongside the gas cooking. Installation of the grills and related equipment cost the Debtors nearly $1.6 million.

**ANSWER:** Applebee's admits that, among other things, it implemented a wood-fired grill platform in its restaurants, which required certain changes and/or adjustments to equipment in restaurants, and admits the wood-fired grills used wood and gas as a fuel source. Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the Debtors' costs and therefore denies those allegations. Applebee's denies all allegations not expressly admitted herein.

39. The change to "wood fired" grills also imposed a number of ancillary costs on the Debtors, such as the cost associated with purchasing the wood that would burn while customers' food was cooking. The conversion also caused franchisees, including the Debtors, to bring each of their locations into compliance with the particular local and municipal rules and regulations concerning the production and ventilation of wood smoke, which entailed significant costs for permits, variances, inspections, and legal fees. These compliance efforts alone cost the Debtors nearly $600,000.

**ANSWER:** Applebee's admits the implementation of the wood-fired grill platform involved some ancillary costs, including costs for purchasing wood. Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 39 and therefore denies those allegations.

40. The Franchisor also insisted on using more expensive USDA Choice steaks. The Franchisor further caused these steaks to be hand-cut daily, which was labor-intensive and expensive, requiring extensive training for kitchen personnel and increasing the amount of more expensive cuts of steak, which restaurants were forced to discard as waste. Indeed, the Debtors spent nearly $250,000 on additional training and nearly $180,000 on wasted steak. Yet it was well known in the industry that many actual steakhouses had long since stopped hand-cutting steaks because it was too expensive.

**ANSWER:** Applebee's admits the wood-fired grill platform included use of USDA Choice steaks that were hand cut and admits that Choice grade meat generally is more expensive than lower grades of meat and that some training was required with regard to hand-cutting. Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 40 and therefore denies those allegations.

41. Even though USDA Choice, hand-cut steaks were more expensive for the Debtors and other franchisees, the menu prices set by the Franchisor were no higher, and thus, the profitability of the Debtors and other franchisees declined precipitously. Because the Franchisor's royalty fees are based on sales, it was indifferent to the pricing discrepancy.

**ANSWER:** Applebee's denies the allegations of paragraph 41.

42. Indeed, when the Franchisor implemented the System Change, it was well aware that 100% of the risk and burden of the changes to the System would be borne by the franchisees in general and by the Debtors in particular. In fact, as of December 31, 2015, the Franchisor no longer owned or operated any company locations, thus ensuring that it did not share in any of the risk.

**ANSWER:** Applebee's denies the allegations of paragraph 42.

43. The System Change thus had a disproportionately adverse impact on the Debtors and other franchisees. By way of illustration, the Debtors' last-twelve-months EBITDA (the driver of profitability and enterprise value for franchisees) declined by 59.9% for the period from March 2016 to March 2018, whereas the royalty fees that the Debtors paid or accrued to the Franchisor declined by just 12.8% over the same period.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 43 and therefore denies those allegations.

44. The Franchisor was also indifferent to the fact that, even as it caused the Debtors to make significant capital expenditures and incur significant labor costs and other expenses, the Debtors' debt levels were not mitigated by the Debtors' decrease in sales in the same way that royalty fees were.

**ANSWER:** Applebee's denies the allegations of paragraph 44.

45. The Franchisor's System Change further caused franchisees, including the Debtors, to make increased advertising contributions at a time when individual franchisees were experiencing 9 straight quarters of steadily diminishing sales. On February 12, 2016, Ms. Stewart notified franchisees that the Franchisor had decided to institute an incremental franchisee investment of $8 million in national media to support the System Change. This amount was explicitly "over and above [franchisees'] 2016 contribution[s] to the National Advertising Fund."

**ANSWER:** Applebee's admits it made an incremental increase in the rate for franchisees' advertising contributions in connection with the System Change, as it was permitted to do under the franchise agreements. Applebee's denies all allegations not expressly admitted herein.

46. In sum, as the Franchisor's own press release touted, the System Change required the "[p]urchase and installation of the grills, a combined 60,000 hours of training for meat cutters and the marketing campaign to support the introduction represent[ed] an investment of more than $75 million by Applebee's franchisees." As the *New York Daily News* put it at the time, "[n]ever has one company spent so much on so little."

**ANSWER:** Applebee's states that the quoted press release and news article speak for themselves and are the best evidence of their contents. Because the allegations in paragraph 46 selectively quote, interpret, or construe the press release and/or news article, Applebee's denies any and all allegations contained in paragraph 46. Applebee's denies all allegations not expressly admitted herein.

### D. The Franchisor Knew from the Start That the System Change Would Be a Failure.

47. The problems with the Franchisor's System Change were obvious from the start. As the Franchisor's then-CEO Julia Stewart conceded to *Fortune* magazine at the time, she was

not sure that it would be feasible for Applebee's to change how it prepared steaks across all roughly 1,800 restaurants. "I remember saying, 'Come on guys. You are in the test kitchen and everything is perfection,'" Stewart told *Fortune*. She recalled asking: "How am I going to duplicate this?"

      **ANSWER:**    Applebee's states that the quoted *Fortune* magazine article speaks for

itself as to its contents.  Because the allegations in paragraph 47 selectively quote, interpret, or

construe the article, Applebee's denies any and all allegations contained in paragraph 47.

Applebee's denies all allegations not expressly admitted herein.

      48.    The Debtors and other franchisees had concerns from the beginning that the franchisor's proposed System Change was ill conceived and poorly tested.

      **ANSWER:**    Applebee's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 48 and therefore denies those allegations.

      49.    Upon information and belief, the Franchisor's tests of the System Change raised serious questions about its viability. The complete results were not shared with the Debtors or other franchisees. The Franchisor recklessly ignored these warning signs and did not take any action to scale back, amend, or adjust its plan to radically change the Applebee's System as a result of these negative indications.

      **ANSWER:**    Applebee's denies the allegations of paragraph 49.

      50.    The Franchisor did not consult with its franchisees meaningfully or in good faith regarding the System Change and, proceeding with that change nonetheless, failed to give due consideration to the financial burden and risk to, and other interests of, franchisees in general and the Debtors in particular.

      **ANSWER:**    Applebee's denies the allegations of paragraph 50.

      51.    Because the Franchisor had no alternative strategy, the Debtors and other franchisees went along with the System Change reluctantly. As explained in a June 20, 2016, report by the FBC:

- "The testing of [the System Change] was non collaborative, there was no deviation allowed and virtually no sharing of real information, cutting procedures etc"

- "Expert meat cutter's opinions were ignored and the financials were flawed"

- The[franchisees], "despite being highly skeptical about the validity of the results, as well as having no Plan B, all agreed to follow the brand and roll out the platform, furthermore agreeing to invest a further $8,000,000."

**ANSWER:** Applebee's states that the June 20, 2016 report speaks for itself as to its contents. Because the allegations in paragraph 51 selectively quote, interpret, or construe the report, Applebee's denies any and all allegations contained in paragraph 51. Applebee's denies all allegations not expressly admitted herein.

52. The Debtors and other franchisees made their concerns known to the Franchisor, directly and through the FBC. The Franchisor did not listen to their reasoned complaints, however, and instead pushed forward with its "transformation," ignoring their objections.

**ANSWER:** Applebee's denies the allegations of paragraph 52.

### E. As Predicted, the System Change Was a Massive Failure from the Outset, Borne Entirely by the Franchisees.

53. The Debtors' sales decline was apparent almost immediately after the System Change took effect. Just a month after rollout of the System Change, the FBC was able to report that the System Change "**has been a disaster.**"

**ANSWER:** Applebee's states that the FBC report speaks for itself as to its contents. Because the allegations in paragraph 53 selectively quote, interpret, or construe the report, Applebee's denies any and all allegations contained in paragraph 53. Applebee's denies all allegations not expressly admitted herein.

54. On June 10, 2016, the FBC emailed Ms. Stewart noting that franchisees were "in a crisis situation" and "seriously concerned by [her] general lack of communication and leadership during this crisis." The FBC felt "strongly" that Applebee's advertising should focus on programs other than the hand-cut, wood-fired transformation "effective immediately."

**ANSWER:** Applebee's states that the FBC's June 10, 2016 email speaks for itself as to its contents. Because the allegations in paragraph 54 selectively quote, interpret, or construe the email, Applebee's denies any and all allegations contained in paragraph 54. Applebee's denies all allegations not expressly admitted herein.

55. On June 20, 2016, the FBC met with Ms. Stewart to discuss the "imminent threat to the survival of franchisees and the franchisor." According to the FBC, "[y]ears of DineEquity leadership, mismanagement and bad decision making are threatening the very existence of a great brand," and the "[d]eterioration has accelerated" with the System Change.

**ANSWER:** Applebee's admits that Ms. Stewart met with some representatives of the FBC on or about June 20, 2016, and that one or more of the representatives made a comment similar to those quoted in paragraph 55. Applebee's denies all allegations not expressly admitted herein.

56. Prior to the June 2016 meeting, the FBC's membership was split regarding whether Ms. Stewart had to be replaced. After that meeting, however, the FBC was unanimous that she had to go but was thereafter denied access to the Dine Brands board to make its views known.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 56 and therefore denies those allegations.

57. On November 15, 2016, the Franchisor notified franchisees that it had fired its advertising agency and was beginning the search for a replacement. The new advertising agency did not debut until May 2017.

**ANSWER:** Applebee's admits that on or about November 15, 2016, it notified franchisees it was transitioning advertising agencies. Applebee's denies all allegations not expressly admitted herein, including, but not limited to, any insinuation that it was not represented by an advertising agency at any period between November 2016 and May 2017.

58. The Franchisor pushed forward with its System Change for approximately 6 to 8 months with messaging initiatives, even providing its franchisees with new guidelines for hand-cutting to make the steaks look bigger, before admitting that the System Change was a mistake and ordering its franchisees to return to the original System. But the damage was done. As the FBC reported, the System Change had already "caused sales and traffic to decline precipitously."

**ANSWER:** Applebee's denies the allegations of paragraph 58.

59. On or about December 21, 2016, the franchisees requested that the Franchisor remove all mention of the System Change from the March 2017 menu and that the Franchisor's promotional efforts move away from promotion of the System Change.

**ANSWER:** Applebee's states that on or about December 21, 2016, representatives of some franchisees requested that the hand-cut, wood-fired platform be removed from the March

2017 menu and that certain promotions be implemented. Applebee's denies all allegations not expressly admitted herein.

60. The Franchisor responded that the hand-cut steaks change would stay on the March and May 2017 menus but that the wood-fired grill change would be removed from the March menu, subject to franchisees burning through their inventories of wood. The Franchisor further responded that it would revisit the focus of its promotions.

**ANSWER:** Applebee's states that Applebee's written response to the FBC's December 21, 2016 communication speaks for itself as to its contents. Because the allegations in paragraph 60 selectively quote, interpret, or construe the response, Applebee's denies any and all allegations contained in paragraph 60. Applebee's denies all allegations not expressly admitted herein.

61. The Franchisor had devoted nearly its entire advertising budget to the System Change, however, leaving the Applebee's brand unable to pivot after the System Change failed and resulting in a 72% drop in the number of commercials Applebee's was able to air in the two months following launch of the System Change.

**ANSWER:** Applebee's denies the allegations of paragraph 61.

62. Unwinding the System Change was no small feat, however. The Debtors were contractually obligated to use a certain quantity of the more expensive USDA choice steak, and it took fully another year for the Debtors to run through the quantity of steak they were contractually obligated to purchase, resulting in significant additional costs to the Debtors.

**ANSWER:** Applebee's admits that franchisees were contractually obligated to use USDA Choice steak. Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 62 and therefore denies those allegations.

63. The lost profits attributable to the Franchisor's mismanagement had a multiplier effect on the enterprise value of every franchisee, including the Debtors. For the trailing twelve months ending March 31, 2018, the Debtors generated approximately $375.9 million in gross revenue, and $12.6 million of EBITDA, on a consolidated basis, a drop of 59.9%—in just two years—from the Debtors' peak of $431.1 million and $31.4 million, respectively, in the twelve months ending March 31, 2016. Utilizing an industry multiple of 7.5 times EBITDA, the enterprise value of the Debtors alone was reduced by more than $141 million.

**ANSWER:** Applebee's denies the allegations of paragraph 63.

[Chart in Counter-complaint excluded from Answer]

64.     As demonstrated in the chart above, Applebee's experienced ordinary variances in same-restaurant sales, with positive growth in 2014 and the first two quarters of 2015 (though the rate of growth was decelerating in 2015). After the Franchisor shuttered Applebee's Kansas City headquarters in September 2015, however, stripping franchisees of their support system and leaving key marketing, training, and operational positions unfilled, same-restaurant sales declined precipitously the next quarter—and continued declining for the next 7 quarters (with the rate of decline accelerating over that period). During this period, Applebee's same-restaurant sales figures fell far below those of its peers in the casual-dining segment.

**ANSWER:**     Applebee's denies the allegations of paragraph 64.

65.     Dine Brands' board appeared to simply continue to watch Applebee's sales deteriorate without intervention until, finally, the FBC demanded that it take action.

**ANSWER:**     Applebee's denies the allegations of paragraph 65.

**F. The Aftermath: Bain & Company's Post-Mortem Confirms That the System Change Was an Ill-Advised, Unmitigated Disaster.**

66.     In or around the fourth quarter of 2016, the Franchisor commissioned Bain & Company, a preeminent business consulting firm, to prepare an analysis of Applebee's Brand and Business Strategy, diagnosing some of the missteps made by the Franchisor that caused Applebee's to underperform its category by such a wide margin in 2016–2017.

**ANSWER:**     Applebee's admits that in 2016 it retained Bain & Company to prepare an analysis of Applebee's Brand and Business Strategy in 2016. Applebee's denies the remaining allegations in paragraph 66.

67.     Bain concluded, among other things, that guests were unsatisfied with portion sizes, along with the lack of unique crave-able quality food items, and that Applebee's failed to capitalize on the takeout/delivery opportunities that its competitors seized. These shortcomings were institutional failures. According to Bain's assessment, the Franchisor had a "[s]mall innovation pipeline [,] offering fewer alternatives and options to test from than ideal."

**ANSWER:**     Applebee's states that Bain & Company's written presentation speaks for itself as to its contents. Because the allegations in paragraph 67 selectively quote, interpret, or construe Bain & Company's written presentation, Applebee's denies any and all allegations contained in paragraph 67. Applebee's denies all allegations not expressly admitted herein.

68.     Moreover, the "relationship and ways of working between management and franchisees [was] unsustainable; lacking both trust and a sense of aligned incentives – leading to slow decision making and inconsistent execution/offering of promotions."

**ANSWER:** Applebee's states that Bain & Company's written presentation speaks for itself as to its contents. Because the allegations in paragraph 68 selectively quote, interpret, or construe Bain & Company's written presentation, Applebee's denies any and all allegations contained in paragraph 68. Applebee's denies all allegations not expressly admitted herein.

69. In particular, Bain traced the widening of the traffic gap between Applebee's and its competitors to the roll-out of the System Change. The Franchisor "zigged," focusing on quality, while its competitors "zagged," doubling down on value. According to Bain's analysis, even if the steak quality may have improved, Applebee's customers did not know and did not care.

**ANSWER:** Applebee's states that Bain & Company's written presentation speaks for itself as to its contents. Because the allegations in paragraph 69 selectively quote, interpret, or construe Bain & Company's written presentation, Applebee's denies any and all allegations contained in paragraph 69. Applebee's denies all allegations not expressly admitted herein.

70. Bain also diagnosed that the Franchisor's decision-making process was fundamentally flawed. It was "[u]nclear who is accountable and responsible for final decision at each stage and/or how that decision should be made"; "[p]rocesses tend[ed] to be inefficient (frequent and time-consuming meetings)"; the "[l]ack of trust from franchisees raise[d] hurdle[s] on even minor changes[,] extending time-to-market significantly."

**ANSWER:** Applebee's states that Bain & Company's written presentation speaks for itself as to its contents. Because the allegations in paragraph 70 selectively quote, interpret, or construe Bain & Company's written presentation, Applebee's denies any and all allegations contained in paragraph 70. Applebee's denies all allegations not expressly admitted herein.

71. Moreover, Bain also found that the Franchisor failed to test its proposed System Change effectively or understand its impact before rolling it out, stating that the "mechanics" of the Franchisor's tests "introduce[d] challenges in interpretation of results." More specifically, "[t]esting franchisee by franchisee limit[ed] [the Franchisor's] ability to build a rep[resentative] sample (e.g., St. Louis selected for [buy-one-get-one] test but not representative of US market) . . . ." And the Franchisor's "[i]nability to work directly with restaurant GMs limit[ed] [its] ability to ensure tests are deployed as intended, and franchisees setting own pricing during testing can challenge ability to effectively read results." According to Bain, the Franchisor's failure to perform multi-variable tests led "to challenges in understanding [the] impact of [the] different concept elements tested (e.g., [hand-cut] vs. [wood-fired] vs. USDA Choice) but also against other alternatives (e.g., vs. cast-iron)." The franchisees, for example, had specifically requested

that the Franchisor run control tests comparing the hand-cut change to the wood-fired change. The Franchisor refused to do so.

**ANSWER:** Applebee's states that Bain & Company's written presentation speaks for itself as to its contents. Because the allegations in paragraph 71 selectively quote, interpret, or construe Bain & Company's written presentation, Applebee's denies any and all allegations contained in paragraph 71. Applebee's denies all allegations not expressly admitted herein.

72. Compounding these failures, according to Bain, was that "[a]fter launch," the Franchisor had "no feedback loop system that [would have] enable[d] continuous improvement over time."

**ANSWER:** Applebee's states that Bain & Company's report speaks for itself as to its contents. Because the allegations in paragraph 72 selectively quote, interpret, or construe Bain & Company's report, Applebee's denies any and all allegations contained in paragraph 72. Applebee's denies all allegations not expressly admitted herein.

73. In a letter to Ms. Stewart dated December 19, 2016, the FBC stated the franchisee community's desire to have access to the Dine Brands board of directors. Ms. Stewart ignored this request, which the FBC repeated on January 3, 2017.

**ANSWER:** Applebee's states that the FBC's December 19, 2016 letter speaks for itself as to its contents. Because the allegations in paragraph 73 selectively quote, interpret, or construe the FBC's December 19, 2016 letter, Applebee's denies any and all allegations contained in paragraph 73. Applebee's denies all allegations not expressly admitted herein.

74. On January 19, 2017, Richard Dahl, the lead director of Dine Brands, met with a representative of the franchisees who expressed that the franchisees did not believe they could trust Ms. Stewart and that she needed to be replaced.

**ANSWER:** Applebee's admits Richard Dahl, the Lead Director at the time of Dine Brands' Board of Directors, met with a representative of some franchisees on or about January 19, 2017. Applebee's denies all allegations not expressly admitted herein.

75. On February 17, 2017, the Franchisor announced to its franchisees that Ms. Stewart would be resigning effective March 1, 2017.

**ANSWER:**     Applebee's admits the allegations of paragraph 75.

### G. The Franchisor Confesses, but Accepts No Responsibility for the Damage It Caused.

76.     On or about March 3, 2017, the Franchisor's acting CEO Richard Dahl, who had served on the Dine Brands board since 2004, admitted in a call to investors that new products introduced during 2015 and 2016, like its hand-cut grilled meat, did not resonate well with customers and were "off target with value-focused trends in the industry."

**ANSWER:**     Applebee's states that the recording and transcript of the March 3, 2017 earnings call with investors speak for themselves and are the best evidence of their respective contents and the speakers on the call and their statements. Because the allegations in paragraph 76 selectively quote, interpret, or construe the recording and transcript of the March 3, 2017 earnings call, Applebee's denies any and all allegations contained in paragraph 76. Applebee's denies all allegations not expressly admitted herein.

77.     On April 27, 2017, the Franchisor's President John Cywinski provided a brand overview, stating that "Applebee's drifted from core guest and failed to enhance relevance" and that this was "[c]ompounded by 2016 tactical missteps."

**ANSWER:**     Applebee's states that the recording and transcript of the April 27, 2017 brand overview speak for themselves and are the best evidence of their respective contents and the speakers on the call and their statements. Because the allegations in paragraph 77 selectively quote, interpret, or construe the recording and transcript of the April 27, 2017 brand overview, Applebee's denies any and all allegations contained in paragraph 77. Applebee's denies all allegations not expressly admitted herein.

78.     Mr. Cywinksi further asserted that Applebee's had "[s]elf-inflicted wounds on multiple fronts":

- Guest: Targeted more aspirational demographic while alienating the core

- Operations: Widening variability of restaurant-level guest satisfaction

- Menu: Aggressive item deletions, portion size reductions and diminished innovation pipeline

- Marketing: Inconsistent positioning/messaging, absence of lead-time and compromised testing discipline

- Franchisees: Absence of leadership/partnership … strained relationship

**ANSWER:** Applebee's states that the recording and transcript of the April 27, 2017 brand overview speak for themselves and are the best evidence of their respective contents and the speakers on the call and their statements. Because the allegations in paragraph 78 selectively quote, interpret, or construe the recording and transcript of the April 27, 2017 brand overview, Applebee's denies any and all allegations contained in paragraph 78. Applebee's denies all allegations not expressly admitted herein.

79. Mr. Cywinksi further conceded that the Franchisor's "[b]rand messaging ha[d] been uninspired and inconsistent."

**ANSWER:** Applebee's states that the recording and transcript of the April 27, 2017 brand overview speak for themselves and are the best evidence of their respective contents and the speakers on the call and their statements. Because the allegations in paragraph 79 selectively quote, interpret, or construe the recording and transcript of the April 27, 2017 brand overview, Applebee's denies any and all allegations contained in paragraph 79. Applebee's denies all allegations not expressly admitted herein.

80. On a May 2, 2017, earnings call, Mr. Cywinski said it's his job to work with franchisees to repair the brand. He said some of the chain's recent sales erosion has been self-inflicted, and it will take time to fully implement a plan to win back the support of former customers.

**ANSWER:** Applebee's states that the recording and transcript of the May 2, 2017 earnings call with investors speak for themselves and are the best evidence of their respective contents and the speakers on the call and their statements. Because the allegations in paragraph 80 selectively quote, interpret, or construe the recording and transcript of the May 2, 2017

earnings call, Applebee's denies any and all allegations contained in paragraph 80. Applebee's denies all allegations not expressly admitted herein.

81. When asked about the missteps that drove customers away from this iconic brand, Mr. Cywinski mentioned the primary mistakes made over the last 18 months:

> ON BRAND IDENTITY: "There was an attempt to kind of reposition the brand in a somewhat aspirational manner around a modern bar and grill, and it's very clear from the data that we may have alienated some core guests in the process."

> ON PRICE: "This is a brand that's always had a strong heritage around value. We are an affordable indulgence, plain and simple — and a pretty accessible and approachable one. Candidly, I think we've taken our eye off our core value proposition over time."

**ANSWER:** Applebee's states that the recording and transcript of the May 2, 2017 earnings call with investors speak for themselves and are the best evidence of their respective contents and the speakers on the call and their statements. Because the allegations in paragraph 81 selectively quote, interpret, or construe the recording and transcript of the May 2, 2017 earnings call, Applebee's denies any and all allegations contained in paragraph 81. Applebee's denies all allegations not expressly admitted herein.

82. Despite repeatedly conceding its missteps, the Franchisor never offered help to the franchisee network, such as reducing royalty rates, providing a royalty vacation, or doing anything else to help offset the financial damage it had caused the franchise network.

**ANSWER:** Applebee's denies the allegations of paragraph 82.

83. The Dine Brands' board witnessed all of these missteps firsthand and effectively took no action to correct them until the FBC demanded action.

**ANSWER:** Applebee's denies the allegations of paragraph 83.

**H. The Debtors Cut Costs to Survive While Attempting to Negotiate a Reasonable Solution with the Franchisor.**

84. To better navigate the challenging business environment, improve liquidity and ensure the continued viability of their franchised locations, over the past year the Debtors have engaged in considerable efforts to reduce cash expenditures.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 84 and therefore denies those allegations.

85. Among other things, the Debtors put off scheduled store refreshes/remodels, focusing its capital expenditures instead on maintenance and critical deferred maintenance items, and went through several reductions in force to compensate for their declining EBITDA.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 85 and therefore denies those allegations.

86. The Debtors also closed a number of their underperforming locations without objection from any representative of the Franchisor. The Franchise Agreements do not support the Franchisor's assertion that the Debtors lacked authority to do so or that the Franchisor is entitled to "phantom" royalties for closed restaurants. The Franchisor never asserted a claim for such amounts prior to its Complaint, and in fact, franchisees were specifically told that there would be no penalties for closing certain stores.

**ANSWER:** Applebee's denies the allegations of paragraph 86.

87. As John Cywinski stated in an email dated August 11, 2017, reassuring franchisees about restaurant closures, "some franchisees are simply taking steps to ensure future success and long-term health. . . . Bottom line, you are best positioned to address any concerns as you are the decision-maker with respect to your markets and restaurants. You know your plans for closures and can reassure team members as to restaurants that are not closing (93% of restaurants nationally)."

**ANSWER:** Applebee's states that the August 11, 2017 email speaks for itself as to its contents. Because the allegations in paragraph 87 selectively quote, interpret, or construe the report, Applebee's denies any and all allegations contained in paragraph 87. Applebee's denies all allegations not expressly admitted herein.

88. In the ordinary course of business, the Franchisor sends the Debtors two invoices at month end—one for royalty payments and one for contributions to the advertising fund. Historically, the Debtors paid both invoices with a single wire transfer.

**ANSWER:** Applebee's admits that, in the ordinary course of business, it sends the Debtors two invoices at month end—one for royalty payments and one for contributions to the advertising fund. Applebee's further admits that when the Debtors paid the invoices in the past,

they did so with a single wire transfer. Applebee's denies all allegations not expressly admitted herein.

89. In June of 2017, after wasting significant funds on the Franchisor's System Change and weathering 9 straight quarters of declining sales, the Debtors, confronted with the immutability of their debt payments, were unable to pay their monthly royalty fees.

**ANSWER:** Applebee's denies the allegations of paragraph 89.

90. The Franchisor reached out to the Debtors and asked them to make the royalty payment for June because it was an earnings quarter for the publicly held Dine Brands. The Debtors made that June payment, albeit a month late, because of their longstanding relationship with the Franchisor, but were unable to make any further monthly royalty payments as of July 2017.

**ANSWER:** Applebee's denies the allegations of paragraph 90.

91. Other franchisees similarly paid only what they could, when they could. The Franchisor suggested that their franchisees should stop paying their Senior Lenders rather than stop the payments to the Franchisor.

**ANSWER:** Applebee's denies the allegations of paragraph 91.

92. Upon information and belief, the Franchisor discriminated against the Debtors, giving more favorable treatment to other franchisees that were similarly unable to pay their monthly franchise fees.

**ANSWER:** Applebee's denies the allegations of paragraph 92.

93. After June 2017, the Debtors were unable to pay their royalty fees and maintain operational liquidity. However, the Debtors continued to pay the advertising invoice and to make timely contributions to the advertising fund to ensure the continued strength of the Applebee's brand and associated goodwill. The Debtors gave the Franchisor advance notice that they were unable to pay royalties but would continue to make advertising contributions.

**ANSWER:** Applebee's admits that the Debtors made their required payments of advertising contributions until February 2018. Applebee's denies all allegations not expressly admitted herein.

94. At the time, the Debtors maintained a $3.5 million letter of credit to provide royalty support for the benefit of the Franchisor.

**ANSWER:** Applebee's admits that in or around June 2017 the Debtors maintained a $3.5 million letter of credit. Applebee's denies all allegations not expressly admitted herein.

95.     In July 2017, the Debtors engaged Hilco Real Estate, LLC to approach the Debtors' landlords in an effort to renegotiate and amend leases with lower rents, or negotiate lease terminations where appropriate. In an effort to conserve cash, the Debtors also withheld rent payments to select landlords where the Debtors' management was negotiating lease amendments or terminations. Ultimately, the Debtors and Hilco reached agreements on improved terms for a number of locations, including entering into a global amended agreement with its largest landlord STORE Capital.

**ANSWER:**     Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 95 and therefore denies those allegations.

96.     As disclosed in Dine Brand's 10-K for 2017, at least three other franchisees were similarly unable to make timely payment of their monthly royalty fees. Upon information and belief, Dine Brands loaned certain other franchisees experiencing financial difficulty money to allow those franchisees to make their monthly royalty payments, which had the effect of manufacturing higher earnings for Dine Brands. Upon information and belief, Dine Brands pressured franchisees whose payment obligations were secured by personal guaranties to get the franchisees to accept the loans. Dine Brands offered such a loan to the Debtors, but the Debtors declined.

**ANSWER:**     Applebee's states that Dine Brands' 10-K for 2017 speaks for itself as to its contents.  Because the allegations in paragraph 96 selectively quote, interpret, or construe Dine Brands' 10-K for 2017, Applebee's denies any and all allegations contained in paragraph 96 related to Dine Brands' 10-K for 2017.  Applebee's admits that certain other franchisees were unable to pay their monthly royalty fees.  Applebee's further admits that Dine Brands made loans to certain franchisees and offered a loan to the Debtors, which the Debtors declined to sign.  Applebee's denies all allegations not expressly admitted herein.

97.     Given their financial straits and limited liquidity, the Debtors were similarly unable to make the principal payments due to their Senior Lenders for October, November, and December 2017. In December 2017, the Debtors paid the Senior Lenders current and past due interest at a reduced default rate.

**ANSWER:**     Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 97 and therefore denies those allegations.

98.     On January 12, 2018, the Debtors made a payment in the amount $1,148,788.38 to the Franchisor for the invoiced advertising contribution for December 2017. However, the Franchisor applied the advertising contribution to the Debtors' unpaid November royalties in the

amount of $973,189.61, with the remainder split between December advertising ($162,766.39) and royalties ($12,732.78). Simultaneously, the Franchisor was telling other franchisees that the Debtors were not contributing their fair share to the communal advertising fund.

**ANSWER:** Applebee's admits the Debtors made a payment in the amount $1,148,788.38 to Applebee's on or about January 12, 2018. Applebee's denies all allegations not expressly admitted herein.

99. There is no provision in the Franchise Agreements that gives the Franchisor the right to unilaterally allocate payments designated by the Debtors for one obligation to a different obligation.

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

100. Upon information and belief, the Franchisor diverted the Debtors advertising contributions for the purpose of publicly shaming the Debtors and damaging their relationships with other franchisees.

**ANSWER:** Applebee's denies the allegations of paragraph 100.

101. With liquidity concerns mounting, the Debtors discontinued their contributions to the advertising fund starting in February 2018.

**ANSWER:** Applebee's admits that the Debtors discontinued their contributions to the advertising fund starting in February 2018.

102. The Debtors were at all times upfront with the Franchisor and their other stakeholders about their financial straits and the need to maintain sufficient liquidity to allow the franchises to continue operating in a manner consistent with Applebee's reputation for quality and value.

**ANSWER:** Applebee's denies the allegations of paragraph 102.

**I. The Debtors' Best Efforts at Prepetition Negotiations Are Met with Bad Faith.**

103. On or about September 1, 2016, the Debtors provided the Franchisor with a report on their finances, notifying the Franchisor of the Debtors' impending financial crisis. Among other things, the Debtors' report noted that, the Debtors' trailing twelve-month EBITDA had declined by $2.8 million from the first quarter of 2016 to the second (that is, during the course of the Franchisor's rollout of the System Change).

**ANSWER:** Applebee's states that the Debtors' report speaks for itself as to its contents. Because the allegations in paragraph 103 selectively quote, interpret, or construe the email, Applebee's denies any and all allegations contained in paragraph 103. Applebee's denies all allegations not expressly admitted herein.

104. In or around January 2017, with a majority of its franchisees having suffered financial decline, the Franchisor hired Trinity Capital Investment Banking ("Trinity") purportedly on behalf of all Applebee's stakeholders to try to stave off collapse of the entire enterprise. Indeed, at a lenders symposium held on April 27, 2017, a presentation by Trinity argued for a "[s]hared vision by **all constituents** that all parties will fare better in a consensual transaction versus bankruptcy." Trinity's retention, in and of itself, demonstrates the substantial harm inflicted by the Franchisor across the entire franchise network.

**ANSWER:** Applebee's admits that it hired Trinity Capital Investment Banking ("Trinity") in January 2017. Applebee's states that Trinity's April 27, 2017 presentation speaks for itself as to its contents. Because the allegations in paragraph 104 selectively quote, interpret, or construe Trinity's April 27, 2017 presentation, Applebee's denies any and all allegations contained in paragraph 104 related to Trinity's April 27, 2017 presentation. Applebee's denies all allegations not expressly admitted herein.

105. Thus, at the outset of Trinity's engagement, the Debtors believed that the Franchisor was committed to working collaboratively with the Debtors, their Senior Lenders, and equity-holders to return Applebee's to historical profitability levels. The Debtors began good-faith discussions with Trinity to negotiate a workout that would be mutually beneficial to the Debtors, their Senior Lenders, the Franchisors, and the other Applebee's franchisees.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 105, and therefore denies those allegations.

106. On September 12, 2017, Dine Brands appointed Stephen Joyce, a Dine Brands board member since 2012 and the former CEO of Choice Hotels, as its new CEO. In his first earnings call as Dine Brands' CEO, Mr. Joyce stated that he was "looking forward to working further with [his] talented senior management team to strengthen the efforts already underway to build on the partnership with our franchisees."

**ANSWER:** Applebee's admits Stephen Joyce has served as a Dine Brands board member since 2012 and previously served as the former Chief Executive Officer of Choice

Hotels International, Inc. and was appointed as Chief Executive Officer of Dine Brands effective

September 12, 2017.  Applebee's states that the recording and transcript of the earnings call with

investors speak for themselves and are the best evidence of their respective contents and the

speakers on the call and their statements.  Because the allegations in paragraph 106 selectively

quote, interpret, or construe the recording and transcript of the earnings call, Applebee's denies

any and all allegations contained in paragraph 106 related to the earnings call.  Applebee's

denies all allegations not expressly admitted herein.

107.    Instead, just days after Mr. Joyce's appointment, on September 20, 2017, the Franchisor sent a notice of default (the "Notice of Default") for failure to pay monthly royalty fees. The Franchisor demanded that the Debtors pay the overdue amount within 90 days of receipt of the letter and stated that the Franchise Agreements would thereafter expire automatically despite the requirement for written notice of termination under the Franchise Agreements: "For restaurants for which RMH does not cure the default, the franchise agreements for the restaurants will terminate on the 91st day *without further notice* . . . ." Notice of Default (emphasis added).

**ANSWER:**    Applebee's admits that it sent a notice of default (the "Notice of Default")

to the Debtors on September 20, 2017.  Applebee's further states that the Notice of Default and

the Franchise Agreements speak for themselves and Applebee's denies any allegations

inconsistent therewith.  Applebee's denies all allegations not expressly admitted herein.

108.    Although the Debtors continued to negotiate a workout with Trinity throughout this period, as time went on, it became clear to the Debtors that Trinity was working to advance the Franchisor's agenda without regard for other stakeholders. For instance, Trinity at one point drafted a proposed term sheet under which AFH would contribute further funds to the Debtors' enterprise, even though AFH had been explicit that it was not willing to do so. Trinity in fact circulated that term sheet to the Senior Lenders and the Franchisor despite the fact that AFH specifically instructed Trinity not to do so.

**ANSWER:**    Applebee's lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 108 and therefore denies those allegations.

109.    In October 2017, frustrated with Trinity and dissatisfied with the lack of progress in negotiating a workout, the Debtors retained Mastodon Ventures Inc. ("Mastodon") to represent them in discussions with the Franchisor. Mastodon is a well-known financial advisor

that focuses its work on providing strategic advisory services to restaurant companies with enterprise values of $20 million to $400 million.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 109 and therefore denies those allegations.

110. Over the next several months, the Debtors' representatives and the Franchisor's representatives were in constant contact negotiating the terms of a workout.

**ANSWER:** Applebee's admits it and the Debtors' representatives engaged in negotiations related to a potential workout. Applebee's denies all allegations not expressly admitted herein.

111. On December 18, 2017, the Franchisor sent a letter purporting to extend the Debtors' cure period to January 22, 2018: "In light of our scheduled call this week with respect to the restaurants in your portfolio, and without waiver of any of our rights and remedies, we are amenable to extend your cure period for the restaurants listed on the attached schedule by an additional 30 days to **January 22, 2018.** We reserve our right to revisit the extension at any time." All of the Debtors' restaurants were listed on the schedule attached to the Franchisor's letter.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on December 18, 2017. Applebee's further states that the December 18, 2017 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

112. On December 20, 2017, the Debtors provided the Franchisor with an initial restructuring proposal in advance of the teleconference scheduled for later that morning.

**ANSWER:** Applebee's admits the allegations of paragraph 112.

113. On January 17, 2018, the Franchisor circulated its workout counterproposal in advance of a teleconference between the parties scheduled for that afternoon.

**ANSWER:** Applebee's admits its circulated a workout counterproposal. Applebee's denies all allegations not expressly admitted herein.

114. Also on January 17, 2018, the Franchisor sent a "Notice of Termination of Development Agreements." Referring back to the Notice of Default, the Franchisor's Notice of Termination of Development Agreements stated: "To date, RMH has not cured any of the

arrearages, and has not paid royalties and/or advertising fees since receiving that Notice. Each Development Agreement as well as all related amendments, supplements, and other ancillary agreements, including, without limitation, those listed on the attached list, has terminated."

**ANSWER:** Applebee's admits that it sent the Debtors a Notice of Termination of Development Agreements on January 17, 2018. Applebee's further states that the Notice of Termination of Development Agreements speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

115. On January 18, 2018, the Franchisor sent a letter purporting to further extend the Debtors' cure period to February 18, 2018: "Without waiver of any of our rights and remedies, we are extending your cure period for the restaurants listed on the attached schedule to February 18, 2018. We reserve our right to revisit the extension at any time."

**ANSWER:** Applebee's admits that it sent the Debtors a letter on January 18, 2018. Applebee's further states that the January 18, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

116. On or around January 22, 2018, without notice to the Debtors, the Franchisor drew on the Debtors' letters of credit in the full amount of $3.5 million, resulting in the Debtors having to immediately replace the letter-of-credit draw to the banks with cash, which further reduced the Debtors' liquidity. In light of the draw, Robert Hersch, a Senior Managing Director at Mastodon, emailed his counterparts at Trinity, canceling a call scheduled for later that day to discuss the Franchisor's workout proposal and stating that the Franchisor's draw was "really bad faith action."

**ANSWER:** Applebee's admits that it drew on the Debtors' letters of credit in the full amount of $3.5 million, as it was permitted to do. Applebee's denies that it drew on the letter of credit without notice to the Debtors. Applebee's states that Mr. Hersch's January 22, 2018 email speaks for itself as to its contents. Because the allegations in paragraph 116 selectively quote, interpret, or construe the email, Applebee's denies any and all allegations contained in paragraph 116 related to the email. Applebee's denies all allegations not expressly admitted herein.

117. Mr. Hersch also sought a face-to-face meeting with the Franchisor's general counsel and wrote him an "Urgent" email stating that the Debtors could not repay the letter of

credit and remain sustainable with regard to operating capital. Mr. Hersch urged the Franchisor to call him immediately to avoid any "unintended consequences."

**ANSWER:** Applebee's states that Mr. Hersch's email speaks for itself as to its contents. Because the allegations in paragraph 117 selectively quote, interpret, or construe the email, Applebee's denies any and all allegations contained in paragraph 117. Applebee's denies all allegations not expressly admitted herein.

118. On January 24, 2018, representatives from the Debtors and the Franchisor spoke by phone, with Mr. Hersch stating that the parties "made some progress" and would "likely find the correct path" soon. Mr. Hersch further warned, however, that the Debtors were "dangerously close to insufficient working capital."

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 118 and therefore denies those allegations.

119. The parties had a "productive" meeting on January 26, 2018, after which the Debtors indicated that they were "hard at work preparing a proposal" that reflected the parties' discussions.

**ANSWER:** Applebee's admits that the parties met on or about January 26, 2018. Applebee's denies all allegations not expressly admitted herein.

120. The Debtors had repaid approximately $2.5 million of the letter of credit to the banks and requested the Franchisor to contribute the remaining $1 million, which the Franchisor declined to do absent a global agreement.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 120 and therefore denies those allegations.

121. On February 8, 2018, the Franchisor sent a letter purporting to extend the Debtors' cure period to March 1, 2018.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on February 8, 2018. Applebee's further states that the February 8, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

122. On February 21, 2018, the parties met in New York as scheduled, and the Debtors made a comprehensive new proposal to resolve the parties' dispute (the "February Proposal"). The Franchisor's representatives indicated that the February Proposal was constructive and would provide a path forward.

**ANSWER:** Applebee's admits the parties met in New York on or about February 21, 2018, and that the Debtors made a proposal at that meeting. Applebee's denies all allegations not expressly admitted herein.

123. On February 26, 2018, the Franchisor sent a letter purporting to extend the Debtors' cure period to March 15, 2018.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on February 26, 2018. Applebee's further states that the February 26, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

124. Mr. Hersch conferred with the Franchisor's representatives on March 1, 2018, and began incorporating their comments and the Senior Lenders' feedback, proposing that the parties "try to wrap this up in [M]arch so that the company can resume royalty and marketing payments according to the new agreement effective April 1."

**ANSWER:** Applebee's admits Mr. Hersch communicated with Applebee's representatives on or about March 1, 2018. Applebee's states that Mr. Hersch's email following the meeting speaks for itself as to its contents. Because the allegations in paragraph 124 selectively quote, interpret, or construe Mr. Hersch's email following the meeting, Applebee's denies any and all allegations contained in paragraph 124 related to the email. Applebee's denies all allegations not expressly admitted herein.

125. On March 12, 2018, the Debtors informed the Franchisor that they were "getting close to a plan that should be workable for all."

**ANSWER:** Applebee's states that the Debtors' March 12, 2018 email speaks for itself as to its contents. Because the allegations in paragraph 125 selectively quote, interpret, or construe the Debtors' March 12, 2018 email, Applebee's denies any and all allegations contained

in paragraph 125 related to the email. Applebee's denies all allegations not expressly admitted herein.

126. Also on March 12, 2018, the Franchisor sent a letter purporting to extend the Debtors' cure period to April 12, 2018.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on March 12, 2018. Applebee's further states that the March 12, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

127. On March 15, 2018, Mr. Hersch received some verbal comments to the February Proposal from the Franchisor. On March 19, 2018, he responded to the Franchisor's information request and stated that he needed the Franchisor's comments to the list of store closures, as that was a "gating issue" to incorporating the Franchisor's other comments to the February Proposal.

**ANSWER:** Applebee's admits that on or about March 15, 2018, it provided some verbal comments on the February Proposal to Mr. Hersch. Applebee's states that Mr. Hersch's March 19, 2018 email speaks for itself as to its contents. Because the allegations in paragraph 127 selectively quote, interpret, or construe Mr. Hersch's March 19, 2018 email, Applebee's denies any and all allegations contained in paragraph 127 related to the email. Applebee's denies all allegations not expressly admitted herein.

128. On March 27, 2018, the Franchisor sent its written response to the Debtors' February Proposal. This proposal (the "March Proposal") rejected substantially all of the items from the February meeting in New York and was completely at odds with the parties' conversations at the February meeting and on the Franchisor's verbal comments from March 15.

**ANSWER:** Applebee's admits it sent the Debtors the March Proposal on March 27, 2018. Applebee's further states that the March Proposal speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

129. On April 11, 2018, and April 16, 2018, the Debtors informed the Franchisor that they had not yet received the Senior Lenders' reaction to the March Proposal and were unable to respond to that proposal until they did.

**ANSWER:** Applebee's states that the Debtors' April 11, 2018, and April 16, 2018, written communications speak for themselves as to their contents. Because the allegations in paragraph 129 selectively quote, interpret, or construe the Debtors' April 11, 2018, and April 16, 2018, written communications, Applebee's denies any and all allegations contained in paragraph 129. Applebee's denies all allegations not expressly admitted herein.

130. On April 16, 2018, the Franchisor sent a letter asserting that the Debtors were delinquent in responding to the March Proposal. The Franchisor also sent a letter purporting to extend the Debtors' cure period to April 26, 2018.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on April 16, 2018. Applebee's further states that the April 16, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

131. On April 17, 2018, Mr. Hersch emailed Messrs. Adel and Barr as follows: "We just finished a call with the bank- I am hoping [sic] on a flight and have early meetings – will provide response tomorrow."

**ANSWER:** Applebee's states that Mr. Hersch's April 17, 2018 email speaks for itself as to its contents. Because the allegations in paragraph 131 selectively quote, interpret, or construe Mr. Hersch's April 17, 2018 email, Applebee's denies any and all allegations contained in paragraph 131. Applebee's denies all allegations not expressly admitted herein.

132. During a teleconference with the Franchisor's general counsel on April 18, 2018, Mr. Hersch asserted that the terms of Franchisor's March 27 Proposal were not consistent with the parties' prior discussions. Mr. Hersch further asserted that the Debtors had been timely responding to the Franchisors' proposals and that the parties should come to agreement on the economics of a resolution even if certain details still needed to be resolved.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 132 and therefore denies those allegations.

133. On April 23, 2018, Mr. Hersch sent the Franchisor the latest proposal (the "April Proposal"), noting that it was still subject to final approval from the Debtors but that he wanted to provide the latest proposal in advance of the parties' call that afternoon.

**ANSWER:** Applebee's states that Mr. Hersch's April 23, 2018 proposal speaks for itself as to its contents. Because the allegations in paragraph 133 selectively quote, interpret, or construe Mr. Hersch's April 23, 2018 proposal, Applebee's denies any and all allegations contained in paragraph 133. Applebee's denies all allegations not expressly admitted herein.

134. On April 25, 2018, Ms. Cheong sent a letter claiming that the Debtors' cure period had expired, notwithstanding its April 16 letter extending the cure period to April 26, and that the Franchisor was now forbearing "from taking any further actions . . . to enforce [its] rights and remedies" under the Franchise Agreements:

> Without waiver of any of our rights and remedies under the applicable franchise agreements for the Applebee's restaurants listed on the attached schedule (the "Franchise Restaurants"), Applebee's agrees that it will forbear from taking any further actions against you or the Franchise Restaurants, whether at law or in equity, to enforce our rights and remedies against you or the Franchise Restaurants, under or in connection with the franchise agreements, until May 8, 2018. This agreement to forbear is not an extension of the cure periods referred to in prior Notices, which have already expired.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on April 25, 2018. Applebee's further states that the April 25, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

135. The Debtors and the Franchisor continued to work together on an operational level in the ordinary course of business. From April 30, 2018, through May 3, 2018, the Debtors held their annual General Manager Conference, with every restaurant general manager, director of operations, regional vice president, and department head in attendance. The Franchisor had six representatives in attendance. Five of the Franchisor's field operators attended the entire event, and four participated in the Debtors' training breakout sessions in front of every general manager and director of operations. Kevin Carroll, the Franchisor's Chief Operations Officer, attended for two days and presented in a general session for approximately 50 minutes on May 2, 2018. In his presentation, Mr. Carroll acknowledged the Franchisor's missteps but made multiple references to working with the Debtors in the future—even leading some 230 of the Debtors' key leaders in chanting the company's "we are RMH" slogan.

**ANSWER:** Applebee's admits that some representatives from Applebee's attended part of the Debtors' General Manager Conference and that Kevin Carroll, Applebee's Chief

Operations Officer, was previously scheduled to present and attend at the General Manager Conference and did so on or about May 2, 2018. Applebee's states Mr. Carroll's written presentation speaks for itself as to its contents. Because the allegations in paragraph 135 selectively quote, interpret, or construe Mr. Carroll's written presentation, Applebee's denies any and all allegations contained in paragraph 135 Applebee's denies all allegations not expressly admitted herein.

136.    On May 1, 2018, Mr. Hersch emailed the Franchisor's general counsel as follows: "Do you have any feedback for me. I am trying hard to wrap this up."

**ANSWER:**    Applebee's states that Mr. Hersch's May 1, 2018 email speaks for itself as to its contents. Because the allegations in paragraph 136 selectively quote, interpret, or construe Mr. Hersch's May 1, 2018 email, Applebee's denies any and all allegations contained in paragraph 136. Applebee's denies all allegations not expressly admitted herein.

137.    The response of the Franchisor's general counsel, Bryan Adel, also dated May 1, 2018, gave no indication that he believed the Franchise Agreements had terminated five days previously. Rather, Mr. Adel responded that the April Proposal was not agreeable and accused the Debtors of attempting to make the Franchisor responsible for "a bad loan that Acon entered into with Bank of Montreal."

**ANSWER:**    Applebee's admits Dine Brands' General Counsel, Bryan Adel, sent the Debtors a response on May 1, 2018. Applebee's further states that Mr. Adel's May 1, 2018 response speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

138.    On May 2, 2018, Mr. Hersch responded to the Franchisor as follows:

We have a meeting with our lenders May 9th . You are invited to join.

However, we would like to try and make headway with [the Franchisor] prior to that date.

. . . .

I feel the absolute need to point out that RMH is not attempting to make [the Franchisor] responsible for a bad loan that Acon entered into with Bank of

Montreal. On the contrary, [the Franchisor] is responsible for the fact that the RMH cash flow declined by over 50% between 2015 and 2017 (similar to most other franchisees in the system). Absent the brand failings the loan with BMO is actually a great loan for RMH because RMH does not have to consume any cash for interest or amortization – there's no better loan than that. Acon has acted as benefactor to [the Franchisor] in that a strong operator took over stores from a weaker operator. Further Acon's capital structure has saved both RMH and [the Franchisor] [from] disaster. Imagine if there was no guarantee and all the debt was senior and amortizing, is there any scenario where this company with that structure would not be in bankruptcy? Acon is not asking [the Franchisor] to save RMH from any mistakes, other than the mistakes made at the brand level. The issue is not [the Franchisor's] responsibility for the loan, but rather the loss of 50% of the EBITDA. Given that both perspectives have now been aired, can we move forward ahead of May 9th to complete an agreement that will ensure the continued operation of more than 150 stores paying millions in royalties. The Agreement we offered allows all parties to focus on the future [while] recognizing that the past has been painful to all.

Please let me know when you would next like to speak.

**ANSWER:**     Applebee's states that Mr. Hersch's May 2, 2018 email speaks for itself as to its contents.  Because the allegations in paragraph 138 selectively quote, interpret, or construe Mr. Hersch's May 2, 2018 email, Applebee's denies any and all allegations contained in paragraph 138.  Applebee's denies all allegations not expressly admitted herein.

139.     On May 4, 2018, the chairman of AFH's board, Daniel Jinich, and the Franchisor's CEO, Stephen Joyce, arranged a call for May 7, 2018. Mr. Joyce gave no indication that he believed the Franchise Agreements had terminated 8 days previously.

**ANSWER:**     Applebee's admits that on or about May 4, 2018, Mr. Jinich and Mr. Joyce arranged for a call on or about May 7, 2018.  Applebee's denies all allegations not expressly admitted herein.

140.     During that call on May 7, 2018, none of the Franchisor's representatives gave any indication that they believed the Franchise Agreements had terminated 11 days previously. To the contrary, the Franchisor expressly stated it would terminate the Arizona and Texas franchise agreements unless the Debtors paid $12 million by the end of the day.

**ANSWER:**     Applebee's denies the allegations of paragraph 140.

141.     These actions demonstrate Dine Brands' complete lack of concern for the Applebee's franchisee community. The decision to abruptly abandon confidential, good-faith negotiations with the Debtors and to make the parties' disputes public has cast a dark cloud over

the Applebee's brand and strained the franchisee network at a time when Applebee's was only just recovering from the harms inflicted on the Debtors and other franchisees under Dine Brands' watch.

**ANSWER:**   Applebee's denies the allegations of paragraph 141.

**J. The Franchisor's Improper Attempt to Terminate Postpetition.**

142.   On May 8, 2018, at approximately 3:30 a.m. (ET), the Debtors filed their chapter 11 bankruptcy cases—halting, and rendering void *ab initio,* any efforts by the Franchisor to exercise its right to terminate the Franchise Agreements. At approximately 5:59 AM on May 8, 2018, Mr. Hersch emailed the Franchisor's representatives, informing them of the bankruptcy filing.

**ANSWER:**   Applebee's admits that the Debtors filed their chapter 11 bankruptcy cased on May 8, 2018 at approximately 3:30 a.m. (ET).   Applebee's states that Mr. Hersch's May 8, 2018 email speaks for itself as to its contents.   Because the allegations in paragraph 142 selectively quote, interpret, or construe Mr. Hersch's May 8, 2018 email, Applebee's denies any and all allegations contained in paragraph 142 related to the email.   Further answering, Applebee's states that the Franchise Agreements were terminated prior to the Debtors' bankruptcy filing and denies any allegations in paragraph 142 that imply otherwise. Applebee's denies all allegations not expressly admitted herein.

143.   At approximately 8:02 a.m. on May 8, 2018—approximately 4.5 hours after the Debtors filed bankruptcy—the Franchisor hand-delivered a letter, to the address indicated therein, with subject line "Re: Termination of Franchise Agreements for Restaurants in Arizona and Texas," stating that the Franchisor was purporting to terminate the Franchise Agreements for the Debtors' 41 restaurants located in Arizona and Texas, with such termination supposedly retroactive to April 27, 2018.

**ANSWER:**   Applebee's admits that it sent the Debtors a letter on May 8, 2018 regarding the restaurants in Arizona and Texas, which was received by the Debtors at approximately 8:02 a.m. (ET).   Applebee's further states that this May 8, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith.   Applebee's denies all allegations not expressly admitted herein.

144. The Franchisor attempted to cherry-pick the Debtors' best-performing stores by targeting the Arizona and Texas markets, which, through April 2018, were generating 2018 store-level EBITDA margins of 11.2%, as compared to store-level EBITDA margins of 9.3% for the remaining markets. In addition, the Franchisor specifically excluded two underperforming stores in Arizona and Texas, which it tried to leave for the Debtors to de-image and close.

**ANSWER:** Applebee's admits it exercised certain post-termination assignment and other rights for all of the Debtors' restaurants in Arizona and Texas except for two restaurants, for which Applebee's exercised other post-termination rights. Applebee's denies all allegations not expressly admitted herein.

145. The Franchisor generally has the ability to obtain the Debtors' sales figures on a daily basis. After dragging out the workout negotiations for 16 months, the Franchisor attempted to grab the Debtors' restaurants at nearly the precise moment that the Debtors' business was starting to improve—which it did in the first quarter of 2018.

**ANSWER:** Applebee's denies the allegations of paragraph 145.

146. Concurrently with the letter purporting to terminate the Franchise Agreements for the Debtors' 41 Arizona and Texas locations, the Franchisor sent the Debtors a further letter stating that the Franchisor agreed that it would "forbear from enforcing its termination rights . . . until May 20, 2018" for the Debtors' 133 franchises not located in Arizona or Texas. The Franchisor's letter further stated: "This agreement to forbear is not an extension or a restarting of the cure period referred to in prior Notice, which has already expired, nor is it a new cure period."

**ANSWER:** Applebee's admits that it sent the Debtors a letter on May 8, 2018 regarding the Debtors' franchises not located in Arizona or Texas. Applebee's further states that this May 8, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

147. In addition, also on May 8, 2018, the Franchisor filed its *Complaint for Damages, a Temporary-Restraining Order, and Preliminary and Permanent Injunctive Relief* in the United States District Court for the District of Kansas in violation of the automatic stay. *See Applebee's Restaurants LLC v. RMH Franchise Corp.,* Case No. 18-cv-02226-JAR-GLR (D. Kan. May 8, 2018) (the "Kansas Complaint").

**ANSWER:** Applebee's admits that, on May 8, 2018, it filed its *Complaint for Damages, a Temporary-Restraining Order, and Preliminary and Permanent Injunctive Relief* in the lawsuit titled *Applebee's Restaurants LLC v. RMH Franchise Corp.,* Case No. 18-cv-02226-

JAR-GLR (D. Kan. May 8, 2018) (the "Kansas Complaint"). Applebee's denies all allegations not expressly admitted herein.

148.    In the Kansas Complaint, the Franchisor asserted the following facts:

- "On May 7, 2018, during a telephone call among multiple representatives of Applebee's and RMH, Applebee's notified RMH that Applebee's *would be exercising certain termination rights on May 8, 2018* with respect to the Arizona and Texas franchises . . . ." Kansas Complaint ¶ 9 (emphasis added).

- "[O]n April 25, 2018, Applebee's notified RMH that Applebee's agreed to forebear from taking any further actions against RMH until May 8, 2018, *to allow the parties time to see if an amicable resolution was possible.*" Kansas Complaint ¶ 56 (emphasis added).

- "In the afternoon of May 7, 2018, Applebee's representatives called RMH and informed RMH that Applebee's *intended to exercise its termination rights on May 8, 2018* for the Arizona and Texas franchises . . . ." Kansas Complaint ¶ 58 (emphasis added).

- "Based on RMH's stated position on the May 7, 2018 telephone call, *by letter dated May 8, 2018, Applebee's notified RMH that the Franchise Agreements for the Arizona and Texas franchises terminated* on April 27, 2018 . . . ." Kansas Complaint ¶ 59 (emphasis added).

**ANSWER:**    Applebee's states that the Kansas Complaint speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

149.    After the Debtors' bankruptcy filing, the Franchisor's President John Cywinski called Jeff Neumann, the Debtors' founder and currently board member of AFH, to state that Dine Brands would continue to support the Debtors as it always had and expected the same from the Debtors.

**ANSWER:**    Applebee's admits its President, John Cywinski, called Jeff Neumann after the Debtors' bankruptcy filing. Applebee's denies all allegations not expressly admitted herein.

150.    On June 5, 2018, the Franchisor announced that Bryan Marks, who formerly served in operations leadership roles with several franchisees, would be joining the Franchisor as Vice President of Operations, effective July 16, 2018. Upon information and belief, the Franchisor hired Mr. Marks with the intention of having him take over operation of the Debtors' restaurants.

**ANSWER:** Applebee's admits that, on June 5, 2018, it announced that Bryan Marks would be joining Applebee's as Vice President of Operations, effective July 16, 2018. Applebee's denies all allegations not expressly admitted herein.

### K. Dine Brands Engages in Further Postpetition Misconduct, Announcing Its Competing "IHOb" Rebrand.

151. On June 11, 2018, Dine Brands announced that its IHOP franchise would be rebranding as IHOb—with the "b" standing for "burgers"—bringing IHOb into direct competition with the Debtors and other Applebee's franchisees.

**ANSWER:** Applebee's admits that, on June 11, 2018, Dine Brands announced that its IHOP franchise would be rebranded as IHOb—with the "b" standing for "burgers." Applebee's denies all allegations not expressly admitted herein.

152. Dine Brands franchised 1,671 IHOb restaurants across the United States.

**ANSWER:** Applebee's denies the allegations of paragraph 152.

153. In the press release announcing the rebranding, Brad Haley, Chief Marketing Officer for IHOb restaurants, asserted that "when you try them, I think you'll agree with me that IHOb's new line of Ultimate Steakburgers are so good that I'd put them up against anyone's . . . ."

**ANSWER:** Applebee's states that the quoted press release speaks for itself as to its contents and Mr. Haley's statements. Because the allegations in paragraph 153 selectively quote, interpret, or construe the press release, Applebee's denies any and all allegations contained in paragraph 153. Applebee's denies all allegations not expressly admitted herein.

154. In 2017, approximately 16% of the Debtors' entrée sales were in the burger category.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 154 and therefore denies those allegations.

155. Much of the recent Applebee's advertising campaign—for which Dine Brands asked Applebee's franchisees to pay for an increased portion of the bill—is focused on advertising burgers.

**ANSWER:** Applebee's denies the allegations of paragraph 155.

156.    In addition, in a recent Dine Brands' earnings call, Dine Brands' CEO Steve Joyce promised to continue to position Applebee's with its traditional customers and touted the new burger menu's popularity with millennial consumers.

**ANSWER:**    Applebee's states that the recording and transcript of the earnings call with investors speak for themselves and are the best evidence of their respective contents and the speakers on the call and their statements.  Because the allegations in paragraph 156 selectively quote, interpret, or construe the recording and transcript of the earnings call, Applebee's denies any and all allegations contained in paragraph 156.  Applebee's denies all allegations not expressly admitted herein.

157.    Dine Brands unveiled its ballyhooed rebranding of IHOP at the same time that Applebee's was debuting an innovative new technology that allows customers to order ahead so that their food is ready upon arrival at the restaurant. Dine Brand's promotion of the IHOb rebranding overshadowed Applebee's own initiative. While Dine Brands is indifferent to the IHOb's competition with Applebee's franchises, the Debtors are not.

**ANSWER:**    Applebee's admits that, in addition to other initiatives, Applebee's debuted new technology that allows customers to order ahead so that their food is ready upon arrival at the restaurant.  Applebee's denies the remaining allegations in paragraph 157.

## COUNT I
## (BREACH OF CONTRACT)
### (Against the Dine Subsidiaries)

158.    The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

**ANSWER:**    Applebee's repeats and realleges by reference its answers to paragraphs 1-157 above, as though fully set forth herein.

159.    The Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties have contractual rights and obligations. The Franchise Agreements are valid and binding contracts.

**ANSWER:**    Applebee's admits the Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties had contractual rights and obligations.  The

Franchise Agreements were valid and binding contracts. Applebee's denies all allegations not expressly admitted herein.

160. The Applebee's unique "System" is at the heart of the Franchise Agreements. The very first Recital of the Franchise Agreements defines "the System" as Applebee's "designs, decor and color schemes for restaurant premises, signs, equipment, procedures and formulae for preparing food and beverage products, specifications for certain food and beverage products, inventory methods, operating methods, financial control concepts, training facilities and teaching techniques." Franchise Agreement, Recital A.

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to the role and definition of the System and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

161. The Applebee's System had an established track record of success and profitability, and has earned Applebee's pride of place among bar-and-grill franchises.

**ANSWER:** Applebee's admits the allegations of paragraph 161.

162. The Debtors agreed to enter into the Franchise Agreements and become Applebee's franchisees because of, and in reliance on, the Applebee's System.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 162 and therefore denies those allegations.

163. The System is fundamental to the Franchise Agreements, and the Debtors would not have entered into those agreements absent the Applebee's system.

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to the role of the System, and Applebee's denies any allegations inconsistent therewith. Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 163 and therefore denies those allegations. Applebee's denies all allegations not expressly admitted herein.

164. The Dine Subsidiaries abandoned the System contemplated under the Franchise Agreements by, among other things:

a. Operating with numerous key positions, including president, head of marketing, and head of technology/IT, unfilled for lengthy periods of time and then hiring executives without relevant restaurant industry experience;

b.   Failing to provide franchisees with reasonable marketing, training, or operational support;

c.   Performing inadequate testing of the System Change, failing to share test results with the Debtors, suppressing unfavorable test results, and failing to amend or adjust course in light of unfavorable test results;

d.   Causing the Debtors to abandon the traditional gas grills, which had become an industry standard, and install new wood-fired grill platforms in all restaurants, imposing immense costs on the Debtors;

e.   Causing the Debtors to use more expensive USDA Choice steaks and to hand-cut those steaks daily, which came at enormous cost to the Debtors as it required extensive training for kitchen personnel and increased the amount of steak that the Debtors' restaurants were forced to discard as waste;

f.   Transforming the taste and flavor profile of fully 40% of the items on Applebee's then-existing menu;

g.   Abandoning the Applebee's core customers in favor of "millennials" whose interests and outlook were diametrically opposed to those of Applebee's core customers; and

h.   Threatening the Debtors with termination of the Franchise Agreements if the Debtors did not agree to pay $12 million by the end of the day on May 7, 2018.

**ANSWER:**   Applebee's denies the allegations of paragraph 164.

165.   The Dine Subsidiaries' wholesale abandonment of the System contemplated under the Franchise Agreements is a material violation of those agreements and has deprived the Debtors of the benefit of their bargain.

**ANSWER:**   Applebee's denies the allegations of paragraph 165.

166.   Nothing in the Franchise Agreements permits the Dine Subsidiaries to make such wholesale changes to the System that the Debtors had agreed to implement under the Franchise Agreements. Moreover, the Franchise Agreements require that any revision or amendment to the System must be "in the good faith exercise of [the Franchisor's] reasonable business judgment, consistent with the overall best interests of the System generally, [and] having due regard for the financial burden which may be placed upon its franchisees[,]" none of which can be said with respect to the System Change.

**ANSWER:**   Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith.

Applebee's denies all allegations not expressly admitted herein.

167.   As a result of the Dine Subsidiaries' abandonment of the System that the Debtors had agreed to implement under the Franchise Agreements, which was a fundamental term of

those Franchise Agreements, and failure to implement the System Change consistent with reasonable business judgment and the overall best interests of the System generally, without due regard for the financial burden placed on the franchisees, the Dine Subsidiaries have materially breached those agreements.

**ANSWER:** Applebee's denies the allegations of paragraph 167.

168. The Dine Subsidiaries' breach of the Franchise Agreements excused the Debtors from performance thereunder.

**ANSWER:** Applebee's denies the allegations of paragraph 168.

169. The Debtors have suffered, and will continue to suffer, a material reduction in enterprise value and other damages as a result of this breach of the Franchise Agreements, including, but not limited to, financial injury and lost business opportunities.

**ANSWER:** Applebee's denies the allegations of paragraph 169.

170. In addition, the Debtors are entitled to reasonable attorneys' fees in connection with this proceeding pursuant to section 19.3 of the Franchise Agreement.

**ANSWER:** Applebee's denies the allegations of paragraph 170.

## COUNT II
### (BREACH OF CONTRACT - IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)
### (Against the Dine Subsidiaries)

171. The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Applebee's repeats and realleges by reference its answers to paragraphs 1-170 above, as though fully set forth herein.

172. The Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties have contractual rights and obligations. The Franchise Agreements are valid and binding contracts.

**ANSWER:** Applebee's admits the Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties had contractual rights and obligations. The Franchise Agreements were valid and binding contracts. Applebee's denies all allegations not expressly admitted herein.

173.    Inherent to the Franchise Agreements is an implied covenant that the parties will act in good faith and deal fairly with each other in the performance of their respective covenants and obligations under the contract and will not take any action that will injure the other party or compromise their benefit of the contract.

**ANSWER:**    Applebee's states that the allegations of paragraph 173 constitute legal conclusions to which no response is required. To the extent a response is required, Applebee's denies the allegations of paragraph 173.

174.    The implied covenant of good faith and fair dealing applies to the Franchise Agreements.

**ANSWER:**    Applebee's states that the allegations of paragraph 174 constitute legal conclusions to which no response is required. To the extent a response is required, Applebee's denies the allegations of paragraph 174.

175.    The Dine Subsidiaries have violated the implied covenant of good faith and fair dealing and denied the Debtors the ability to achieve their reasonable expectations in entering into the franchise relationship by, among other things:

a.  Operating with numerous key positions, including president, head of marketing, and head of technology/IT, unfilled for lengthy periods of time and then hiring executives without relevant restaurant industry experience;

b.  Failing to provide franchisees with reasonable marketing, training, or operational support;

c.  Performing inadequate testing of the System Change, failing to share test results with the Debtors, suppressing unfavorable test results, and failing to amend or adjust course in light of unfavorable test results;

d.  Imposing commercially unreasonable system changes on the Debtors that served to materially and negatively change the nature of the Debtors' franchisee business, disregarded the best interests of the franchisees and the financial burden placed on them, detrimentally affected profit margins, and caused previously profitable franchise locations to be rendered near-inoperable due to unnecessary financial strain;

e.  Disregarding the reasonable expectation that the Dine Subsidiaries would not unilaterally terminate their franchise agreements after the Debtors spent significant time, resources, and capital investment on required system updates and devoted significant time and effort on negotiating a consensual, mutually beneficial workout; and

f. Threatening the Debtors with termination of the Franchise Agreements if the Debtors did not agree to pay $12 million by the end of the day on May 7, 2018.

**ANSWER:** Applebee's denies the allegations of paragraph 175.

176. The Dine Subsidiaries caused the Debtors to abandon the traditional gas grills that had become an industry standard and install new wood-fired grill platforms in all restaurants, imposing immense costs on the Debtors at a time when Debtors were experiencing 9 straight quarters of steadily diminishing sales.

**ANSWER:** Applebee's admits that it obligated its franchisees, including the Debtors, to install new wood-fired grill platforms in restaurants. Applebee's denies all allegations not expressly admitted herein.

177. The Dine Subsidiaries caused the Debtors to use more expensive USDA Choice steaks and to hand-cut those steaks daily, which came at enormous cost to the Debtors as it required extensive training for kitchen personnel and increased the amount of steak that the Debtors' restaurants were forced to discard as waste.

**ANSWER:** Applebee's admits that it obligated its franchisees, including the Debtors, to use USDA Choice steaks and to hand-cut those steaks. Applebee's denies all allegations not expressly admitted herein.

178. On top of the significant capital expenditures, the Dine Subsidiaries caused the Debtors to make unprecedented contributions to the advertising funds to market and promote Applebee's "transformation."

**ANSWER:** Applebee's admits that the Debtors, under the terms of the Franchise Agreements, were obligated to pay advertising fees. Applebee's denies all allegations not expressly admitted herein.

179. The Dine Subsidiaries failed to exercise reasonable care or business judgment in testing or evaluating their "transformation" of Applebee's before causing the Debtors to implement that System Change.

**ANSWER:** Applebee's denies the allegations of paragraph 179.

180. The Dine Subsidiaries ignored the reasoned objections that had been made to their proposed "transformation" by the Debtors, the FBC, and other franchisees.

**ANSWER:** Applebee's denies the allegations of paragraph 180.

181.   After causing the Debtors to incur huge expense in its proposed "transformation" of the Applebee's brand and causing the Debtors to suffer financial decline quarter after quarter, the Dine Subsidiaries coaxed the Debtors into false restructuring negotiations and sought to steal the Debtors' franchises as soon as the Debtors had bottomed out and were poised to rebound.

**ANSWER:**   Applebee's denies the allegations of paragraph 181.

182.   The Dine Subsidiaries led the Debtors on during the purported workout negotiations, regularly extending the Debtors' cure period, before abruptly refusing further negotiations and purporting to terminate the Debtors' franchises unilaterally.

**ANSWER:**   Applebee's admits that it participated in negotiations with the Debtors and

extended the cure period multiple times, in an attempt to achieve a workout.  Applebee's further

admits that the Franchise Agreements terminated prior to the Debtors' bankruptcy filing.

Applebee's denies all allegations not expressly admitted herein.

183.   The Dine Subsidiaries' abrupt, unilateral attempt to terminate the Franchise Agreements was contrary to the parties' course of dealing and to reasonable business expectations and practice, and was made in bad faith.

**ANSWER:**   Applebee's denies the allegations of paragraph 183.

184.   As a result of the Dine Subsidiaries' ongoing actions and/or omissions during the parties' franchise relationship, the Debtors have suffered, and will continue to suffer, a material reduction in enterprise value and other damages as a result of the Dine Subsidiaries' breach of the implied covenant of good faith and fair dealing contained in the franchise agreements, including, but not limited to, financial injury and lost business opportunities.

**ANSWER:**   Applebee's denies the allegations of paragraph 184.

185.   In addition, the Debtors are entitled to reasonable attorneys' fees in connection with this proceeding pursuant to section 19.3 of the Franchise Agreement.

**ANSWER:**   Applebee's denies the allegations of paragraph 185.

## COUNT III
## (BREACH OF IMPLIED WARRANTY OF COMPETENCE)
### (Against the Dine Subsidiaries)

186.   The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

**ANSWER:**   Applebee's repeats and realleges by reference its answers to paragraphs 1-

185 above, as though fully set forth herein.

187.    The Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties have contractual rights and obligations. The Franchise Agreements are valid and binding contracts.

**ANSWER:**    Applebee's admits the Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties had contractual rights and obligations.    The Franchise Agreements were valid and binding contracts.    Applebee's denies all allegations not expressly admitted herein.

188.    The implied warranty of competence and workmanlike performance is imposed upon the parties by operation of law.

**ANSWER:**    Applebee's states that the allegations of paragraph 188 constitute legal conclusions to which no response is required.    To the extent a response is required, Applebee's denies the allegations of paragraph 188.

189.    The Franchise Agreements involve the performance of work and delivery of services by the Dine Subsidiaries.

**ANSWER:**    Applebee's states that the allegations of paragraph 189 constitute legal conclusions to which no response is required.    To the extent a response is required, Applebee's denies the allegations of paragraph 189.

190.    The Debtors entered into the Franchise Agreements based in part on the Dine Subsidiaries' claimed "know-how."

**ANSWER:**    Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 190 and therefore denies those allegations.

191.    The implied warranty of competence and workmanlike performance arises because of the parties' agreement under the Franchise Agreements.

**ANSWER:**    Applebee's states that the allegations of paragraph 191 constitute legal conclusions to which no response is required.    To the extent a response is required, Applebee's denies the allegations of paragraph 191.

192. The Dine Subsidiaries have violated the implied warranty of competence and workmanlike performance and denied the Debtors the ability to achieve their reasonable expectations in entering into the franchise relationship by, among other things:

a. Operating with numerous key positions, including president, head of marketing, and head of technology/IT, unfilled for lengthy periods of time and then hiring executives without relevant restaurant industry experience;

b. Failing to provide franchisees with reasonable marketing, training, or operational support;

c. Performing inadequate testing of the System Change, failing to share test results with the Debtors, suppressing unfavorable test results, and failing to amend or adjust course in light of unfavorable test results; and

d. Imposing commercially unreasonable system changes on the Debtors that served to materially and negatively change the nature of the Debtors' franchisee business, detrimentally affect profit margins, and cause previously profitable franchise locations to be rendered near-inoperable due to unnecessary financial strain.

**ANSWER:** Applebee's denies the allegations of paragraph 192.

193. The Dine Subsidiaries caused the Debtors to abandon the traditional gas grills that had become an industry standard and install new wood-fired grill platforms in all restaurants, imposing immense costs on the Debtors at a time when Debtors were experiencing 9 straight quarters of diminishing sales.

**ANSWER:** Applebee's admits that it obligated its franchisees, including the Debtors, to install new wood-fired grill platforms in restaurants. Applebee's denies all allegations not expressly admitted herein.

194. The Dine Subsidiaries caused the Debtors to use more expensive USDA Choice steaks and to hand-cut those steaks daily, which came at enormous cost to the Debtors as it required extensive training for kitchen personnel and increased the amount of steak that the Debtors' restaurants were forced to discard as waste.

**ANSWER:** Applebee's admits that it obligated its franchisees, including the Debtors, to use USDA Choice steaks and to hand-cut those steaks. Applebee's denies all allegations not expressly admitted herein.

195. On top of the significant capital expenditures, the Dine Subsidiaries caused the Debtors to make unprecedented contributions to the advertising funds to market and promote Applebee's "transformation."

**ANSWER:** Applebee's admits that the Debtors, under the terms of the Franchise Agreements, were obligated to pay advertising fees. Applebee's denies all allegations not expressly admitted herein.

196.    The Dine Subsidiaries failed to exercise reasonable care or business judgment in testing or evaluating the transformative System Change before causing the Debtors to implement it.

**ANSWER:** Applebee's denies the allegations of paragraph 196.

197.    The System Change that the Dine Subsidiaries caused the Debtors to implement was not tested, prepared, or planned with reasonable care or business judgment.

**ANSWER:** Applebee's denies the allegations of paragraph 197.

198.    The Dine Subsidiaries withheld test results from the Debtors, suppressed unfavorable test results, and proceeded with the System Change without amendment or adjustment despite unfavorable test results.

**ANSWER:** Applebee's denies the allegations of paragraph 198.

199.    The Dine Subsidiaries ignored the reasoned objections that had been made to their proposed "transformation" by the Debtors, the FBC, and other franchisees.

**ANSWER:** Applebee's denies the allegations of paragraph 199.

200.    After causing the Debtors to incur huge expense in its ill-fated "transformation" of the Applebee's brand and causing the Debtors to suffer financial decline quarter after quarter, the Dine Subsidiaries coaxed the Debtors into bad faith restructuring negotiations and sought to steal the Debtors' franchises as soon as the Debtors had bottomed out and were poised to rebound.

**ANSWER:** Applebee's denies the allegations of paragraph 200.

201.    The Dine Subsidiaries led the Debtors on during the purported workout negotiations, regularly extending the Debtors' cure period, before abruptly refusing further negotiations and purporting to terminate the Debtors' franchises unilaterally and seize them for themselves once the franchises were regaining their footing.

**ANSWER:** Applebee's admits that it participated in negotiations with the Debtors and extended the cure period multiple times, in an attempt to achieve a workout. Applebee's further admits that the Franchise Agreements terminated prior to the Debtors' bankruptcy filing. Applebee's denies all allegations not expressly admitted herein.

202.     The Dine Subsidiaries' abrupt, unilateral attempt to terminate the Franchise Agreements was contrary to the parties' course of dealing and to reasonable business expectations and practice, and was made in bad faith.

**ANSWER:**     Applebee's denies the allegations of paragraph 202.

203.     As a result of the Dine Subsidiaries' ongoing actions and/or omissions during the parties' franchise relationship, the Debtors have suffered, and will continue to suffer, a material reduction in enterprise value and other damages as a result of the Dine Subsidiaries' breach of the implied warranty of competence and workmanlike performance, including, but not limited to, financial injury and lost business opportunities.

**ANSWER:**     Applebee's denies the allegations of paragraph 203.

### COUNT IV
### (TORTIOUS INTERFERENCE WITH CONTRACTUAL
### RELATIONSHIPS—SYSTEM CHANGE)
### (Against Dine Brands)

204.     The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

**ANSWER:**     Applebee's repeats and realleges by reference its answers to paragraphs 1-203 above, as though fully set forth herein.

205.     The Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties have contractual rights and obligations. The Franchise Agreements are valid and binding contracts.

**ANSWER:**     Applebee's admits the Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties had contractual rights and obligations.  The Franchise Agreements were valid and binding contracts.  Applebee's denies all allegations not expressly admitted herein.

206.     The Debtors have contractual rights to use the Applebee's Marks and System.

**ANSWER:**     Applebee's admits that, under the terms of the Franchise Agreements, franchisees had the right to use the Applebee's Marks and System.  Further answering, because the Franchise Agreements were terminated pre-petition, Applebee's denies that the Debtors have

a right to use the Applebee's Marks and System. Applebee's denies all allegations not expressly admitted herein.

207. Dine Brands is the ultimate parent company of the Dine Subsidiaries.

**ANSWER:** Applebee's admits the allegations of paragraph 207.

208. Dine Brands has full and actual knowledge of the Debtors' contractual relationship with the Dine Subsidiaries.

**ANSWER:** Applebee's admits the allegations of paragraph 208.

209. Dine Brands closed Applebee's Kansas City headquarters and moved Applebee's to its own headquarters in Glendale, California.

**ANSWER:** Applebee's admits the allegations of paragraph 209.

210. Numerous Applebee's personnel, many of them longstanding employees, opposed the relocation and declined to transfer. Thereafter, Dine Brands intentionally induced the Dine Subsidiaries to operate with numerous key positions unfilled for lengthy periods of time.

**ANSWER:** Applebee's admits that some employees did not transfer to the headquarters in Glendale, California. Applebee's denies all allegations not expressly admitted herein.

211. The Debtors and other franchisees suffered from having these key position unfilled. Dine Brands intentionally induced the Dine Subsidiaries to fail to provide their franchisees with reasonable marketing, training, or operational support.

**ANSWER:** Applebee's denies the allegations of paragraph 211.

212. Dine Brands intentionally induced the Dine Subsidiaries to cause the Debtors to make significant capital expenditures in a commercially unreasonable attempt to transform the Applebee's brand:

    a. Dine Brands intentionally induced the Dine Subsidiaries to cause the Debtors to abandon the traditional gas grills that had become an industry standard in favor of new wood-fired grill platforms in all restaurants.

    b. Dine Brands intentionally induced the Dine Subsidiaries to cause the Debtors to use more expensive USDA Choice steaks.

    c. Dine Brands intentionally induced the Dine Subsidiaries to cause the Debtors to hand-cut its steaks daily, requiring extensive training for kitchen personnel and increasing the amount of steak that restaurants were forced to discard as waste.

d. Dine Brands intentionally induced the Dine Subsidiaries to cause the Debtors to make unprecedented contributions to the advertising funds at a time when the Debtors were experiencing 9 straight quarters of steadily diminishing sales.

**ANSWER:** Applebee's denies the allegations of paragraph 212.

213. The System Change that Dine Brands intentionally induced the Dine Subsidiaries to implement was not tested, prepared, or planned with reasonable care or business judgment.

**ANSWER:** Applebee's denies the allegations of paragraph 213.

214. Dine Brands intentionally induced the Dine Subsidiaries to withhold test results from the Debtors, suppress unfavorable test results, and proceed with the System Change without amendment or adjustment despite unfavorable test results.

**ANSWER:** Applebee's denies the allegations of paragraph 214.

215. Dine Brands threatened to intentionally induce the Dine Subsidiaries to terminate of the Franchise Agreements if the Debtors did not agree to pay $12 million by the end of the day on May 7, 2018.

**ANSWER:** Applebee's denies the allegations of paragraph 215.

216. On June 11, 2018, Dine Brands announced that it was rebranding its IHOP franchise as IHOb—with the "b" standing for "burgers"—exacerbating the deterioration of Applebee's brand.

**ANSWER:** Applebee's denies the allegations of paragraph 216.

217. Dine Brands franchised 1,671 IHOb restaurants across the United States.

**ANSWER:** Applebee's denies the allegations of paragraph 217.

218. In the press release announcing the rebranding, Brad Haley, Chief Marketing Officer for IHOb restaurants, asserted that "when you try them, I think you'll agree with me that IHOb's new line of Ultimate Steakburgers are so good that I'd put them up against anyone's . . . ."

**ANSWER:** Applebee's states that the quoted press release speaks for itself as to its contents and Mr. Haley's statements. Because the allegations in paragraph 218 selectively quote, interpret, or construe the press release, Applebee's denies any and all allegations contained in paragraph 218. Applebee's denies all allegations not expressly admitted herein.

219. In 2017, approximately 16% of the Debtors' entrée sales were in the burger category.

**ANSWER:** Applebee's lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 219 and therefore denies those allegations.

220. Much of the recent Applebee's advertising campaign—for which Dine Brands asked Applebee's franchisees to pay for an increased portion of the bill—is focused on advertising burgers.

**ANSWER:** Applebee's denies the allegations of paragraph 220.

221. In addition, in a recent Dine Brands' earnings call, Dine Brands' CEO Steve Joyce promised to continue to position Applebee's with its traditional customers and touted the new burger menu's popularity with millennial consumers.

**ANSWER:** Applebee's states that the recording and transcript of the earnings call with investors speak for themselves and are the best evidence of their respective contents and the speakers on the call and their statements. Because the allegations in paragraph 221 selectively quote, interpret, or construe the recording and transcript of the earnings call, Applebee's denies any and all allegations contained in paragraph 221. Applebee's denies all allegations not expressly admitted herein.

222. Dine Brands unveiled its ballyhooed rebranding of IHOP at the same time that Applebee's was debuting an innovative new technology that allows customers to order ahead so that their food is ready upon arrival at the restaurant. Dine Brand's promotion of the IHOb rebranding overshadowed Applebee's own initiative.

**ANSWER:** Applebee's admits that, in addition to other initiatives, Applebee's debuted new technology that allows customers to order ahead so that their food is ready upon arrival at the restaurant. Applebee's denies the remaining allegations in paragraph 222.

223. Dine Brands knew, or should have known, that such actions and/or omissions would naturally and probably result in damages to the Debtors, but Dine Brands continued such conduct and/or omissions with reckless disregard of the consequences and Dine Brands intentionally pursued a course of conduct the purpose of which was causing damage to the Debtors.

**ANSWER:** Applebee's denies the allegations of paragraph 223.

224. Dine Brands had and has no lawful justification for its tortious interference with the Debtors' contracts and prospective economic advantage with the Dine Subsidiaries.

**ANSWER:** Applebee's denies the allegations of paragraph 224.

225. As a result of Dine Brands' tortious interference with the Debtors' contractual relationship with the Dine Subsidiaries, the Debtors have incurred economic damages in an amount to be proven at trial.

**ANSWER:** Applebee's denies the allegations of paragraph 225.

### COUNT V
### (TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS—IMPROPER TERMINATION)
### (Against Dine Brands)

226. The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Applebee's repeats and realleges by reference its answers to paragraphs 1-225 above, as though fully set forth herein.

227. The Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties have contractual rights and obligations. The Franchise Agreements are valid and binding contracts.

**ANSWER:** Applebee's admits the Debtors and the Dine Subsidiaries entered into franchise agreements under which both parties had contractual rights and obligations. The Franchise Agreements were valid and binding contracts. Applebee's denies all allegations not expressly admitted herein.

228. The Debtors have contractual rights to use the Applebee's Marks and System.

**ANSWER:** Applebee's admits that, under the terms of the Franchise Agreements, franchisees had the right to use the Applebee's Marks and System. Further answering, because the Franchise Agreements were terminated pre-petition, Applebee's denies that the Debtors have a right to use the Applebee's Marks and System. Applebee's denies all allegations not expressly admitted herein.

229. Dine Brands is the ultimate parent company of the Dine Subsidiaries.

**ANSWER:** Applebee's admits the allegations of paragraph 229.

230. Dine Brands has full and actual knowledge of the Debtors' contractual relationship with the Dine Subsidiaries.

**ANSWER:** Applebee's admits the allegations of paragraph 230.

231. The Franchise Agreements require the designated franchisor under the contract to provide written notice of termination.

**ANSWER:** Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

232. Dine Brands intentionally induced the Dine Subsidiaries to purport to terminate its contracts with the Debtors automatically after 90 days without the written notice of termination required under the Franchise Agreements.

**ANSWER:** Applebee's denies the allegations of paragraph 232.

233. Dine Brands threatened to intentionally induce the Dine Subsidiaries to terminate of the Franchise Agreements if the Debtors did not agree to pay $12 million by the end of the day on May 7, 2018.

**ANSWER:** Applebee's denies the allegations of paragraph 233.

234. Dine Brands knew, or should have known, that such actions and/or omissions would naturally and probably result in damages to the Debtors, but Dine Brands continued such conduct and/or omissions with reckless disregard of the consequences and Dine Brands intentionally pursued a course of conduct the purpose of which was causing damage to the Debtors.

**ANSWER:** Applebee's denies the allegations of paragraph 234.

235. Dine Brands had and has no lawful justification for its tortious interference with the Debtors' contracts and prospective economic advantage with the Dine Subsidiaries.

**ANSWER:** Applebee's denies the allegations of paragraph 235.

236. As a result of Dine Brands' tortious interference with the Debtors' contractual relationship with the Dine Subsidiaries, the Debtors have incurred economic damages in an amount to be proven at trial.

**ANSWER:** Applebee's denies the allegations of paragraph 236.

## COUNT VI
### (DECLARATORY JUDGMENT THAT THE FRANCHISE AGREEMENTS WERE NOT TERMINATED PREPETITION AND ARE PROPERTY OF THE ESTATES)

**(Against the Franchisor)**

237.    The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

**ANSWER:**    Applebee's repeats and realleges by reference its answers to paragraphs 1-236 above, as though fully set forth herein.

238.    Section 19.1 of the various Franchise Agreements states that the "Franchisor shall have the right to terminate this Agreement immediately upon written notice to Franchisor stating the reason for such termination[.]"

**ANSWER:**    Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

239.    A notice of cancellation of contract must be clear and unambiguous to be effective.

**ANSWER:**    Applebee's states that the allegations of paragraph 239 constitute legal conclusions to which no response is required.  To the extent a response is required, Applebee's denies the allegations of paragraph 239.

240.    Non-compliance with termination provisions of a contract are grounds for voiding the terminations thereof as ineffective.

**ANSWER:**    Applebee's states that the allegations of paragraph 240 constitute legal conclusions to which no response is required.  To the extent a response is required, Applebee's denies the allegations of paragraph 240.

241.    On September 20, 2017, the Franchisor sent a letter declaring a default and stating that, unless the Debtors paid the overdue royalty fees within 90 days, the Franchise Agreements would terminate without further notice.

**ANSWER:**    Applebee's admits that it sent the Debtors a letter on September 20, 2017. Applebee's further states that the September 20, 2017 letter speaks for itself and Applebee's denies any allegations inconsistent therewith.  Applebee's denies all allegations not expressly admitted herein.

242.     For many of the Franchise Agreements, the Franchisor failed to deliver its letter dated September 20, 2017, to the addresses set forth in the Franchise Agreements for giving proper notice thereunder.

**ANSWER:**     Applebee's denies the allegations of paragraph 242.

243.     On December 18, 2017, the Franchisor sent a letter purporting to extend the deadline to cure the defaults under the Franchise Agreements to January 22, 2018.

**ANSWER:**     Applebee's admits that it sent the Debtors a letter on December 18, 2017. Applebee's further states that the December 18, 2017 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

244.     On January 17, 2018, the Franchisor sent a "Notice of Termination of Development Agreements." Referring back to the Notice of Default, the Franchisor's Notice of Termination of Development Agreements stated: "To date, RMH has not cured any of the arrearages, and has not paid royalties and/or advertising fees since receiving that Notice. Each Development Agreement as well as all related amendments, supplements, and other ancillary agreements, including, without limitation, those listed on the attached list, has terminated."

**ANSWER:**     Applebee's admits that it sent the Debtors a Notice of Termination of Development Agreements on January 17, 2018. Applebee's further states that the January 17, 2018 Notice of Termination of Development Agreements speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

245.     On January 18, 2018, the Franchisor sent a letter purporting to further extend the cure period for the Franchise Agreements to February 18, 2018.

**ANSWER:**     Applebee's admits that it sent the Debtors a letter on January 18, 2018. Applebee's further states that the January 18, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

246.     On February 8, 2018, the Franchisor sent a further letter purporting to extend the cure period to March 1, 2018.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on February 8, 2018. Applebee's further states that the February 8, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

247. On February 26, 2018, the Franchisor sent a letter purporting to further extend the cure period to March 15, 2018.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on February 26, 2018. Applebee's further states that the February 26, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

248. On March 12, 2018, the Franchisor sent a further letter purporting to extend the cure period to April 12, 2018.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on March 12, 2018. Applebee's further states that the March 12, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

249. On April 9, 2018, the Franchisor sent a letter purporting to further extend the Debtors' cure period to April 19, 2018.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on April 9, 2018. Applebee's further states that the April 9, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

250. On April 16, 2018, the Franchisor sent a further letter purporting to extend the Debtors' cure period to April 26, 2018.

**ANSWER:** Applebee's admits that it sent the Debtors a letter on April 16, 2018. Applebee's further states that the April 16, 2018 letter speaks for itself and Applebee's denies

any allegations inconsistent therewith.  Applebee's denies all allegations not expressly admitted herein.

251.    On April 25, 2018, the Franchisor sent a letter stating that the Franchisor agreed that it would "forbear from taking any further actions against you or the Franchise Restaurants, whether at law or in equity, to enforce our rights and remedies against you or the Franchise Restaurants, under or in connection with the franchise agreements, until May 8, 2018." Despite the fact that the Franchisor had previously extended the Debtors' cure period to April 26, 2018, the Franchisor's April 25 letter stated: "This agreement to forbear is not an extension of the cure periods referred to in prior Notice, which have already expired."

**ANSWER:**    Applebee's admits that it sent the Debtors a letter on April 25, 2018. Applebee's further states that the April 25, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith.  Applebee's denies all allegations not expressly admitted herein.

252.    The Franchisor's letter dated April 25, 2018, makes plain that the Franchisor was required to take "further action" to exercise its right to terminate under the Franchise Agreements.

**ANSWER:**    Applebee's denies the allegations of paragraph 252.  Further answering, Applebee's states that the April 25, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith.  Applebee's denies all allegations not expressly admitted herein.

253.    On May 7, 2018, the Franchisor threatened to terminate of the Franchise Agreements if the Debtors did not agree to pay $12 million by the end of the day.

**ANSWER:**    Applebee's denies the allegations of paragraph 253.

254.    When the Franchisor sought to terminate the Development Agreements with the Debtors, it sent a formal "Notice of Termination of Development Agreements" stating unequivocally that "[e]ach Development Agreement . . . has terminated."

**ANSWER:**    Applebee's admits that the Notice of Termination of Development Agreements speaks for itself and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

255.    Similarly, when the Franchisor sought to terminate the Franchise Agreements for the Debtors' 41 restaurants located in Arizona and Texas, the Franchisor sent a letter with the subject line "Re: Termination of Franchise Agreements for Restaurants in Arizona and Texas," stating that the Franchisor was purporting to terminate the Franchise Agreements for the Arizona and Texas restaurants, with such termination supposedly retroactive to April 27, 2018.

**ANSWER:**    Applebee's admits that it sent the Debtors a letter on May 8, 2018 regarding the termination of the Franchise Agreements for the restaurants in Arizona and Texas. Applebee's further states that this May 8, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith.   Applebee's denies all allegations not expressly admitted herein.

256.    The Franchisor hand-delivered a letter, to the address indicated therein, at approximately 8:02 a.m. on May 8, 2018, approximately 4.5 hours after the filing of their bankruptcy petitions.

**ANSWER:**    Applebee's admits that it sent the Debtors a letter on May 8, 2018 regarding the restaurants in Arizona and Texas, which was received by the Debtors at approximately 8:02 a.m. (ET).  Applebee's denies all allegations not expressly admitted herein.

257.    Concurrently with the letter purporting to terminate the Franchise Agreements for the Debtors' 41 Arizona and Texas locations, the Franchisor sent a further letter stating that the Franchisor agreed that it would "forbear from enforcing its termination rights . . . until May 20, 2018" for the Debtors' 133 franchises not located in Arizona or Texas. The Franchisor's letter further stated: "This agreement to forbear is not an extension or a restarting of the cure period referred to in prior Notice, which has already expired, nor is it a new cure period."

**ANSWER:**    Applebee's admits that it sent the Debtors a letter on May 8, 2018 regarding the Debtors' franchises not located in Arizona or Texas.  Applebee's further states that this May 8, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith.  Applebee's denies all allegations not expressly admitted herein.

258.    The Franchisor did not provide written notice of termination of the Franchise Agreements for the 41 Arizona and Texas restaurants, as required under the Franchise Agreements, until after the filing of the Debtors' bankruptcy petitions.

**ANSWER:**    Applebee's denies the allegations of paragraph 258.

259. The Franchisor's notice of termination of the Franchise Agreements for the 41 Arizona and Texas restaurants was void *ab initio* as a violation of the automatic stay.

**ANSWER:** Applebee's denies the allegations of paragraph 259.

260. To date, the Franchisor has not provided any written notice of termination of the Franchise Agreements for the Debtors' 133 franchises not located in Arizona or Texas, as would be required under the Franchise Agreements.

**ANSWER:** Applebee's denies the allegations of paragraph 260.

261. By virtue of the foregoing allegations, a real and justiciable controversy exists concerning the purported termination with respect to the Franchise Agreements.

**ANSWER:** Applebee's states that the allegations of paragraph 261 constitute legal conclusions to which no response is required. To the extent a response is required, Applebee's denies the allegations of paragraph 261.

262. The Court should find and declare that the purported termination notice was invalid, the Franchise Agreements were not terminated rendering them property of the Debtors' estates, and any attempt to obtain possession of or exercise control over any of the Debtors' property is void *ab initio*.

**ANSWER:** Applebee's states that the allegations of paragraph 262 constitute legal conclusions to which no response is required. To the extent a response is required, Applebee's denies the allegations of paragraph 262.

## COUNT VII
## (DECLARATORY RELIEF AS TO FRANCHISOR'S WILLFUL VIOLATION OF AUTOMATIC STAY)
### (Against the Franchisor)

263. The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

**ANSWER:** Applebee's repeats and realleges by reference its answers to paragraphs 1-262 above, as though fully set forth herein.

264. At approximately 3:30 a.m. (ET) on May 8, 2018, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

**ANSWER:** Applebee's admits the allegations of paragraph 264.

265.     At approximately 5:59 a.m. (ET) on May 8, 2018, Robert Hersch, a Senior Managing Director at Mastodon, emailed Stephen Joyce (the Franchisor's CEO), Bryan Adel (the Franchisor's General Counsel), and Lucy Cheong (the Franchisor's Vice President, Finance) informing them of the bankruptcy filing.

**ANSWER:**     Applebee's admits the allegations of paragraph 265.

266.     At approximately 8:02 a.m. on May 8, 2018—approximately 4.5 hours after the Debtors filed bankruptcy—the Franchisor hand-delivered a letter, to the address indicated therein, with subject line "Re: Termination of Franchise Agreements for Restaurants in Arizona and Texas," stating that the Franchisor was purporting to terminate the Franchise Agreements for the Debtors' 41 restaurants located in Arizona and Texas, with such termination supposedly retroactive to April 27, 2018.

**ANSWER:**     Applebee's admits that it sent the Debtors a letter on May 8, 2018 regarding the restaurants in Arizona and Texas, which was received by the Debtors at approximately 8:02 a.m. (ET).  Applebee's further states that this May 8, 2018 letter speaks for itself and Applebee's denies any allegations inconsistent therewith.  Applebee's denies all allegations not expressly admitted herein.

267.     In addition, also subsequent to the Debtors' bankruptcy filing on May 8, 2018, the Franchisor filed its *Complaint for Damages, a Temporary-Restraining Order, and Preliminary and Permanent Injunctive Relief* in the United States District Court for the District of Kansas. *See Applebee's Restaurants LLC v. RMH Franchise Corp.,* Case No. 18-cv-02226-JAR-GLR (D. Kan. May 8, 2018).

**ANSWER:**     Applebee's admits that, on May 8, 2018, it filed its *Complaint for Damages, a Temporary-Restraining Order, and Preliminary and Permanent Injunctive Relief* in the lawsuit titled *Applebee's Restaurants LLC v. RMH Franchise Corp.,* Case No. 18-cv-02226-JAR-GLR (D. Kan. May 8, 2018) (the "Kansas Complaint").  Applebee's further states that the Kansas Complaint speaks for itself and Applebee's denies any allegations inconsistent therewith.  Applebee's denies all allegations not expressly admitted herein.

268.     Section 362(a) of the Bankruptcy Code prohibits the Franchisor from taking any action to obtain possession of, or exercise control over, property of the Debtors' estate.

**ANSWER:** Applebee's states that the allegations of paragraph 268 constitute legal conclusions to which no response is required. To the extent a response is required, Applebee's admits the allegations of paragraph 268.

269. Upon information and belief, the Franchisor was aware of the Debtors' bankruptcy filing on the morning of May 8, 2018, prior to sending its purported termination notice, and was further aware that it had not validly terminated the Franchise Agreements prepetition.

**ANSWER:** Applebee's denies the allegations of paragraph 269.

270. The purported notice of termination of the Franchise Agreements that the Franchisor sent on May 8, 2018, was void *ab initio* as a violation of the automatic stay.

**ANSWER:** Applebee's denies the allegations of paragraph 270.

271. Upon information and belief, the Franchisor was aware of the Debtors' bankruptcy filing on the morning of May 8, 2018, prior to commencing the Kansas action, and was further aware that it had not validly terminated the Franchise Agreements prepetition.

**ANSWER:** Applebee's denies the allegations of paragraph 271.

272. The filing of the Kansas action was void *ab initio* as a violation of the automatic stay.

**ANSWER:** Applebee's denies the allegations of paragraph 272.

273. By virtue of the foregoing allegations, a real and justiciable controversy exists concerning the application of the automatic stay to the Franchisor's actions postpetition.

**ANSWER:** Applebee's states that the allegations of paragraph 273 constitute legal conclusions to which no response is required. To the extent a response is required, Applebee's denies the allegations of paragraph 273.

274. The Court should find and declare that the purported termination notice and the filing of the Kansas action were void *ab initio* as willful attempts to obtain possession of or exercise control over any of the Debtors' property in violation of the automatic stay.

**ANSWER:** Applebee's states that the allegations of paragraph 274 constitute legal conclusions to which no response is required. To the extent a response is required, Applebee's denies the allegations of paragraph 274.

## COUNT VIII
## (DECLARATORY RELIEF AS TO FRANCHISOR'S NON-
## EXISTENT POST-TERMINATION RIGHTS)
### (Against the Franchisor)

275.    The Debtors repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

**ANSWER:**    Applebee's repeats and realleges by reference its answers to paragraphs 1-274 above, as though fully set forth herein.

276.    Section 19 of the Franchise Agreements require the Debtors to refrain from taking certain actions post-termination and provide the Franchisor with certain options with respect to acquiring the franchised locations.

**ANSWER:**    Applebee's states that the Franchise Agreements speak for themselves as to their terms and conditions and Applebee's denies any allegations inconsistent therewith. Applebee's denies all allegations not expressly admitted herein.

277.    Even assuming that the Franchise Agreements were validly terminated pre-petition (which they were not), contractual obligations cease upon the termination of the contract.

**ANSWER:**    Applebee's states that the allegations of paragraph 277 constitute legal conclusions to which no response is required.  To the extent a response is required, Applebee's denies the allegations of paragraph 277.

278.    By virtue of the foregoing allegations, a real and justiciable controversy exists concerning the existence of the Franchise Agreements (or contractual obligations thereunder) after a purported termination.

**ANSWER:**    Applebee's states that the allegations of paragraph 278 constitute legal conclusions to which no response is required.  To the extent a response is required, Applebee's denies the allegations of paragraph 278.

279.    The Court should find and declare that if any Franchise Agreements were validly terminated pre-petition (which they were not), the Debtors' contractual obligations under those agreements ceased upon their termination.

**ANSWER:** Applebee's states that the allegations of paragraph 279 constitute legal conclusions to which no response is required. To the extent a response is required, Applebee's denies the allegations of paragraph 279.

### APPLEBEE'S ADDITIONAL DEFENSES

### FIRST DEFENSE

The Debtors' Counter-Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

To the extent that any applicable statute of limitations has lapsed, any and all claims against Applebee's are barred.

### THIRD DEFENSE

The Debtors' claims are or may be barred in whole or in part by the doctrine of laches, unclean hands, waiver or estoppel.

### FOURTH DEFENSE

The Debtors' claims are or may be barred in whole or in part by the parties' course of dealing.

### FIFTH DEFENSE

The Debtors' damages, if any, were caused by their own acts, negligence and/or omissions.

### SIXTH DEFENSE

The Debtors' claims are barred to the extent that the Debtors have failed to mitigate, minimize or avoid any alleged damage.

### SEVENTH DEFENSE

The Debtors' claims are barred in whole or in part by the provisions of the applicable Franchise Agreements, including, but not limited to, Section 25.7.

**EIGHTH DEFENSE**

The Debtors' Counter-Complaint does not describe the claims made against Applebee's with sufficient particularity to enable Applebee's to determine all defenses it has. Therefore, Applebee's reserves the right to assert all defenses which may be pertinent to Counter-Complaint once the precise nature of the claims is ascertained through further discovery and investigation.

WHEREFORE, Applebee's respectfully prays that this Court enter an Order:

a)      Dismissing the Debtors' Counter-Complaint as against Applebee's;

b)      For Applebee's costs and attorneys' fees; and

c)      For such other relief as the Court deems appropriate.


Dated: July 13, 2018                        PACHULSKI STANG ZIEHL & JONES LLP

                                             */s/ Laura Davis Jones*
                                            Laura Davis Jones (DE Bar No. 2436)
                                            Timothy P. Cairns (DE Bar No. 4228)
                                            919 N. Market Street, 17th Floor
                                            P.O. Box 8705
                                            Wilmington, DE 19899-8705 (Courier 19801)
                                            Telephone: (302) 652-4100
                                            Facsimile: (302) 652-4400
                                            Email: ljones@pszjlaw.com
                                                      tcairns@pszjlaw.com
                                             -and-

                                            DENTONS US LLP
                                            Joel Siegel (*Admitted Pro Hac Vice*)
                                            Samuel Maizel (*Admitted Pro Hac Vice* )
                                            601 S. Figueroa Street
                                            Suite 2500
                                            Los Angeles, California
                                            Telephone: 213-623-9300
                                            Facsimile: 213-623-9924
                                            E-mail: joel.siegel@dentons.com
                                                      samuel.maizel@dentons.com

                                             -and-

DENTONS US LLP
Geoffrey Miller (*Admitted Pro Hac Vice*)
233 South Wacker Drive
Suite 5900
Chicago, Illinois 60606
Telephone:  312-876-8000
Facsimile:  312-876-7934
E-mail:  robert.richards@dentons.com
          geoffrey.miller@dentons.com

*Counsel to Dine Brands Global Inc., Applebee's Restaurants LLC and Applebee's Franchisor LLC*