## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RMH Franchise Holdings, Inc., *et al.*,[1] | ) | Case No. 18-11092 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| _____ | ) | |
| | ) | |
| DINE BRANDS GLOBAL, INC., | ) | |
| APPLEBEE'S RESTAURANTS LLC, | ) | |
| and APPLEBEE'S FRANCHISOR LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Pro. No. 18-50481 (BLS) |
| v. | ) | |
| | ) | |
| RMH FRANCHISE HOLDINGS, INC., | ) | |
| NULNK, INC., RMH ILLINOIS, LLC, | ) | |
| RMH FRANCHISE CORP., and | ) | |
| CONTEX RESTAURANTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## APPLEBEE'S OPENING BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

[1] The Defendants and the last four digits of their respective taxpayer identification numbers are as follows: RMH Franchise Holdings, Inc. (7150); NuLnk, Inc. (7381); RMH Illinois, LLC (0696); RMH Franchise Corp. (1807); Contex Restaurants, Inc. (0710). The headquarters for the above-captioned Defendants is located at One Concourse Parkway, N.E., Suite 600, Atlanta, GA 30328.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

NATURE AND STATE OF PROCEEDINGS ......................................................................... 3

SUMMARY OF ARGUMENT ................................................................................................. 4

    A.   Applebee's Is Entitled to Summary Judgment With Respect to all Claims Asserted in its Complaint .......................................................................................................... 4

    B.   Applebee's Is Entitled to Summary Judgment on Counts VI and VIII of the Counter-Complaint. ............................................................................................................. 5

STATEMENT OF MATERIAL FACTS ................................................................................... 5

    A.   The Parties and the Franchise Agreements. .............................................................. 5

    B.   The Debtors' Breach of the Franchise Agreements. .................................................. 9

    C.   Applebee's Ample Notice of Default, Opportunity to Cure, and Termination to the Debtors. ................................................................................................................... 10

    D.   Pre-Petition Termination of the Franchise Agreements. .......................................... 13

    E.   Applebee's Exercise of its Post-Termination Rights. .............................................. 15

APPLICABLE STANDARD ................................................................................................... 16

ARGUMENT .......................................................................................................................... 17

    I.   The Franchise Agreements Terminated on April 27, 2018, And Are Not Property of the Debtors' Estates (Complaint - Count I; Counter-Complaint - Count VI). ..................... 17

    A.   Applebee's Fully Complied With the Termination Provisions in the Franchise Agreements. ............................................................................................................ 17

    B.   Applebee's Forbearance Letters and Termination Confirmation Notice Did Not Waive the Termination of the Franchise Agreements. ....................................................... 20

    C.   The Parties' Negotiations and Alleged Course of Dealing Did not Modify Applebee's Right to Terminate the Franchise Agreements. ........................................................ 22

    D.   Applebee's Alleged Breaches of the Franchise Agreements Do Not Preclude Applebee's Ability to Terminate the Franchise Agreements. ................................... 24

    E.   Applebee's Notices Were Effective Under the Franchise Agreements and Actually Received by the Debtors. ........................................................................................ 27

    II.   Applebee's Timely Exercised its Post-Termination Right to (1) Take Control of the Arizona and Texas RMH Restaurants (Complaint - Count II) and (2) To Take Control of the Remaining RMH Restaurants (Complaint - Count III). ............................................. 30

    III.   Applebee's Has Other Post-Termination Rights Under the Franchise Agreements (Complaint - Count IV; Counter-Complaint - Count VIII). ......................................... 31

CONCLUSION ....................................................................................................................... 32

- i -

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*7-Eleven, Inc. v. McEvoy,*
    300 F. Supp. 2d 352 (D. Md. 2004) ................................................................. 24, 25

*Adderly v. Ferrier,*
    419 F. App'x 135 (3d Cir. 2011) ....................................................................... 16

*Amirsalah v. Bd. Of Trace of City of N.Y., Inc.,*
    27 A.3d 522 (Del. 2011) ................................................................................... 20

*Burger King Corp. v. Hall,*
    770 F. Supp. 633 (S.D. Fla. 1991) ................................................................... 26

*Burger King Corp. v. Lee,*
    766 F. Supp. 1149 (S.D. Fla. 1991) ................................................................. 23

*California Sun Tanning USA, Inc. v. Elec. Beach, Inc.,*
    369 Fed. Appx. 340 (3rd Cir. Mar. 11, 2010) ................................................ 25

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ......................................................................................... 16

*Century 21 Real Estate LLC v. All Prof'l Realty, Inc.,*
    No. 2:10-2751, 2011 WL 4594910 (C.D. Cal. Feb. 23, 2011) ........................ 26

*Denis F. McKenna Co. v. Smith,*
    302 Ill. App. 3d 28 (1998) ............................................................................... 28, 29

*Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.,*
    702 A.2d 1228 (Del. 1997) ............................................................................... 22

*Fast v. Kahan,*
    206 Kan. 682 (1971) ......................................................................................... 22

*Flintkote Co. v. Aviva PLC,*
    769 F.3d 215 (3rd Cir. 2014) ........................................................................... 19

*Kiriakides v. United Artists Communications, Inc.,*
    307 S.C. 72, 413 S.E.2d 850 (S.C.Ct.App.1992), *affirmed on other grounds by*
    *Kiriakides v. United Artists Communications, Inc.,* 312 S.C. 271, 440 S.E.2d
    364 (1994) ......................................................................................................... 28

*Knights Franchise Sys., Inc. v. P.C.P.S. Corp.,*
    No. 06-5243, 2009 WL 3526229 (D.N.J. Oct. 21, 2009) ................................ 26

DOCS_DE:220353.1 18037/001

*In re Making the Dough, Inc.*,
    No. 1:09-ap-00119MDF, 2009 WL 975170 (Bankr. W.D. Pa. Mar. 27, 2009) ..................20

*McDonald's Corp. v. Robertson*,
    147 F.3d 1301 (11th Cir. 1998) .........................................................................28

*Moody v. Amoco Oil Co.*,
    734 F.2d 1200 (7th Cir. 1984) ................................................................17, 18, 28

*Pappan Enter., Inc. v. Hardee's Food Sys., Inc.*,
    143 F.3d 800 (3rd Cir. 1998) ..........................................................................25

*Patrons Mut. Ins. Ass'n v. Union Gas System, Inc.*,
    830 P.2d 35 (Kan. 1992) ................................................................................22

*Razorback Contractors of Kansas, Inc. v. Board of County Com'rs of Johnson
County*,
    43 Kan. App. 2d 527 (2010) ............................................................................22

*Red Roof Franchising, LLC v. Patel*,
    564 Fed. Appx. 685 (3rd Cir. 2014)....................................................................25

*S & R Corporation v. Jiffy Lube Int'l, Inc.*,
    968 F.2d 371 (3d Cir.1992)........................................................................24, 25

*Steckline Communications, Inc. v. Journal Broadcast Group of Kansas, Inc.*,
    305 Kan. 761 (2017) ......................................................................................20

*TGI Friday's, Inc. v. Great Northwest Restaurants*,
    652 F. Supp. 2d 763 (N.D. Tex. 2009) ..........................................................23, 25

*In re Tornado Pizza, LLC*,
    431 B.R. 503 (Bankr. D. Kan. 2010) ............................................................19, 20

*United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*,
    221 Kan. 523 (1977) .....................................................................................20

**Statutes**

815 Illinois Compiled Statutes
    705, § 19 (the "Franchise Disclosure Act")..........................................................20

Indiana Code
    § 23-2-2.-3..................................................................................................20

Mississippi Code
    § 75-24-53..................................................................................................20

Missouri Revised Statutes
    § 407.405.................................................................................................................20

Nebraska Revised Statutes
    § 87-404 ...............................................................................................................20

## Other Authorities

Federal Rules of Bankruptcy Procedure
    § 7056..................................................................................................................19

Federal Rules of Civiv Procedure
    § 56(a) .................................................................................................................19

DOCS_DE:220353.1 18037/001

The above-named plaintiffs, Dine Brands Global, Inc. ("Dine Brands") and its subsidiaries, Applebee's Restaurants LLC and Applebee's Franchisor LLC (together, the "Dine Subsidiaries") (Dine Brands and the Dine Subsidiaries, collectively, "Applebee's"), respectfully submit this opening brief in support of the *Plaintiffs' Motion for Summary Judgment* (the "Motion"), filed concurrently herewith.

## Preliminary Statement

1.      Defendants RMH Franchise Holdings, Inc., RMH Franchise Corporation, RMH Illinois, LLC, NuLnk, Inc. and Context Restaurants, Inc. (the "Debtors" or "RMH") combine to operate Applebee's® restaurants pursuant to franchise agreements (the "Franchise Agreements") with Applebee's.  A Form Franchise Agreement is attached as Exhibit 2 to the *Declaration of Lucy Cheong in Support of Applebee's Motion for Summary Judgment* (the "Cheong Decl.") (Cheong Decl., ¶¶ 7-9, Exhibit 2, Franchise Agreement; Counter-Complaint, ¶ 15.)

2.      At the heart of a franchise relationship is the duty of the franchisor to provide a franchisee with a license to use the franchisor's trademarks ("Marks") and the right to operate the franchised business.  In return, the franchisee bears the fundamental obligation to use the Marks as prescribed by the franchisor, comply with the franchisor's operational and brand standards, and—centrally at issue here—pay the franchisor royalties and other fees in exchange for use of the Marks and system.

3.      It is this last fundamental obligation that the Debtors have willfully ignored.  The Debtors stopped paying their royalties and advertising fees to Applebee's in clear breach of the Franchise Agreements.  Applebee's sent the Debtors a clear and unequivocal notice of default and termination pursuant to the Franchise Agreements and, even though not required to do so

- 1 -

under the Franchise Agreements, provided the Debtors with 90 days to cure the default. The notice of default and termination expressly stated the Franchise Agreements would terminate automatically on the first day after the cure period if the default was not cured.

4.      Hoping to resolve this issue amicably, Applebee's extended the Debtors' time to cure their default <u>several more</u> times, with each extension notice clearly incorporating the terms of the first notice of default and termination. The last extension provided the Debtors with a deadline to cure their defaults of April 26, 2018.

5.      The Debtors did not cure by the April 26 deadline, and <u>the Franchise Agreements terminated automatically on April 27, 2018,</u> just as Applebee's had advised in writing in September 2017. (*See* Counter-Complaint, ¶¶ 90, 93, 101, admitting the Debtors stopped paying royalties and advertising fees to Applebee's; *see also* Amended List 30 Largest Unsecured Claims [Dkt. No. 28] (listing Applebee's as the second largest unsecured creditor with a $14,276,476.40 claim existing on the petition date); Cheong Decl., ¶ 50).

6.      The Debtors then filed the above-captioned chapter 11 bankruptcy cases on May 8, 2018.

7.      With this Motion, its previously filed motion for stay relief, and its complaint in this adversary proceeding [Dkt. No. 1] (the "<u>Complaint</u>"), Applebee's seeks a declaration that the Franchise Agreements were terminated pre-petition according to their own terms, and therefore, are not property of the Debtors' estates.

8.      Applebee's also seeks judgment on the other counts of its Complaint. Specifically, Applebee's requests a declaration that it timely exercised its post-termination right

- 2 -

to take control of the RMH Restaurants (defined herein) and as to its remaining post-termination rights.

9.     There is no dispute of material fact with regard to any of the four counts of Applebee's Complaint.  The Debtors do not dispute they failed perform their obligation pre-petition to pay for the right to use the Marks and cannot dispute when Applebee's notices were sent, the content of the notices, or that the Debtors ultimately received the notices.  Also, the termination provisions of the Franchise Agreements are clear and unambiguous, and Applebee's fully complied with them.

10.     Applebee's also seeks summary judgment dismissing Counts VI and VIII of the Debtors' answer and counter-complaint [Dkt. No. 7] (the "Counter-Complaint").  Each of these counterclaims fails as a matter of law.[2]

## Nature and State of Proceedings

11.     The Debtors commenced the above-captioned chapter 11 bankruptcy cases on May 8, 2018.

12.     On May 16, 2018, Applebee's filed *Applebee's Motion to Modify the Automatic Stay* [Case No. 18-11092, Dkt. No. 91] (the "Motion for Stay Relief").  Because the Franchise Agreements terminated pre-petition, Applebee's sought stay relief out of an abundance of caution to expressly confirm the automatic stay does not apply and to allow Applebee's to exercise its post-termination rights under the Franchise Agreements.

---

[2]     Because the Answer to Complaint and Counterclaims of the committee of unsecured creditors ("Committee") [Dkt. No. 12] joins in the claims of the Debtors, the Motion also seeks dismissal of those same counts in the Committee Counter-Complaint.

- 3 -

13.     On May 23, 2018, the Court found Applebee's should seek the relief sought in the Motion for Stay Relief by adversary proceeding, but did not dismiss the Motion for Stay Relief and, instead, continued the matter on the docket.

14.     Two days after the Court's directive, Applebee's filed its Complaint on May 25, 2018, initiating the above-captioned adversary proceeding.

15.     The Debtors filed their Answer and Counter-Complaint on June 19, 2018, asserting various counterclaims and seeking damages and a declaratory judgment.   Applebee's filed its Answer to the Counter-Complaint on July 13, 2018.

## Summary of Argument

**A.     *Applebee's Is Entitled to Summary Judgment With Respect to all Claims Asserted in its Complaint.***

16.     Applebee's is entitled to a judgment declaring the Franchise Agreements terminated pre-petition, and thus, are not property of the Debtors' estates.   Whether the Debtors defaulted under the Franchise Agreements is not at issue—the Debtors admit they stopped paying royalties and advertising fees in their own Counter-Complaint.  As a result, the Franchise Agreements expressly provided Applebee's with the right to terminate the Franchise Agreements immediately upon providing written notice.  Applebee's did just that when it delivered written notice to the Debtors giving them an opportunity to cure, but unequivocally notifying them that the Franchise Agreements would terminate automatically if the defaults were not cured.   The Debtors received Applebee's notice of default and termination, and failed to cure within the period provided in the notice and several extension notices.  Accordingly, just as Applebee's had clearly instructed at the outset, the Franchise Agreements terminated automatically on April 27, 2018, the day after the final extension of the cure period expired.

- 4 -

17.    That Applebee's forbore exercising its post-termination rights for roughly two weeks is wholly irrelevant.  Each forbearance notice expressly stated that it did not waive the prior termination of the Franchise Agreements.  Nor did the attempt by Applebee's to negotiate a workout with the Debtors both before and after the notices—certainly a sensible approach given the alternative of litigation—operate to otherwise waive the termination of the Franchise Agreements.

18.    Applebee's also timely exercised its right to take over the RMH Restaurants when it filed its adversary Complaint notifying the Debtors it was exercising such right.  As with this right, Applebee's other post-termination rights under the Franchise Agreements survived following termination.

**B.    *Applebee's Is Entitled to Summary Judgment on Counts VI and VIII of the Counter-Complaint.***

19.    Counter-Complaint Counts VI and VIII should be dismissed.  For the reasons discussed *supra*, the Franchise Agreements terminated pre-petition on April 27, 2018, and thus, are not property of the Debtors' estates, and Applebee's properly and timely exercised its post-termination rights under the Franchise Agreements.

## Statement of Material Facts

**A.    *The Parties and the Franchise Agreements.***

20.    The Debtors are in the business of operating the Applebee's restaurants listed and noted in Exhibit 1 to the Cheong Declaration (collectively, the "RMH Restaurants").  (Counter-Complaint, ¶ 15; Cheong Decl., ¶¶ 7-9, Exhibit 1.[3])

---

[3]    Exhibit 1 is a list of the RMH Restaurants operated by the Debtors as of the date of their bankruptcy petition.

- 5 -

21.     The Debtors' license to use the Applebee's Marks and right to operate the RMH Restaurants was governed by Franchise Agreements for each of the RMH Restaurants. (Counter-Complaint, ¶ 15; Cheong Decl., ¶¶ 7-11, Exhibit 2, Franchise Agreement, ¶ 1.1 (granting Debtors a license to use the Marks and operate the restaurants)[4].)

22.     The Franchise Agreements required the Debtors to, among other things, pay certain royalties, advertising fees, and other fees to Applebee's as consideration for the use of the Marks.   (Cheong Decl., ¶¶ 11-14, Exhibit 2, Franchise Agreement, §§ 8.2, 9.1; Counter-Complaint, ¶¶ 25-26.)

23.     Failure to pay such fees and royalties was expressly considered a material breach under the Franchise Agreements and entitled Applebee's by right "to terminate [the Franchise Agreements] immediately upon written notice to Franchisee stating the reason for such termination in the event of any breach or default of any of the provisions of Subsection 9.1 [(requiring Franchisee to pay royalties and other fees)]. . . ."   (Cheong Decl., ¶¶ 10, 13–14, Exhibit 2, Franchise Agreement, § 19.1(a); Counter-Complaint, ¶ 27.)

---

[4]     In its Complaint, Applebee's attached the Form Franchise Agreement as an exhibit.  In their Answer, the Debtors did not dispute the Form Franchise Agreement was one they had entered into, nor did they claim it differed in any material way from the Franchise Agreements for the other 173 restaurants the Debtors operated at one time.  Instead, the Debtors merely stated the obvious—that "the various Franchise Agreements are not identical."  (Debtors' Answer, ¶ 12.)  This, however, does not preclude the Court from entering summary judgment based on the Form Franchise Agreement.  The only relevant difference between the Franchise Agreements, for purposes of this Motion, is that the notice address for the Debtors alternates between three different addresses in Lincoln, Nebraska.  That difference is irrelevant—regardless of the address, the Debtors received actual notice of the relevant communications from Applebee's. *See infra* ¶¶ 52-59, 91-96.  Further, Applebee's is submitting on a CD-Rom a set of all of the franchise agreements for the approximately 159 restaurants RMH operated pre-petition to this Court and the parties and intervenors in this Adversary Proceeding.

24.    The Franchise Agreements also outlined in detail what the Debtors were required to do upon termination and the post-termination rights of Applebee's.  Specifically, the Franchise Agreements provided for the following upon termination:

- Ceasing Use of the Marks: "[The Debtors] shall immediately discontinue use of the System and its use of the Marks and other identifying characteristics."

- De-Identification of the RMH Restaurants: "[I]f the Restaurant premises are owned by [the Debtors] or leased from a third party, [the Debtors] shall, upon demand by [Applebee's], remove (at [the Debtors'] expense) the Marks, sign fascia, and other identifying characteristics from all premises, and paint all premises and other improvements maintained pursuant to this Agreement a design and color which is basically different from [Applebee's] authorized design and color."

- Ceasing Operation of the RMH Restaurants: "[The Debtors] shall not thereafter use the Marks or any other trademark, trade name, service mark, logo, insignia, slogan, emblem, symbol, design or other identifying characteristic that is in any way associated with [Applebee's], or use any food or proprietary menu item, recipe or method of food preparation or operate or do business under any name or in any manner that might tend to give the public the impression that [the Debtors are] or [were] a licensee or franchisee of, or otherwise associated with, [Applebee's] or its affiliated companies."

(Cheong Decl., ¶¶ 10, 15–17, Exhibit 2, Franchise Agreement, § 19.2(a)-(c).)

25.    In the event of termination of the Franchise Agreements where the Debtors leased the real estate for the restaurants—which was the situation for all of the RMH Restaurants—the Franchise Agreements afforded Applebee's important rights wherein Applebee's could step into the shoes of the Debtors on the leases and purchase the RMH Restaurants' equipment, furnishings, supplies, and other products.  Specifically, the Franchise Agreements provided as follows:

- Requirement that leases be assignable to Applebee's: "If the Restaurant premises are leased by [the Debtors] from a third party, such lease must allow [the Debtors] to assign the lease to [Applebee's]."

- 7 -

- Right to Assignment of the Leases and Surrender of the Premises: "Upon termination of this Agreement for any reason, [Applebee's] has the right, exercisable upon written notice to [the Debtors] within thirty (30) days after termination is effective, to require [the Debtors] to assign all [the Debtors'] rights and obligations under the lease to [Applebee's] and to immediately surrender possession of the premises, including all fixtures and leasehold improvements, to [Applebee's]."

- Right to Purchase Equipment, Furnishings, and Supplies: "If [Applebee's] exercises that right [of assignment and surrender of the premises], it has an additional right, to be exercised within thirty (30) days after taking possession of the premises, to purchase all of [the Debtors] equipment, signs, decor items, furnishings, supplies and other products and materials at their then-fair market value. If the parties cannot agree on the price, the price will be determined in the matter set forth in connection with Franchisee-owned Restaurant premises [i.e., by a panel of three appraisers with each party choosing one appraiser and the two appraisers choosing the third.]"

(Cheong Decl., ¶¶ 10, 16, Exhibit 2, Franchise Agreement, ¶ 19.4(f).)

26.    Further, pursuant to Applebee's right under the Franchise Agreements to require assignment of any real-estate lease for the RMH Restaurants, there is a form rider which is attached to and made a part of the Debtors' real-estate leases that acknowledges and provides for the Debtors' right to sublet or assign the premises specifically to Applebee's or its affiliates. (Cheong Decl., ¶ 19, Exhibit 3, Lease Rider.)  In the rider, the Debtors and the landlords for the RMH Restaurants specifically agreed Applebee's is an intended third-party beneficiary of the rider and has the right to enforce the terms of the rider as if it was a party to it.  (Cheong Decl., ¶ 19, Exhibit 3, Lease Rider, ¶ 10.)

27.    The Franchise Agreements included the following notice provision that, depending on the Franchise Agreement, listed the Debtors' address in Nebraska as either (1) 1701 Windhoek Drive, Lincoln, Nebraska 68512 ("the Windhoek Drive Address"); (2) 1701 Pine Lake Road, Ste. 4, Lincoln, Nebraska 68512 ("the 1701 Pine Lake Road Address"); or (3) 2021 Pine Lake Road, #100, Lincoln Nebraska 68512 ("the 2021 Pine Lake Road Address"):

- 8 -

All notices and other communications required or permitted to be given hereunder shall be deemed given when delivered in person, by overnight courier service, facsimile transmission or mailed by registered or certified mail addressed to the recipient at the address set forth below, unless that party shall have given written notice of change of address to the sending party, in which event the new address so specified shall be used.

(Cheong Decl., ¶¶ 10, 18, Exhibit 2, Franchise Agreement, § 25.1.)

28.    The Franchise Agreements contain the following broad choice-of-law provision in favor of Kansas law:

> **. . . THE PARTIES AGREE THAT TO THE EXTENT THAT THE LAW OF THE STATE OF KANSAS DOES NOT CONFLICT WITH LOCAL FRANCHISE STATUTES, RULES AND REGULATIONS, KANSAS LAW SHALL GOVERN ALL QUESTIONS WHICH ARISE WITH REFERENCE HERETO; PROVIDED, HOWEVER, THAT PROVISIONS OF KANSAS LAW REGARDING CONFLICTS OF LAW SHALL NOT APPLY HERETO.**

(Cheong Decl., ¶ 10, Exhibit 2, Franchise Agreement, § 21.2 (emphasis in original).)

**B.    The Debtors' Breach of the Franchise Agreements.**

29.    It is undisputed that, beginning in or around June 2017 the Debtors stopped paying royalties due under the Franchise Agreements.  (Cheong Decl., ¶ 20; Counter-Complaint, ¶ 90.)

30.    It is undisputed that, in or around January 2018 the Debtors stopped paying advertising and other fees due under the Franchise Agreements on a majority of the franchises and, eventually, stopped paying on all of them.  (Cheong Decl., ¶ 21; Counter-Complaint, ¶ 101.)

31.    Finally, it is also undisputed that, notwithstanding their non-payment of royalties and advertising fees, the Debtors continued to operate the RMH Restaurants using Applebee's federally-registered Marks.  (Cheong Decl., ¶ 22.)

- 9 -

108555383\V-13

**C.      Applebee's Ample Notice of Default, Opportunity to Cure, and Termination to the Debtors.**

32.      After the Debtors defaulted under the Franchise Agreements, Applebee's and the Debtors participated in negotiations in an attempt to address the Debtors' default.  Ultimately, however, those negotiations were not successful.  (Counter-Complaint, ¶¶ 116-134.)

33.      On or about September 20, 2017, Applebee's provided a notice to the Debtors by Federal Express with the subject line, "Notice of Default, Cure Period, and Termination of Franchise Agreements," and notified the Debtors of their material breaches of the Franchise Agreements stemming from their nonpayment of royalties (the "Notice of Default and Termination").  (Cheong Decl., ¶¶ 25, Exhibit 5, Notice of Default and Termination; Counter-Complaint, ¶ 107.)   The Notice of Default and Termination informed the Debtors of the following:

> RMH has outstanding arrearages for fees that it is obligated to pay under Section 9.1 of the franchise agreements for the restaurants identified in the attachment, including without limitation, for royalties. Some of these arrearages go back to June 2017.  A detailed spreadsheet of the overdue amounts for each restaurant is attached. In summary, RMH's overdue payments total $3,433,391.73 ("Overdue Amount"). . . .

> Pursuant to Section 19 and applicable law, Applebee's demands that RMH pay the Overdue Amount within 90 days of receipt of this letter to cure each default of the franchise agreements for the restaurants identified on the attached chart.  For restaurants for which RMH does not cure the default, the franchise agreements for the restaurants will terminate on the 91st day **without further notice**, and RMH will be expected to fully comply with its post-termination obligations under the relevant franchise agreement(s).

(Cheong Decl., ¶¶ 25-27, Exhibit 5, Notice of Default and Termination (emphasis added), Exhibit 6, Federal Express Receipt.)

- 10 -

34.    The Debtors did not cure any of the defaults with regard to the Franchise Agreements within the initial 90-day period specified in the Notice of Default and Termination. (Cheong Decl., ¶ 28; Counter-Complaint, ¶¶ 93, 101 (admitting the Debtors stopped paying royalties and advertising fees beginning around June 2017 and January 2018, respectively).)

35.    As the initial 90-day cure period neared expiration and over the next four months, Applebee's sent—and the Debtors received—written notices extending the cure period to allow the Debtors to cure the defaults.    The written notices were sent on December 18, 2017; January 19, 2018[5]; February 8, 2018; February 26, 2018; March 12, 2018; April 9, 2018; and April 16, 2018 (collectively, "Cure Extension Letters").    (Cheong Decl., ¶¶ 29-51, Exhibits 7-30.)

36.    The April 16, 2018 Cure Extension Letter extended the cure period for the last time and to April 26, 2018 ("Final Cure Extension Letter").    (Cheong Decl., ¶¶ 46-47, Exhibit 29, Final Cure Extension Letter, Exhibit 30, Transmittal Email.)

37.    Each of the Cure Extension Letters was sent and received before the cure period expired and stated it was "without waiver of any of [Applebee's] rights and remedies" and included the following paragraph:

> Nothing in this letter shall be construed to modify or limit any rights or remedies of Applebee's.  Applebee's expressly reserves all of its rights with respect to any and all remedies at law or in equity, under the franchise agreement, any other contract, or any other source of right or remedy.  Neither this letter nor any action taken or not taken by Applebee's, including, but not limited to, continuing to do business, accepting records, accepting money, or any other action or inaction, shall be deemed to be a waiver of Applebee's right to any remedies.

---

[5]    In Paragraph 115 of their Counter-Complaint, the Debtors alleged Applebee's sent a cure-extension letter on January 18, 2018.  (*See* Counter-Complaint, ¶ 115.)  However, as set forth in Applebee's Complaint and Ms. Cheong's Declaration, the letter was actually dated January 19, 2018, and, in response to that allegation, the Debtors "admit that the documents attached to the Complaint as Exhibits 6-10 were sent to the addresses listed therein on or about the dates listed in Paragraph 27."  (Answer to Complaint, ¶ 27.)  Therefore, Applebee's assumes the Debtors' reference to a January 18, 2018 cure-extension letter is merely a typo.

(Cheong Decl., ¶¶ 29-51, Exhibits 7, 9, 13, 18, 21, 26, 29 (emphasis added).)

38.      Rather than cure the defaults, the Debtors, as noted above, only compounded the defaults in or around January 2018 when the Debtors stopped paying advertising and other fees due under the Franchise Agreements.  (Cheong Decl., ¶ 31; Counter-Complaint, ¶ 101.)

39.      Each of the Cure Extension Letters tied back to the Notice of Default and Termination and was sent before the cure period expired; so, the Franchise Agreements would expire automatically and without further notice at the end of the extended cure period.  (Cheong Decl., ¶¶ 28-29, 32-35, 37-40, 43-44, 46-47, Exhibits 7, 9, 13, 18, 21, 26, 29, Cure Extension Letters.)

40.      Each of the Cure Extension Letters was sent by Federal Express to either the address specified in the Franchise Agreement or one the Debtors identified as the proper address; all but the first two Cure Extension Letters were emailed to one or more of the Debtors' officers; and the Debtors received all of the Cure Extension Letters.  (Cheong Decl., ¶¶ 24, 28-29, 32-45, 46-48; Exhibits 4, 7, 9, 11-13, 15-27, 29-30.)

41.      At no point did the Debtors object to Applebee's, or claim, that they had not received the Notice of Default and Termination or any of the Cure Extension Letters and, even now, have not made such an allegation.  (Cheong Decl., ¶ 49.)

42.      On April 16, 2018, Applebee's reminded the Debtors by letter of their failure to respond to Applebee's latest counter-proposal in March 2018 and stressed, again, not only the urgency of the matter, but also the possibility of litigation.  (Cheong Decl., ¶ 46, Exhibit 28, Mr. Adel's April 16, 2018 Letter; Counter-Complaint, ¶ 130.)

- 12 -

108555383\V-13

DOCS_DE:220353.1 18037/001

43.     The Debtors did not cure the defaults on April 26, 2018, and, as a result, the Franchise Agreements terminated the next day, April 27, 2018, pursuant to their own terms and the Notice of Default and Termination.  (Cheong Decl., ¶ 50.)

**D.      Pre-Petition Termination of the Franchise Agreements.**

44.     The Debtors did not cure any of the defaults by April 26, 2018. (Cheong Decl., ¶ 50; Counter-Complaint, ¶¶ 93, 101 (admitting the Debtors stopped paying royalties and advertising fees beginning around June 2017 and January 2018, respectively); *see also* Amended List 30 Largest Unsecured Claims [Dkt. No. 28] (listing Applebee's as the second largest unsecured creditor with a $14,276,476.40 claim as of the petition date).)  Accordingly, the Franchise Agreements terminated the next day, April 27, 2018, pursuant to their own terms and the previously issued Notice of Default and Termination.  (Cheong Decl., ¶¶ 25, 50, Exhibit 5.)

45.     As of April 27, 2018, the Debtors had no right or authorization, under the Franchise Agreements or otherwise, to continue to operate the RMH Restaurants and use Applebee's Marks and trade name.  (Cheong Decl., ¶¶ 10, 15, 16–17, 50, Exhibit 2, §§ 19.1, 19.2(b).)

46.     On April 25, 2018, in anticipation that the Debtors would not cure their defaults by the April 26, 2018 deadline, Applebee's prepared a letter to the Debtors notifying them that Applebee's agreed to forbear from taking any further enforcement actions against the Debtors until May 8, 2018 ("Initial Forbearance Notice").  (Cheong Decl., ¶ 52, Exhibit 31, Initial Forbearance Notice; Counter-Complaint, ¶ 134.)  The Initial Forbearance Notice specifically provided:

> Without waiver of any of our rights and remedies under the applicable franchise agreements for the Applebee's restaurants listed on the attached schedule (the

- 13 -

"Franchise Restaurants"), Applebee's agrees that it will forbear from taking any further actions against you or the Franchise Restaurants, whether at law or in equity, to enforce our rights and remedies against you or the Franchise Restaurants, under or in connection with the franchise agreements, until May 8, 2018. This agreement to forbear is not an extension of the cure periods referred to in prior Notices, which have already expired.

(Cheong Decl., ¶ 52, Exhibit 31, Initial Forbearance Notice (emphasis added).)

47.    Applebee's sent the Initial Forbearance Notice by Federal Express to the 2021 Pine Lake Road Address, and the Debtors received the Initial Forbearance Notice on April 27, 2018.    Applebee's emailed the Initial Forbearance Notice to Mike Muldoon, the Debtors' President, and Mitch Blocher, the Debtors' CFO, on April 26, 2018.  (Cheong Decl., ¶ 53, Exhibits 32-33.)

48.    Applebee's sent the Initial Forbearance Notice because it needed to make extensive preparations to take over the large number of RMH restaurants, including, among other things, ensuring the necessary operational and logistical support was in place.  (Cheong Decl., ¶ 54.)

49.    The Initial Forbearance Notice, which was effective on April 27, 2018, the day the Franchise Agreements terminated, expired on May 7, 2018.  As a result, on May 8, 2018, the Debtors were also required to comply with certain post-termination obligations under the Franchise Agreements, including ceasing operation of the RMH Restaurants and either de-identifying the RMH Restaurants or complying with Applebee's right, if exercised under the Franchise Agreements, to assign any real-estate leases for and surrender the premises of any leased RMH Restaurants.   (Cheong Decl., ¶¶ 10, 15-17, 51, 52, Exhibit 2, §§ 19.1, 19.2(b), 19.4(f), Exhibit 31.)

- 14 -

**E.      Applebee's Exercise of its Post-Termination Rights.**

50.    Given the complicated logistics and substantial resources needed to potentially take over each RMH Restaurant across 15 states, Applebee's decided to proceed in a phased approach beginning with taking over the RMH Restaurants in Arizona and Texas.  (Cheong Decl., ¶ 55.)

51.    Therefore, on May 8, 2018, Applebee's hand-delivered a letter to the Debtors to reconfirm and make clear "[t]he last extension Applebee's provided of the cure period expired on April 26, 2018.  Without waiver of any of its rights under any of the franchise agreements, Applebee's hereby notifies you that the franchise agreements for the Applebee's restaurants in Arizona and Texas, as identified in the attached Exhibit A, terminated on April 27, 2018, in accordance with Section 19 of the franchise agreements" ("Post-Termination Transfer Notice"). (Cheong Decl., ¶ 56, Exhibit 34, Post-Termination Transfer Notice; Counter-Complaint, ¶ 143.) The Post-Termination Transfer Notice further provided that:

> Applebee's hereby exercises its rights under Section 19.4(f) of each franchise agreement, including, without limitation, its rights "to require Franchisee to assign all Franchisee's rights and obligations under the lease to Franchisor and to immediately surrender possession of the premises, including all fixtures and leasehold improvements, to Franchisor."  Applebee's exercises this right for all the restaurants identified in the attached list except for the 4 previously closed restaurants as well as the restaurants located at (1) 565 E. Wetmore Road, Tucson, Arizona, and (2) 2912 Boca Chica Blvd., Brownsville, Texas.

(Cheong Decl., ¶ 56, Exhibit 34, Post-Termination Transfer Notice.)

52.    For the remaining RMH Restaurants outside of Arizona and Texas, Applebee's hand-delivered a separate letter to the Debtors on May 8, 2018 wherein Applebee's agreed to forbear from enforcing its termination rights with the RMH Restaurants, other than the Arizona and Texas restaurants, until May 20, 2018 ("May Forbearance Notice").  (Cheong Decl., ¶ 57,

- 15 -

Exhibit 35, May Forbearance Notice; Counter-Complaint, ¶ 146.)  This May Forbearance Notice, similar to the previously issued Initial Forbearance Notice, provided that "[t]his agreement to forbear is not an extension or a restarting of the prior cure period referred to in prior Notices, which has already expired, nor is it a new cure period."  (Cheong Decl., ¶ 57, Exhibit 35, May Forbearance Notice.)

53.    On May 19, 2018, Applebee's filed the adversary Complaint notifying the Debtors it was exercising its post-termination right to take over all RMH Restaurants pursuant to Section 19.4(f) of the Franchise Agreements.  (Cheong Decl., ¶ 58; Complaint, ¶ 61 (electing to "take back the specified RMH Restaurants located in Arizona and Texas," listed in Exhibit 16 to the Complaint) and ¶ 65 (electing to "take back the RMH Restaurants listed on Exhibit 17 [to the Complaint] (the "Remaining RMH Restaurants")).

### Applicable Standard

54.    Under Fed. R. Civ. P. 56(a), made applicable herein by Fed. R. Bankr. P. 7056, the Court "shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986) (internal quotation marks omitted).  Once the moving party establishes the absence of any genuine issue of material fact, the burden of proof then "shifts to the non-moving

- 16 -

party to set forth specific facts demonstrating a genuine issue for trial." *Adderly v. Ferrier*, 419

F. App'x 135, 136 (3d Cir. 2011) (citation omitted).

## Argument

### I.    The Franchise Agreements Terminated on April 27, 2018, And Are Not Property of the Debtors' Estates (Complaint - Count I; Counter-Complaint - Count VI).

55.    Having admitted they materially breached the Franchise Agreements by not

paying royalties and advertising fees to Applebee's (SOF 22-23, 29-30), the Debtors' strategy on

termination is that of throwing every argument against the wall and seeing if any stick.  None do

here.

#### A.    *Applebee's Fully Complied With the Termination Provisions in the Franchise Agreements.*

56.    The Franchise Agreements left no ambiguity about Applebee's rights based on the

Debtors' breaches:  under Section 19.1, Applebee's had "the right to terminate *immediately* upon

written notice to [the Debtors] stating the reason for such termination."  SOF 23 (emphasis

added).  Applebee's exercised that right when, on September 20, 2017, after three months of the

Debtors shirking their obligation to pay royalties, Applebee's delivered a notice to the Debtors

with the subject line "Notice of Default, Cure Period, and Termination of the Franchise

Agreements."  SOF 33.  However, instead of acting rashly and terminating the Franchise

Agreements then and there, Applebee's gave the Debtors a 90-day period to cure their default—a

benefit Applebee's had no obligation to provide for many of the RMH restaurants.[6]  In providing

---

[6]    Certain states where the RMH restaurants are located have statutory franchise-relationship laws that require cure periods or advance notice of termination of between 30 to 90 days. 815 ILCS 705/19; Ind. Code § 23-2-2.-3; Mo. Rev. Stat. § 407.405; Miss. Code. § 75-24-53; Neb. Rev. Stat. § 87-404.  Applebee's provided the 90-day cure period to the Debtors, in part, to comply with the laws in those states.

- 17 -

108555383\V-13

the cure period, Applebee's unambiguously explained the consequences of the Debtors' non-compliance:

> For restaurants for which RMH does not cure the default, the franchise agreements for the restaurants will terminate on the 91st day **without further notice**, and RMH will be expected to fully comply with its post-termination obligations under the relevant franchise agreement(s).

SOF 33 (emphasis added). Thus, as of September 20, 2017, and in full compliance with Section 19.1 of the Franchise Agreements, Applebee's had provided (1) written notice (2) stating the reasons for termination and (3) stating termination would be effective immediately upon the Debtors' failure to cure within the time period Applebee's identified.  SOF 33.

57.    The Debtors could have cured the defaults, perhaps paying under a reservation of rights or under protest.  However, the Debtors purposely chose not to do so; rather, they compounded the problem by continuing not to pay royalties and, later, advertising fees as an apparent strategic leverage play.  SOF 34-38.  Even so, Applebee's again gave the Debtors every opportunity to save the restaurants by extending the cure period through multiple written notices between December 2017 and April 2018.  SOF 34-44.  Each Cure Extension was littered with statements notifying the Debtors that the cure extensions were provided "without waiver," and with Applebee's express and full reservation of its rights.  SOF 37.  The Last Extension Letter on April 16, 2018, plainly stated "we are extending your cure period for the restaurants listed on the attached schedule to April 26, 2018."  SOF 42.  However, April 26, 2018—the 218th day of the extended cure period—came and went, again, without the Debtors paying in full the outstanding royalties and advertising fees.  SOF 43.  As a result, and pursuant to the unequivocal statement in the Notice of Default and Termination, the Franchise Agreements terminated "on the [219th] day

- 18 -

without further notice," or, in other words, on April 27, 2018.[7] SOFs 33, 40-43. This was more than a full week before the Debtors filed bankruptcy, and the Debtors have no rights in the Franchise Agreements. *See, e.g., Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1214 (7th Cir. 1984) ("Where a contract has been validly terminated pre-bankruptcy, the debtor's rights to continued performance under the contract have expired. The filing of a petition under Chapter 11 cannot resuscitate those rights."); *In re Tornado Pizza, LLC*, 431 B.R. 503, 510-11 (Bankr. D. Kan. 2010) ("[W]hen a franchise agreement has been terminated for cause prepetition and the termination process is complete with no right to cure when the petition is filed, the debtor does not have a property interest in the franchise on the date of filing and there is no executory contract to assume, even if on the date of filing the debtor remains in possession of the franchised business and continues to use the franchisor's trademark property. The bankruptcy filing does not resuscitate the terminated rights.").

58.    None of this is complex or challenged. The Debtors, operators of a substantial number of Applebee's restaurants, sought a free ride on Applebee's Marks or perhaps decided not to pay as a pressure tactic in the negotiations (which decision it made at its own legal peril). Regardless of the Debtors' motives, Applebee's exercised its right to terminate the Franchise Agreements, and patiently gave the Debtors a lengthy opportunity to cure their breach, making it clear at the outset that failure to do so would result in termination without further notice.

---

[7]    In an apples-to-oranges comparison, the Debtors will likely point to Applebee's January 17, 2018 Notice of Termination of the Development Agreements with the Debtors, and note that it stated that "[e]ach Development Agreement . . . has terminated," and claim this language demonstrates that, for the Franchise Agreements, another notice of termination after the September 20, 2017 Notice of Default and Termination was required. But this is wrong. The September 20, 2017 Notice of Default and Termination only referenced and related to the Franchise Agreements. (Cheong Decl., ¶¶ 25-27.) It had nothing to do with any Development Agreements, which explains why a separate termination notice was sent for the Development Agreements.

Whether the Debtors were unable to pay the amounts owed or thought Applebee's was bluffing, they cannot claim now termination was improper or occurred post-petition.

> **B.**     ***Applebee's Forbearance Letters and Termination Confirmation Notice Did Not Waive the Termination of the Franchise Agreements.***

59.     The Debtors suggest Applebee's Forbearance Notices and Termination Confirmation Letter "waived" the termination of the Franchise Agreements or otherwise indicated they had not terminated.

60.     To establish a waiver of a contractual right, there must be conduct by a party that, "to a reasonable observer, would have conveyed an intent to waive or otherwise forgo its rights under" the agreement.  *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 223-24 (3rd Cir. 2014) (*quoting Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 27 A.3d 522, 529 (Del. 2011)).  A valid waiver requires a party to voluntarily and intentionally renounce or give up a known right, or cause some positive act inconsistent with that right.  *Steckline Communications, Inc. v. Journal Broadcast Group of Kansas, Inc.*, 305 Kan. 761, 769 (2017*) (quoting United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 526–27 (1977)). "Because the gravamen of a waiver claim is the voluntary relinquishment of a right (or its continued existence)" a party may "innoculate itself against future claims that it has waived a contractual right by including a valid anti-waiver provision in the contract." *Id.*

61.     The Initial Forbearance Notice and the May Forbearance Notice both made clear what they did <u>not</u> do: "This agreement to forbear is <u>not</u> an extension of the cure periods referred

- 20 -

to in prior Notices, <u>which have already expired</u>." SOF 46 (emphasis added).[8] Contrary to the Debtors' arguments, these letters do not evidence any intent to waive termination of the Franchise Agreements; they only served as a forbearance of Applebee's right to exercise its post-termination rights. *See In re Making the Dough, Inc.*, No. 1:09-ap-00119MDF, 2009 WL 975170, at *4 (Bankr. W.D. Pa. Mar. 27, 2009) (holding franchisor's forbearance from collecting on a debt owed to it by franchisee did not result in an implied waiver because the forbearance necessarily benefited the franchisee such that it "<u>would be a gross distortion of the law to find implied waiver where the party who relied upon a purportedly misleading act or representation by another benefitted as a result thereof while only the party who so misled them suffered a detriment</u>.") (emphasis added); *In re Tornado Pizza, LLC*, 431 B.R. at 516-17 (Bankr. D. Kan. 2010) (finding franchisor did not waive its termination by staying enforcement of its termination rights to allow the franchisee to sell its stores).

62.     Further, the Post-Termination Transfer Notice, which related to restaurants in Arizona and Texas, did not convey any intent to waive the prior termination of the Franchise Agreements. Quite the opposite, it unequivocally reminded the Debtors (1) that "the cure period expired on April 26, 2018"; and (2) that the Franchise Agreements "terminated on April 27, 2018, in accordance with Section 19 of the franchise agreements." SOF 52. And, consistent with the original Notice of Default and Termination informing the Debtors of the automatic termination if no cure was made, the Post-Termination Transfer Notice used the past tense—"terminated."

---

[8]     The May Forbearance Notice has substantially similar language: "This agreement to forbear is not an extension or a restarting of the prior cure period referred to in prior Notices, which has already expired, nor is it a new cure period." SOF 52.

- 21 -

Nowhere did it state that Applebee's was taking some affirmative action to terminate or restart the clock to cure. *Id.*

63.     The Debtors will likely latch on to the reference in the May Forbearance Notice to Applebee's forbearing from enforcing its "termination rights" and claim this phrase implies the Franchise Agreements had not yet been terminated.  This argument, too, is without merit.  First, this general reference in no way overcomes the very specific instruction provided in the Notice of Default and Termination seven months earlier that the Franchise Agreements would terminate automatically if the Debtors did not cure the default within the cure period.  Second, the May Forbearance Notice must be read alongside the Post-Termination Transfer Notice, which, as noted above, made abundantly clear the Franchise Agreements terminated automatically on April 27, 2018.  Lastly, under the Franchise Agreements, Applebee's enjoys a variety of post-termination rights, including, among other things, the right to assignment of any real-estate leases for the restaurants, surrender of the restaurants' premises, and de-identification.  SOF 24-26.  That is what the reference to "termination rights" concerned.  SOF 51-52.

**C.      The Parties' Negotiations and Alleged Course of Dealing Did not Modify Applebee's Right to Terminate the Franchise Agreements.**

64.     The Debtors contend Applebee's "claims are barred in whole or in part by the parties' course of dealing." (Answer and Counter-Complaint, Seventh Affirmative Defense.)

65.     Even after the Debtors defaulted under the Franchise Agreements, Applebee's and the Debtors participated in negotiations in an attempt to assist the Debtors in curing the default. SOF 32.  While unsuccessful, SOF 32, these negotiations did not modify Applebee's right to terminate the Franchise Agreements.

- 22 -

66.    Similar to a claim of waiver, courts will not utilize evidence of a course of dealing to modify the term of a contract where the contract is otherwise unambiguous. *See Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."). While a course of conduct may be used to infer a waiver has occurred, such conduct will not be sufficient unless it evidences an "unequivocal" intent to waive a known right. *Razorback Contractors of Kansas, Inc. v. Board of County Com'rs of Johnson County*, 43 Kan. App. 2d 527, 545-46 (2010). *See also Patrons Mut. Ins. Ass'n v. Union Gas System, Inc.*, 830 P.2d 35, 39-40 (Kan. 1992) ("Waiver must be manifested in some unequivocal manner by some distinct act or by inaction inconsistent with an intention to claim forfeiture of a right."). A course of conduct must demonstrate a mutual assent by the parties to modify a contract term. *Fast v. Kahan*, 206 Kan. 682, 684-85 (1971).

67.    Numerous courts evaluating franchise terminations have rejected the same or similar course-of-dealing arguments the Debtors raise here. *See, e.g., TGI Friday's, Inc. v. Great Northwest Restaurants*, 652 F. Supp. 2d 763, 770 (N.D. Tex. 2009) (rejecting franchisee's argument of waiver based on the franchisor's continued post-termination inspection of the restaurants, sending menus and other promotional materials, and listing the restaurants on its website); *Burger King Corp. v. Lee*, 766 F. Supp. 1149, 1156 (S.D. Fla. 1991) (holding franchisor's providing of food products to terminated franchises did not demonstrate waiver of termination or consent).

68.    While Applebee's did attempt to negotiate a workout with the Debtors after issuing the Notice of Default and Termination, Applebee's never retracted, suspended, or stayed

- 23 -

the cure period or termination. Indeed, nowhere in the Debtors' 279-paragraph Counterclaims do they even allege Applebee's made any such statement related to the cure period or termination. Even in the midst of the parties' workout discussions, Applebee's regularly sent the Cure Extension Letters stating unambiguously that "[n]either this letter nor any action taken or not taken by Applebee's, including, but not limited to, continuing to do business, accepting records, accepting money, or any other action or inaction, shall be deemed a waiver of Applebee's right to any remedies." SOF 37. As a sophisticated private-equity owned franchisee, the Debtors were on notice that nothing Applebee's did could or should be construed as a waiver.

69.    And Applebee's did not sit silent for an extended period of time following termination of the Franchise Agreements and lull the Debtors into a belief the Franchise Agreements were still in place. With the Post-Termination Transfer Notice, Applebee's exercised its post-termination rights for the Arizona and Texas Restaurants just eleven days after termination of the Franchise Agreements. Thus, Applebee's alleged course of dealing has no impact on the effectiveness of the termination of the Franchise Agreements.

**D.    *Applebee's Alleged Breaches of the Franchise Agreements Do Not Preclude Applebee's Ability to Terminate the Franchise Agreements.***

70.    The Debtors' Answer and (belated) Counter-Complaint also asserts an affirmative defense that "[t]he Franchisor's claims are barred, in whole or in part, due to the Franchisor's material breach and failure to substantially perform under the Franchise Agreements." (Answer and Counter-Complaint, Third Affirmative Defense.) The Debtors similarly (and belatedly) assert a claim for breach of contract against the Dine Subsidiaries for certain alleged changes to the Applebee's System. (*See* Counter-Complaint, Counts I-III.)

- 24 -

71.     The Debtors' position rests on the untenable and flawed logic that, if the Debtors disagree with Applebee's business decisions regarding its own franchise system, then Applebee's is powerless to terminate the Franchise Agreements for the Debtors' non-payment and the Debtors are permitted to operate as franchisees in perpetuity while, ironically, reaping the rewards from the very franchise system the Debtors criticize.  This is not the law.

72.     To be clear, Applebee's denies those alleged breaches of contract have any merit. But even if every single one of the Debtors' allegations of breach was true, they provide no excuse for the Debtors' non-payment of royalties and advertising fees and did not preclude Applebee's from terminating the Franchise Agreements.   The termination of the Franchise Agreements following the Debtors' default is a completely separate issue from the Debtors' claimed damages from Applebee's alleged breaches.

73.     Just like the Debtors do here, in *7-Eleven, Inc. v. McEvoy*, 300 F. Supp. 2d 352 (D. Md. 2004), the franchisee claimed termination was improper because the franchisee allegedly breached the franchise agreement first.   The court quickly rejected the franchisee's defense and explained what the franchisee should have done if it had believed a breach occurred:

> Had 7–Eleven breached the agreement before McEvoy breached, he could have: 1) treated 7–Eleven's breach, if material, as a repudiation of the agreement and discontinued his performance and acceptance of benefits under the agreement; or 2) treated the breach as a partial breach and sued for damages.   *S & R Corporation v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir.1992).  McEvoy could not respond to 7–Eleven's breach by reaping the agreement's benefits while discontinuing his performance under the agreement.  *Id.*   Accordingly, McEvoy cannot assert 7–Eleven's alleged breaches of the agreement as an affirmative defense to his breaches of the agreement.

300 F. Supp. 2d at 358 (D. Md. 2004) (emphasis added); *see also TGI Friday's, Inc.*, 652 F. Supp. 2d at 769 (explaining the same options and stating, "Even if defendants [franchisees]

- 25 -

have a claim for breach of a duty of good faith and fair dealing . . . this does not excuse their nonperformance under the franchise agreements or render TGIF's termination of the agreements improper.").

74.    Other courts similarly have held a franchisor's alleged breach of the franchise agreement does not excuse performance by the franchisee under the franchise agreement and continued unauthorized use of the applicable trademarks. *See Red Roof Franchising, LLC v. Patel*, 564 Fed. Appx. 685, 688 n. 4 (3rd Cir. 2014) ("[W]here a franchisee alleges breach of contract by a franchisor . . . the franchisee may not . . . withhold royalties and continue to operate as usual."); *California Sun Tanning USA, Inc. v. Elec. Beach, Inc.*, 369 Fed. Appx. 340, 348 (3rd Cir. Mar. 11, 2010) (rejecting a franchisee's argument that the franchisor's breach of contract barred specific performance); *Pappan Enter., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806-07 (3rd Cir. 1998) (holding a franchisee's claim that the franchisor breached the franchise agreement went to the issue of determining damages and not whether performance is excused); *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3rd Cir. 1992) ("a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor."); *see also McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308-09 (11th Cir. 1998) ("[A] franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor.  The franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated."); *Century 21 Real Estate LLC v. All Prof'l Realty, Inc.*, No. 2:10-2751, 2011 WL 4594910, at *1-2 (C.D. Cal. Feb. 23, 2011) ("The validity of a franchisor's termination depends on whether the franchisee breached the franchise agreement, and a franchisor's breach does not excuse a franchisee's breach.");

- 26 -

*Knights Franchise Sys., Inc. v. P.C.P.S. Corp.*, No. 06-5243, 2009 WL 3526229, at \*3-4 (D.N.J. Oct. 21, 2009) (holding a franchisee is not excused from paying franchise fees based on a claim the franchisor breached the franchise agreement); *Burger King Corp. v. Hall*, 770 F. Supp. 633, 638 (S.D. Fla. 1991) ("[A] terminated franchisee's remedy for [alleged] wrongful termination is an action for money damages, and not the continued unauthorized use of its franchisor's trademarks.").

75.    Accordingly, the Debtors' claims that Applebee's allegedly breached the Franchise Agreements do not preclude Applebee's termination of the Franchise Agreements.

### E.    Applebee's Notices Were Effective Under the Franchise Agreements and Actually Received by the Debtors.

76.    The Debtors contend the "purported notice of termination of the Franchise Agreements was ineffective to the extent that such notice was not delivered to the address set forth in the Franchise Agreements for giving notice thereunder."   (Answer and Counter-Complaint, Eighth Affirmative Defense.)  The Debtors' defense ignores the purpose of and plain language in the notice provision in the Franchise Agreements, the Debtors' notice to Applebee's of a change in their address, and the Debtors' actual receipt of each of Applebee's Notices.  SOF 27; (Cheong Decl., ¶¶ 24, 37-40.)

77.    Applebee's does not deny the Franchise Agreements originally listed one of three addresses in Nebraska for the Debtors: (1) the Windhoek Drive Address; (2) the 1701 Pine Lake Road Address; or (3) the 2021 Pine Lake Road Address.  SOF 27.  The notice provision—in each Franchise Agreement—also provided the following:

> All notices and other communications required or permitted to be given hereunder <u>shall be deemed given</u> when delivered in person, by overnight courier service, facsimile transmission or mailed by registered or certified mail addressed to the

- 27 -

recipient at the address set forth below, <u>unless that party shall have given written notice of change of address to the sending party</u>, in which event the new address so specified shall be used.

SOF 27 (emphasis added).  The Notice of Default and Termination and three subsequent Cure Extension Letters were sent to the Pine Lake Road address; the remaining Cure Extension Letters and Final Cure Extension Letter were sent to the following address: One Concourse Parkway, N.E. Suite 600, Atlanta, Georgia 30328.  SOF 33-45.

78.    The Debtors' argument ignores the fact that, in 2013, they notified Applebee's that their new address <u>was</u> the 2021 Pine Lake Road Address.  (Cheong Decl., ¶ 24.)  Thus, under the notice provision, Applebee's properly adhered to the instruction that "the new address so specified shall be used."  It did so again for the last four Cure Extension Letters when RMH's <u>own</u> president, Mike Muldoon, emailed Applebee's on February 9, 2018, and instructed Applebee's to "[p]lease change our address of record to the Atlanta address in my signature below.  Please send all correspondence to Mitch Blocher (CFO) and myself."  (Cheong Decl., ¶¶ 37-40.)  Applebee's complied with the Franchise Agreements at all times and also sent the Cure Extension Letters by e-mail as well.

79.    But even if Applebee's notices were not sent to the address identified in the Franchise Agreements, the issue is irrelevant because the Debtors actually received every Notice.  The notice provision in the Franchise Agreements does not provide the exclusive means of providing notice; it merely states notice "shall be deemed given" if sent in the manner and to the address noted in the notice provision.  SOF 27.  Importantly, the provision does not *preclude* a party from providing actual notice in other ways.

- 28 -

80.     The case law is consistent with this interpretation.   Courts have held that if the party to a contract actually receives the notice, the fact notice was not sent to the address specified in the contract to receive notices is a harmless error and will not render the notice ineffective.  *See Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1211 (7th Cir. 1984) ("the lease does provide that the notices shall be sent to "105 Murphy Drive" rather than to "Hwy. 82 & I– 90/94," where the notices actually were sent.  The purpose of such a provision is to ensure the franchisee receives timely notice.   Where, as here, there is no dispute that the difference in address caused no delay in receipt, the discrepancy is harmless."); *Denis F. McKenna Co. v. Smith*, 302 Ill. App. 3d 28, 31-32 (1998) (finding actual notice was sufficient to render the notice effective because the purpose of a contractual notice provision is to ensure notice is delivered); *Kiriakides v. United Artists Communications, Inc.*, 307 S.C. 72, 74, 413 S.E.2d 850, 851 (S.C. Ct. App.1992), *affirmed on other grounds by Kiriakides v. United Artists Communications, Inc.*, 312 S.C. 271, 440 S.E.2d 364 (1994) (lease notice provisions were substantially complied with when sent to an incorrect address.).

81.     Here, the Notice of Default and Termination and Cure Extension Letters were actually delivered to the Debtors either by email, Federal Express with receipt notices signed by the Debtors, or, in many cases, both ways.  SOF 40-41.  Indeed, when RMH's Mr. Muldoon notified Applebee's by email of a change in the Debtors' address of record, he did so as <u>he acknowledged receipt</u> of the February 8, 2018 Cure Extension Letter.  (Cheong Decl., ¶¶ 37-40.).  At no point did he or anyone else from the Debtors claim the Debtors never actually received any of the Notices from Applebee's.  Even now, the Debtors do not make such an allegation in their Answer and Counterclaims.  Nor can they in the face of the overwhelming evidence of actual

- 29 -

receipt, the lack of any objection, and the detailed allegations of the parties' workout discussions, which, of course, were triggered by Applebee's notices.

**II.     Applebee's Timely Exercised its Post-Termination Right to (1) Take Control of the Arizona and Texas RMH Restaurants (Complaint - Count II) and (2) To Take Control of the Remaining RMH Restaurants (Complaint - Count III).**

82.     Section 19.4(f) of the Franchise Agreements provides Applebee's the right to take control of the RMH Restaurants following termination of the Franchise Agreements:

> Upon termination of this Agreement for any reason, [Applebee's] has the right, exercisable upon written notice to [the Debtors] within thirty (30) days after termination is effective, to require [the Debtors] to assign all [the Debtors'] rights and obligations under the lease to [Applebee's] and to immediately surrender possession of the premises, including all fixtures and leasehold improvements, to [Applebee's].

SOF 25.

83.     Applebee's filed its Complaint on May 19, 2018, which resulted in service on the Debtors that same day and well within 30 days after the termination of the Franchise Agreements on April 27, 2018.  SOF 53.

84.     The filing of the Complaint (1) "advise[d] [the Debtors] of Applebee's election to take back the specified RMH Restaurants located in Arizona and Texas," listed in Exhibit 16 to the Complaint; and (2) "advise[d] [the Debtors] of Applebee's election to take back the RMH Restaurants listed on Exhibit 17 [to the Complaint] (the "Remaining RMH Restaurants")." SOF 53.

85.     Thus, Applebee's Complaint provided effective notice to the Debtors of Applebee's exercise of these post-termination rights. *See Denis F. McKenna Co.*, 302 Ill. App. 3d at 31-32 (notice of rejection of a sale agreement, which was sent to the plaintiff's counsel

- 30 -

rather than plaintiff himself, as specified per the notice provision in the sale agreement, was effective).

86.    Accordingly, Applebee's is entitled to a declaratory judgment that when it filed its Complaint, Applebee's timely exercised its post-termination rights to take control of both the RMH Restaurants located in Arizona and Texas and the remaining RMH Restaurants.

**III.    Applebee's Has Other Post-Termination Rights Under the Franchise Agreements (Complaint - Count IV; Counter-Complaint - Count VIII).**

87.    In addition to entitling Applebee's to demand assignment of the real-estate leases for the restaurants, Section 19 of the Franchise Agreements provides Applebee's with certain other rights in connection with termination of the Franchise Agreements, including requiring the Defendants to de-affiliate the RMH Restaurants and compelling the Defendants to sell their inventory, equipment, and fixtures to Applebee's.  SOF 24-26.

88.    Because the Franchise Agreements terminated pre-petition on April 27, 2018, Applebee's is entitled to a declaratory judgment that it currently has a right to enforce all of its post-termination rights under the Section 19 Franchise Agreements.

1085553383\V-13

DOCS_DE:220353.1 18037/001

## **Conclusion**

89.     For the foregoing reasons, Applebee's respectfully requests the Court grant the

Motion, enter declaratory judgment as to each count of its Complaint, and dismiss Counts VI and

VIII of the Debtor's Counter-Complaint, as well as Counts VI and VIII of the Committee's

Counter-Complaint.

Dated: July 17, 2018

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
            tcairns@pszjlaw.com
   -and-

DENTONS US LLP
Joel Siegel (*Admitted Pro Hac Vice*)
Samuel Maizel (*Admitted Pro Hac Vice* )
601 S. Figueroa Street
Suite 2500
Los Angeles, California
Telephone: 213-623-9300
Facsimile: 213-623-9924
E-mail: joel.siegel@dentons.com
            samuel.maizel@dentons.com


*Counsel to Dine Brands Global Inc., Applebee's Restaurants LLC and Applebee's Franchisor LLC*

- 32 -