**STANDARD FORM**

**APPLEBEE'S NEIGHBORHOOD GRILL & BAR**

**FRANCHISE AGREEMENT**

2810 Soncy Road, Amarillo, Texas

**RMH FRANCHISE CORPORATION**

December 27, 2012

737025v1

2012

Exhibit 2

**SUMMARY PAGES**

1.   Addresses for Notices:

   Franchisor:   Applebee's International, Inc.
   8140 Ward Parkway
   Kansas City, Missouri 64114
   Attn:  Brand Counsel
   Telephone Number: (913) 890-0100
   Fax Number:  (913) 890-9100

   Franchisee:   RMH Franchise Corporation
   1701 Windhoek Drive
   Lincoln, Nebraska 68512
   Attn.: President

2.   Commencement Date:  December 27, 2012

3.   Delivery Date of Franchise Disclosure Document:  October 24, 2012

4.   Development Agreement:  The Development Agreement between Franchisor and Franchisee dated December 27, 2012

5.   Governing Law and Jurisdiction: State of Kansas and Federal Courts of the State of Kansas (Johnson County)

6.   Initial Franchise Fee:  N/A (See Addendum for franchise fee and due date)

7.   Insurance:  See Section 16

8.   Internet/World Wide Web:  Franchisee has no right, license or authority to use any of the Marks on or in connection with the Internet, except as stated in and permitted by Section 18.5.

9.   Interference with Employment Relations:  If Franchisee seeks to employ a person employed by another franchisee or Franchisor in a managerial position presently or during the past 6 months without written consent of the employer, Franchisee must pay 3 times the annual salary plus reimbursement of costs to employer.

10.   Local Ad Expenditure: 1% of each calendar month's Gross Sales

11.   Monthly Advertising Fee: 2.75%

12.   Ownership Interests in Franchisee are owned by:

| Name | Percentage |
| --- | --- |
| RMH Franchise Holdings, Inc.* | 100% |

737025v1                                         i                                         2012

*See Appendix A for information on the ownership of RMH Franchise Holdings, Inc.

13.    Principal Shareholder(s):   RMH Franchise Holdings, Inc., a Delaware corporation; and ACON Franchise Holdings, LLC, a Delaware limited liability company.

14.    Renewal:  Four 5-year terms at 10% of the then-current Franchise Fee for each renewal period.  Franchisee must notify Franchisor 7-12 months before agreement expires if wish to renew.

15.    Restaurant Location:  2810 Soncy Road, Amarillo, Texas

16.    Restricted Area:  The lesser of (a) a three (3) mile radius of the Restaurant within an international border or (b) a radius from the Restaurant that includes either a daytime or residential population of forty thousand (40,000) or more people.

17.    Royalty Rate: 4% through January 1, 2020

18.    Term: The period commencing on the Commencement Date and ending 20 years from the Commencement Date, subject to earlier termination in accordance with the terms of this Franchise Agreement

19.    Training: N/A

20.    Transfer Fee:  $2,500 for this Franchise Agreement

The Summary Pages are provided for information purposes only and to the extent the Summary Pages conflict with the terms of the Franchise Agreement, the terms of the Franchise Agreement will control.

## TABLE OF CONTENTS

RECITALS ........................................................................................... 1

1. FRANCHISE GRANT AND TERM ..................................................... 2
2. UNIFORM STANDARDS ................................................................ 4
3. COMPLIANCE WITH THE SYSTEM ............................................... 4
4. GENERAL SERVICES OF FRANCHISOR ....................................... 5
5. RESTAURANT SYSTEM AND PROCEDURES ................................ 5
6. TRAINING .................................................................................... 8
7. RESTAURANT MAINTENANCE ...................................................... 9
8. ADVERTISING .............................................................................. 10
9. FEES ........................................................................................... 11
10. RECORD KEEPING ...................................................................... 15
11. FRANCHISEE ORGANIZATION, AUTHORITY,
    FINANCIAL CONDITION AND SHAREHOLDERS ........................... 16
12. TRANSFER .................................................................................. 19
13. CONFIDENTIALITY; RESTRICTIONS ............................................ 23
14. INSPECTIONS .............................................................................. 25
15. RELATIONSHIP OF PARTIES AND INDEMNIFICATION ................. 26
16. INSURANCE ................................................................................ 27
17. DEBTS AND TAXES .................................................................... 30
18. TRADE NAMES, SERVICE MARKS AND TRADEMARKS .............. 30
19. EXPIRATION AND TERMINATION; OPTION TO
    PURCHASE RESTAURANT; ATTORNEYS' FEES ........................... 32
20. NO WAIVER OF DEFAULT ........................................................... 37
21. CONSTRUCTION, SEVERABILITY,
    GOVERNING LAW AND JURISDICTION ........................................ 37
22. INTERFERENCE WITH EMPLOYMENT RELATIONS ..................... 38
23. LIQUOR LICENSE ........................................................................ 39
24. FORCE MAJEURE ....................................................................... 39
25. MISCELLANEOUS ....................................................................... 40
26. ACKNOWLEDGMENTS ................................................................ 42

EXHIBIT 1:      ROYALTY FEE ........................................................... 45

APPENDIX A:    STATEMENT OF OWNERSHIP INTERESTS ..................... 49

APPENDIX B:    REVIEW AND CONSENT WITH
                RESPECT TO TRANSFERS ................................. 47

APPENDIX C:    CONFIDENTIALITY AGREEMENT ...................................... 48

APPENDIX D:    EFT WITHDRAWAL AUTHORIZATION .......................... 51

# APPLEBEE'S NEIGHBORHOOD GRILL & BAR
# FRANCHISE AGREEMENT

This Agreement is made this 27th day of December, 2012, by and among Applebee's International, Inc., a Delaware corporation ("Franchisor"), RMH Franchise Corporation, a Kansas corporation, ("Franchisee") and RMH Franchise Holdings, Inc., a Delaware corporation; and ACON Franchise Holdings, LLC, a Delaware limited liability company (collectively, the "Principal Shareholders" and, individually, a "Principal Shareholder").

## WITNESSETH:

## RECITALS

A.    Franchisor owns the rights to develop and operate a unique system of restaurants which specialize in the sale of high quality, moderately priced food and alcoholic beverages in an attractive, casual setting.  Franchisor owns the service mark Applebee's Neighborhood Grill & Bar and variations of such mark, and other names, service marks and trademarks which may be adopted for use in the future (the "Marks"), designs, decor and color schemes for restaurant premises, signs, equipment, procedures and formulae for preparing food and beverage products, specifications for certain food and beverage products, inventory methods, operating methods, financial control concepts, training facilities and teaching techniques ("the System").  Franchisor has  the  right to offer franchises for the use of the Marks and the System.

B.    Franchisor established, through its own development and operation, and through the granting of franchises, a chain of Applebee's Neighborhood Grill & Bar restaurants which are distinctive; which are similar in appearance, design and decor; and which are uniform in operation and product consistency.

C.    The value of the Marks used in the System is based upon:    (1) the maintenance of uniform high quality standards in connection with the preparation and sale of Franchisor-approved food and beverage products, (2) the uniform high standards of appearance of the individual restaurant units in the System, (3) the use of distinctive trademarks, service marks, building designs and advertising signs representing a uniformly high quality of product and services, and (4) the assumption by Franchisor and its franchisees of the obligation to maintain and enhance the goodwill and public acceptance of the System (and of the Marks) by strict adherence to the high standards required by Franchisor.

D.    Franchisor, Franchisee and the Principal Shareholders have entered into a Development Agreement dated December 27, 2012 ("Development Agreement"), relating to the development by Franchisee of Applebee's Neighborhood Grill & Bar restaurants.

E.    Franchisee desires to use the System in connection with the operation of an Applebee's Neighborhood Grill & Bar restaurant at the location which is specified in

737025v1                                  1                                  2012

Subsection 1.1 of this Agreement, pursuant to the terms, conditions and provisions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual obligations contained herein, it is hereby agreed as follows:

1.    FRANCHISE GRANT AND TERM

    1.1    Franchisor grants Franchisee, for the term stated below, the right, license and privilege:

        (a)    to use the System incident to the operation of an Applebee's Neighborhood Grill & Bar restaurant at 2810 Soncy Road, Amarillo, Texas (the "Restaurant");

        (b)    to use the Marks which Franchisor shall from time to time designate as part of the System, but only in connection with the sale at the Restaurant of those products which Franchisor has designated and approved; and

        (c)    to hold itself out to the public as a Franchisee of Franchisor.

    1.2    The term of the franchise shall commence as of the Commencement Date, as hereinafter defined, and shall end twenty (20) years thereafter, unless this Agreement is terminated prior to that date in accordance with its provisions.  "Commencement Date," as used herein, shall mean the date upon which the Restaurant opens for business. The parties agree that Franchisor, without obtaining the signature of Franchisee, may affix to this Agreement an addendum expressly setting forth the Commencement Date, which, when so affixed, shall become a part of this Agreement.

    1.3    At the expiration of the term hereof, Franchisee shall have an option to operate the Restaurant for four (4) successive terms of five (5) years (unless the franchise agreement with respect to that additional term is sooner terminated in accordance with its provisions), provided that immediately prior to each such five (5) year term (a) Franchisee satisfies the requirements which Franchisor then-imposes on its new franchisees, (b) all other restaurant units within the System which Franchisee then-operates substantially comply, in the opinion of Franchisor, with Franchisor's then-current standards, specifications, requirements and instructions, and (c) Franchisee executes the form of franchise agreement which Franchisor is then using with respect to new restaurants within the System, with the amount of royalty and advertising fees payable at the rates then-prevailing under the franchise agreements which Franchisor is then using for new restaurants within the System, and Franchisee pays to Franchisor for each of said five (5) year periods a franchise fee equal to ten percent (10%) of the prevailing franchise fee paid by new franchisees at that time.  Any franchise agreement which Franchisee executes for such additional term will also contain options to obtain an assignment of Franchisee's lease with a third party and/or to purchase certain property or to purchase or lease the Restaurant premises exercisable by Franchisor upon termination thereof and an option to purchase or lease the Restaurant premises exercisable by Franchisor upon expiration of the renewal term (subject to any

then-existing renewal rights of Franchisee). Such options will contain provisions substantially similar to the provisions of Franchisor's options described in Subsection 19.4 hereof. Franchisee shall give Franchisor written notice of its desire to exercise its option to operate the Restaurant for an additional term no earlier than twelve (12) months, and no later than seven (7) months, prior to expiration of the initial term. If Franchisee gives that notice, Franchisor, in its sole discretion, reasonably exercised, shall determine whether Franchisee has satisfied the foregoing requirements. Within forty-five (45) days of receiving the notice described above, Franchisor shall notify Franchisee in writing whether or not Franchisee is eligible to exercise the option described in this Subsection.

1.4   During the period from the date of this Agreement to the expiration or earlier termination of this Agreement, Franchisor shall not establish a restaurant unit utilizing the System, or license another franchisee to establish a restaurant unit utilizing the System, at any location within the lesser of a three (3) mile radius of the Restaurant or a radius from the Restaurant which includes either a daytime or residential population of forty thousand (40,000) or more people; provided, however, the three (3) mile radius will be reduced to the extent it would extend over an international border. Notwithstanding the foregoing, Franchisor may establish a restaurant unit or may license a restaurant unit to a third party within the geographic area set forth in the preceding sentence, provided that (i) such restaurant is located within an airport (serviced by one or more public or charter carrier), train station, bus terminal, port authority, campus at any college, university or other post-secondary education institution, hospitals and other health care facilities, arena, stadium, state or national park, or military fort, post or base, (ii) is located across an international border, or (iii) does not utilize the System or utilize the Applebee's Neighborhood Grill & Bar service mark.

1.5   Franchisee, in consideration of the benefits and privileges provided to it by this Agreement, agrees to operate the Restaurant and perform as required hereunder for the full term of this Agreement.

1.6   This Agreement is entered into pursuant to and subject to the terms and conditions which are set forth in the Development Agreement.

2.   UNIFORM STANDARDS

2.1   The System is a comprehensive restaurant system for the retailing of certain uniform and quality food and beverage products (including alcoholic beverages), emphasizing a varied menu of high quality, moderately priced food products (including appetizers, creative sandwiches, dinner entrees and desserts), a selection of alcoholic and other beverages, and prompt and courteous service in a clean, wholesome, casual atmosphere. The foundation of the System is the establishment and maintenance of a reputation among the public for the operation of high quality restaurant units. A fundamental requirement of the System, this Franchise Agreement and franchises which Franchisor will grant to others is adherence by all franchisees to Franchisor's standards and policies providing for the uniform operation of all restaurant units within the System, including, but not limited to, (a) selling only those products which Franchisor has designated and approved, (b) using only Franchisor's prescribed

building layout and designs, equipment, signs, interior and exterior decor items, fixtures and furnishings, (c) adhering strictly to Franchisor's standards and specifications relating to the selection, purchase, storage, preparation, packaging, service and sale of all food and beverage products being sold at the Restaurant, and (d) satisfying all of Franchisor's prescribed standards of quality, service and cleanliness. Compliance by all franchisees with the foregoing standards and policies in conjunction with the use of the Marks provides the basis for the wide public acceptance of the System and its valuable goodwill.  Accordingly, strict adherence by all franchisees to all aspects of the System is required at all times.

2.2   The provisions of the Agreement shall be interpreted to give effect to the intent of the parties stated in this Section 2 to assure that Franchisee shall operate the Restaurant in conformity with the System, through strict adherence to Franchisor's standards and policies as they now exist and as they may be modified from time to time.

3.   COMPLIANCE WITH THE SYSTEM

Franchisee acknowledges that every component of the System is important to Franchisor, to all franchisees and to the operation of the Restaurant, including the requirements (a) that only those products designated and approved by the Franchisor are sold at the Restaurant, and (b) that there is uniformity of food and beverage specifications, preparation methods, quality, appearance, building and interior design, color and decor, landscaping, facilities and service among all restaurant units in the System.  Accordingly, Franchisee agrees to and shall comply with all aspects of the System (as it now exists and as it may be modified from time to time).  Franchisee recognizes and agrees that Franchisor may prohibit the use of the System and its trade names, notwithstanding the granting of this Agreement, if Franchisee fails to design, construct, equip, furnish or operate its Restaurant in compliance with the specifications designated by Franchisor, unless prior written approval has been received from Franchisor.

4.   GENERAL SERVICES OF FRANCHISOR

4.1   Franchisor shall advise and consult with Franchisee periodically in connection with the operation of the Restaurant, and at other reasonable times upon Franchisee's request. Franchisor will provide to Franchisee such of its know-how, new developments, techniques and improvements in areas of restaurant design, management, food and beverage preparation, sales promotion and service concepts as may be pertinent to the construction and operation of the Restaurant under the System. Franchisor may provide the foregoing information (a) by sending representatives to visit the Restaurant, (b) by providing written or other material, (c) at meetings or seminars, and (d) at training sessions at Franchisor's training facility and/or such other locations as may be selected by Franchisor from time to time.  Franchisor also shall make available to Franchisee all additional services, facilities, rights and privileges which Franchisor makes available from time to time to its franchisees of the System generally.

4.2   For approximately eight (8) days prior to the opening of the Restaurant and the first six (6) days that the Restaurant is open for business, Franchisor shall provide

Franchisee, at Franchisor's expense, with the services of up to a maximum of six (6) of Franchisor's training personnel to facilitate proper operation of the kitchen, bar and dining room areas during that period and to assist in correcting any operational problems which may arise.  Franchisee shall reimburse Franchisor for any additional training support required or requested.

4.3  From time to time during the term of this Agreement, Franchisor will develop and test new menu items.  The menu consists of approved national food and beverage selections.  Franchisee shall comply with all menu changes which generally occur every six (6) months.  The menu may be modified to reflect food and beverage items peculiar to Franchisee's local area, subject to Franchisor's testing and approval.

5.   RESTAURANT SYSTEM AND PROCEDURES

5.1  Franchisor shall furnish Franchisee with advice and assistance in managing and operating the Restaurant, and Franchisor's representatives will visit the Restaurant periodically.   Franchisor will assist Franchisee in coordinating the Restaurant's pre-opening activities, and as noted more particularly in Subsection 4.2 hereof, shall provide Franchisee with the services of certain of Franchisor's personnel to facilitate proper operation of the Restaurant when it opens for business.

5.2  Franchisee shall designate an employee who will supervise the Restaurant, and devote his or her full time, best efforts and constant personal attention to the day-to-day operation of the Restaurant (the "General Manager").  Franchisee also shall designate an employee who will supervise the Restaurant kitchen, and devote his or her full time, best efforts and constant personal attention to the day-to-day operation of the Restaurant kitchen (the "Kitchen Manager") and an appropriate number of Assistant Managers.

5.3  Franchisee shall require that the General Manager, the Kitchen Manager and each of Franchisee's employees who serve as Assistant  Managers to maintain his or her  principal  personal  residence  within  a  usual  driving  time  of  not  more  than approximately one (1) hour from the Restaurant.  Franchisor reserves the right to require that, as a condition of his or her employment, the General Manager must successfully complete Franchisor's interview process and a psychological profile test in a manner which satisfies a uniform standard established by Franchisor.  The test shall be administered by Franchisor, or by a testing agency designated by Franchisor, at Franchisee's expense.

5.4  Unless Franchisor shall have given its prior written approval, Franchisee shall keep the Restaurant open for business only during the hours which are specified by Franchisor in the Franchise Operations Manual or in such other materials or manuals provided or made available by Franchisor to Franchisee (collectively the "Manuals"), provided that such hours do not conflict with state laws or local ordinances relating to the sale of alcoholic beverages or governing the hours during which restaurant establishments may be open for business.  In addition, Franchisee expressly agrees to:

(a)   operate the Restaurant in a clean, safe and orderly manner, providing courteous, first-class service to the public;

(b)   diligently promote and make every reasonable effort to increase the business of the Restaurant;

(c)   advertise the business of the Restaurant by the use of the Marks and such other insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or established from time to time by Franchisor and included in the Manuals, subject to the limitations of Subsections 8.4 and 8.5 hereof;

(d)   prohibit and, to the best of Franchisee's ability, prevent the use of the Restaurant for any immoral or illegal purpose, or for any other purpose, business activity, use or function which is not expressly authorized hereunder or in the Manuals; and

(e)   comply fully with all applicable laws and regulations, including, but not limited to, those relating to building construction, maintenance and safety, environmental, fire prevention, food safety, public access and the sale of alcoholic beverages.

5.5   Franchisee hereby acknowledges receipt and loan of a copy of the Manuals heretofore or hereinafter furnished to Franchisee, and agrees to faithfully, completely and continuously perform, fulfill, observe and follow all instructions, requirements, standards, specifications, systems and procedures contained therein, including (a) those relating to the construction, design, decor, building and equipping of the Restaurant, (b) those relating to the selection, purchase, storage, preparation, packaging, service and sale of all products being sold at the Restaurant, (c) those relating to the maintenance and repair of Restaurant building, grounds, equipment, signs, interior and exterior decor items, fixtures and furnishings, and (d) those relating to employee uniforms and dress, accounting, bookkeeping, record retention, and other business systems, procedures and operations.   The Manuals are incorporated herein by reference and hereby made part of this Agreement.   Franchisee acknowledges and agrees that the materials contained in the Manuals are integral, necessary and material elements of the System.

5.6   Franchisee understands, acknowledges and agrees that strict conformity with the System, including the standards, specifications, systems, procedures, requirements and instructions contained in this Agreement and in the Manuals, is vitally important, not only to the success of Franchisor, but to the collective success of all of Franchisor's other franchisees, by reason of the benefits which Franchisor and all of its franchisees will derive from uniformity in products sold, identity, quality, appearance, facilities and service among all restaurant units which are part of the System. Without limiting the generality of the foregoing provisions, Franchisee agrees to adhere strictly to the requirements in the Manuals relating (a) to the construction, design, decor, building and equipping of the Restaurant, (b) to the maximum permissible ratio of sales of alcoholic beverages to sales of food at the Restaurant, and (c) to the limitations on the number of

video games or similar devices which may be placed on the Restaurant premises.  Any failure to adhere to the standards, specifications, systems, requirements or instructions contained in this Agreement or in the Manuals shall constitute a material breach of this Agreement.

5.7   Franchisor shall have the right, at any time and from time to time, in the good faith exercise of its reasonable business judgment, consistent with the overall best interests of the System generally, having due regard for the financial burden which may be placed upon its franchisees, to revise, amend, delete from and add to the System and the material contained in the Manuals.  Franchisee expressly agrees to comply with all such revisions, amendments, deletions and additions.

5.8   Franchisee shall offer for sale from the Restaurant, at all times when the Restaurant is open for business, only the products which are expressly designated in the Manuals, except, as noted more particularly in Subsection 4.3, to the extent that Franchisee has obtained Franchisor's prior written consent to a modification of that requirement.  No product shall be offered or sold at or from the Restaurant under, or in connection with, any trademark or service mark other than Franchisor's designated Marks without Franchisor's prior written consent.

5.9   Franchisor shall have the right to establish or to designate a group purchasing program from time to time (which may include a purchasing or distribution cooperative), with respect to equipment, supplies, inventory and services used in or by the Restaurant.  Promptly upon notice thereof from Franchisor, Franchisee shall execute a participation agreement in the form approved by Franchisor for the group purchasing program and participate therein. Franchisor may modify or discontinue the group purchasing program at any time upon thirty (30) days prior written notice to Franchisee.

5.10 Franchisee shall obtain all food and beverage products, equipments, signs, interior and exterior decor items, fixtures, furnishings, supplies, and other products and materials required for the operation of or sold at the Restaurant solely from suppliers (including manufacturers, distributors and other sources) who demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's then-current standards and specifications for such items; who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; and who have been approved in writing by Franchisor and not thereafter disapproved.  The Manuals contain a list of approved suppliers.  If Franchisee desires to purchase any items from an unapproved supplier, Franchisee shall submit to Franchisor a written request for such approval, which approval shall not be unreasonably withheld, or shall request the supplier itself to do so.  Franchisor shall have the right to inspect the supplier's facilities, and to require that samples from the supplier be delivered, at Franchisor's option, either to Franchisor or to an independent, certified laboratory designated by Franchisor for testing.  Franchisee or the supplier shall pay the costs of any such test. Franchisor shall notify Franchisee in writing within sixty (60) days of receiving any such request whether it disapproves the supplier. Failure by Franchisor to so notify Franchisee within that period shall be deemed to constitute Franchisor's approval of such supplier. Franchisor reserves the right, at its option, to reinspect the facilities and retest products of any such approved supplier at any time and to revoke its approval upon the supplier's failure to

continue to meet any of Franchisor's criteria. Notwithstanding the foregoing, any supplier of goods which will bear any of the Marks shall not be approved to supply Franchisee such goods until such supplier has entered a written agreement with Franchisor or its affiliated companies regarding the production, use and sale of such goods.

5.11 No food or beverage product, interior or exterior decor item, sign, item of equipment, fixtures, furnishings or supplies, or other product or material required for the operation of the Restaurant, which bears any of the Marks, shall be used or sold in or upon the Restaurant premises unless the same shall have been first submitted to and approved in writing by Franchisor.

5.12 The Manuals and all related material furnished to Franchisee hereunder are and shall remain the property of Franchisor, and must be returned to Franchisor, along with any copies made thereof, immediately upon request or upon the expiration or earlier termination of this Agreement.

6.   TRAINING

6.1   Franchisor shall make its operations training course available to the General Manager, the Kitchen Manager, and Franchisee's Assistant Managers and other Restaurant managers.

6.2   Before the Restaurant opens for business, and thereafter as replacement personnel are employed by Franchisee, the General Manager, the Kitchen Manager and each Assistant Manager shall attend Franchisor's operations training facility for such period of time as Franchisor shall deem reasonably necessary, and shall successfully complete that course to Franchisor's reasonable satisfaction. If the General Manager, Kitchen Manager or an Assistant Manager fails to successfully complete Franchisor's operations training course, Franchisor may require designation of a new General Manager, Kitchen Manager or Assistant Manager, as the case may be, and Franchisee shall designate a new General Manager, Kitchen Manager or Assistant Manager, who shall be required to successfully complete such training course.

6.3   The General Manager, the Kitchen Manager and each Assistant Manager shall, from time to time as reasonably required by Franchisor, attend and successfully complete to Franchisor's reasonable satisfaction a Franchisor-provided refresher course in restaurant operations.

6.4   Franchisee shall be responsible for the Restaurant's compliance with the operating standards, methods, techniques and material taught at Franchisor's operations training course, and shall cause the employees of the Restaurant to be trained in such standards, methods and techniques as are relevant to the performance of their respective duties.

6.5   Attendance of the General Manager, the Kitchen Manager and each Assistant Manager at any of Franchisor's training courses shall be tuition-free. Franchisee shall pay all other costs and expenses relating to the attendance of Franchisee's personnel at

any of Franchisor's training courses, including, without limitation, the cost of travel, lodging, meals, and other related and incidental expenses.

## 7.   RESTAURANT MAINTENANCE

7.1   Franchisee shall, at Franchisee's sole cost and expense, maintain the Restaurant in conformity with the standards, specifications and requirements of the System, as the same may be designated by Franchisor from time to time.  Franchisee specifically agrees to repair or replace, at Franchisee's cost and expense, equipment, signs, interior and exterior decor items, fixtures, furnishings, supplies, and other products and materials required for the operation of the Restaurant as necessary or desirable, and to obtain, at Franchisee's cost and expense, any new or additional equipment, signs, interior and exterior decor items, fixtures, furnishings, supplies, and other products and materials which may be reasonably required by Franchisor for new products or procedures.  Except as may be expressly provided in the Manuals, no alterations or improvements, or changes of any kind in design, equipment, signs, interior or exterior decor items, fixtures or furnishings shall be made in or about the Restaurant or Restaurant premises without the prior written approval of Franchisor in each instance.

7.2   In order to assure the continued success of the Restaurant, Franchisee must, at any time from time to time after the six (6) year anniversary of the date of this Agreement as reasonably required by Franchisor (taking into consideration the cost and then-remaining term of this Agreement), modernize the Restaurant premises, equipment, signs, interior and exterior decor items, fixtures, furnishings, supplies, and other products and materials required for the operation of the Restaurant, to Franchisor's then-current standards and specifications, provided that at the time Franchisor requires Franchisee to so modernize the Restaurant premises at least twenty-five percent (25%) of the Restaurants owned and operated by Franchisor or its affiliates meet such standards and specifications.  Franchisee's obligations under this Subsection are in addition to, and shall not relieve Franchisee from, any of its other obligations under this Agreement, including those contained in the Manuals.

7.3   If Franchisee is or becomes a lessee of the Restaurant premises, Franchisee shall have included in the lease provisions expressly permitting both Franchisee and Franchisor to take all actions and make all alterations referred to under Subsections 7.1 and 7.2 hereof, requiring the lessor thereunder to give Franchisor reasonable notice of any contemplated termination, and providing that Franchisee has the unrestricted right to assign the lease to Franchisor, Franchisor's affiliates or approved franchisees of Franchisor without the lessor having any right to impose conditions on such assignment or to obtain any payment in connection therewith.  Franchisee shall not, without the prior written consent of Franchisor, execute any lease or other agreement which imposes, or purports to impose, any limitations on the ability of Franchisee and/or of Franchisor or its affiliates to operate additional restaurants at any particular location beyond the geographic limitation set forth in Section 1.4 hereof, or any lease the term of which is shorter than the term of this Agreement.  For purposes of clarification, Franchisor may require the lease to contain such other provisions as may be specified in Franchisor's

then current lease approval policy or the terms and conditions of Franchisor's approval of the site for the Restaurant.

8.    ADVERTISING

8.1    Franchisor shall develop and administer advertising, public relations and sales promotion programs designed to promote and enhance the collective success of all restaurant units in the System.  It is expressly understood, acknowledged and agreed that in all phases of such advertising and promotion, including, without limitation, type, quantity, timing, placement and choice of media and medium, market areas, advertising agencies and public relations firms, Franchisor's decisions shall be final and binding. Franchisee shall have the right to participate actively in all such advertising, public relations and sales promotion programs, but only in full and complete accordance with such terms and conditions as may be established by Franchisor for each such program.

8.2    Franchisee shall pay the amounts described in this Section 8.2, in the manner described in Section 9 hereof.

(a)    Franchisee shall pay to Franchisor a minimum dollar amount equal to two and seventy five hundredths percent (2.75%) of Franchisee's gross sales, as defined in Subsection 9.3 hereof.  Such funds shall become the sole and absolute property of Franchisor, to be allocated to a separate "advertising account" established by Franchisor (the "Fund").  Franchisor shall use such funds for market studies, advertising and marketing studies or services, production of commercials, advertising copy and layouts, traffic costs, agency fees, marketing personnel, or any other costs associated with the development, marketing and testing of advertising, and for the purchase of advertising time, space or materials in national, regional or other advertising media, in a manner determined by Franchisor in its sole discretion; provided, however, that all interest earned on such funds shall be Franchisor's or its affiliate's sole property.  Within six (6) months following the end of Franchisor's fiscal year, Franchisor shall provide all franchisees with an accounting of all amounts received from them and expended by Franchisor from the Fund for the matters set forth above.

(b)    In addition, Franchisee shall expend a minimum dollar amount equal to one percent (1%) of Franchisee's gross sales, for local promotional activities, subject to the provisions of Subsections 8.3, 8.5 and 8.6 hereof.  Franchisor shall have the right at all times to review Franchisee's books and records, and to require Franchisee to produce evidence of its gross sales and local promotional activities, to ensure Franchisee's compliance with this Section.  Any amount determined by said audit to be due Franchisor as part of the advertising fee will be paid to Franchisor by Franchisee within ten (10) days thereafter.

(c)    At any time after execution of this Agreement, Franchisor may in its sole discretion increase, to a maximum of four percent (4%) of gross sales, the percentage of gross sales which Franchisee shall be required to pay to Franchisor for allocation to the Fund pursuant to Subsection 8.2.  Franchisor shall use the funds paid pursuant to that increased percentage requirement solely for the purchase of advertising time, space or materials in national, regional or other advertising media, in a manner

determined by Franchisor in its sole discretion, provided that in each calendar year (or other twelve (12) month period established by Franchisor) in which Franchisor makes expenditures for advertising from the Fund, so long as Franchisee is in compliance with its obligations hereunder, Franchisor's expenditures for advertising in the Territory encompassed by the Development Agreement (including expenditures for national or regional advertising in media which reach that Territory) shall be on a basis which is roughly proportional to Franchisee's contribution to the Fund during that calendar year or other twelve (12) month period; provided that, Franchisor does not guarantee that the benefits of such advertising will be equal to or comparable to the benefits of advertising received by other Applebee's Neighborhood Grill & Bar franchisees.

(d)    Franchisor also may increase the percentage of gross sales which Franchisee shall be required to spend for local promotional activities, provided however, that in no event shall Franchisee be required to make payments pursuant to Subsection 8.2 in an aggregate dollar amount in excess of five percent (5%) of gross sales.    For purposes of clarification, Franchisor may also decrease the amounts required to be paid or expended by Franchisor pursuant to this Subsection 8.2.

8.3    Franchisor may designate any geographic area in which two (2) or more Restaurants are located and owned by different parties as a region for purposes of establishing an advertising cooperative (a "Cooperative").

(a)    If a Cooperative is established, the members of the Cooperative for that region will consist of all Restaurants whether operated by Franchisor, its affiliated companies, or franchisees.  Franchisor will determine in advance how each Cooperative will be organized and governed and when it must start operation.  Each Cooperative will be governed by a co-op advertising policy, which will be provided to all members of the Cooperative upon request.  Once the Cooperative is established, members of the Cooperative may not dissolve, merge or change the structure of a Cooperative without the prior written consent of Franchisor.  Each Cooperative will be organized for the exclusive purposes of administering advertising programs and developing, subject to Franchisor's approval, promotional materials for use by the members in Local Advertising.  If a Cooperative has been established for a geographic area where the Restaurant is located when the Franchise Agreement is signed, or if any Cooperative is established during the term of the Franchise Agreement, Franchisee must sign all documents Franchisor requests and become a member of the Cooperative according to the terms of the documents.  Franchisor will provide to Franchisee a copy of the Cooperative documents applicable to the geographic area in which the Restaurant will be located upon Franchisee's request.

(b)    Franchisee must contribute to the Cooperative the amounts required by the documents governing the Cooperative, subject to the maximum contributions described in Section 8.2(b) above. Franchisee's payments to the Cooperative will apply toward satisfaction of Franchisee's Local Advertising requirement.  Franchisee agrees to submit to Franchisor and the Cooperative any reports that Franchisor or the Cooperative requires.  All contributions to the Cooperative will be maintained and administered according to the Cooperative governing documents.  Franchisor retains the right to approve all expenditures made by the Cooperative. The Cooperative will be

operated solely as a means for the collection and expenditure of the Cooperative fees for the purposes outlined above.  No advertising or promotional plans or materials may be used by the Cooperative or furnished to its members without first obtaining Franchisor's approval.

8.4  Franchisee shall submit to Franchisor, for Franchisor's approval, an advertising campaign plan relating to the promotion of the opening of the Restaurant which is sufficient to meet the needs of the market.  The Manuals contain a Press Release kit to assist Franchisee in this regard.  Franchisee shall conduct the approved advertising campaign and make all expenditures for advertising to promote the opening of the Restaurant no later than sixty (60) days after the Restaurant opens for business.  Franchisor will reimburse fifty percent (50%) of Franchisee's out-of-pocket advertising expenditures up to a maximum of two thousand five hundred dollars ($2,500), if Franchisee meets the following criteria:

> (a)  Franchisee's opening advertising expenditures are made, and the approved advertising campaign has been conducted, within sixty (60) days after the opening of the Restaurant;

> (b)   Franchisee submits to Franchisor within one hundred twenty (120) days after the opening of the Restaurant documentation for the opening advertising expenditures, such as paid invoices from suppliers of goods or services evidencing expenditure on the opening advertising promotion; and

> (c)  Franchisee's opening advertising expenditures are made pursuant to the approved advertising campaign plan and in accordance with the Grand Opening Reimbursement Program Policy Guidelines set forth in the Manuals.

8.5  Nothing in the foregoing Subsections shall be deemed to prohibit Franchisee from making additional expenditures for local promotional activities.  All of the Franchisee's local promotional activities shall utilize approved advertising media.  "Approved advertising media" are limited to the following:

> (a)   Newspapers, magazines and other such periodicals;

> (b)   Radio and television;

> (c)   Outdoor advertising by signs displayed on billboards or buildings; and

> (d)   Handbills, flyers, door-hangers and direct mail.

In the event Franchisee wants to use a form of advertising medium not set forth above, Franchisee shall submit a description of such medium and advertising to Franchisor.  Franchisor shall notify Franchisee whether it approves the use of such medium within thirty (30) days of Franchisee's request.  Failure by Franchisor to so notify Franchisee within that period shall be deemed to constitute Franchisor's approval of such request.  Guidelines for local promotional activities are contained in the

737025v1                          12                          2012

Manuals, including Franchisee's required participation in any co-operative marketing program.

8.6  All advertising copy and other materials employed by Franchisee in local promotional activities shall be in strict accordance and conformity with the standards, formats and specimens contained in the Manuals and shall receive the prior approval of Franchisor.  In the event Franchisee wishes to deviate from the materials contained in the Manuals, Franchisee shall submit, in each instance, the proposed advertising copy and materials to Franchisor for approval in advance of publication.  Franchisor shall notify Franchisee in writing, within fifteen (15) days of such submission, whether Franchisor disapproves such advertising copy and materials.  Failure by Franchisor to so notify Franchisee within that period shall be deemed to constitute Franchisor's approval of such advertising copy and materials.  In no event shall Franchisee's advertising contain any statement or material which may be considered (a) in bad taste or offensive to the public or to any group of persons, (b) defamatory of any person or an attack on any competitor, (c) to infringe upon the use, without permission, of any other persons' trade name, trademark, service mark or identification, or (d) inconsistent with the public image of Franchisor or of the System.

9.   FEES

9.1  As partial consideration for the rights granted hereunder, Franchisee shall pay Franchisor:

   (a)   an initial franchise fee of thirty five thousand dollars ($35,000), to be paid in the manner prescribed in Subsection 4.l of the Development Agreement as payment for the grant of the franchise;

   (b)   a monthly royalty fee as determined by Franchisor, not to exceed five percent (5%) of each calendar month's gross sales, as provided in Subsection 4.3 of the Development Agreement, as payment for Franchisee's continuing right to operate the Restaurant as part of the System (see Exhibit 1); and

   (c)   a monthly advertising fee equal to such percentage of each calendar month's gross sales as Franchisor may require pursuant to Subsection 8.2 hereof.

9.2  The fees referred to in Subsections 9.1(b) and (c) (the "Fees") shall be paid on or before the twelfth day of the next full month immediately following the month to which the Fees relate.  Any Fees, including the initial franchise fee, which are not paid when due shall bear interest from and after the due dates thereof at the rate of eighteen percent (18%) per annum or the highest rate permitted by applicable law, whichever is less.

9.3  (a)   Except for the sale of a gift card (on which royalty shall be due and payable upon redemption of the gift card and as provided in Subsection 9.3(b) hereof, the term "gross sales," as used in this Agreement, shall mean all receipts (cash, cash equivalents or credit) or revenues from sales from all business conducted upon or from the Restaurant premises, whether evidenced by check, cash, credit, debit card, charge

account, exchange or otherwise, including, but not limited to, amounts received from the sale of goods, wares and merchandise (including sales of food beverages and tangible property of every kind and nature, promotional or otherwise), from all services performed from or at the Restaurant premises, and from all orders taken or received at the Restaurant premises, regardless of where such orders are filled (including any payments received from the sale of meals to employees). Gross sales shall not be reduced by any deductions for cash shortages incurred in connection with the transaction of business with customers, credit card company charges or theft which is reimbursed by insurance or is not reported to the appropriate police authorities. Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale shall be first made, irrespective of the time when Franchisee shall receive payment (whether full or partial) therefor.

(b)    Gross sales shall not include: (i) the sale of merchandise for which cash has been refunded or, except as provided in the second sentence of Subsection 9.3(a), not received, or allowances made for merchandise, if the sales of any such returned or exchanged merchandise shall have been previously included in gross sales, (ii) the amount of any sales tax imposed by any federal, state, municipal or other governmental authority directly on sales and intended to be collected from customers, provided that the amount thereof is added to the selling price and actually paid by the Franchisee to such governmental authority, (iii) the sale of merchandise for which a gift card is redeemed, if the initial sale of the gift card shall have been previously included in gross sales, (iv) the sale of waste products of the Restaurant, (v) telephone, game and vending machine revenues, (vi) the sale of non-food items or beverages at a discount in connection with a promotional campaign, (vii) one-time sale of furniture, fixtures or equipment, and (viii) theft which is not covered by insurance and is reported to the appropriate police authorities. In addition, Franchisor may, from time to time, in writing, permit or allow certain other items to be excluded from gross sales. Any such permission or allowance may be revoked or withdrawn at Franchisor's discretion.

9.4    Franchisee agrees that, subject to the provisions of this Section 9.4, Franchisor or its designee may withdraw funds from Franchisee's designated bank account by electronic funds transfer ("EFT") in the amount of any royalties or other fees payable to Franchisor under this Agreement. Franchisor or its designee will make each EFT withdrawal of the royalty fees described in Section 9.1(b) and advertising fees described in Section 9.1(c) on the dates such payments are due. Franchisor or its designee may withdraw any other payments owed to Franchisor pursuant to, or in connection with, this Agreement if such payments become more than 10 days past due. Franchisee's designated bank account for EFT withdrawals shall at all times be maintained in the United States and such account shall permit EFT withdrawals by Franchisor or its designee without approval of, or involvement by, a government agency or authority. If Franchisee has not submitted a monthly Restaurant report as required by Section 10.2(a) hereof, Franchisor or its designee may make an EFT withdrawal for overdue royalty fees based on a good faith estimate of the Gross Sales for the applicable month. After the applicable monthly Restaurant report is submitted, Franchisor or its designee will make an appropriate credit to Franchisee for any overpayment or will invoice Franchisee for any underpayment, as applicable.

9.5   Franchisee will, upon execution of this Agreement, execute a document in the form of <u>Appendix D</u>, granting to Franchisor or its designee the authority to process EFTs from Franchisee's designated bank account.  From time-to-time at Franchisor's request, Franchisee will execute any additional documents necessary to confirm or update this authority.  Franchisee will be responsible for any EFT transfer fee or similar charge imposed by Franchisee's bank, and for any service charges incurred by Franchisor or its designee and/or imposed by Franchisee's bank should any EFT not be honored by Franchisee's bank for any reason.  Throughout the term of this Agreement, Franchisee will maintain a minimum balance sufficient to satisfy all of Franchisee's obligations under this Agreement.  It will be a material event of default of Franchisee if Franchisee closes the account without Franchisor's consent, or closes the account with Franchisor's consent, but fails to promptly establish another account and execute all documents necessary for Franchisor or its designee to process all payments by EFT from the new account.

10.   RECORD KEEPING; ACCESS TO INFORMATION

10.1   Franchisee shall employ a point of sale system approved by Franchisor, without modification, in connection with the business of the Restaurant.  Franchisee shall use such bookkeeping and record keeping forms as shall be prescribed in the Manuals.

10.2   Franchisee shall complete and submit to Franchisor, on a regular, continuous basis, each of the following reports, in the form specified in the Manuals:

(a)   monthly Restaurant reports, on or before the twelfth day of each calendar month following the month to which the report relates;

(b)   annual Restaurant reports, on or before the fifteenth day of April of each year;
(c)   weekly gross sales reports, on or before the Tuesday following the calendar week to which the report relates; and

(d)   such additional reports as the Franchisor shall request.

10.3   The annual Restaurant reports referred to above shall include a balance sheet dated as of the end of Franchisee's fiscal year or calendar year and a profit and loss statement for such year, together with such additional financial information as Franchisor may reasonably request.  Such balance sheet and profit and loss statement shall be prepared in accordance with generally accepted accounting principles, certified as correct and complete by Franchisee's chief executive officer, president, chief financial officer or controller and reported on and reviewed by an independent state-licensed certified public accountant.  If Franchisee fails to provide Franchisor with such balance sheet and profit and loss statement, Franchisor shall have the right to have an independent audit made of Franchisee's books and records, and Franchisee shall promptly reimburse Franchisor for the cost thereof.

10.4     Each of the reports referred to in this Section 10 shall be completed by Franchisee or its accountant in the respective specimen forms, and in accordance with the instructions, contained in the Manuals.  Subsection 10.3 notwithstanding, time is of the essence with respect to the completion and submission of each such report.

10.5     Franchisee shall install and maintain such equipment, make such arrangements and follow such procedures as Franchisor may require in the Manuals or otherwise in writing (including the establishment and maintenance of Internet, intranet or extranet access or such other means of electronic communication, as specified by Franchisor from time to time) to permit Franchisor to access, download, and retrieve electronically, by telecommunication or other designated method, any information stored in Franchisee's electronic cash registers or on Franchisee's computer systems, including information concerning the gross sales of the Restaurant, and to permit Franchisor to upload and for Franchisee to receive and download information from Franchisor with or without Franchisee's prior consent.  Franchisee further agrees that Franchisor will have and be afforded access to such information at the times and in the manner that Franchisor may specify from time to time, including extracting information by electronic, digital or other means.

11.   FRANCHISEE ORGANIZATION, AUTHORITY, FINANCIAL CONDITION AND SHAREHOLDERS

11.1     Franchisee and each Principal Shareholder represent and warrant that: (a) Franchisee is a corporation duly incorporated, validly existing and in good standing under the laws of the State of its incorporation; (b) Franchisee is duly qualified and is authorized to do business and is in good standing as a foreign corporation in each jurisdiction in which its business activities or the nature of the properties owned by it requires such qualification; (c) the execution and delivery of this Agreement and the transaction contemplated hereby are within Franchisee's corporate power; (d) the execution and delivery of this Agreement has been duly authorized by the Franchisee; (e) the articles of incorporation and by-laws of Franchisee delivered to Franchisor are true, complete and correct, and there have been no changes therein since the date thereof; (f) the certified copies of the minutes electing the officers of Franchisee and authorizing the execution and delivery of this Agreement are true, correct and complete, and there have been no changes therein since the date(s) thereof; (g) the specimen stock certificate delivered to Franchisor is a true specimen of Franchisee's stock certificate; (h) the most recent balance sheet of Franchisee ("Balance Sheet") and the most recent balance sheets of its Principal Shareholders heretofore delivered to Franchisor, are true, complete and correct, and fairly present the financial positions of Franchisee and each Principal Shareholder, respectively, as of the dates thereof; (i) the Balance Sheet and each such balance sheet have been prepared in accordance with generally accepted accounting principles; and (j) there have been no materially adverse changes in the condition, assets or liabilities of Franchisee or Principal Shareholders since the date or dates thereof.

11.2     Franchisee and each Principal Shareholder covenant that during the term of this Agreement: (a) Franchisee shall do or cause to be done all things necessary to preserve and keep in full force its corporate existence and shall be in good

standing as a foreign corporation in each jurisdiction in which its business activities or the nature of the properties owned by it requires such qualification; (b) Franchisee shall have the corporate authority to carry out the terms of this Agreement; and (c) Franchisee shall print, in a conspicuous fashion on all certificates representing shares of its stock when issued, a legend referring to this Agreement and the restrictions on and obligations of Franchisee and Principal Shareholders hereunder, including the restrictions on transfer of Franchisee's shares.

11.3    In addition to the financial information which Franchisee is required to provide to Franchisor under Subsections 10.2 and 11.1 hereof, Franchisee and Principal Shareholders shall provide Franchisor with such other financial information as Franchisor may reasonably request from time to time, including, on an annual basis, copies of the then-most current financial statements of Franchisee and each Principal Shareholder, dated as of the end of the last preceding fiscal year of the Franchisee or Principal Shareholder, said statements to be delivered to Franchisor no later than April 15 of each year, which financial statements shall conform to the standards set forth in Subsection 11.1 hereof.

11.4    Franchisee and each Principal Shareholder represent, warrant and covenant that all Interests (as defined in Subsection 12.4 hereto) in Franchisee are owned as set forth on Appendix A hereto, that no Interest has been pledged or hypothecated (except in accordance with Section 12 of this Agreement), and that no change will be made in the ownership of any such Interest other than as permitted by this Agreement, or otherwise consented to in writing by Franchisor. Franchisee and Principal Shareholders agree to furnish Franchisor with such evidence as Franchisor may request, from time to time, for the purpose of assuring Franchisor that the Interests of Franchisee and Principal Shareholders remain as represented herein.

11.5    Each Principal Shareholder, jointly and severally, hereby personally and unconditionally guarantees each of Franchisee's financial obligations to Franchisor (including, but not limited to, all obligations relating to the payment of fees by Franchisee to Franchisor). Each Principal Shareholder agrees that Franchisor may resort to such Principal Shareholder (or any of them) for payment of any such financial obligation, whether or not Franchisor shall have proceeded against Franchisee, any other Principal Shareholder or any other obligor primarily or secondarily obligated to Franchisor with respect to such financial obligation. Each Principal Shareholder hereby expressly waives presentment, demand, notice of dishonor, protest, and all other notices whatsoever with respect to Franchisor's enforcement of this guaranty.  In addition, each Principal Shareholder agrees that if the performance or observance by Franchisee of any term or provision hereof is waived or the time of performance thereof extended by Franchisor, or payment of any such financial obligation is accelerated in accordance with any agreement between Franchisor and any party liable in respect thereto or extended or renewed, in whole or in part, all as Franchisor may determine, whether or not notice to or consent by any Principal Shareholder or any other party liable in respect to such financial obligations is given or obtained, such actions shall not affect or alter the guaranty of each Principal Shareholder described in this Subsection.

11.6    Franchisee and each Principal Shareholder represent and warrant to Franchisor that:

(a)  Neither Franchisee nor any Principal Shareholder or any other person with a direct or indirect ownership interest in Franchisee is identified, either by name or an alias, pseudonym or nickname, on the list of "Specially Designated Nationals and Blocked Persons" maintained by the U.S. Treasury Department's Office of Foreign Assets Control (texts available at www.treas.gov/offices/enforcement/ofac/).  Further, Franchisee and its Principal Shareholders represent and warrant that neither has violated and agree that neither will violate any law (in effect now or which may become effective in the future) prohibiting corrupt business practices, money laundering or the aid or support of persons or entities who conspire to commit acts of terror against any person or government, including acts prohibited by the U.S. Patriot Act (text available at http://www.epic.org/privacy/terrorism/hr3162.html), U.S. Executive Order 13244 (text available at http://treas.gov/offices/enforcement/ofac/sanctions/terrorism.html), or similar law;

(b)  Franchisee has not made, nor has any Principal Shareholder made, any expenditures other than for lawful purposes or directly or indirectly offered, gave, promised to give or authorized the payment or the gift of any money, or anything of value, to any person or entity, while knowing or having reason to know that all or a portion of such money or thing of value would be given or promised, directly or indirectly, to any government official, official of an international organization, officer or employee of a foreign government or anyone acting in an official capacity for a foreign government, for the purpose of (1) influencing any action, inaction or decision of such official in a manner contrary to his or her position or creating an improper advantage; or (2) inducing such official to influence any government or instrumentality thereof to effect or influence any act or decision of such government or instrumentality.

(c)  Franchisee nor any Principal Shareholder or any other person or entity who has any direct or indirect ownership interest is or will become directly or indirectly owned or controlled by governmental authorities of any country that is subject to a United States embargo; and

(d)  Franchisee understands and its Principal Shareholders understand and have been advised by legal counsel on the requirements of the United States Foreign Corrupt Practices Act (currently located at www.usdoj.gov/criminal/fraud/fcpa.html, any local foreign corrupt practices laws and the Patriot Act (currently located at www.epic.org/privacy/terrorism/hr3162.html, acknowledge the importance to Franchisor and the Restaurants and the parties' relationship of their respective compliance with the requirements of these laws, including any applicable auditing requirements and any requirement to report or provide access to information to Franchisor or any government, that is made part of any applicable law, and agree to take all steps required by their consultants, agents and employees to comply with such laws prior to engaging or employing any such individuals or entities.

## 12.  TRANSFER

12.1    There shall be no Transfer of any Interest of Franchisee, or of a Principal Shareholder in Franchisee, in whole or in part (whether voluntarily or by operation of law), directly, indirectly or contingently, except in accordance with the provisions of this Section 12.  "Transfer" and "Interest" are defined in Subsections 12.2, 12.3 and 12.4. Any proposed Transfer also shall be subject to the provisions of the Development Agreement, which are incorporated herein by reference.

12.2    Except as provided in Subsection 12.3, "Transfer" shall mean any assignment, sale, pledge, hypothecation, gift or any other event which would change ownership of or change or create a new Interest, including, but not limited to:

(a)    any change in the ownership of or rights in or to any shares of stock or other equity interest in Franchisee which would result from the act of any shareholder of Franchisee ("Shareholder"), such as a sale, exchange, pledge or hypothecation of shares, or any interest in or rights to any of Franchisee's profits, revenues or assets, or any such change which would result by operation of law; and

(b)    any change in the percentage interest owned by any Shareholder in the shares of stock of Franchisee, or interests in its profits, revenues or assets which would result from any act of Franchisee such as a sale, pledge or hypothecation of any Restaurant assets (other than a pledge of assets to secure *bona fide* loans made or credit extended in connection with acquisition of the assets pledged, provided that immediately before and after such transaction the net worth of Franchisee shall not be less than the amount which is reflected on the Balance Sheet referred to in Subsection 11.1 of this Agreement); any sale or issuance of any shares of Franchisee's stock; the retirement or redemption of any shares of Franchisee's stock; or any sale or grant to any person of any right to participate in or otherwise to share or become entitled to any part of Franchisee's profits, revenues, assets or equity.

12.3    "Transfer" shall not include (a) a change in the ownership of or rights to any shares or other equity interest in Franchisee pursuant to a public offering of Franchisee's securities registered under the Securities Act of 1933, or (b) a change in the ownership of or rights to any securities or other equity interest in Franchisee pursuant to a private offering of Franchisee's securities exempted from registration under such Act, provided that Franchisee provides Franchisor with a copy of its prospectus and/or offering memorandum ten (10) days prior to its filing with the Securities and Exchange Commission or circulation to third parties so that Franchisor may comment and, if necessary, correct any information concerning Franchisor and/or the System, and further provided that after giving effect to such public or private offering, the Principal Shareholders, or any of them, "control" Franchisee.  For purposes of this Section 12, "control" means either (1) owning legal and equitable title to fifty-one percent (51%) or more of the outstanding voting securities of Franchisee, which are not subject to a proxy granted to or contract with any other person or party granting that

party the right to vote part or all of such securities, or (2) having and continually exercising the contractual power presently to designate a majority of the directors of Franchisee.

12.4   "Interest" shall mean:  when referring to interests or rights in Franchisee, any shares of Franchisee's stock and any other equitable or legal right in or to any of Franchisee's stock, revenues, profits or assets; when referring to rights or assets of Franchisee, Franchisee's rights under and interest in this Agreement, the Restaurant and its revenues, profits and assets.

12.5   (a)   The Interest of a Principal Shareholder may be transferred to such Principal Shareholder's spouse or children or to a person designated in such Principal Shareholder's will or trust (individually and collectively referred to as a "Successor"), upon such Principal Shareholder's death or permanent incapacity, without Franchisor's approval, provided that such Successor shall agree to be bound by the restrictions contained in this Section 12, and the other agreements and covenants of the Principal Shareholders contained in this Agreement.

(b)   The Interest of a Principal Shareholder may not be transferred to another Principal Shareholder without Franchisor's approval, which approval shall not be unreasonably withheld.

(c)   The Interest of a Successor may only be transferred in accordance with Subsection 12.5(b), 12.6, 12.7 or 12.8, regardless of whether such Transfer is for consideration or by gift or will or other device.

12.6   If at any time any of the Principal Shareholders desires to dispose of all or substantially all of the Interests of the Principal Shareholder(s) in Franchisee, or any of the Principal Shareholders (or Franchisee) desires to dispose of all or substantially all of Franchisee's Interest in this Agreement or in the assets which Franchisee has acquired as a result of this Agreement, the Principal Shareholder(s) or Franchisee, as the case may be, shall notify Franchisor of that desire, in writing, thirty (30) days before announcing that fact publicly or engaging the services of a broker or sales agent.

12.7   (a)   If at any time any of the Principal Shareholders or Franchisee, as the case may be, obtains from a third party or third parties a *bona fide* offer (the "Offer") in writing for the purchase of all or substantially all of the Interests of the Principal Shareholders in Franchisee, or of Franchisee's Interest in this Agreement or in the assets which Franchisee has acquired as a result of this Agreement, the Principal Shareholders or Franchisee shall give notice (the "Selling Notice") to Franchisor stating that the Principal Shareholders or Franchisee, as the case may be, have received the Offer, identifying the prospective purchaser by name and address, specifying the proposed purchase price and attaching a true and complete copy of the Offer, including all relevant materials required for approval by Franchisor.

(b)   Franchisor shall have an option to purchase (the "Option"), exercisable within a period of forty-five (45) days after receipt of the Selling Notice (the "Option Period"), such Interests at the price and on the conditions set forth in the Offer,

except that Franchisor shall not be obligated to pay any finder's or broker's fee, and if the Offer provides for payment of consideration other than cash, or if the Offer involves certain intangible benefits, Franchisor may elect to purchase such Interests by offering a reasonable dollar value substitute for the non-cash/intangible benefits part of the Offer. Notwithstanding the foregoing, if Franchisor exercises the Option, Franchisor (a) will be entitled to receive representations and warranties from Franchisee and the Principal Shareholders, jointly and severally, that are customarily received by purchasers in similar transactions and (b) will be permitted to not close if it is not satisfied with the results of its business, legal and financial due diligence.

(c)    The Option shall be exercisable by Franchisor delivering to the Principal Shareholders or Franchisee, as the case may be, within the Option Period, a notice (i) stating that the Option is being exercised, and (ii) specifying the time, date and place at which such purchase and sale will take place, which date shall be within forty-five (45) days after Franchisor delivers such notice.    Franchisee shall provide Franchisor access to and copies of such information and documentation Franchisor shall request regarding the purchase prior to the start of the Option Period.    The forty-five (45) day limitation for purposes of determining the sale date shall not apply if at the end of said forty-five (45) day period the only issue which prevents completion of the purchase and sale is the need to effect transfers of the applicable liquor licenses. In the event of such a delay, the purchase and sale shall take place within ten (10) days after those liquor licenses have been transferred.

(d)    If the Option is not exercised, the Principal Shareholders or Franchisee, as the case may be, may sell the Interests in or of Franchisee to the third party which made the Offer, on conditions no more favorable to the third-party offerer than those set forth in the Offer, provided that Franchisor approves the proposed transferee in accordance with the criteria set forth in Appendix B and provided further that such sale takes place within ninety (90) days after the expiration of the Option Period.    The ninety (90) day limitation described in the preceding sentence shall not apply if at the end of said ninety (90) day period the issue which prevents completion of the purchase and sale is either the need to effect transfers of the applicable liquor licenses or consent or approval of the transaction by a state or federal regulatory agency.    In the event of such a delay, the purchase and sale shall take place within ten (10) days after those issues have been resolved or waived by Franchisor.

(e)    If the Option is not exercised, the Principal Shareholders or Franchisee, as the case may be, shall immediately notify Franchisor in writing of any change in the terms of an Offer.    Any change in the terms of an Offer shall cause it to be deemed a new Offer, conferring upon Franchisor a new Option pursuant to this Subsection 12.7; the Option Period with respect to the new Option shall be deemed to commence on the day on which Franchisor receives written notice of a change in the terms of the original Offer.    Provided however, in such an instance, Franchisor shall provide Franchisee its response within fifteen (15) days after Franchisor's receipt of all of the modified terms, unless such changes are deemed material by Franchisor and in such an event, Franchisor shall have a forty-five (45) day period within which to review said changes.

12.8    (a)   Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that Franchisor has entered into this Agreement in reliance on the business skill and financial capability of Franchisee, and the business skill, financial capability and personal character of each Principal Shareholder.  Except as otherwise provided in this Section 12, the Principal Shareholders shall at all times retain control of Franchisee.  Except as otherwise provided in this Section 12, no Transfer of any part of Franchisee's Interest in this Agreement or in the Restaurant, and no Transfer of any Interest of any Principal Shareholder, shall be completed except in accordance with this Subsection 12.8.  In the event of such a proposed Transfer of any part of Franchisee's Interest in this Agreement or in the Restaurant, or of any Interest of any Principal Shareholder, the party or parties desiring to effect such Transfer shall give Franchisor notice in writing of the proposed Transfer, which notice shall set forth the name and address of the proposed transferee, its financial condition, including a copy of its financial statement dated not more than ninety (90) days prior to the date of said notice, and all the terms and conditions of the proposed Transfer.    Upon receiving such notice, Franchisor may (i) approve the Transfer, or (ii) withhold its consent to the Transfer.   Franchisor shall, within forty-five (45) days of receiving such notice and all of the information requested by Franchisor regarding the proposed Transfer and the parties thereto, advise the party or parties desiring to effect the Transfer whether it (1) approves the Transfer, or (2) withholds its consent to the Transfer, giving the reasons for such disapproval.  Failure of Franchisor to so advise said party or parties within that forty-five (45) day period shall be deemed to be an approval of the proposed Transfer.  Appendix B sets forth the criteria for obtaining Franchisor's consent to a proposed Transfer.

(b)    In the event that Franchisor approves the Transfer, and the Transfer is not completed within ninety (90) days of the later of (i) expiration of the forty-five (45) day notice period, or (ii) delivery of notice of Franchisor's approval of the proposed Transfer, Franchisor's approval of the proposed Transfer shall automatically be revoked.  The ninety (90) day limitation described in the preceding sentence shall not apply if at the end of said ninety (90) day period the only issue which prevents completion of the Transfer is the need to effect transfers of the applicable liquor licenses.  In the event of such a delay, the Transfer shall take place within ten (10) days after those liquor licenses have been transferred.  Any subsequent proposal to complete the proposed Transfer shall be subject to Franchisor's right of approval as provided herein.  The party which desires to effect the proposed Transfer shall immediately notify Franchisor in writing of any change in the terms of a Transfer.  Any change in the terms of a Transfer prior to closing shall cause it to be deemed a new Transfer, revoking any approval previously given by Franchisor and conferring upon Franchisor a new right to approve such Transfer, which shall be deemed to commence on the day on which Franchisor receives written notice of such changes in terms.

12.9   In connection with any request for Franchisor's approval of a proposed Transfer pursuant to this Section 12, the parties to the proposed Transfer shall pay Franchisor a non-accountable fee to defray the actual cost of review and the administrative and professional expenses related to the proposed Transfer and the preparation and execution of documents and agreements of two thousand five hundred dollars ($2,500).  For purposes of clarification, the transfer fee reflected in the preceding

sentence relates to this Agreement only and does not limit the ability of Franchisor to charge fees in connection with other franchise agreements involved in the Transfer.

13.    CONFIDENTIALITY; RESTRICTIONS

13.1    Franchisee and its Principal Shareholders acknowledge that over the term of this Agreement they are to receive proprietary information which Franchisor or its affiliates have acquired or developed over time at great expense, including, but not limited to, information regarding the System, methods of site selection, marketing and public relations methods, product analysis and selection, and service methods and skills relating to the development and operation of restaurants. They further acknowledge that this information, which includes, but is not necessarily limited to, that contained in the Manuals, is not generally known in the industry and is beyond their own present skills and experience, and that to develop it themselves would be expensive, time consuming and difficult.  Franchisee and its Principal Shareholders further acknowledge that such information provides a competitive advantage and will be valuable to them in the development of their business, and that gaining access to it is therefore a primary reason why they are entering into this Agreement. Accordingly, Franchisee and its Principal Shareholders agree that such information, as described above, which may or may not be "trade secrets" under prevailing judicial interpretations or statutes, is private and valuable, and constitutes trade secrets belonging to Franchisor or its affiliates. Accordingly, in consideration of Franchisor's confidential disclosure to them of these trade secrets, Franchisee and Principal Shareholders agree as follows (subject to the provisions of the Development Agreement and any other franchise agreement between Franchisor and Franchisee):

(a)    During the term of this Agreement, neither Franchisee nor any Principal Shareholder, for so long as such Principal Shareholder owns an Interest in Franchisee, may, without the prior written consent of Franchisor, directly or indirectly engage in, or acquire any financial or beneficial interest (including any interest in corporations, partnerships, trusts, unincorporated associations or joint ventures) in, advise, help, guarantee loans or make loans to, any restaurant business whose menu or method of operation is similar to that employed by restaurant units within the System which is either (i) located in the Territory, as defined in the Development Agreement, (ii) located in the Area of Dominant Influence (as defined and established from time to time by Arbitron Ratings Company) of any restaurant developed pursuant to the Development Agreement, (iii) located within a five (5) mile radius of any restaurant unit within the System, or (iv) determined by Franchisor, exercising reasonable good faith judgment, to be a direct competitor of the System.

(b)    Neither Franchisee, for two (2) years following the termination of this Agreement, nor any Principal Shareholder, for two (2) years following the termination of all of his or her Interest in Franchisee or the termination of this Agreement, whichever occurs first, may directly or indirectly engage in, or acquire any financial or beneficial interest (including any interest in corporations, partnerships, trusts, unincorporated associations or joint ventures) in, advise, help, guarantee loans or make loans to, any restaurant business whose menu or method

of operation is similar to that employed by restaurant units within the System which is located either (i) in the Territory, as defined in the Development Agreement, (ii) in the Area of Dominant Influence (as defined and established from time to time by Arbitron Ratings Company) of any restaurant developed pursuant to the Development Agreement, (iii) within a five (5) mile radius of any restaurant unit within the System, or (iv) within any area for which an active, currently binding development agreement has been granted by Franchisor to another franchisee as of the date of the termination.

(c)    Neither Franchisee nor any Shareholder shall at any time (i) appropriate or use the trade secrets incorporated in the System, or any portion thereof, in any restaurant business which is not within the System, (ii) disclose or reveal any portion of the System to any person, other than to Franchisee's Restaurant employees as an incident of their training, (iii) acquire any right to use any name, mark or other intellectual property right which is or may be granted by this Agreement, except in connection with the operation of the Restaurant, or (iv) communicate, divulge or use for the benefit of any other person or entity any confidential information, knowledge or know-how of Franchisor or its affiliates concerning the methods of development or operation of a restaurant utilizing the System.

13.2    Franchisee and Principal Shareholders agree that the provisions of this Section 13 are and have been a primary inducement to Franchisor to enter into this Agreement, and that in the event of breach thereof Franchisor would be irreparably injured and would be without adequate remedy at law.  Therefore, in the event of a breach, or a threatened or attempted breach, of any of such provisions Franchisor shall be entitled, in addition to any other remedies which it may have hereunder or at law or in equity (including the right to terminate this Agreement), to a preliminary and/or permanent injunction and a decree for specific performance of the terms hereof without the necessity of showing actual or threatened damage, and without being required to furnish a bond or other security.

13.3    The restrictions contained in Subsection 13.1(a) and (b) above shall not apply to ownership of less than two percent (2%) of the shares of a company whose shares are listed and traded on a national securities exchange if such shares are owned for investment only, and are not owned by an officer, director, employee, or consultant of such publicly traded company.

13.4    If any court or other tribunal having jurisdiction to determine the validity or enforceability of this Section 13 determines that it would be invalid or unenforceable as written, then the provisions hereof shall be deemed to be modified or limited to such extent or in such manner as necessary for such provisions to be valid and enforceable to the greatest extent possible.

13.5    Franchisee shall require the General Manager, the Kitchen Manager and each of its Restaurant managers to execute a confidentiality agreement in the form attached hereto as Appendix C.  Franchisee shall be responsible for compliance of its employees with the agreements identified in this Subsection.

14.    INSPECTIONS

14.1    Franchisor shall have the right at any time, and from time to time, to have its representatives enter the Restaurant premises without notice for the purpose of inspecting the condition thereof and the operation of the Restaurant in order to determine whether Franchisee is in compliance with the standards, specifications, requirements and instructions contained in this Agreement and in the Manuals, and for any other reasonable purpose connected with the operation of the Restaurant.

14.2    Without limiting the generality of Subsection 14.1, a representative of Franchisor shall be present in the Restaurant to consult with Franchisee or its General Manager from time to time and, at least semi-annually, a representative shall conduct an inspection/ consultation at the Restaurant (which may be conducted with or without notice).  During such inspection, Franchisor's representative will inspect the condition of the Restaurant and observe procedures and operations at the Restaurant.  Also during the inspection/consultation, Franchisor's representative will meet with the General Manager and such other Restaurant employees as Franchisor's representative may designate, for the purpose of evaluating the condition and operation of the Restaurant and seeking to maintain or achieve compliance with the standards, specifications, requirements and instructions contained in this Agreement and in the Manuals.

14.3    Without limiting the generality of Subsection 14.1, Franchisor's representatives shall have the right at all times during normal business hours to confer with Restaurant employees and customers, and to inspect Franchisee's books, records and tax returns, or such portions thereof as pertain to the operation of the Restaurant.  All such books, records and tax returns shall be kept and maintained at the principal executive offices of Franchisee or such other place as may be agreed upon by the parties in writing.  If any inspection reveals that the gross sales reported in any report or statement are less than the actual gross sales ascertained by such inspection, then the Franchisee shall immediately pay Franchisor the additional amount of fees owing by reason of the understatement of gross sales previously reported, together with interest as provided in Subsection 9.2.  In the event that any report or statement understates gross sales by more than three percent (3%) of the actual gross sales ascertained by Franchisor's inspection, Franchisee shall, in addition to making the payment provided for in the immediately preceding sentence, pay and reimburse Franchisor for any and all expenses incurred in connection with its inspection, including, but not limited to, reasonable accounting and legal fees.  Such payments shall be without prejudice to any other rights or remedies which Franchisor may have under this Agreement or otherwise.  If any inspection reveals that the gross sales reported in any report or statement are greater than the actual gross sales ascertained by such inspection, and that Franchisee thereby has made an overpayment of fees, the amount of the overpayment (without interest) shall be offset against future fees owing by Franchisee to Franchisor.

14.4    Franchisee shall maintain an accurate stock register.  In the event that the beneficial ownership of Franchisee's stock differs in any respect from record ownership, Franchisee also shall maintain a list of the names, addresses and interests of all beneficial owners of its stock.  Franchisee shall produce its stock register, and any list of

beneficial owners certified by the corporation's secretary to be correct, at its principal executive offices upon ten (10) days prior written request by Franchisor. Franchisor's representatives shall have the right to examine the stock register and any list of beneficial owners, and to reproduce all or any part thereof. Further, upon ten (10) days written notice, Franchisor may request a copy of the list of stockholders and owners of beneficial interests to be forwarded to it at Franchisor's principal office.

## 15.    RELATIONSHIP OF PARTIES AND INDEMNIFICATION

15.1    Franchisee is not, and shall not represent or hold itself out as, an agent, legal representative, joint venturer, partner, employee or servant of Franchisor for any purpose whatsoever and, where permitted by law to do so, shall file a business certificate to such effect with the proper recording authorities. Franchisee is an independent contractor and is not authorized to make any contract, agreement, warranty or representation on behalf of Franchisor, or to create any obligation, express or implied, on behalf of Franchisor. Franchisee agrees that Franchisor does not have any fiduciary obligation to Franchisee. Franchisee shall not use the name Applebee's Neighborhood Grill & Bar (other than in connection with the operation of the Restaurant), or Applebee's International, or any similar words as part of or in association with any trade name of any business entity which is, directly or indirectly, associated with Franchisee.

15.2    Franchisee shall indemnify and hold harmless Franchisor and its officers, directors, employees, agents, affiliates, successors and assigns from and against (a) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Restaurant or Restaurant premises, the conduct of business thereat, the ownership or possession of real or personal property, and any negligent act, misfeasance or nonfeasance by Franchisee or any of its agents, contractors, servants, employees or licensees (including, without limitation, the performance by Franchisee of any act required by, or performed pursuant to, any provision of this Agreement), and (b) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of Franchisor in the investigation of or defense against any and all such claims. Without limiting the generality of the foregoing, Franchisee will satisfy the obligations set forth in this paragraph without regard to any acts or omissions, real or alleged, of Franchisor or its officers, directors, employees, agents, affiliates, successors and assigns.

15.3    In addition to, and not in limitation of, any subsection hereof, Franchisee specifically covenants, represents and warrants that Franchisee is in compliance in all material respects with all federal, state, municipal and local laws governing the generation, use or disposal of hazardous waste or hazardous materials, and any and all other laws designed to protect the environment and that:

(a)    There have been no past, and there are no current or anticipated, releases or substantial threats of a release of a hazardous substance, pollutant or contaminant from or onto the Restaurant or real property upon which the Restaurant is located and referred to in this Agreement ("Premises") which is or may be subject to regulation under the Comprehensive Environmental Response,

Compensation and Liability Act (42 U.S.C. 9601, *et seq.*) or other laws designed to protect the environment;

(b)   The Premises have not previously been used, are not now being used and are not contemplated to be used for the treatment, collection, storage or disposal of any refuse or objectionable waste so as to require a permit or approval from the Environmental Protection Agency pursuant to the Hazardous and Solid Waste Amendments of 1984 (96 Stat. 3221) or any other federal, state, county or municipal agency charged with the responsibility of protecting the environment;

(c)   The Premises have not previously been used, are not now being used, and are not contemplated to be used, for the generation, transportation, treatment, storage or disposal of any hazardous waste;

(d)   No portion of the Premises are located on or over a "sanitary landfill" or an "open dump" within the meaning of the Resource Conservation and Recovery Act (42 U.S.C. 6941 *et seq.*), as amended by the Hazardous and Solid Waste Amendments of 1984 (96 Stat. 3221);

(e)   No asbestos fibers or materials or polychlorinated biphenyls (PCB's) are on or in the Premises;

(f)   There have not been, nor are there presently pending, any federal or state enforcement actions against the Premises, nor is the Franchisee or its Landlord, if any, subject to any outstanding administrative orders which require ongoing compliance efforts in connection with compliance with laws designed to protect the environment;

(g)   The Franchisee has not entered into any consent decrees or administrative consent orders with any agency charged with the responsibility of protecting the environment;

(h)   There have not been any notices of violation sent to the Franchisee under the Citizens Suit Provisions of any statute;

(i)   The Franchisee has not received any request for information, notice or demand letters for administrative inquiries from any governmental entity with regard to its environmental practices;

(j)   The Franchisee has maintained all required records under each and every applicable environmental statute and is in full compliance with all environmental permits issued to it by any governmental or regulatory agency;

(k)   The Franchisee maintains all insurance policies as may be required by any applicable law governing the environment;

(l)   The Franchisee has no reason to believe that any operation of equipment on or at the Premises may be the cause of a future spill or release of a pollutant;

(m)   The Franchisee has not in the past, nor is it presently, generating, transporting or disposing of a hazardous substance as defined by Section 9601(12) of CERCLA; and

(n)   The Franchisor shall have the right, at Franchisee's expense, to require an environmental audit of the Premises from a company or companies satisfactory to Franchisor.

16.   INSURANCE

16.1   Franchisee shall procure before the commencement of Restaurant operations, and shall maintain in full force and effect during the entire term of this Agreement, at its sole cost and expense, an insurance policy or policies protecting Franchisee and Franchisor and their respective officers, directors and employees against any and all claims, loss, liability or expense whatsoever, arising out of or in connection with the condition, operation, use or occupancy of the Restaurant or Restaurant Premises.   Franchisee shall procure workers' compensation coverage for each of its employees no later than the first date of such employee's employment. Franchisee shall also insure the Restaurant building and other improvements, equipment, signs, interior and exterior decor items, furnishings and fixtures, and any additions thereto, in accordance with standard fire and extended coverage insurance policies then in effect for similar businesses.   Franchisor and such of Franchisor's affiliates as may be specified by Franchisor from time to time shall be named as an additional insured in all such policies, workers' compensation excepted, and the certificate or certificates of insurance shall state that the policy or policies shall not be subject to cancellation or alteration without at least thirty (30) days prior written notice to Franchisor.   Such policy or policies shall be written by a responsible insurance company or companies satisfactory to Franchisor, and shall be in such form and contain such limits of liability and other required insurance as shall be satisfactory to Franchisor from time to time.   In any event, such policy or policies shall include at least the following for the year 2012:

| KIND OF INSURANCE | MINIMUM LIMITS OF LIABILITY |
|---|---|
| Workers' Compensation | Statutory |
| Employer's Liability | $500,000 bodily injury by accident<br>$500,000 bodily injury by disease |
| General Public Liability, including Product Liability, Injury and Liquor Liability | $1,000,000 each person,<br>$1,000,000 each incident<br>$2,000,000 aggregate |
| Fire and Extended Coverage | Full replacement value |

737025v1                                                28                                                2012

| including (a) Business Interruption | Policy limits per occurrence, except service interruption; |
|---|---|
| and (b) Service Interruption | 24 hour waiting period; $250,000 limit |
| Umbrella Liability Insurance | $30,000,000 |

Franchisee shall provide certificates of such insurance to Franchisor prior to the opening of the Restaurant and at the time of each policy renewal. Upon request, Franchisee shall provide copies of each insurance policy to Franchisor. The insurance afforded by the policy or policies respecting public liability shall not be limited in any way by reason of any insurance which may be maintained by Franchisor or its affiliates.

16.2    Within sixty (60) days after the execution of this Agreement, but in no event later than the day before the Restaurant opens for business, Franchisee shall submit to Franchisor for approval certificates of insurance showing compliance with the requirements of Subsection 16.1. Notwithstanding the foregoing, Franchisee shall submit to Franchisor for approval certificates of insurance showing compliance with the worker's compensation requirements set forth in Subsection 16.1 prior to the training of any Franchisee employee at a Restaurant operated by Franchisor.  Maintenance of such insurance and the performance by Franchisee of its obligations under this Section 16 shall not relieve Franchisee of liability under the indemnity provisions of this Agreement, and shall not limit such liability.

16.3  Should Franchisee, for any reason, fail to procure or maintain the insurance coverage required by this Section, then Franchisor shall have the right and authority to immediately procure such insurance coverage and to charge the cost thereof to Franchisee, which amounts shall be paid immediately upon notice and shall be subject to charges for late payments in the manner set forth in Subsection 9.2.

16.4    No later than thirty (30) days following Franchisee's receipt of same, Franchisee shall submit to Franchisor a copy of any written report relating to the condition of the Restaurant premises, or any aspect thereof, prepared by an insurer or prospective insurer or by a representative of a federal, state or local government agency, provided that if any such report contains comments or information which could materially and detrimentally affect the Restaurant, such report shall be submitted to Franchisor within three (3) days following Franchisee's receipt thereof.

17.    DEBTS AND TAXES

Franchisee shall pay or cause to be paid promptly when due all obligations incurred, directly or indirectly, in connection with the Restaurant and its operation, including, without limitation, (a) all taxes and assessments that may be assessed against the Restaurant land, building and other improvements, equipment, fixtures, signs, furnishings, and other property; (b) all debts or other sums secured by liens and encumbrances of every kind and character created or placed upon or against any of said property, and; (c) all accounts and other indebtedness of every kind and character incurred by or on behalf of Franchisee in the conduct of the Restaurant business. Notwithstanding the foregoing, Franchisee will not be in default of this Agreement as a

result of a non-payment or non-performance of the foregoing so long as it disputes said debt or lien and is, in the sole opinion of Franchisor, validly and in good faith pursuing a resolution of said claim or lien and has reserved sufficient sums to pay the debt/claim as is agreed to by Franchisor.

## 18.    TRADE NAMES, SERVICE MARKS AND TRADEMARKS

18.1    Franchisee acknowledges the sole and exclusive right of Franchisor and its affiliates (except for rights granted under existing and future franchise agreements) to use the Marks in connection with the products and services to which they are or may be applied by Franchisor or its affiliates, and represents, warrants and agrees that Franchisee shall not, either during the term of this Agreement, or after the expiration or other termination hereof, directly or indirectly, contest or aid in contesting the validity, ownership or use thereof by Franchisor or its affiliates, or take any action whatsoever in derogation of the rights claimed herein by Franchisor or its affiliates.

18.2    The right granted to Franchisee under this Agreement to use the Marks is nonexclusive, and Franchisor and its affiliates, in its or their sole discretion, subject only to the limitations contained in Subsection 1.4 of this Agreement, have the right to grant other rights in, to and under those names and marks in addition to those rights already granted, and to develop and grant rights in other names and marks on any such terms and conditions as Franchisor or its affiliates deem appropriate.    The rights granted under this Agreement do not include any right or authority of any kind whatsoever to pre-package or sell pre-packaged food products, under any of the Marks, or any menu items approved for sale at the Restaurant, whether at the Restaurant, on the Internet, or at any other location, including grocery stores.

18.3    Franchisee understands and acknowledges and agrees that Franchisor has the unrestricted right, subject only to the limitations contained in Subsection 1.4 of this Agreement, to engage, directly and indirectly, through its employees, representatives, licenses, assigns, agents, affiliates, subsidiaries and others, at wholesale, retail, and otherwise, in (a) the production, distribution and sale of products under the Marks or other names or marks, (b) the use, in connection with such production, distribution and sale, of any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or used, from time to time, by Franchisor or its affiliated companies with respect to the System or otherwise, and (c) the production, distribution and sale of products through another restaurant or restaurants which do not utilize the System or the Applebee's Neighborhood Grill & Bar service mark and which otherwise compete or might compete with the Restaurant.    Further, Franchisee agrees that ownership of any trademarks, service marks or other insignia, symbols, designs or slogans used in development and promotion of any products or menu items, including any general promotion or concept not tied to a specific product, and all recipes and copyrighted material, whether such development was instituted at the request or suggestion of Franchisee or Franchisor, and whether such development was done in collaboration with Franchisor or done independently by Franchisee, shall, as between Franchisor and Franchisee, be the sole and exclusive property of Franchisor. Any goodwill engendered by the trademarks, service marks, insignia, symbols, designs or

slogans used shall inure to the benefit of Franchisor and its affiliated companies whose ownership shall be sole and exclusive.

18.4    Nothing contained in this Agreement shall be construed to vest in Franchisee any right, title or interest in or to any of Franchisor's names or the Marks, the goodwill now or hereafter associated therewith, or any right in the design of any restaurant building or premises, or the decor or trade-dress of the Restaurant, other than the rights and license expressly granted herein for the term hereof.  Any and all goodwill associated with or identified by any of Franchisor's names or the Marks shall inure directly and exclusively to the benefit of Franchisor and its affiliates, including, without limitation, any goodwill resulting from operation and promotion of the Restaurant, provided that this Subsection shall not be construed to entitle Franchisor to receive any portion of the consideration paid to Franchisee and/or any Principal Shareholder as a result of a Transfer of an Interest pursuant to Section 12 hereof.

18.5    Franchisee shall adopt and use each of the Marks only in a manner expressly approved by Franchisor, and shall not use any of the Marks in connection with any statement or material which may, in the judgment of Franchisor, be in bad taste or inconsistent with Franchisor's public image, or tend to bring disparagement, ridicule or scorn upon Franchisor, any of the Marks, or the goodwill associated therewith. Franchisee shall not adopt, use or register as its corporate name (by filing a certificate or articles of incorporation or otherwise) any trade or business name, style or design which includes, or is similar to, any of Marks, logos, insignia, slogans, emblems, symbols, designs or other identifying characteristics. Franchisee has no right, license or authority to use any of the Marks on or in connection with the Internet, except as stated in and permitted by this Section 18.5.  Without limiting the foregoing, Franchisee shall not use any of the Marks in any Internet domain name or URL or use any Internet domain name or URL that may be confusingly similar to one or more of the Marks. Franchisee shall not display or use any of the Marks or other of Franchisor's intellectual property in connection with, or associate the System with (through a link or otherwise) any web site advertising, address, or listing on the World Wide Web or any other portion of the Internet without Franchisor's prior written consent. Franchisee shall submit for Franchisor's approval any Internet domain name, URL or Internet e-mail address Franchisee intends to use in connection with the Restaurant.

18.6    Franchisor shall have the right, at any time and from time to time, upon notice to Franchisee, to make additions to, deletions from and changes in any of the Marks, or all of them, all of which additions, deletions and changes shall be made in good faith, on a reasonable basis and with a view toward the overall best interests of the System.

18.7    Franchisee agrees to notify Franchisor promptly in writing of any suit or claim for infringement relating to the marks.  Subject to the terms and conditions of this Subsection 18.7, Franchisor and its affiliates shall have the sole right to defend or settle any such suit or claim of infringement at Franchisor's or its affiliates' expense. Franchisee, at Franchisee's expense, shall have the right to be represented by counsel. Franchisor or its affiliates shall, however, retain control of any negotiations with respect to such claim or of any litigation involving such suit.  Franchisee agrees to cooperate

with Franchisor and its affiliates and to assist Franchisor and its affiliates' whenever reasonably requested by them, at Franchisor's and its affiliates' expense, in the defense of any such infringement suit or claim.

    18.8    Franchisor represents that it is the sole owner of the service mark Applebee's Neighborhood Grill & Bar.

19.    EXPIRATION AND TERMINATION; OPTION TO PURCHASE RESTAURANT; ATTORNEYS' FEES

    19.1    Franchisor shall have the right to terminate this Agreement immediately upon written notice to Franchisee stating the reason for such termination:

    (a)    in the event of any breach or default of any of the provisions of Subsection 9.1, Sections 12 or 13, Subsection 14.1 or Section 23;

    (b)    if a petition in bankruptcy, an arrangement for the benefit of creditors, or a petition for reorganization is filed by Franchisee, or is filed against Franchisee and not dismissed within ninety (90) days from the filing thereof, or if Franchisee shall make any assignment for the benefit of creditors, or if a receiver or trustee is appointed for Franchisee and is not dismissed within ninety (90) days of such appointment;

    (c)    if Franchisee ceases to operate the Restaurant without the prior written consent of Franchisor or loses its right to possession of the Restaurant premises; provided however, this provision will not apply if Franchisee ceases to operate the Restaurant or loses its right to possession of the Restaurant premises by reason of Force Majeure and Franchisee complies with the requirements of Section 24 of this Agreement;

    (d)    if Franchisor discovers that Franchisee has made any material misrepresentation or omitted any material fact in the information which was furnished to Franchisor in connection with this Agreement;

    (e)    if any part of this Agreement relating to the payment of fees to Franchisor, or the preservation of any of the Marks, trade secrets or secret formulae licensed or disclosed hereunder is, for any reason, declared invalid or unenforceable; or

    (f)    if Franchisee or any Principal Shareholder is convicted of or pleads *nolo contendere* to a felony or any crime involving moral turpitude.

    If Franchisee defaults in the performance or observance of any of its other obligations hereunder, and such default continues for a period of sixty (60) days after written notice to Franchisee specifying such default, Franchisor shall have the right to terminate this Agreement upon thirty (30) days written notice to Franchisee.   If Franchisee defaults in the performance or observance of the same obligation two (2) or more times within a twelve (12) month period, Franchisor shall have the right to terminate this Agreement immediately upon commission of the second act of default,

upon thirty (30) days written notice to Franchisee stating the reason for such termination, without allowance for any curative period.

The foregoing provisions of this Subsection 19.1 are subject to the provisions of any local statutes or regulations which limit the grounds upon which Franchisor may terminate this Agreement, or which require that Franchisor give Franchisee additional prior written notice of termination and opportunity to cure any default.

19.2    Upon the termination of this Agreement by Franchisor, Franchisee may not remove any property from the Restaurant premises for thirty (30) days after the termination. Upon the expiration or earlier termination of this Agreement for any reason:

(a)    Franchisee shall immediately discontinue its use of the System and its use of the Marks and other identifying characteristics;

(b)    if the Restaurant premises are owned by Franchisee or leased from a third party, Franchisee shall, upon demand by Franchisor, remove (at Franchisee's expense) the Marks, sign facia, and other identifying characteristics from all premises, and paint all premises and other improvements maintained pursuant to this Agreement a design and color which is basically different from Franchisor's authorized design and color.  If Franchisee shall fail to make or cause to be made any such removal or repainting within thirty (30) days after written notice, then Franchisor shall have the right to enter upon the Restaurant premises, without being deemed guilty of trespass or any tort (or Franchisee shall cause Franchisor to be permitted on the premises as necessary), and make or cause to be made such removal, alterations and repainting at the reasonable expense of Franchisee, which expense Franchisee shall pay to Franchisor immediately upon demand; and

(c)    Franchisee shall not thereafter use the Marks or any other trademark, trade name, service mark, logo, insignia, slogan, emblem, symbol, design or other identifying characteristic that is in any way associated with Franchisor or similar to those associated with Franchisor, or use any food or proprietary menu item, recipe or method of food preparation or operate or do business under any name or in any manner that might tend to give the public the impression that Franchisee is or was a licensee or franchisee of, or otherwise associated with, Franchisor or its affiliated companies.

19.3    In the event that any party to this Agreement initiates any legal proceeding to construe or enforce any of the terms, conditions and/or provisions of this Agreement, including, but not limited to, its termination provisions and its provisions requiring Franchisee to make certain payments to Franchisor incident to the operation of the Restaurant, or to obtain damages or other relief to which any such party may be entitled by virtue of this Agreement, the prevailing party or parties shall be paid its reasonable attorneys' fees and expenses by the other party or parties.  If Franchisee fails to comply with a written notice of termination sent by Franchisor and a court later upholds such termination of this Agreement, Franchisee's operation of the Restaurant, from and after the date of termination stated in such notice, shall constitute willful trademark infringement and unfair competition by Franchisee, and Franchisee shall be

liable to Franchisor for damages resulting from such infringement in addition to any fees paid or payable hereunder, including, without limitation, any profits which Franchisee derived from such post-termination operation of the Restaurant.

19.4    (a)   With respect to Restaurant premises owned by Franchisee, in the event of termination of this Agreement, Franchisor shall have, for thirty (30) days after the termination is effective, an option, exercisable upon written notice to Franchisee within such thirty (30) day period, to elect to purchase the Restaurant premises from Franchisee for the fair market value of the land and buildings, furnishings and equipment located therein.

(b)   In addition to the option described above, Franchisor shall have an option, exercisable upon written notice to Franchisee, to elect to purchase the Restaurant premises from Franchisee upon expiration of this Agreement for the fair market value of the land and buildings, furnishings, and equipment located therein subject to Franchisee's option to operate the Restaurant for an additional term under Subsection 1.3 hereof.   If Franchisee does not notify Franchisor, pursuant to Subsection 1.3 hereof, of a desire to operate the Restaurant for an additional term, then Franchisor shall provide the written notice described in the preceding sentence within thirty (30) days after the latest date by which Franchisee is required by Subsection 1.3 to advise Franchisor of such a desire; if Franchisee does notify Franchisor of a desire to operate the Restaurant for an additional term and Franchisor determines that Franchisee is not eligible to do so, Franchisor shall provide the written notice described in the preceding sentence within thirty (30) days of its written notice to Franchisee that Franchisee is not eligible to operate the Restaurant for such additional term.   With respect to the option to purchase upon expiration of this Agreement, this option shall not apply if prior to thirty (30) days before said expiration, Franchisee enters into an agreement to sell such Restaurant premises to a third party upon the expiration of the Franchise Agreement, provided that Franchisee's agreement with the purchaser includes a covenant by the purchaser, which is expressly enforceable by Franchisee as a third-party beneficiary thereof, pursuant to which the purchaser agrees that, for a period of twelve (12) months after the expiration of this Agreement, the purchaser shall not use such premises for the operation of a restaurant business whose menu or method of operation is similar to that employed by restaurant units within the System.

(c)   If Franchisee receives approval to operate the Restaurant premises for an additional term in accordance with Subsection 1.3 hereof, Franchisee will be required to execute the then-existing form of franchise agreement, which shall contain an option to obtain assignment of Franchisee's lease with a third party and/or to purchase certain property, exercisable by Franchisor upon termination thereof, and an option to purchase the Restaurant premises, exercisable by Franchisor upon expiration of the additional term (subject to any then-existing rights to renew of Franchisee).   Such options shall be substantially similar to the provisions described in this Subsection 19.4.

(d)   If the parties cannot agree on the purchase price or other terms of purchase within thirty (30) days following Franchisor's exercise of its option pursuant to Subsection 19.4(a) and (b), the price or disputed terms of purchase shall be determined by three (3) appraisers, with each party selecting one (1) appraiser and the two (2)

appraisers, so chosen, selecting the third appraiser. In the event of such an appraisal, each party shall bear its own legal and other costs and shall split equally the appraisal fees. The appraisers' determination of the price and other disputed terms of purchase shall be final and binding.

(e)    If Franchisor elects to exercise its option to purchase upon termination of this Agreement, the purchase price shall be paid within thirty (30) days of the determination of the purchase price and other terms of purchase. If Franchisor elects to exercise its option to purchase upon expiration of this Agreement, the purchase price shall be paid within thirty (30) days of the later of (a) the determination of the purchase price and other terms of purchase, or (b) expiration of this Agreement. If the Franchisor does not elect to exercise its option to purchase the Restaurant premises, the Franchisee may sell such premises to a third party, provided that Franchisee's agreement with the purchaser includes a covenant by the purchaser, which is expressly enforceable by Franchisor as a third-party beneficiary thereof, pursuant to which the purchaser agrees that it shall not use such premises for the operation of a restaurant business whose menu or method of operation is similar to that employed by restaurant units within the System for a period of twelve (12) months after the termination or expiration of this Agreement.

(f)    If the Restaurant premises are leased by Franchisee from a third party, such lease must allow Franchisee to assign the lease to Franchisor. Upon termination of this Agreement for any reason, Franchisor has the right, exercisable upon written notice to Franchisee within thirty (30) days after termination is effective, to require Franchisee to assign all Franchisee's rights and obligations under the lease to Franchisor and to immediately surrender possession of the premises, including all fixtures and leasehold improvements, to Franchisor. The lessor may not impose any assignment fee or other similar charge on Franchisor in connection with such assignment. If Franchisor exercises that right, it has an additional right, to be exercised within thirty (30) days after taking possession of the premises, to purchase all of Franchisee's equipment, signs, decor items, furnishings, supplies and other products and materials at their then-fair market value. If the parties cannot agree on the price, the price will be determined in the manner set forth in connection with Franchisee-owned Restaurant premises. If Franchisor elects not to purchase the items mentioned above, Franchisee shall, at Franchisee's own expense and under Franchisor's supervision remove those items from the premises within ten (10) days after such final election, or ten (10) days after expiration of the option period, whichever is earlier. If Franchisee fails to remove all such property from the premises within such period, Franchisor shall be entitled to do so, or to authorize a third party to do so, all at Franchisee's expense.

19.5    In addition to the provisions contained in Subsection 19.4 hereof:

(a)    With respect to Restaurant premises owned by Franchisee, in the event of termination of this Agreement and Franchisor's exercise of its option to purchase the Restaurant premises pursuant to Subsection 19.4(a) hereof, Franchisee shall have, for ten (10) days after its receipt of written notice of Franchisor's election to purchase, an option, exercisable upon written notice to Franchisor, to lease said

premises to Franchisor, pursuant to a lease which provides for rental at a rate not in excess of six percent (6%) of gross sales and triple net terms. Said lease shall provide for a lease term of at least ten (10) years with two (2) five (5)-year options to renew, and for primary annual rent of not in excess of the number derived from multiplying six percent (6%) times the gross sales reported by Franchisee to Franchisor for which Franchisee has paid a royalty fee for the next preceding calendar year times eighty percent (80%).

(b)    In addition to the option described above, Franchisee shall have an option, exercisable upon written notice to Franchisor, to elect to lease the Restaurant premises to Franchisor upon expiration of this Agreement and Franchisor's exercise of its option to purchase the Restaurant premises pursuant to Subsection 19.4(b) hereof, pursuant to the same terms set forth in Subsection 19.5(a) above, subject to Franchisee's option to operate the Restaurant for an additional term under Subsection 1.3 hereof.  If (i) Franchisee does not notify Franchisor, pursuant to Subsection 1.3 hereof, of a desire to operate the Restaurant for an additional term, or (ii) Franchisee does notify Franchisor of a desire to operate the Restaurant for an additional term and Franchisor determines that Franchisee is not eligible to do so, and Franchisor exercises its option to purchase the Restaurant premises, then Franchisee shall provide the written notice described in the preceding sentence within ten (10) days after its receipt of written notice of Franchisor's election to purchase.  With respect to the option to lease upon expiration of this Agreement, this option shall not apply if prior to thirty (30) days before said expiration, Franchisee enters into an agreement to sell such Restaurant premises to a third party upon the expiration of the Franchise Agreement, provided that Franchisee's agreement with the purchaser includes a covenant by the purchaser, which is expressly enforceable by Franchisor as a third-party beneficiary thereof, pursuant to which the purchaser agrees, at Franchisor's option, either to lease said premises to Franchisor upon the terms set forth in Subsection 19.5(a), or that for a period of twelve (12) months after the expiration of this Agreement, the purchaser shall not use such premises for the operation of a restaurant business whose menu or method of operation is similar to that employed by restaurant units within the System.

(c)    If Franchisee receives approval to operate the Restaurant premises for an additional term in accordance with Subsection 1.3 hereof, Franchisee will be required to execute the then-existing form of franchise agreement which shall contain an option to obtain assignment of Franchisee's lease with a third party and/or to lease certain property, exercisable by Franchisor upon termination thereof, and an option to lease the Restaurant premises, exercisable by Franchisor upon expiration of the additional term (subject to any then-existing rights to renew of Franchisee).  Such options shall be substantially similar to the provisions described in this Subsection 19.5.

20.    NO WAIVER OF DEFAULT

20.1    The waiver by any party to this Agreement of any breach or default, or series of breaches or defaults, of any term, covenant or condition herein, or of any same

or similar term, covenant or condition contained in any other agreement between Franchisor and any franchisee, shall not be deemed a waiver of any subsequent or continuing breach or default of the same or any other term, covenant or condition contained in this Agreement, or in any other agreement between Franchisor and any franchisee.

20.2    All rights and remedies of the parties hereto shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies which are provided for herein or which may be available at law or in equity in case of any breach, failure or default or threatened breach, failure or default of any term, provision or condition of this Agreement. The rights and remedies of the parties hereto shall be continuing and shall not be exhausted by any one (1) or more uses thereof, and may be exercised at any time or from time to time as often as may be expedient; and any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time.  The expiration or earlier termination of this Agreement shall not discharge or release Franchisee or any Principal Shareholder from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration or earlier termination of the Agreement.

21.    CONSTRUCTION, SEVERABILITY, GOVERNING LAW AND JURISDICTION

21.1    If any part of this Agreement shall for any reason be declared invalid, unenforceable or impaired in any way, the validity of the remaining portions shall remain in full force and effect as if the Agreement had been executed with such invalid portion eliminated, and it is hereby declared the intention of the parties that they would have executed the remaining portion of this Agreement without including therein any such portions which might be declared invalid; provided however, that in the event any part hereof relating to the payment of fees to Franchisor, or the preservation of any of Franchisor's Marks, trade secrets or secret formulae licensed or disclosed hereunder is for any reason declared invalid or unenforceable, then Franchisor shall have the right to terminate this Agreement upon written notice to Franchisee.  If any clause or provision herein would be deemed invalid or unenforceable as written, it shall be deemed modified or limited to such extent or in such manner as may be necessary to render the clause or provision valid and enforceable to the greatest extent possible in light of the interest of the parties expressed in that clause or provision, subject to the provisions of the preceding sentence.

**21.2    FRANCHISEE AND PRINCIPAL SHAREHOLDERS ACKNOWLEDGE THAT FRANCHISOR MAY GRANT NUMEROUS FRANCHISES THROUGHOUT THE UNITED STATES ON TERMS AND CONDITIONS SIMILAR TO THOSE SET FORTH IN THIS AGREEMENT, AND THAT IT IS OF MUTUAL BENEFIT TO FRANCHISEE AND PRINCIPAL SHAREHOLDERS AND TO FRANCHISOR THAT THESE TERMS AND CONDITIONS BE UNIFORMLY INTERPRETED.  THEREFORE, THE PARTIES AGREE THAT TO THE EXTENT THAT THE LAW OF THE STATE OF KANSAS DOES NOT CONFLICT WITH LOCAL FRANCHISE STATUTES, RULES AND REGULATIONS, KANSAS LAW SHALL APPLY TO THE CONSTRUCTION OF THIS AGREEMENT AND SHALL GOVERN ALL QUESTIONS WHICH ARISE WITH**

**REFERENCE HERETO; PROVIDED HOWEVER, THAT PROVISIONS OF KANSAS LAW REGARDING CONFLICTS OF LAW SHALL NOT APPLY HERETO.**

**21.3 THE PARTIES AGREE THAT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PERFORMANCE THEREOF WHICH CANNOT BE AMICABLY SETTLED, EXCEPT AS OTHERWISE PROVIDED HEREIN WILL BE RESOLVED BY A PROCEEDING IN A COURT IN JOHNSON COUNTY, KANSAS, AND FRANCHISEE AND PRINCIPAL SHAREHOLDERS EACH IRREVOCABLY ACCEPT THE JURISDICTION OF THE COURTS OF THE STATE OF KANSAS AND THE FEDERAL COURTS SERVING JOHNSON COUNTY, KANSAS FOR SUCH CLAIMS, CONTROVERSIES OR DISPUTES. EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL IN ANY COURT ACTION ARISING AMONG THE PARTIES UNDER THIS AGREEMENT OR OTHERWISE RELATED TO THIS AGREEMENT, WHETHER MADE BY CLAIM, COUNTERCLAIM, THIRD PARTY CLAIM OR OTHERWISE.**

The parties agree that service of process in any proceeding arising out of or relating to this Agreement or the performance thereof may be made as to Franchisee and any Principal Shareholder by serving a person of suitable age and discretion (such as the person in charge of the office) at the address of Franchisee specified in this Agreement and as to Franchisor by serving the president or a vice-president of Franchisor at the address of Franchisor or by serving Franchisor's registered agent.

22.    INTERFERENCE WITH EMPLOYMENT RELATIONS

During the term of this Agreement, neither Franchisor nor Franchisee shall employ or seek to employ in a managerial position (i.e., in a position at a pay grade at or above that of Assistant Restaurant Manager or Kitchen Manager), directly or indirectly, any person who is at the time or was at any time during the prior six (6) months employed by the other party or any of its subsidiaries or affiliates, or by any franchisee in the System. This section shall not be violated if, at the time Franchisor or Franchisee employs or seeks to employ such person, such former employer has given its written consent. Notwithstanding any other provision of this Agreement, the parties hereto acknowledge that if this Section is violated, such former employer shall be entitled to liquidated damages equal to three (3) times the annual salary of the employee involved, plus reimbursement of all costs and attorneys' fees incurred. In addition to the rights granted to the parties hereto, the parties acknowledge and agree that any franchisee from which an employee was hired by either party to this Agreement in violation of the terms of this Section shall be deemed to be a third-party beneficiary of this provision and may sue and recover against the offending party the liquidated damages herein set forth; provided however, the failure by Franchisor to enforce this Section shall not be deemed to be a violation of this Section.

23.    LIQUOR LICENSE

The grant of the rights which are the subject of this Agreement is expressly conditioned upon the ability of the Franchisee to obtain and maintain any and all required state and/or local licenses permitting the sale of liquor by the drink on the

Restaurant premises, and Franchisee agrees to use its best efforts to obtain such licenses. After obtaining the necessary state or local liquor licenses, Franchisee shall thereafter comply with all applicable laws and regulations relating to the sale of liquor on the Restaurant premises. If, during any twelve (12) month period during the term of this Agreement, Franchisee is prohibited for any reason from selling liquor on the Restaurant premises for more than thirty (30) days because of a violation or violations of state or local liquor laws, then at the option of Franchisor this Agreement may be terminated forthwith by Franchisor upon written notice to Franchisee.

24.   FORCE MAJEURE

24.1   As used in this Agreement, the term "Force Majeure" shall mean any act of God, strike, lock-out or other industrial disturbance, war (declared or undeclared), riot, epidemic, fire or other catastrophe, act of any government and any other similar cause not within the control of the party affected thereby.

24.2   If the performance of any obligation by any party under this Agreement is prevented or delayed by reason of Force Majeure, which cannot be overcome by use of normal commercial measures, the parties shall be relieved of their respective obligations to the extent the parties are respectively necessarily prevented or delayed in such performance during the period of such Force Majeure. The party whose performance is affected by an event of Force Majeure shall give prompt notice of such Force Majeure event to the other party by facsimile, telephone or telegram (in each case to be confirmed in writing), setting forth the nature thereof and an estimate as to its duration, and shall be liable for failure to give such timely notice only to the extent of damage actually caused.

24.3   Notwithstanding the provisions of this Section 24, if, as a result of an event of Force Majeure (including condemnation proceedings), the Franchisee ceases to operate the Restaurant or loses the right to possession of the Restaurant premises, Franchisee shall apply within thirty (30) days after the event of Force Majeure for Franchisor's approval to relocate and/or reconstruct the Restaurant. If relocation is necessary, Franchisor agrees to use its reasonable efforts to assist Franchisee in locating an alternative site in the same general area where Franchisee can operate a Restaurant within the System for the balance of the term of the Franchise Agreement. If Franchisor so assists Franchisee, Franchisee shall reimburse Franchisor for its reasonable out-of-pocket expenses incurred as a result thereof. (This provision shall not be construed to prevent Franchisee from receiving the full amount of any condemnation award of damages relating to the closing of the Restaurant; provided however, that if Franchisor or an affiliate is the lessor of the Restaurant premises, Franchisee specifically waives and releases any claim it may have for the value of any building, fixtures and other improvements on the premises, whether or not installed or paid for by the Franchisee, and Franchisee agrees to subordinate any claim it may have to Franchisor's claim for such improvements.) Selection of an alternative location will be subject to the site approval procedures set forth in Section 5 of the Development Agreement. For purposes of clarification, if Franchisee does not have development rights, Franchisor does not have any obligation to approve a new site. Once Franchisee has obtained Franchisor's approval to relocate and/or reconstruct the Restaurant,

Franchisee must diligently pursue relocation and/or reconstruction until the Restaurant is reopened for business.

25.    MISCELLANEOUS

25.1    All notices and other communications required or permitted to be given hereunder shall be deemed given when delivered in person, by overnight courier service, facsimile transmission or mailed by registered or certified mail addressed to the recipient at the address set forth below, unless that party shall have given written notice of change of address to the sending party, in which event the new address so specified shall be used.

FRANCHISOR:    Applebee's International, Inc.
8140 Ward Parkway
Kansas City, Missouri 64114
Attention:  President

FRANCHISEE:    RMH Franchise Corporation
1701 Windhoek Drive
Lincoln, Nebraska 68512
Attention:  President

PRINCIPAL SHAREHOLDERS:    Same as Franchisee

25.2    All terms used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Agreement may require, the same as if such words had been written in this Agreement themselves. The words "includes", "including" and "inclusive" and the phrases "in particular", "such as", "i.e." and "for example" when used in this Agreement shall be interpreted and construed so as not to limit the generality of the words of general application and nature which precede these words and phrases. The headings inserted in this Agreement are for reference purposes only and shall not affect the construction of this Agreement or limit the generality of any of its provisions.

25.3    Franchisee shall, at its own cost and expense, promptly comply with all laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments and appropriate departments, commissions, boards and offices thereof.  Without limiting the generality of the foregoing, Franchisee shall abide by all applicable rules and regulations of any public health department.

25.4    In the event that Franchisor or its affiliates have leased the Restaurant premises to Franchisee pursuant to a written lease agreement (the "Lease"), the Lease is hereby incorporated in this Agreement by reference, and any failure on the part of Franchisee (Lessee therein) to perform, fulfill or observe any of the covenants, conditions or agreements contained in the Lease shall constitute a material breach of this Agreement.  It is expressly understood, acknowledged and agreed by Franchisee

that any termination of the Lease shall result in automatic and immediate termination of this Agreement without additional notice to Franchisee.

25.5    This Agreement and the documents referred to herein constitute the entire agreement between the parties, superseding and canceling any and all prior and contemporaneous agreements, understandings, representations, inducements and statements, oral or written, of the parties in connection with the subject matter hereof. FRANCHISEE EXPRESSLY ACKNOWLEDGES THAT IT HAS ENTERED INTO THIS FRANCHISE AGREEMENT AS A RESULT OF ITS OWN INDEPENDENT INVESTIGATION AND AFTER CONSULTATION WITH ITS OWN ATTORNEY, AND NOT AS A RESULT OF ANY REPRESENTATIONS OF FRANCHISOR, ITS AGENTS, OFFICERS OR EMPLOYEES, EXCEPT AS CONTAINED HEREIN AND IN FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT, HERETOFORE MADE AVAILABLE TO FRANCHISEE. Nothing in this Agreement will disclaim or require Franchisee to waive reliance on any representation that Franchisor made in the most recent disclosure document (including its exhibits and amendments) that Franchisor delivered to Franchisee or its representative.

25.6    Except as expressly authorized herein, no amendment or modification of this Agreement shall be binding unless executed in writing both by Franchisor and by Franchisee and Principal Shareholders.

25.7    Franchisee and the Principal Shareholders acknowledge and agree that (i) this Agreement (and the relationship of the parties contemplated by this Agreement) grants Franchisor the discretion to make decisions, take actions and/or refrain from taking actions not inconsistent with Franchisee's explicit rights and obligations hereunder that may affect favorably or adversely Franchisee's interests; (ii) Franchisor will use its business judgment in exercising such discretion based on Franchisor's assessment of its interests and the System, balancing those interests with or against the interests of the operators of Restaurants generally (including Franchisor, its affiliates and other franchisees) and specifically without considering the individual interests of any particular franchisee; (iii) Franchisor will have no liability to Franchisee for the exercise of its discretion in this manner and (iv) even if Franchisor has numerous motives for a particular action or decision, so long as at least one motive is a reasonable business justification for such action or decision, no trier of fact in any legal action shall substitute its judgment for Franchisor's judgment so exercised, and such action or decision will not be subject to challenge for abuse of discretion.   If Franchisor takes any action or chooses not to take any action in Franchisor's discretion with regard to any matter related to this Agreement and Franchisor's action or inaction is challenged for any reason, the parties expressly direct the trier of fact that Franchisor's reliance on a business reason in the exercise of its discretion is to be viewed as a reasonable and proper exercise of Franchisor's discretion, without regard to whether other reasons for its decision may exist and without regard to whether the trier of fact would independently accord the same weight to the business reason.

25.8    This Agreement may be signed in counterparts and each counterpart with a hand-written signature, whether an original or an electronic data text (including telegram, telex, facsimile, electronic data interchange and electronic mail) is considered

an original and all counterparts constitute one and the same instrument.

26.   ACKNOWLEDGMENTS

Franchisee and Principal Shareholders acknowledge that:

(a)   Franchisee has received a copy of this Agreement and has had an opportunity to consult with its attorney with respect thereto at least seven days prior to execution of this Agreement;

(b)   No representation has been made by Franchisor as to the future profitability of the Restaurant;

(c)   Prior to the execution of this Agreement, Franchisee has had ample opportunity to contact Franchisor's existing franchisees, if any, and to investigate all statements made by Franchisor relating to the System;

(d)   This Agreement establishes the right to construct and operate a Restaurant only at the location specified in Subsection 1.1 hereof; and

(e)   Franchisor is the sole owner of the service marks identified in this Agreement, and of the goodwill associated therewith, and Franchisee acquires no right, title or interest in those names and marks other than the right to use them only in the manner and to the extent prescribed and approved by Franchisor.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as of the date first above written.

**FRANCHISOR**:

APPLEBEE'S INTERNATIONAL, INC.

By: _____
Name:  James A. McDermott III
Title:  Vice President, Development

Signature Page to Franchise Agreement

**FRANCHISEE**:

RMH FRANCHISE CORPORATION

By: _____
Name: Jeffrey Neumann
Title: President

**PRINCIPAL SHAREHOLDERS**:

RMH FRANCHISE HOLDINGS, INC.

By: _____
Name: Jeffrey Neumann
Title: President


ACON FRANCHISE HOLDINGS, LLC

By: _____
Name: Daniel Jinich
Title: President and Managing Director

Signature Page to Franchise Agreement

**FRANCHISEE:**

RMH FRANCHISE CORPORATION

By: _____
Name: Jeffrey Neumann
Title: President

**PRINCIPAL SHAREHOLDERS:**

RMH FRANCHISE HOLDINGS, INC.

By: _____
Name: Jeffrey Neumann
Title: President

ACON FRANCHISE HOLDINGS, LLC

By: _____
Name: Daniel Jinich
Title: President and Managing Director

**EXHIBIT 1 TO FRANCHISE AGREEMENT**

**ROYALTY FEE**

The monthly royalty fee to be paid by Franchisee shall be four percent (4%) of each calendar month's gross sales until January 1, 2020.  Thereafter, a monthly royalty fee shall be determined by Franchisor in its sole discretion.

**APPENDIX A TO FRANCHISE AGREEMENT**

**STATEMENT OF OWNERSHIP INTERESTS**

| Shareholder | Percent of Issued and Outstanding Shares of Franchisee |
| --- | --- |
| RMH Franchise Holdings, Inc. | 100.00% |

As of the date of this Agreement, the ownership of RMH Franchise Holdings, Inc. is as follows:

| Shareholder | Percent of Issued and Outstanding Shares |
| --- | --- |
| ACON Franchise Holdings, LLC | 100.00% |

As of the date of this Agreement, the ownership of ACON Franchise Holdings, LLC is as follows:

| Member | Ownership % |
| --- | --- |
| ACON Equity Partners III, L.P. | 97.3% |
| Jeffrey D. Neumann | 1.8% |
| Joe Leone | 0.9% |

## APPENDIX B TO FRANCHISE AGREEMENT
### REVIEW AND CONSENT WITH RESPECT TO TRANSFERS

In determining whether to grant or to withhold consent to a proposed Transfer, Franchisor shall consider all of the facts and circumstances which it views as relevant in the particular instance, including, but not limited to, any of the following:  (i) work experience and aptitude of Proposed New Owner and/or proposed new management (a proposed transferee of a Principal Shareholder's Interest and/or a proposed transferee of this Agreement is referred to as "Proposed New Owner"); (ii) financial background and condition of Proposed New Owner, and actual and pro forma financial condition of Franchisee; (iii) character and reputation of Proposed New Owner; (iv) conflicting interests of Proposed New Owner; (v) the terms and conditions of Proposed New Owner's rights, if the proposed Transfer is a pledge or hypothecation; (vi) the adequacy of Franchisee's operation of any Restaurant and compliance with the System and this Agreement; and (vii) such other criteria and conditions as Franchisor shall then consider relevant in the case of an application for a new franchise to operate a restaurant unit within the System by an applicant that is not then currently doing so.  Franchisor's consent also may be conditioned upon execution by Proposed New Owner of an agreement whereby Proposed New Owner assumes full, unconditional, joint and several liability for, and agrees to perform from the date of such Transfer, all obligations, covenants and agreements contained herein to the same extent as if it had been an original party to this Agreement and may also require Franchisee and Principal Shareholders, including the proposed Transferor(s), to execute a general release which releases Franchisor and its affiliates from any claims they may have had or then have against Franchisor and its affiliates.  In the event Proposed New Owner is a partnership (including, but not limited to, a limited partnership), Proposed New Owner will also be required to execute an addendum to the Agreement which amends the references to Franchisee and its Principal Shareholders to include the partnership approved by Franchisor and Proposed New Owner's general partner(s) and the principal shareholders of the general partner(s), if the general partner(s) is a corporation.  This addendum will contain a provision including in the definition of "Transfer" the withdrawal, removal or voluntary/involuntary dissolution (if applicable) of the general partner(s) or the substitution or addition of a new general partner.  Franchisee or Principal Shareholders, as the case may be, shall provide Franchisor with such information as it may require in connection with a request for approval of a proposed Transfer.  For purposes of clarification, nothing in this Appendix B shall limit Franchisor's discretion in granting or withholding consent to a Transfer or to require the applicable parties to agree to certain terms as a condition to obtaining consent to a Transfer.

**APPENDIX C TO FRANCHISE AGREEMENT**

**CONFIDENTIALITY AGREEMENT**

*Intentionally deleted per Addendum to Franchise Agreement*

**APPENDIX D**

**EFT WITHDRAWAL AUTHORIZATION**

APPLEBEE'S SERVICES, INC. ("COMPANY")
ID NUMBER: _____

      The undersigned ("DEPOSITOR") authorizes COMPANY to initiate debit entries to the Checking Account indicated below at the DEPOSITORY named below, and authorizes DEPOSITORY to debit to such account all entries COMPANY initiates.

DEPOSITORY
NAME _____BRANCH _____
CITY _____STATE _____
CHECKING ACCOUNT NO. _____
ROUTING NUMBER _____

      **DEPOSITOR agrees that this authorization will remain in full force and effect until DEPOSITOR has given COMPANY written notice of its revocation in such time and in such manner as to afford COMPANY and DEPOSITORY a reasonable opportunity to act on the notice.**

DEPOSITOR'S
NAME _____ ID NUMBER _____

DEPOSITOR'S SIGNATURE _____

NAME AND TITLE OF PERSON SIGNING (if signed in a representative capacity) _____
_____

DATE _____

NOTE:    ALL WRITTEN DEBIT AUTHORIZATIONS MUST PROVIDE THAT THE DEPOSITOR MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE DEBIT ORIGINATOR (COMPANY) IN THE MANNER SPECIFIED IN THE AUTHORIZATION.

# Document Coversheet

**Name**    Kelly Wayman

**Date**    06/04/14


**Restaurant ID**  AP089077
Example: (AP123)

**Franchisee Name**  RMH Franchise Corporation

**Document Class/Type**  Franchise Agreement
Valid Types: (Franchise Agreement,
Development Agreement, Amendment to Franchise Agreement,
Amendment to Development Agreement, Addendum to
Development Agreement, Addendum to Franchise Agreement,
Global Amendment to Franchise Agreement, Global Amendment
to Development Agreement, Assignment of Franchise Agreement,
Assignment of Development Agreement)

**Effective Date**   12272012
Format (05212014)

## ADDENDUM TO FRANCHISE AGREEMENT

THIS ADDENDUM TO FRANCHISE AGREEMENT ("**Addendum**") is made and entered into as of this 27th day of December, 2012, by and among Applebee's International, Inc., a Delaware corporation ("**Franchisor**"); RMH Franchise Corporation, a Kansas corporation ("**Franchisee**"); and RMH Franchise Holdings, Inc., a Delaware corporation; and ACON Franchise Holdings, LLC, a Delaware limited liability company (collectively, the "**Principal Shareholders**" and, individually, a "**Principal Shareholder**").

### WITNESSETH

WHEREAS, contemporaneous with the execution of this Addendum, Franchisor, Franchisee and the Principal Shareholders have entered into an Applebee's Neighborhood Grill & Bar Franchise Agreement for the operation of the Restaurant located at 2810 Soncy Road, Amarillo, Texas (the "**Franchise Agreement**"); and

WHEREAS, Franchisor, Franchisee and the Principal Shareholders desire to amend the Franchise Agreement as hereinafter set forth.

NOW, THEREFORE, in consideration of mutual covenants and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Amendment.    The Franchise Agreement is hereby amended and supplemented by this Addendum. Any conflict between this Addendum and the Franchise Agreement shall be governed and controlled by the terms of this Addendum. Capitalized terms used herein but not defined herein will be ascribed the meaning given to such terms in the Franchise Agreement.

2.    Existing Restaurant; Commencement Date.    Franchisee acknowledges and agrees that the Restaurant is an existing Restaurant and that Franchisor has fully satisfied the obligations set forth in the Franchise Agreement to be performed by Franchisor prior to or in connection with the opening of the Restaurant, including without limitation, the obligations of Franchisor as set forth in Section 4.2 and 5.1 of the Franchise Agreement.  Notwithstanding Section 1.2 of the Franchise Agreement, the "Commencement Date" will be deemed to be the date of this Addendum.

3.    Section 4.2.  Section 4.2 of the Franchise Agreement regarding opening assistance is hereby deleted in its entirety.

4.    Initial Training.  Notwithstanding Sections 6.1 and 6.2 of the Franchise Agreement regarding initial training, Franchisor may waive such initial training requirements for the Restaurant if the General Manager, Kitchen Manager and/or the assistant managers were previously employed at the Restaurant and/or are not in need of additional training, as determined by Franchisor in its sole discretion.

5.    Opening Restaurant Advertising.  Section 8.4 of the Franchise Agreement is hereby deleted in its entirety.

6.    Franchise Fee.  Notwithstanding the provisions of Section 1.2 and 9.1(a) of the Franchise Agreement, the franchise fee to be paid by Franchisee to Franchisor will be $31,208 and must be paid to Franchisor on or before March 7, 2015.

7.    Restaurant Modernization.  Section 7.2 of the Franchise Agreement is hereby amended by deleting the first sentence thereof and replacing it with the following:

"In order to assure the continued success of the Restaurant, Franchisee shall, at any time and from time to time, as reasonably required by Franchisor (taking into consideration the cost and then-remaining term of this Agreement), modernize the Premises, equipment, signs, interior and exterior decor items, fixtures, furnishings, supplies, and other products and materials required for the operation of the Restaurant, to Franchisor's then-current standards and specifications, provided that at the time Franchisor requires Franchisee to so modernize the Premises at least twenty-five percent (25%) of the Restaurants owned and operated by Franchisor or its affiliates meet such standards and specifications.  Notwithstanding the foregoing, the parties agree that the first modernization of the Restaurant premises after the date hereof will be completed by June 30, 2013, and that such modernization will be completed to Franchisor's then-current standards and specifications (which is the "Connections Remodel" as of the date of this Agreement) without regard to whether twenty-five percent (25%) of the Restaurants owned and operated by Franchisor or its affiliates meet such standards and specifications."

8.    Amendments to Transfer Restrictions.  The following subsections of Section 12 of the Franchise Agreement are amended as set forth below:

a.    References to Principal Shareholders in connection with "control" of Franchisee in Section 12.3 and Section 12.8(a) shall be deemed to mean ACON Equity Partners III, L.P., a Delaware limited partnership.

b.    Sections 12.5(a) and (c) of the Development Agreement are hereby deleted in their entirety.

9.    Letter of Credit.  Effective as of the Commencement Date and continuing so long as the Franchise Agreement or any other franchise agreement between Franchisor and Franchisee is in effect, Franchisee shall procure and maintain one or more irrevocable letters of credit in the aggregate amount of $4,000,000 (the "**Amount**") from a financial institution reasonably acceptable to Franchisor (including any replacement letter of credit, the "**Letter of Credit**") to secure the performance of the obligations of Franchisee, Principal Shareholders and their respective affiliates to Franchisor and its affiliates (the "**Secured Obligations**").  The Letter of Credit must:  (a) provide that it may be drawn upon by Franchisor one or more times upon presentation of a sight draft to the issuing bank; (b) have an expiration date at least one year from the date of issuance; and (c) provide that it is automatically extended for one year from the expiration date (and any future expiration date) unless the issuing bank has delivered to Franchisor, at least 30 days prior to the then current expiration date, written

notice of its election not to so renew, in which event Franchisor shall be entitled to fully draw upon the Letter of Credit unless Franchisee has first delivered to Franchisor an acceptable replacement letter of credit. If the Letter of Credit is drawn upon pursuant to clause (c) above, Franchisor shall hold and apply the proceeds as a cash deposit (the "**Deposit**") to secure the performance of the Secured Obligations. If at any time the Letter of Credit is drawn upon, or the Deposit is used, in either case, to satisfy one or more Secured Obligations, and the aggregate balance of the Letter of Credit and Deposit thereafter is less than the Amount, then within ten (10) days thereafter, Franchisee must provide a replacement letter of credit meeting the requirements of this Section in an amount that, when combined with the remaining balance of the Letter of Credit and the remaining balance of the Deposit, equals the Amount. The Letter of Credit will be in the form attached hereto as **Exhibit A**, subject to such changes as may be approved in writing by Franchisor from time to time in its sole discretion. If Franchisee breaches the provisions of this paragraph, Franchisor will have the right to immediately terminate the Franchise Agreement upon written notice to Franchisee.

10.    Financial Information. Franchisee will deliver to Franchisor copies of any compliance worksheets, certificates or any other financial information that is required to be submitted to any person from whom Franchisee has borrowed money (each, a "**Lender**"), which information will be provided to Franchisor at the same time it is delivered to a Lender. Franchisee hereby authorizes any Lender to provide such information directly to Franchisor and Franchisor may contact any Lender for purposes of requesting such information. In addition, Franchisee will provide Franchisor the quarterly financial packages provided to any Lender by Franchisee contemporaneously with the delivery to any such Lender. If Franchisee's financial statements are not included in the quarterly financial packages provided to Franchisor and Lender, Franchisee will deliver unaudited financial statements (i.e., balance sheet, income statement and statement of cash flows) prepared in accordance with GAAP to Franchisor within 45 days of the end of each quarter. The foregoing rights of Franchisor in this Section will not be construed to limit any of the other rights of Franchisor set forth in the Franchise Agreement or any Development Agreements between Franchisor and Franchisee to receive information or conduct inspections

11.    Royalty Rate Cap Confirmation. For purposes of clarification, Franchisor confirms that the monthly royalty fee under this Agreement after January 1, 2020 may not exceed 5% of each calendar month's gross sales.

12.    Breach of Consent Agreement. The Consent Agreement dated as of the date hereof, by and among Concord Hospitality, Inc. a Nebraska corporation, and certain of its affiliates and owners; Franchisee, Principal Shareholders, and Franchisor (the "**Consent Agreement**") is hereby incorporated into this Agreement by reference, and any failure on the part of Franchisee (defined as New Franchisee in the Consent Agreement) to perform, fulfill or observe any of the covenants, conditions or agreements contained in the Consent Agreement shall constitute a material breach of this Agreement.

13.    Sole Business Purpose. Neither Franchisee nor any of the Principal Shareholders will conduct any business other than the operation of Applebee's

Neighborhood Grill & Bar restaurants and the development and operation of new restaurants pursuant to the terms of the Development Agreements between Franchisor and Franchisee.

14.    Competitors.  Notwithstanding the terms of Sections 13.1(a) and (b) of the Franchise Agreement, the following examples of restaurants or restaurant chains (and restaurants that are similar to the following) are illustrative of, and not limited to, those concepts that Franchisor deems to be competitors of Applebee's, defined as restaurants with a menu or method of operation similar to that employed by the Applebee's System: Chili's, Ruby Tuesday, TGI Friday's, Bennigan's, Red Robin, Hop's, and Pizzeria Uno. The following examples of restaurants or restaurant chains are illustrative of, but not limited to, those concepts, as they currently exist, that are considered not to be competitive with Applebee's:   Ruth's Chris Steak House, Morton's The Steakhouse, Panera Bread, Subway, Friendly's, Benihana, Steak & Shake, Ryan's Family Steak House, Papa John's, Landry's Seafood House, McDonald's, Burger King, KFC, Taco Bell, Pizza Hut, Wendy's and Arby's.

15.    Designation and Approval of Key Management/Supervisory Personnel.

a.    Prior to the Effective Date, Franchisee must have designated an individual employee who will serve as the President of Franchisee (or other title so long as such individual has similar functional responsibilities) during the term of the Franchise Agreement (the "President").  The President must devote his or her full-time, best efforts and constant personal attention to Franchisee's business and must have executive responsibility for the oversight of the day to day operations of Franchisee's business.  As of the date of the Franchise Agreement, the President is Jeffrey D. Neumann.  Franchisee will promptly (but in no event less than 5 business days) notify Franchisor in writing of the cessation of employment of the President without regard to the reason for cessation of employment.  Any successor to the President will be subject to the prior written approval of Franchisor, which approval will not be arbitrarily withheld. Franchisor must notify Franchisee in writing within twenty one (21) days of receipt of Franchisee's request whether Franchisor disapproves such person as a successor to the President.  Failure by Franchisor to so notify Franchisee within that period will be deemed to constitute Franchisor's approval of such person as a successor to the President.

b.    Prior to the Effective Date, Franchisee must have designated an individual employee who will serve as the Director of Operations of Franchisee (or other title so long as such individual has similar functional responsibilities) during the term of the Franchise Agreement (the "Director of Operations").  The Director of Operations must devote his or her full-time, best efforts and constant personal attention to Franchisee's business and must have responsibility for the oversight of the day to day operations of the Restaurant and each other Applebee's Neighborhood Grill & Bar restaurant operated by Franchisee in the Territory (as defined in the Development Agreement).  As of the date of the Franchise Agreement, the Director of Operations is Mario Cernadas.  Franchisee will promptly (but in no event less than 5 business days) notify Franchisor in writing of the cessation of employment of the Director of Operations without regard to the reason for cessation of employment.   Any successor to the

Director of Operations will be subject to the prior written approval of Franchisor, which approval will not be arbitrarily withheld. Franchisor will notify Franchisee in writing within twenty one (21) days of receipt of Franchisee's request whether Franchisor disapproves such person as a successor to the Director of Operations. Failure by Franchisor to so notify Franchisee within that period will be deemed to constitute Franchisor's approval of such person as a successor to the Director of Operations.

        c.    The President and the Director of Operations may be collectively referred to as "Key Management". Franchisor reserves the right to require that, as a condition of his or her employment with Franchisee, each member of Key Management, as well as each supervisory employee referred to in Section 15(d) below, must successfully complete Franchisor's interview process and a psychological profile test in a manner which satisfies a uniform standard established by Franchisor. The test will be administered by Franchisor, or by a testing agency designated by Franchisor, at Franchisee's expense.

        d.    If Franchisee desires to designate an employee (in addition to the Director of Operations) who will have supervisory authority over the operation of more than one (1) Restaurant within the Territory, Franchisee's designation of such a supervisory employee will be subject to the prior written approval of Franchisor, which approval will not be arbitrarily withheld. Franchisor will notify Franchisee in writing within twenty one (21) days of receipt of Franchisee's request whether Franchisor disapproves such person. Failure by Franchisor to so notify Franchisee within that period will be deemed to constitute Franchisor's approval of such person. Franchisee will require any such supervisory employee to maintain his or her principal personal residence in the Territory.

        e.    Franchisee will require Key Management and any other supervisory employee designated pursuant to Section 15(d) above to attend and to successfully complete to Franchisor's reasonable satisfaction an operations training course provided by Franchisor. If any such employee fails to successfully complete Franchisor's operations training course, Franchisor may require designation of a new member of Key Management or replacement supervisory employee, as the case may be, and Franchisee will designate a new member of Key Management or replacement supervisory employee, as applicable, who, in either case, will be required to successfully complete such training course.

        f.    The Key Management and supervisory employees designated pursuant to Section 15(d) above will, from time to time as reasonably requested by Franchisor, attend and successfully complete to Franchisor's reasonable satisfaction a Franchisor-provided refresher course in restaurant operations.

        g.    The parties acknowledge and agree that Section 19.1 of the Franchise Agreement is hereby amended to provide that the occurrence of the following will give Franchisor the right to immediately terminate the Franchise Agreement the same as if such occurrence was listed as a subsection of Section 19.1:

Franchisee's failure to hire a successor President or Director of Operations, as applicable, that is approved by Franchisor in accordance with the terms of Section 15 of this Addendum and who has commenced employment in such capacity with Franchisee, in each case, within 180 days of the cessation of employment with Franchisee of the last President or Director of Operations, as applicable, approved by Franchisor to serve in such capacity.

16.    <u>Confidentiality and Noncompete Agreements</u>.

a.    Franchisee must require Key Management to execute a confidentiality agreement and covenant not to compete in the form attached to this Addendum as **Exhibit B**; provided, however, that for purposes of such confidentiality agreements and covenants not to compete to be executed by Mario Cernadas, Section 4 thereof shall be modified such that the restrictions set forth therein only last for the duration of his respective employment by Franchisee.

b.    Each other employee of Franchisee who (i) has supervisory authority over the operation of more than one (1) Restaurant, (ii) is a General Manager, Kitchen Manager or in any other managerial role at the Restaurant or (iii) is designated, in Franchisor's reasonable discretion, as an employee with executive or officer level responsibility (e.g., the employee designated with primary responsibility over development, finance or human resources) must, in each such case, be required by Franchisee to execute a confidentiality agreement in the form attached to this Addendum as **Exhibit C**.

c.    Franchisee will be responsible for compliance of its employees with the agreements identified in this Section 16, including the payment of any costs needed to enforce the obligations set forth herein.

d.    Section 13.5 of the Franchise Agreement (and Appendix C referenced therein) is hereby amended by deleting such section in its entirety.

17.    <u>Confidentiality</u>. Franchisee and Principal Shareholders acknowledge and agree that the terms and conditions set forth herein include terms and conditions negotiated between the parties and disclosure of such terms and conditions by Franchisee and Principal Shareholders would cause Franchisor irreparable harm and monetary damages. Accordingly, Franchisee and Principal Shareholders agree that the terms and conditions contained herein will be maintained in strict confidence and will not be disclosed to any third party without the prior written consent of Franchisor. Franchisee and Principal Shareholders acknowledge that a breach of the provisions of this paragraph will be deemed a breach of the non-disclosure obligations set forth in Section 13 of the Franchise Agreement. For purposes of clarification, the non-disclosure obligations set forth in this paragraph do not prohibit Franchisee from speaking with prospective franchisees about its personal experience as a franchisee in the System.

18.    <u>Entire Agreement</u>.  This Addendum and the Franchise Agreement contain the entire agreement between the parties with respect to the subject matter herein contained, and except as otherwise provided herein, no other agreements, representations or commitments made or discussed prior to the date hereof shall survive the execution of the Franchise Agreement and this Addendum.

19.    <u>No Amendment</u>.  Except as expressly set forth herein or in the documents or instruments herein referred to, no further amendment or modification of this Addendum shall be binding unless executed in writing by the parties hereto or their authorized successors or assigns.

20.    <u>Counterparts</u>.  This Addendum may be signed in counterparts and each counterpart with a hand-written signature, whether an original or an electronic data text (including telegram, telex, facsimile, electronic data interchange and electronic mail) is considered an original and all counterparts constitute one and the same instrument.

21.    <u>Choice of Law</u>.  This Addendum shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns and shall be construed in accordance with and governed by the laws of the state of Kansas without regard to any "choice of law" provision or rule thereof.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the day and year first above written.

**FRANCHISOR**:

APPLEBEE'S INTERNATIONAL, INC.

By: _____
Name: James A. McDermott III
Title:   Vice President, Development

**FRANCHISEE**:

RMH FRANCHISE CORPORATION

By: _____
Name: Jeffrey Neumann
Title: President

**PRINCIPAL SHAREHOLDERS**:

RMH FRANCHISE HOLDINGS, INC.

By: _____
Name: Jeffrey Neumann
Title: President

ACON FRANCHISE HOLDINGS, LLC

By: _____
Name: Daniel Jinich
Title: President and Managing Director

**FRANCHISEE**:

RMH FRANCHISE CORPORATION

By: _____
Name: Jeffrey Neumann
Title: President

**PRINCIPAL SHAREHOLDERS**:

RMH FRANCHISE HOLDINGS, INC.

By: _____
Name: Jeffrey Neumann
Title: President

ACON FRANCHISE HOLDINGS, LLC

By: _____
Name: Daniel Jinich
Title: President and Managing Director

Signature Page to Addendum to Franchise Agreement

## EXHIBIT A
## FORM OF LETTER OF CREDIT

IRREVOCABLE STANDBY LETTER OF CREDIT #_____

================================================================================
| **LETTER OF CREDIT AMOUNT** | **ISSUE DATE** | **EXPIRY DATE** |
================================================================================

| USD 4,000,000.00 | **[Insert Closing Date]** | **[Insert date at least one year from Closing Date]** |
================================================================================

**BENEFICIARY:** | **APPLICANT:**
APPLEBEE'S INTERNATIONAL, INC. | RMH FRANCHISE CORPORATION
or its affiliates
8140 WARD PARKWAY | _____
KANSAS CITY, MO 64114 | _____
ATTN: GENERAL COUNSEL | ATTN: PRESIDENT

WE HEREBY OPEN OUR IRREVOCABLE STANDBY LETTER OF CREDIT IN YOUR FAVOR FOR THE ACCOUNT OF THE ABOVE REFERENCED APPLICANT IN THE AGGREGATE AMOUNT OF FOUR MILLION AND 00/100 UNITED STATES DOLLARS (USD 4,000,000.00) WHICH IS AVAILABLE BY PAYMENT WHEN ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

1.   A DRAFT AT SIGHT DRAWN ON _____, DULY ENDORSED ON ITS REVERSE THEREOF BY A DULY AUTHORIZED REPRESENTATIVE OF THE BENEFICIARY, SPECIFICALLY REFERENCING THIS LETTER OF CREDIT NUMBER.

2.   A COPY OF THE ORIGINAL LETTER OF CREDIT. IF, HOWEVER, YOUR DEMAND REPRESENTS A FULL DRAWING OR IF SUCH DRAWING IS PRESENTED ON THE DAY OF THE RELEVANT EXPIRY DATE HEREOF, THE ORIGINAL LETTER OF CREDIT IS REQUIRED TO BE PRESENTED AND WE WILL HOLD THE ORIGINAL FOR OUR FILES AND REMOVE SAME FROM CIRCULATION.

THIS LETTER OF CREDIT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT WRITTEN AMENDMENT FOR ONE YEAR PERIODS FROM THE PRESENT OR ANY FUTURE EXPIRY DATE UNLESS AT LEAST THIRTY (30) DAYS PRIOR TO SUCH EXPIRY DATE, WE SEND THE BENEFICIARY (DIRECTED TO THE ATTENTION OF THE GENERAL COUNSEL) NOTICE AT THE ABOVE STATED ADDRESS (WHICH MAY BE CHANGED FROM TIME TO TIME BY NOTIFYING US IN WRITING OF SUCH CHANGE AT OUR ADDRESS SET FORTH HEREIN), BY OVERNIGHT COURIER THAT WE ELECT NOT TO EXTEND THIS LETTER OF CREDIT BEYOND THE INITIAL OR ANY EXTENDED EXPIRY DATE THEREOF. IN THE EVENT YOU RECEIVE SUCH NOTICE FROM US, YOU MAY DRAW HEREUNDER ON OR PRIOR TO THE THEN RELEVANT EXPIRY DATE, UP TO THE FULL AMOUNT THEN AVAILABLE UNDER THIS CREDIT, AGAINST YOUR SIGHT DRAFT(S) ON US, BEARING THE NUMBER OF THIS LETTER OF CREDIT.

PARTIAL AND MULTIPLE DRAWINGS ALLOWED.

737025v1

IRREVOCABLE STANDBY LETTER OF CREDIT # _____ PAGE NO. 2

THIS IRREVOCABLE LETTER OF CREDIT SETS FORTH IN FULL THE TERMS OF OUR UNDERTAKING.  THIS UNDERTAKING IS INDEPENDENT OF AND SHALL NOT IN ANY WAY BE MODIFIED, AMENDED, AMPLIFIED OR INCORPORATED BY REFERENCE TO ANY DOCUMENT, CONTRACT, AGREEMENT REFERENCED TO HEREIN.

WE HEREBY AGREE WITH YOU THAT DRAFT(S) DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS CREDIT SHALL BE DULY HONORED IF PRESENTED TOGETHER WITH DOCUMENT(S) AS SPECIFIED AT OUR OFFICE LOCATED AT _____ ON OR BEFORE THE ABOVE STATED EXPIRY DATE, OR ANY EXTENDED EXPIRY DATE IF APPLICABLE.

DRAFT(S) DRAWN UNDER THIS CREDIT MUST SPECIFICALLY REFERENCE OUR CREDIT NUMBER.

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (2007 REVISION), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 600.

SINCERELY,

_____

_____
AUTHORIZED SIGNATURE

THE ORIGINAL OF THIS LETTER OF CREDIT CONTAINS AN EMBOSSED SEAL OVER THE AUTHORIZED SIGNATURE.

PLEASE DIRECT ANY CORRESPONDENCE INCLUDING DRAWING OR INQUIRIES QUOTING OUR REFERENCE NUMBER TO:

_____

_____

_____

## EXHIBIT B

## CONFIDENTIALITY AGREEMENT AND COVENANT NOT TO COMPETE
## FOR KEY MANAGEMENT

THIS AGREEMENT is made this _____ day of _____, 20___, by and between RMH Franchise Corporation, a Kansas corporation ("Franchisee"), and _____, an individual employed by Franchisee ("Employee").

WITNESSETH:

WHEREAS, APPLEBEE'S INTERNATIONAL, INC. ("Applebee's") has the right to grant franchises for all rights in and to a unique system for the development and operation of restaurants (the "System"), which includes proprietary rights in valuable trade names, service marks and trademarks, including the service mark Applebee's Neighborhood Grill & Bar and variations of such mark, designs and color schemes for restaurant premises, signs, equipment, procedures and formulae for preparing food and beverage products, specifications for certain food and beverage products, inventory methods, operating methods, financial control concepts, a training facility and teaching techniques;

WHEREAS, Franchisee is the owner of the exclusive right to develop restaurants franchised by Applebee's which utilize the System ("Restaurants") for the period and in the territory described in one or more Development Agreements between Applebee's and Franchisee (each, a "Development Agreement");

WHEREAS, Franchisee owns and operates Restaurants pursuant to Franchise Agreements between Applebee's and Franchisee (each such agreement, including franchise agreements for Restaurants opened after the date hereof, a "Franchise Agreement");

WHEREAS, Franchisee and Employee acknowledge that Applebee's information as described above was developed over time at great expense, is not generally known in the industry and is beyond Franchisee's own present skills and experience, and that to develop it itself would be expensive, time-consuming and difficult, that it provides a competitive advantage and will be valuable to Franchisee in the development of its business, and that gaining access to it was therefore a primary reason why Franchisee entered into the Development Agreement and the Franchise Agreements; and

WHEREAS, in consideration of Applebee's confidential disclosure to Franchisee of these trade secrets, Franchisee has agreed to be obligated by the terms of the Franchise Agreements to execute, with certain of its employees performing key management functions, a written agreement protecting Applebee's trade secrets and confidential information entrusted to Employee, and protecting against unfair competition;

737025v1

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the parties agree as follows:

(1)     The parties acknowledge and agree that Employee is or will be employed in a supervisory or managerial capacity and in such capacity will have access to information and materials which constitute trade secrets and confidential and proprietary information. The parties further acknowledge and agree that any actual or potential direct or indirect competitor of Applebee's or of any of its franchisees shall not have access to such trade secrets and confidential information.

(2)     The parties acknowledge and agree that the System includes trade secrets and confidential information which Applebee's has revealed or will reveal to Franchisee in confidence, and that protection of said trade secrets and confidential information and protection of Applebee's against unfair competition from others who enjoy or who have had access to said trade secrets and confidential information are essential for the maintenance of goodwill and special value of the System.

(3)     Employee agrees that he or she shall not at any time (i) appropriate or use the trade secrets incorporated in the System, or any portion thereof, for use in any business which is not within the System; (ii) disclose or reveal any portion of the System to any person other than to Franchisee's employees as an incident of their training; (iii) acquire any right to use, or to license or franchise the use of any name, mark or other intellectual property right which is or may be granted by any Franchise Agreement; or (iv) communicate, divulge or use for the benefit of any other person or entity any confidential information, knowledge or know-how concerning the methods of development or operation of a Restaurant which may be communicated to Employee or of which Employee may be apprised by virtue of Employee's employment by Franchisee.  Employee shall divulge such confidential information only to such of Franchisee's other employees as must have access to that information in order to operate a Restaurant or to develop a prospective site for a Restaurant.  Any and all information, knowledge and know-how, including, without limitation, drawings, materials, equipment, specifications, techniques and other data, shall be deemed confidential for purposes of this Agreement without regard to whether such information, knowledge and know-how is designated as "Confidential".

(4)     Employee agrees that for the duration of his or her employment by Franchisee, and for two (2) years following termination thereof, Employee may not, without the prior written consent of Applebee's, directly or indirectly, for himself or through, on behalf of or in conjunction with any person, partnership or corporation, engage in or acquire any financial or beneficial interest (including any interest in corporations, partnerships, trusts, unincorporated associations or joint ventures) in, advise, help, guarantee loans or make loans to, any restaurant business whose menu or method of operation is the same as or similar to that employed by restaurant units within the System which is located either (a) in the Territory, as defined in each Development Agreement, or (b) in the Area of Dominant Influence (as defined and established from time to time by Arbitron Ratings Company or similar successor methodology used by Arbitron Ratings Company or similar company known in the

advertising industry that is commonly used for determining markets for radio and television advertising) of any Restaurant owned and operated by Franchisee.

(5)     Employee further acknowledges and agrees that any materials and manuals provided or made available to Franchisee by Applebee's (collectively, the "Manuals") are loaned by Applebee's to Franchisee for limited purposes only, remain the property of Applebee's, and may not be reproduced, in whole or in part, without the written consent of Applebee's.

(6)     Employee agrees to surrender to Franchisee or to Applebee's each and every copy of the Manuals and any other information or material in his or her possession or control upon request, upon termination of employment, or upon completion of the use for which said Manuals or other information or material may have been furnished to Employee.

(7)     The parties agree that in the event of a breach of this Agreement, Applebee's would be irreparably injured and would be without an adequate remedy at law.  Therefore, in the event of a breach or a threatened or attempted breach of any of the provisions hereof, Applebee's shall be entitled to enforce the provisions of this Agreement as a third-party beneficiary hereof and shall be entitled, in addition to any other remedies which it may have hereunder at law or in equity (including the right to terminate the Development Agreements or the Franchise Agreements), to a temporary and/or permanent injunction and a decree for specific performance of the terms hereof without the necessity of showing actual or threatened damage, and without being required to furnish a bond or other security.

(8)     The restrictions in Subsection (4) hereof shall not apply to ownership of less than two percent (2%) of the shares of a company whose shares are traded on a national securities exchange if such shares are owned for investment only, and are not owned by an officer, director, employee or consultant of such publicly traded company.

(9)     If any court or other tribunal having jurisdiction to determine the validity or enforceability of this Agreement determines that it would be invalid or unenforceable as written, the provisions hereof shall be deemed to be modified or limited to such extent or in such manner necessary for such provisions to be valid and enforceable to the greatest extent possible.

(10)    In the event that any party to this Agreement or Applebee's initiates any legal proceeding to construe or enforce any of the terms, conditions and/or provisions of this Agreement, or to obtain damages or other relief to which any party may be entitled by virtue of this Agreement, the prevailing party or parties shall be paid its/their reasonable attorneys' fees and expenses by other party or parties.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as of the date first above written.

FRANCHISEE:                                EMPLOYEE:

By: _____              By: _____
Name: _____              Name: _____
Title: _____

## EXHIBIT C

## CONFIDENTIALITY AGREEMENT

THIS AGREEMENT is made this ____ day of _____, 20___, by and between RMH Franchise Corporation, a Kansas corporation ("Franchisee"), and _____, an individual employed by Franchisee ("Employee").

WITNESSETH:

WHEREAS, APPLEBEE'S INTERNATIONAL, INC. ("Applebee's") has the right to grant franchises for all rights in and to a unique system for the development and operation of restaurants (the "System"), which includes proprietary rights in valuable trade names, service marks and trademarks, including the service mark Applebee's Neighborhood Grill & Bar and variations of such mark, designs and color schemes for restaurant premises, signs, equipment, procedures and formulae for preparing food and beverage products, specifications for certain food and beverage products, inventory methods, operating methods, financial control concepts, a training facility and teaching techniques;

WHEREAS, Franchisee is the owner of the exclusive right to develop restaurants franchised by Applebee's which utilize the System ("Restaurants") for the period and in the territory described in one or more Development Agreements between Applebee's and Franchisee (each, a "Development Agreement");

WHEREAS, Franchisee owns and operates Restaurants pursuant to Franchise Agreements between Applebee's and Franchisee (each such agreement, including franchise agreements for Restaurants opened after the date hereof, a "Franchise Agreement");

WHEREAS, Franchisee acknowledges that Applebee's information as described above was developed over time at great expense, is not generally known in the industry and is beyond Franchisee's own present skills and experience, and that to develop it itself would be expensive, time-consuming and difficult, that it provides a competitive advantage and will be valuable to Franchisee in the development of its business, and that gaining access to it was therefore a primary reason why Franchisee entered into the Development Agreement and the Franchise Agreements; and

WHEREAS, in consideration of Applebee's confidential disclosure to Franchisee of these trade secrets, Franchisee has agreed to be obligated by the terms of Development Agreement to execute, with each employee of Franchisee who will have supervisory authority over the development or operation of more than one Restaurant or who serves as a General Manager, Kitchen Manager or other managerial position at a Restaurant, a written agreement protecting Applebee's trade secrets and confidential information entrusted to Employee;

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the parties agree as follows:

(1)    The parties acknowledge and agree that Employee is or will be employed in a supervisory or managerial capacity and in such capacity will have access to information and materials which constitute trade secrets and confidential and proprietary information.  The parties further acknowledge and agree that any actual or potential direct or indirect competitor of Applebee's, or of any of its franchisees, shall not have access to such trade secrets and confidential information.

(2)    The parties acknowledge and agree that the System includes trade secrets and confidential information which Applebee's has revealed to Franchisee in confidence, and that protection of said trade secrets and confidential information and protection of Applebee's against unfair competition from others who enjoy or who have had access to said trade secrets and confidential information are essential for the maintenance of goodwill and special value of the System.

(3)    Employee agrees that he or she shall not at any time (i) appropriate or use the trade secrets incorporated in the System, or any portion thereof, for use in any business which is not within the System; (ii) disclose or reveal any portion of the System to any person other than to Franchisee's employees as an incident of their training; (iii) acquire any right to use, or to license or franchise the use of any name, mark or other intellectual property right which is or may be granted by any Franchise Agreement; or (iv) communicate, divulge or use for the benefit of any other person or entity any confidential information, knowledge or know-how concerning the methods of development or operation of a Restaurant which may be communicated to Employee or of which Employee may be apprised by virtue of Employee's employment by Franchisee.  Employee shall divulge such confidential information only to such of Franchisee's other employees as must have access to that information in order to operate a Restaurant or to develop a prospective site for a Restaurant.  Any and all information, knowledge and know-how, including, without limitation, drawings, materials, equipment, specifications, techniques and other data, shall be deemed confidential for purposes of this Agreement without regard to whether such information, knowledge and know-how is designated as "Confidential".

(4)    Employee further acknowledges and agrees that any materials or manuals provided or made available to Franchisee by Applebee's (collectively, the "Manuals") are loaned by Applebee's to Franchisee for limited purposes only, remain the property of Applebee's, and may not be reproduced, in whole or in part, without the written consent of Applebee's.

(5)    Employee agrees to surrender to Franchisee or to Applebee's each and every copy of the Manuals and any other information or material in his or her possession or control upon request, upon termination of employment or upon completion of the use for which said Manuals or other information or material may have been furnished to Employee.

(6)    The parties agree that in the event of a breach of this Agreement, Applebee's would be irreparably injured and would be without an adequate remedy at law.  Therefore, in the event of a breach or a threatened or attempted breach of any of the provisions hereof, Applebee's shall be entitled to enforce the provisions of this Agreement as a third-party beneficiary hereof and shall be entitled, in addition to any other remedies which it may have hereunder at law or in equity (including the right to terminate the Development Agreements or the Franchise Agreements), to a temporary and/or permanent injunction and a decree for specific performance of the terms hereof without the necessity of showing actual or threatened damage, and without being required to furnish a bond or other security.

(7)    If any court or other tribunal having jurisdiction to determine the validity or enforceability of this Agreement determines that it would be invalid or unenforceable as written, the provisions hereof shall be deemed to be modified or limited to such extent or in such manner necessary for such provisions to be valid and enforceable to the greatest extent possible.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as of the date first above written.

FRANCHISEE:                                EMPLOYEE:


By: _____        By: _____
Name: _____        Name: _____
Title: _____

# Document Coversheet

**Name**   Kelly Wayman

**Date**   06/04/14

**Restaurant ID**  AP089077
Example: (AP123)

**Franchisee Name**  RMH Franchise Corporation

**Document Class/Type**  Addendum to Franchise Agreement
Valid Types: (Franchise Agreement,
Development Agreement, Amendment to Franchise Agreement,
Amendment to Development Agreement, Addendum to
Development Agreement, Addendum to Franchise Agreement,
Global Amendment to Franchise Agreement, Global Amendment
to Development Agreement, Assignment of Franchise Agreement,
Assignment of Development Agreement)

**Effective Date**  12272012
Format (05212014)

## 2012 AMENDMENT TO FRANCHISE AGREEMENTS

THIS 2012 AMENDMENT TO FRANCHISE AGREEMENTS ("**Amendment**") is made and entered as of the 27th day of December, 2012 (the "**Effective Date**"), by and among Applebee's International, Inc., a Delaware corporation ("**Franchisor**"), RMH Franchise Corporation, a Kansas corporation, ("**Franchisee**") and RMH Franchise Holdings, Inc., a Delaware corporation; and ACON Franchise Holdings, LLC, a Delaware limited liability company (collectively, the "**Principal Shareholders**" and, individually, a "**Principal Shareholder**").

WITNESSETH:

WHEREAS, contemporaneous with the execution of this Amendment, Franchisor, Franchisee and the Principal Shareholders have entered into Applebee's Neighborhood Grill & Bar Franchise Agreements for the operation of the restaurants at the locations as shown on **Exhibit A** (each, a "**Franchise Agreement**" and collectively, the "**Franchise Agreements**"); and

WHEREAS, Franchisor, Franchisee and the Principal Shareholders desire to amend the Franchise Agreement as hereinafter set forth.

NOW, THEREFORE, in consideration of mutual covenants and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.     <u>Franchise Agreements Amended.</u>   The Franchise Agreements are hereby amended and supplemented by this Amendment. Any conflict between this Amendment, a Franchise Agreement and any addendum, exhibits or attachments thereto shall be governed and controlled by the terms of this Amendment.

2.     <u>Delayed Starting Date - Mario Cernadas</u>.   Notwithstanding the terms of Section 15(b) of each Addendum to Franchise Agreement, Franchisor agrees that Franchisee will not be in breach of such section so long as Mario Cernadas is employed by Franchisee and serving as the Director of Operations within 30 days after the date hereof. If Mario Cernadas is not serving as the Director of Operations within 30 days after the date hereof, the Director of Operations will be deemed to have ceased employment with Franchisee for purposes of Section 15 of each Addendum to Franchise Agreement.

3.     <u>Governing Law</u>.   The interpretation, construction and validity of this Amendment will be governed by the laws of the state of Kansas without regard to the "choice of law" provisions or rules thereof.

4.     <u>No Further Amendment.</u>   No further amendment or modification of the Franchise Agreements shall be binding unless executed in writing by the parties or their authorized successors or assigns. No course of conduct or course of performance under this or any other agreement between the parties will be deemed to modify this Amendment. Except as expressly set forth in this Amendment, the Franchise Agreements remain in full force and effect.

738598v1

5.    Entire Agreement.  This Amendment and the agreements, documents and instruments referred to herein constitute the entire agreement between the parties with respect to the subject matter hereof, superseding and cancelling any and all prior and contemporaneous agreements, understandings, representations, inducements and statements, oral or written, of the parties in connection with the subject matter hereof.

6.    Headings.  The section headings are inserted as a matter of convenience and in no way define, limit or describe the scope of such section or affect the interpretation of this Amendment.

7.    Counterparts.  This Amendment may be signed in counterparts and each counterpart with a hand-written signature, whether an original or an electronic data text (including telegram, telex, facsimile, electronic data interchange and electronic mail) is considered an original and all counterparts constitute one and the same instrument.

8.    Miscellaneous.  Each of the terms and provisions of this Amendment, as applicable, is deemed incorporated by reference into the applicable Franchise Agreement. Any capitalized term not otherwise defined in this Amendment shall have the meaning as set forth in the applicable Franchise Agreement.  If any provision of this Amendment is found to be unenforceable, the remaining provisions will continue to be in full force and effect.  This Amendment shall be binding upon and shall inure to the benefit of the parties, their successors and permitted assigns. No waiver by any party of any provisions of this Amendment shall be deemed to be or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**[SIGNATURE PAGES FOLLOW]**

738598v1

IN WITNESS WHEREOF, the undersigned have entered into this instrument as of the date first above written.

**FRANCHISOR**:

APPLEBEE'S INTERNATIONAL, INC.

By: _____

Name: James A. McDermott III

Title:  Vice President, Development

Signature Page to 2012 Amendment to Franchise Agreements

**FRANCHISEE**:

RMH FRANCHISE CORPORATION

By: _____
Name: Jeffrey Neumann
Title: President


**PRINCIPAL SHAREHOLDERS**:

RMH FRANCHISE HOLDINGS, INC.

By: _____
Name: Jeffrey Neumann
Title: President


ACON FRANCHISE HOLDINGS, LLC

By: _____
Name: Daniel Jinich
Title: President and Managing Director


Signature Page to 2012 Amendment to Franchise Agreements

**FRANCHISEE**:

RMH FRANCHISE CORPORATION

By: _____
Name: Jeffrey Neumann
Title: President

**PRINCIPAL SHAREHOLDERS**:

RMH FRANCHISE HOLDINGS, INC.

By: _____
Name: Jeffrey Neumann
Title: President

ACON FRANCHISE HOLDINGS, LLC

By: _____
Name: Daniel Jinich
Title: President and Managing Director

Signature Page to 2012 Amendment to Franchise Agreements

**Exhibit A**
**Restaurants**

| |
|---|
| 100 Manhattan Town Ctr, Ste P-5, Manhattan, KS |
| 5928 S.W. 17th St., Topeka, KS |
| 3730 Village Drive, Lincoln, NE |
| 4004 Frederick Blvd., St. Joseph, MO |
| 102 Platte Oasis Pkwy., North Platte, NE |
| 6100 O Street, Suite C-318, Lincoln, NE |
| 2901 Eaglecrest Dr., Emporia, KS |
| 3951 N. 27th, Lincoln, NE |
| 721 Diers Ave., Grand Island, NE |
| 1133 Q Street, Lincoln, NE |
| 4619 S. Lincoln Ave., York, NE |
| 5605 2nd Ave., Kearney, NE |
| 328 E. 23rd St., Columbus, NE |
| 2919 S. Main St., Maryville, MO |
| 2303 Osborne Drive, Hastings, NE |
| 4025 South Loop 289, Lubbock, TX |
| 2810 Soncy Road, Amarillo, TX |
| 2911 Kemp Blvd., Wichita Falls, TX |
| 6211 N.W. Cache Road, Lawton, OK |
| 2680 W. Broadway, Ardmore, OK |
| 5630 W. Amarillo Blvd., Amarillo, TX |
| 6501 4th St., Lubbock, TX |
| 3501 N. Main St., Altus, OK |
| 1220 N. Mississippi Ave., Ada, OK |
| 2002 N US Hwy 81, Duncan, OK |
| 2621 5th Avenue, Scottsbluff, NE |
| 3209 Grand Ave., Laramie, WY |
| 359 Miracle, Evansville, WY |
| 1927 Cliff Davis Dr., Gillette, WY |
| 2491 Foothill Blvd., Rock Springs, WY |
| 1401 Dell Range Blvd., Cheyenne, WY |
| 5760 Airport Blvd., Mobile, AL |
| 5091 Bayou Blvd., Pensacola, FL |
| 8670 Highway 98 West, Destin, FL |
| 4940 Government Blvd., Mobile, AL |
| 165 East Nine Mile Blvd., Pensacola, FL |
| 2409 S. McKenzie, St., Foley, AL |
| 1601 Bienville Blvd., Ocean Springs, MS |
| 215 Rasberry Road, Crestview, FL |
| 514 E. Expressway 83, McAllen, TX |
| 4601 North 10th, McAllen, TX |
| 7601 San Dario Ave., Laredo, TX |
| 1519 W. Harrison, Harlingen, TX |
| 6691 S. Padre Island Dr., Corpus Christi, TX |
| 1913 W. Trenton Rd., Edinburg, TX |

# Document Coversheet

**Name**   Kelly Wayman

**Date**   06/04/14

**Restaurant ID**  AP089077
Example: (AP123)

**Franchisee Name**  RMH Franchise Corporation

**Document Class/Type**  Amendment to Franchise Agreement
Valid Types: (Franchise Agreement,
Development Agreement, Amendment to Franchise Agreement,
Amendment to Development Agreement, Addendum to
Development Agreement, Addendum to Franchise Agreement,
Global Amendment to Franchise Agreement, Global Amendment
to Development Agreement, Assignment of Franchise Agreement,
Assignment of Development Agreement)

**Effective Date**   12272012
Format (05212014)

# WEIGHT WATCHERS RIDER TO
# FRANCHISE AGREEMENT

**THIS RIDER** to the Applebee's Neighborhood Grill & Bar Franchise Agreement (the "**Rider**") is made effective the 27th day of December, 2012, between Applebee's International, Inc., a Delaware corporation ("**Franchisor**") and RMH Franchise Corporation, a Kansas corporation ("**Franchisee**"). All capitalized terms used in this Rider but not defined herein shall have the meaning as contained in the Franchise Agreement for the Restaurant located at 2810 Soncy Road, Amarillo, Texas (the "**Franchise Agreement**") between Franchisor and Franchisee to which this Rider is attached, or in the Endorsement Agreement (as defined below).

**WHEREAS**, Weight Watchers International Inc. ("**Weight Watchers**") is a worldwide business offering services and products to help individuals safely lose weight and maintain a healthy weight; and

**WHEREAS,** Weight Watchers is the owner of the "Weight Watchers®" and ""PointsPlus$^{TM}$" trademarks for weight loss and weight maintenance programs and services (the "**WWI Marks**") which are incorporated into a distinctive graphic design to communicate that Weight Watchers endorses an item (the "**Endorsement Icon**");

**WHEREAS**, Applebee's Services, Inc. ("**ASI**") and Weight Watchers have entered into an endorsement agreement ("**Endorsement Agreement**"), as amended July 29, 2008; November 12, 2009; October 7, 2010 and November 14, 2011, whereby ASI shall have the right to use the Endorsement Icon on Menus in Restaurants solely in connection with the sale in Restaurants of certain Menu items ("**Endorsed Menu Items**"); and

**WHEREAS**, Franchisee desires the right to use, and ASI is willing to sublicense to Franchisee the right to use, the Endorsement Icon for use on Menus in Franchisee's Restaurants solely in connection with the sale of the Endorsed Menu Items, subject to the terms and conditions of this Rider.

**NOW, THEREFORE,** in consideration of the mutual covenants, conditions and agreements set forth herein and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.    **Definitions.**

    1.1    "**Endorsement Icon**" means Weight Watchers trademark for weight loss and weight maintenance programs and services, together with the Program Information Weight Watchers deems helpful to consumers (e.g., "PointsPlus$^{TM}$ values), as amended by Weight Watchers from time to time.

    1.2    "**Endorsed Menu Items**" means Weight Watchers' guidelines for the approval of Endorsed Menu Items as set forth in Schedule C, as amended by Weight Watchers in its sole discretion from time to time.

    1.3    "**Main Menu**" means the primary menu used at Franchisee's Restaurants.

1.4    "**Menu**" means the Main Menu and all other menus offered at Franchisee's Restaurants.

1.5    "**Plate Presentation**" means written standards for preparation, cooking, presentation, protocol, safety and quality control and the Recipe for an Endorsed Menu Item, including without limitation standards and controls relating to ASI, the Restaurant Operating Subsidiaries and the Participating Franchisees and Franchisees' suppliers.

1.6    "**Program Information**" means the terminology used in connection with any then-current Weight Watchers program as it may exist from time to time in the Territory which Weight Watchers deems relevant to food and beverage products, recipes and menu items.

1.7    "**Restaurants**" shall mean restaurants under the "Applebee's" or "Applebee's Neighborhood Grill & Bar" trademark.

1.8    "**Specifications**" means specifications for Endorsed Menu Items including, without limitation, recipes, formulation, caloric and nutritional values, ingredients, sizes, shapes, tastes and preparation and presentation guidelines.

1.9    "**Weight Watchers Program**" means the weight-loss and maintenance regimes designed, defined, marketed and adopted by Weight Watchers, as amended by Weight Watchers in its sole discretion from time to time.

2.    <u>Amendment to Franchise Agreement</u>.

This Rider shall amend the Franchise Agreement.  Any conflict between this Rider and the Franchise Agreement shall be governed and controlled by the terms of this Rider.

3.    <u>Weight Watchers/ Applebee's Services, Inc.</u>

3.1    <u>Weight Watchers Rights</u>.  Franchisee expressly acknowledges that Weight Watchers is a third-party beneficiary of this Rider, and as a beneficiary, in addition to Franchisor's rights to enforce the provisions of this Rider, may take action to enforce the provisions of this Rider.  Franchisee acknowledges that Weight Watchers, after giving Franchisor the first right to investigate and take corrective action in consultation with Weight Watchers, has the right to take action to insure compliance by Franchisee of the terms and conditions contained herein and Franchisee waives any defense or claims that Weight Watchers is not entitled or has no standing as a third party beneficiary to protect its rights hereunder.

3.2    <u>Weight Watchers Not a Party</u>.  Nothing contained herein shall be construed as creating any obligation or legal duty upon Weight Watchers or its affiliates with respect to Franchisee.  Franchisee shall look solely to Franchisor for any and all obligations, liabilities, claims or duties with respect to the operation of Franchisee's Restaurants, the use of the Endorsement Icon or the offer and sale of Endorsed Menu Items.  Weight Watchers' rights hereunder to enforce or terminate the Franchisee's rights under this Rider shall not create any duty, privity of contract relationship, or obligation on Weight Watchers to take any action and the failure of

Weight Watchers to take any action shall not be deemed a waiver of any such third party beneficiary rights.

3.3     Applebee's Services, Inc.  Franchisee expressly acknowledges that ASI is a third-party beneficiary of this Rider, and as a beneficiary, in addition to Franchisor's rights to enforce the provisions of this Rider, ASI may take action to enforce the provisions of this Rider.  Franchisee acknowledges that ASI has the right to take action to insure compliance by Franchisee of the terms and conditions contained herein and Franchisee waives any defense or claims that ASI is not entitled or has no standing as a third party beneficiary to protect its rights hereunder.

4.     Grant and Term of Rider.

4.1     Grant.  Subject to the terms and conditions of this Rider, Franchisee is hereby granted a non-transferable, non-sublicensable, non-assignable and non-exclusive right, and Franchisee undertakes the obligation, during the term ("Term") of this Rider to use the Endorsement Icon on Menus in Franchisee's Restaurants solely in connection with the sale of Endorsed Menu Items to consumers in Franchisee's Restaurants pursuant to this Rider.

4.2     Term.  The Term of this Rider shall commence on the date hereof and shall terminate no earlier than November 1, 2014 and no later than November 30, 2014, unless terminated sooner in accordance with the Franchise Agreement or unless sooner terminated by Franchisor in accordance with Section 16 hereunder.

5.     Limitation of Rights.

5.1     General.  All rights granted to Franchisee hereunder are limited to the use of the Endorsement Icon on Menus in Franchisee's Restaurants solely in connection with the sale of Endorsed Menu Items to consumers in Franchisee's Restaurants in accordance with the terms and conditions contained herein and Franchisee has no right to use the Endorsement Icon or the WWI Marks for any other purpose whatsoever.

5.2     Sale of Endorsed Menu Items.   Franchisee shall not offer the Endorsed Menu Items, for sale or distribution, or otherwise use the Endorsement Icon or the WWI Marks outside of Franchisee's Restaurants or offer the Endorsed Menu Items to persons who intend or are likely to distribute or resell them in any area outside of Franchisee's Restaurants.

5.3     Endorsement. Franchisee shall not use the Endorsement Icon as an endorsement of any product or service of Franchisee, Franchisor or any third party, other than the Endorsed Menu Items.

5.4     Use on Internet, in Electronic Medium.  Except for Endorsed Menu Item descriptions and images on websites or email marketing campaigns (in each case as approved by Weight Watchers), Franchisee shall not use the Endorsement Icon or WWI Marks on the internet or any other Electronic Medium.  By way of

example, and without limiting the generality of the foregoing, Franchisee shall not (i) promote, display, provide information about or offer to sell Endorsed Menu Items or otherwise display or distribute any WWI Marks via the internet or any other Electronic Medium (except as approved by Weight Watchers, in Weight Watchers' sole discretion) or (ii) own or operate any website that uses any WWI Marks as, or as part of, a domain name.

5.5    Packaging or Containers.  Franchisee may not use the Endorsement Icon on any packaged food product or on any packaging or containers, including without limitation, those used to store or "take out" any food or beverages to be consumed off the premises of Franchisee's Restaurants by consumers.

5.6    INTENTIONALLY DELETED.

6.    Endorsement Icon.

6.1    Ownership.  Franchisee acknowledges and agrees that Weight Watchers owns exclusively all the rights, title and interest in and to the Endorsement Icon and WWI Marks and the goodwill  pertaining thereto, and agrees that its rights to use the Endorsement Icon and WWI Marks derives solely from the Rider. Franchisee acknowledges the value and goodwill associated with the Endorsement Icon and WWI Marks and agrees that it will use the Endorsement Icon and WWI Marks solely in connection with the sale of Endorsed Menu Items to consumers in Franchisee's Restaurants in a manner designed to protect and enhance the reputation and integrity of the Endorsement Icon and WWI Marks and the Weight Watchers Program. Franchisee shall not exercise the rights granted under this Agreement in any manner that would have a tendency to dilute, denigrate or otherwise diminish the value, the goodwill or the reputation associated with the use of the Endorsement Icon or WWI Marks and shall not, during the Term or thereafter, use any Mark confusingly similar, deceptive or misleading with respect to the Endorsement Icon or WWI Marks or which dilutes, denigrates or otherwise diminishes the value of the Endorsement Icon or WWI Marks.

6.2    Menu.  In accordance with and subject to the terms of the Endorsement Agreement, Franchisee agrees that all references to the Endorsed Menu Items in Franchisee's Restaurant Menu shall conform to the requirements established by Franchisor or Weight Watchers from time to time.

6.3    Cooperation.  Franchisee shall cooperate fully and in good faith for the purpose of securing, preserving and protecting Weight Watchers' rights, as applicable, in and to the Endorsement Icon.

6.4    Corporate Name.  Franchisee shall not change its name to or operate under any name incorporating the Endorsement Icon or, any mark based upon, derived or translated from, identical or confusingly similar to the Endorsement Icon.

7.    Weight Watchers Royalties.

In addition to the monthly royalty or other fee required under the terms of Section 9.1 of the Franchise Agreements, Franchisee shall pay to Franchisor an additional monthly royalty fee of two and one-half percent (2.5%) ("Weight Watchers Royalty") on the Gross Sales of all Endorsed Menu Items in the Restaurants. The Weight Watchers Royalty shall be due and payable in accordance with the terms of Section 9.2 of the Franchise Agreements.  For the avoidance of doubt, sales shall be calculated based on the Gross Sales, as defined in Section 9.3(a) and (b) of the Franchise Agreements, of actual individual unit sales (as opposed to estimated sales) of all Endorsed Menu Items in Franchisee's Restaurants.  Notwithstanding the foregoing, for purposes of calculating the monthly royalty fee due to Franchisor, the Weight Watchers Royalty shall be excluded from Gross Sales under the provisions of Section 9.3(b) of the Franchise Agreement.

8.    Plate Presentations.

Franchisee shall at all times prepare, cook, distribute and serve any and all Endorsed Menu Items in compliance with the Plate Presentations, the Specifications, all applicable laws and in accordance with the terms and conditions of this Rider.  Franchisee acknowledges and agrees that ASI or Weight Watchers may amend or modify the Plate Presentations from time to time.  Franchisee agrees to comply with all other directions as to quality control and levels of variance, if any, as may be reasonably required and modified from time to time by Franchisor, such levels of variance as set forth in the Plate Presentations. Franchisee shall employ its best (e.g., most current) technology and manufacturing, preparation, cooking and presentation practices in the preparation, cooking and presentation of the Endorsed Menu Items.

9.    Specific Menu Requirements.

At any given time, Franchisee shall use its best efforts to have a minimum of five (5) Endorsed Menu Items on its Restaurants' Menu as set forth by ASI in accordance with the Endorsement Agreement; provided, however, the number of Endorsed Menu Items on the Restaurant Menu of a limited unit ("Specially Designated Unit") shall be based on each unit's unique size, location and/or kitchen capacity and shall be approved by Weight Watchers. The Endorsed Menu Items shall be presented at least as prominently as similar Menu items that are listed on Franchisee's Restaurant Menu but do not use the Endorsement Icon.

10.    Consumer Inquiries/Complaints.

Franchisee shall be responsible for taking any and all action at its expense in respect of complaints made by third parties relating to Endorsed Menu Items offered or sold at Franchisee's Restaurants ("Inquiries/Complaints"), whether made to Franchisee, Franchisor or Weight Watchers.  Any such action taken by Franchisee shall at a minimum comply with the Standards and Guidelines for Consumer Inquiries/Complaints agreed to by Weight Watchers and ASI, as determined from time to time, as set forth in the Manuals.

11.    <u>Food Compliance Audits</u>.

Upon prior written notice from Weight Watchers or ASI and as reasonably required by Weight Watchers without unreasonably interfering with Franchisee's business, Franchisee shall permit Weight Watchers or its designee, during regular business hours to visit and to inspect all areas used for the preparation, cooking, storage, distribution, serving and sale of the Endorsed Menu Items.

12.    <u>Spot Checks</u>.

Franchisee also acknowledges that Weight Watchers or its designee shall have the right to make both unannounced and anonymous and unannounced and un-anonymous visits to Franchisee's Restaurants for the purpose of conducting routine "spot checks" of such facilities to confirm compliance with Weight Watchers' standards and practices, all applicable laws and the terms and conditions of this Rider.

13.    <u>Reports</u>.

13.1    <u>Weekly</u>.    Franchisee shall furnish to ASI, on or before five o'clock p.m. (5:00 p.m.) Central Time on the Monday following the calendar week to which the report relates, and in addition to its regular weekly sales report as required by Section 10.2(c) of the Franchise Agreements, a report of total Gross Sales of Endorsed Menu Items, including a detail by Endorsed Menu Item of total sales in dollars, total unit sales, and other similar information to be mutually agreed upon by the parties.    Any adjustments for the fiscal month to which the weekly reports relate shall be included in the final weekly report for each fiscal month submitted to Franchisor.

13.2    <u>Annual Quality Control Statements</u>.    Franchisee shall provide to ASI on an annual basis, on or before the seventy-fifth (75th) day after the end of each fiscal year, two (2) copies of reports prepared by a senior operations officer of Franchisee certifying that Franchisee has maintained appropriate standards of quality control, and conformity to the Plate Presentations, any other standards set forth in this Rider and all applicable laws.    All such annual reports shall be retained by Franchisee during the Term of this Rider and for two (2) additional years thereafter.

13.3    <u>Annual Financial Statement</u>.    Franchisee shall forward to ASI, on or before the seventy-fifth (75th) day after the end of each fiscal year, a statement verifying the accuracy of the weekly sales reports submitted to ASI, certified by a senior financial officer of Franchisee, showing the volume, sales price and aggregate sales revenue relating to the Endorsed Menu Items for that year.

14.    <u>Financial Audits</u>.

Franchisee shall preserve all financial books and records relating to distribution, serving, sale and marketing of Endorsed Menu Items during the Term of this Rider and for two (2) additional years thereafter.

15.    Termination.

15.1    Due to Franchisor's Loss of Rights.    In the event the Endorsement Agreement expires or terminates for any reason, this Rider shall automatically terminate.

15.2    Events of Termination.    Franchisor shall have the right to terminate all rights and privileges arising under and by virtue of this Rider if Franchisee:

(a)    fails to submit any reports, statements, samples or other information required to be submitted within the time periods specified in this Rider and this default is not cured within thirty (30) business days after notice from Franchisor of such default;

(b)    offers for sale, sells, advertises, distributes or promotes any Endorsed Menu Items or uses any Endorsement Icon or WWI Marks, in advertising and promotional materials without having first obtained the requisite approval of Franchisor or Weight Watchers in accordance with the terms and conditions of this Rider;

(c)    fails to comply with any of the obligations, duties or conditions contained in this Rider or otherwise breaches any representation, warranty, covenant or any other provision of this Rider (including without limitation, any laws or Plate Presentations), where such breach is not cured within thirty (30) business days after notice from Franchisor;

(d)    becomes insolvent or any resolution or proceedings for bankruptcy or liquidation (voluntary or involuntary) are instituted by or against Franchisee or in the event of the appointment, with or without consent, of an administrator, assignee or agent for the benefit of a creditor or creditors or of a receiver for the Franchisee;

(e)    makes an unauthorized assignment, transfer or sub-license of its rights under this Rider; or

(f)    loses its right to operate as an Applebee's franchisee.

16.    Effect of Termination.

Franchisee agrees that, upon the termination or expiration of this Rider, Franchisee will discontinue all use of the Endorsement Icon and WWI Marks, and shall destroy (as applicable and as directed by Weight Watchers in Weight Watchers' sole discretion) all Menus containing the Endorsement Icon and/or the WWI Marks and any other materials containing the Endorsement Icon and/or the WWI Marks, and will not in any way use the Endorsement Icon, the WWI Marks or any other mark confusingly similar to such marks.

17.     Insurance; Release; Indemnification.

In addition to those duties and obligations assumed by and imposed upon Franchisee in the Franchise Agreement pertaining to insurance and indemnification, Franchisee shall, concurrently with execution of this Rider, name Weight Watchers or cause Weight Watchers to be named an additional insured party under all general liability and umbrella liability insurance policies pertaining to the Restaurants.  Franchisee shall indemnify, defend and hold harmless ASI, Franchisor and Weight Watchers and their affiliates, officers, directors, agents, employees, partners, members and controlling persons from and against and in respect of any and all losses, claims, causes of action, demands, damages, obligations, penalties, fines, suits, assessments, judgments, liabilities, costs or expenses whatsoever (including reasonable attorney's fees and disbursements), to the fullest extent permitted by law for which they or any of them may become liable, arising out of or resulting from (a) the production, manufacture, sale, preparation, cooking, presentation, serving, distribution, marketing, promotion, labeling, packaging, handling or consumption of the Endorsed Menu Items; (b) the breach by Franchisee of any warranty, representation or covenant contained in this Rider; and (c) any use of the Endorsement Icon and WWI Marks.  By Franchisee's execution hereof, Franchisee releases Weight Watchers from any and all damages incurred by Franchisee arising under the certain Endorsement Agreement between Weight Watchers and ASI, by virtue of which the rights to use the Endorsement Icon are granted to Franchisee, including such damages as may result from the termination of such agreement.

18.     Confidential Information.

        18.1    Generally.  Each party acknowledges that all information relating to the business and operations of the other party which is disclosed to it or which it acquires during the term of this Rider, including without limitation, the data, records, papers, documents, questions, guides, transcripts, findings, studies, databases, surveys, results, presentations, reports, analyses, user information, experience, formulae, methods, processes, techniques, and business plans are valuable, proprietary information of the other party ("**Confidential Information**"). For purposes of this Section 18.1, all recipes, formulations, specifications, costs, expenses, projected and actual sales, communications, advertising and promotional strategies for marketing the Menus and the Endorsed Menu Items developed by ASI, Weight Watchers or by Franchisee independently or under the guidance of ASI or Weight Watchers in contemplation of and during the continuance of this Rider, shall be considered Confidential Information of ASI and/or Weight Watchers.  Each party acknowledges the need to preserve the secrecy and confidentiality of the Confidential Information, during and after the termination or expiration of this Rider and each party shall not disclose or use the Confidential Information for any purpose other than the performance of its obligations under this Rider.  The obligation of confidentiality set forth herein shall not apply to information which (a) was publicly available at the time of the disclosure to the receiving party; (b) subsequently becomes publicly available through no fault of the receiving party; (c) is rightfully acquired by the receiving party from a third party who is not in breach of a confidential obligation with regard

to such information; (d) is independently known by the receiving party whether prior to or during the Term; or (e) is disclosed with the written consent of the party who owns the Confidential Information.

18.2    Public Announcements.  Except as required by any applicable law or order of any governmental authority, in no event shall there be any public announcements or press releases by Franchisee relating to this Rider, the Menus using the Endorsement Icon, the Endorsed Menu Items or the transactions contemplated hereby without Franchisor's or ASI's written approval in their sole discretion.

19.    Non-Competition.

19.1    During the term of this Rider, each of Franchisee and its affiliates will not prepare, sell (or license for sale), distribute or market any products or services for, or list a Menu item in Franchisee's Restaurants utilizing the marks of a "Competitor." "Competitor" shall mean a person or entity offering products or services as or in connection with a weight management program or system (e.g., Slim Fast, Jenny Craig, South Beach) or a weight management brand (e.g., Healthy Choice, Snackwell's, Lean Cuisine or Balance).  For the avoidance of doubt, "Competitors" do not include ASI's use of generic words or phrases or its own marks or icons to identify nutrition and/or health characteristics of Menu items (e.g., low calorie, low fat, low salt, heart healthy).  In addition, "Competitors" do not include better-for-you branded items that are not weight management brands (e.g., Baked Lays, Diet Pepsi and Hellmann's Reduced Fat Mayonnaise).

20.    Transfer; Successors, Assigns, Entire Agreement.

The rights, privileges, duties and obligations granted to Franchisee pursuant to this Rider shall not be assignable or assigned separately and apart from the Franchise Agreement. This Rider shall inure to the benefit of any and all successors and assigns of Franchisor.  This Rider contains the entire understanding between the parties relating to the subject matter hereof and none of the provisions of this Rider may be altered, modified or amended in any way except by an instrument in writing signed by the parties thereto. This Rider may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. If any provision of the Rider or the application thereof to any person or entity or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Rider and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

21.    Survival.

Sections 3, 6, 14, 16, 17, 18, 20, and 21, shall survive the termination or expiration of this Rider.

**[Signature Pages Follow]**

THIS RIDER is executed as of the day and year first above written.

FRANCHISEE:

RMH Franchise Corporation

By: _____
Name: Jeffrey Neumann
Title: President

Not binding without execution by an authorized officer of Franchisor.

APPLEBEE'S INTERNATIONAL, INC.

By:

Name:  James A. McDermott III
Title:  Vice President, Development

# Document Coversheet

**Name**   Kelly Wayman

**Date**   06/04/14


**Restaurant ID**  AP089077
Example: (AP123)

**Franchisee Name**  RMH Franchise Corporation

**Document Class/Type**  Addendum to Franchise Agreement
Valid Types: (Franchise Agreement,
Development Agreement, Amendment to Franchise Agreement,
Amendment to Development Agreement, Addendum to
Development Agreement, Addendum to Franchise Agreement,
Global Amendment to Franchise Agreement, Global Amendment
to Development Agreement, Assignment of Franchise Agreement,
Assignment of Development Agreement)

**Effective Date**  12272012
Format (05212014)

## ADVERTISING AMENDMENT

This Amendment to Franchise Agreement (the "**Amendment**") is made by and among Applebee's Restaurants LLC and Applebee's Franchisor LLC (collectively, as their interests may appear, "**Applebee's**") and the undersigned Franchisee(s) and Principal Shareholder(s) (collectively, "**Franchisee**").

1. Purpose of Amendment. Franchisee and Applebee's have entered into a franchise agreement for each Applebee's restaurant identified on the attached Schedule A (each a "**Franchise Agreement**"). Franchisee and Applebee's wish to increase Franchisee's payments to the advertising account established by Applebee's (the "**Fund**") and obtain Applebee's contribution to the Fund as described in Paragraph 4.

2. New Minimum Rate. Subsection 8.2 of each Franchise Agreement (or the Subsection of each Franchise Agreement related to advertising fees) is amended so that, starting on January 1, 2018 through December 31, 2019 ("**Effective Period**"), Franchisee shall pay to Franchisor a minimum dollar amount equal to 3.50% of Franchisee's gross sales as defined in Subsection 9.3 (or the Subsection of each Franchise Agreement that defines gross sales) for any use or purpose described in Subsection 8.2 (the "**Minimum Rate**"). During the Effective Period, Subsection 8.2 of each Franchise Agreement is amended to lower Franchisee's minimum local promotional expenditures to 0.25% of Franchisee's gross sales.

3. Temporary Increase. Starting on July 1, 2018 through December 31, 2019, in lieu of the payment set forth in Paragraph 2, Subsection 8.2 of each Franchise Agreement is amended so that Franchisee shall pay to Franchisor a minimum dollar amount equal to the Temporary Increased Rate (as defined below) multiplied by Franchisee's gross sales as defined in Subsection 9.3 for any use or purpose described in Subsection 8.2. During the Effective Period, in no event shall the Minimum Rate or the Temporary Increased Rate be below 3.50%; in no event shall the Temporary Increased Rate be above 4.25%.

   (a) "**Temporary Increased Rate**" is defined as the Minimum Rate plus .25 multiplied by any Positive Comparable Sales (as defined below). The mathematical formula to calculate the Temporary Increased Rate is as follows:

   Minimum Rate + (Positive Comparable Sales x .25) = Temporary Increased Rate

   (b) "**Positive Comparable Sales**" is defined as the percentage change in domestic system-wide same restaurant sales on average for the system between January 1, 2018 and June 30, 2018, excluding any consecutive 30-day period during that time, as compared to the identical period in 2017 so long as that number is a positive number.

   A schedule illustrating examples of the calculations of the Temporary Increased Rate is attached as Schedule B.

4. Applebee's Contribution. Subject to approval from the Board of Directors, if all Applebee's franchisees representing 100% of traditional domestic Applebee's restaurants have executed this Amendment by December 31, 2017, then Applebee's shall contribute $30,000,000 to the Fund between January 1, 2018 and June 30, 2018 and such contribution shall not be considered a loan or otherwise repayable to Applebee's. Franchisee's obligations under this Agreement are contingent on Applebee's obtaining approval from the Board of Directors to pay this amount to the Fund.

5. Entire Agreement/Changes. The provisions of this Amendment represent the entire agreement between the parties regarding the subject of this Amendment and supersede any and all prior and contemporaneous proposals, agreements understandings, statements, and presentations, whether oral or written. Except as expressly modified herein, all other terms and conditions of the Franchise Agreement shall remain unmodified and in full force and effect, including all other terms in Subsection 8.2; provided, however, for any Applebee's franchisee that has signed this Amendment and is not in breach of this Amendment, Applebee's, through the Effective Period, shall not exercise its rights to increase the percentage rate payable to the Fund up to a maximum of 4% and also to increase the required spend on local promotional activities up to a maximum of 1%; provided, further, for any Applebee's franchisee that either does not sign this Amendment or fails to comply with its terms, Applebee's reserves all of its rights, including without limitation, the foregoing rights. No statement by either party, or their agents or representatives, will bind the other unless it is set forth in writing and executed by both parties.

6. General. Any undefined capitalized terms used in this Amendment will have the meaning stated in the amended Franchise Agreement. If any term or condition of this Amendment is inconsistent with such Franchise Agreement, this

1

Amendment will prevail.  Each signatory for Franchisee represents and warrants that (a) it has full authority to execute this Amendment on behalf of Franchisees, and (b) shall execute any and all agreements necessary to carry out the terms of this Amendment for all Applebee's restaurants operated by itself or its affiliates.

**Applebee's Restaurants LLC**
**Applebee's Franchisor LLC,** collectively, as their interests may appear:

By: _John C. Cywinski, President_

Date: _12/19/17_

2

**FRANCHISEES:**

RMH FRANCHISE CORPORATION

By: _____
Name:  Michael Muldoon
Title:    President and Chief Executive Officer

RMH ILLINOIS, LLC

By:  RMH FRANCHISE HOLDINGS, LLC
     Its sole member

By: _____
Name:  Michael Muldoon
Title:    President and Chief Executive Officer

**PRINCIPAL SHAREHOLDERS:**

RMH FRANCHISE CORPORATION

By: _____
Name:  Michael Muldoon
Title:    President and Chief Executive Officer

RMH ILLINOIS, LLC

By:  RMH FRANCHISE HOLDINGS, LLC
     Its sole member

By: _____
Name:  Michael Muldoon
Title:    President and Chief Executive Officer

RMH FRANCHISE HOLDINGS, INC.

By: _____
Name:  Michael Muldoon
Title:    President

ACON FRANCHISE HOLDINGS, LLC

By: _____
Name:  Daniel Jinich
Title:    President and Managing Director

SCHEDULE A
to
Advertising Amendment

### RMH FRANCHISE CORPORATION

|      | Restaurant No. | Address |
|------|----------------|---------|
| 1.   | 075011 | 1099 Delaware Avenue, Marysville, OH 43040 |
| 2.   | 075033 | 1913 W. Trenton Road, Edinburg, TX 78539 |
| 3.   | 075040 | 3169 Princeton Road, Hamilton, OH 45011 |
| 4.   | 075077 | 1991 Harner Drive, Xenia, OH 45385 |
| 5.   | 075078 | 5210 W Baseline Rd., Laveen, AZ 85339 |
| 6.   | 077008 | 2912 Boca Chica Blvd, Brownsville, TX 78521 |
| 7.   | 077010 | 2303 Osborne Dr. West, Hastings, NE 68901 |
| 8.   | 077021 | 2002 N US HWY 81, Duncan, OK 73533 |
| 9.   | 077039 | 10719 International Boulevard, Laredo, TX 78045 |
| 10.  | 077073 | 1829 W. Expressway 83, Weslaco, TX 78596 |
| 11.  | 077096 | 1820 US Highway 181, Portland, TX 78374 |
| 12.  | 078022 | 2651 N 75th Ave, Phoenix, AZ 85035 |
| 13.  | 078034 | 306 E Mile 3 Rd, Palmhurst, TX 78573 |
| 14.  | 078041 | 1001 Westside Drive, Durant, OK 74701 |
| 15.  | 078042 | 2302 Frontage Rd., Monument Mall, Scottsbluff, NE 69361 |
| 16.  | 078046 | 625 Cabelas Dr., Sidney, NE 69162 |
| 17.  | 085020 | 5091 Bayou Blvd., Pensacola, FL 32503 |
| 18.  | 085030 | 2053 S. Alma School Road, Mesa, AZ 85210 |
| 19.  | 085064 | 7383 Turfway Road, Florence, KY 41042 |
| 20.  | 085073 | 105 N. Springboro Pike, W. Carrollton, OH 45449 |
| 21.  | 085098 | 4009 Nicholasville Rd, Block B, Lexington, KY 40503 |
| 22.  | 086022 | 2755 Brice Road, Reynoldsburg, OH 43068 |
| 23.  | 086047 | 2720 W. Bell Road, Phoenix, AZ 85053 |
| 24.  | 086063 | 8670 Hwy. 98 West, Miramar Beach, FL 32550 |
| 25.  | 086069 | 967 Hebron Road, Heath, OH 43056 |
| 26.  | 086074 | 565 E. Wetmore, Tucson, AZ 85705 |
| 27.  | 086085 | 5050 Crookshank, Cincinnati, OH 45238 |
| 28.  | 086095 | 3rd & Poyntz, 100 Manhattan Town Center, Suite P-5, Manhattan, KS 66502 |
| 29.  | 087003 | 5928 S.W. 17th Street, Topeka, KS 66604 |
| 30.  | 087012 | 1401 Dell Range Blvd., Cheyenne, WY 82009 |
| 31.  | 087017 | 4440 Glen Este-Withamsville Rd, Batavia, OH 45103 |
| 32.  | 087029 | 650 West Lincoln Highway, Schererville, IN 46375 |
| 33.  | 087037 | 6259 E. Southern Avenue, Mesa, AZ 85206 |
| 34.  | 087051 | 1307 US 127 South, Frankfort, KY 40601 |
| 35.  | 087056 | 30 Crestview Hills Mall Road, Crestview Hills, KY 41017 |
| 36.  | 087061 | 3730 Village Drive, Lincoln, NE 68516 |
| 37.  | 087066 | 5870 East Broadway, Park Mall, Building E, Tucson, AZ 85711 |
| 38.  | 087071 | 2032 East Baseline Road, Mesa, AZ 85204 |
| 39.  | 087075 | 480 Ackerman Road, Columbus, OH 43202 |
| 40.  | 087095 | 5788 Coventry Lane, Ft. Wayne, IN 46804 |
| 41.  | 087099 | 700 Washington Blvd., N.W., Hamilton, OH 45013 |
| 42.  | 088007 | 8001 West Bell Road, Peoria, AZ 85382 |
| 43.  | 088010 | 853 Eastern Bypass, Richmond, KY 40475 |
| 44.  | 088028 | 4940 Government Blvd., Mobile, AL 36693 |
| 45.  | 088030 | 514 E. Expressway 83, McAllen, TX 78503 |
| 46.  | 088039 | 4510 North Clinton Street, Ft. Wayne, IN 46825 |
| 47.  | 088043 | 9595 Colerain Avenue, Cincinnati, OH 45251 |
| 48.  | 088077 | 3240 Towne Blvd., Middletown, OH 45044 |

| | | |
|---|---|---|
| 49. | 088083 | 1655 W. Elliot, Tempe, AZ 85284 |
| 50. | 088097 | 4004 Frederick Blvd., St Joseph, MO 64506 |
| 51. | 089008 | 4601 N 10th Street, McAllen, TX 78504 |
| 52. | 089016 | 8331 Old Troy Pike, Huber Heights, OH 45424 |
| 53. | 089020 | 4025 South Loop 289, Lubbock, TX 79423 |
| 54. | 089024 | 7601 San Dario Avenue, Laredo, TX 78045 |
| 55. | 089044 | 1800 West 1st Street, Springfield, OH 45504 |
| 56. | 089077 | 2810 Soncy Road, Amarillo, TX 79121 |
| 57. | 089094 | 670 Morthland, Valparaiso, IN 46385 |
| 58. | 090003 | 2547 N 44th Street, Phoenix, AZ 85008 |
| 59. | 090005 | 4425 National Road East, Richmond, IN 47374 |
| 60. | 090026 | 6615 N Main Street, Granger, IN 46530 |
| 61. | 090028 | 165 E Nine Mile Road, Pensacola, FL 32534 |
| 62. | 090036 | 1615 Rivervalley Circle North, Lancaster, OH 43130 |
| 63. | 090039 | 102 Platte Oasis Parkway, North Platte, NE 69101 |
| 64. | 090042 | 904 Great East Plaza, Niles, OH 44446 |
| 65. | 090051 | 266 East Alexis Road, Toledo, OH 43612 |
| 66. | 090059 | 2 East Camelback, Phoenix, AZ 85012 |
| 67. | 090068 | 1519 West Harrison, Harlingen, TX 78550 |
| 68. | 090075 | 3241 Interchange Drive, Elkhart, IN 46514 |
| 69. | 090087 | 2911 Kemp Blvd, Wichita Falls, TX 76308 |
| 70. | 090091 | 531 Dussel Road, Maumee, OH 43537 |
| 71. | 091000 | 1525 W Lexington Avenue, Winchester, KY 40391 |
| 72. | 091015 | 1881 East Highway 69, Prescott, AZ 86301 |
| 73. | 091044 | 3894 Morse Road, Columbus, OH 43219 |
| 74. | 091049 | 4702 Monroe Street, Toledo, OH 43623 |
| 75. | 091055 | 1759 West Main Street, Troy, OH 45373 |
| 76. | 091060 | 8425 Broadway, Merrillville, IN 46410 |
| 77. | 091072 | 6100 O Street, Suite C318, Lincoln, NE 68505 |
| 78. | 091076 | 5880 W. Peoria Ave., Glendale, AZ 85302 |
| 79. | 091081 | 3296 Elida Road, Lima, OH 45805 |
| 80. | 091090 | 6211 N.W. Cache Road, Lawton, OK 73505 |
| 81. | 091093 | 1514 Mt. Vernon Avenue, Marion, OH 43302 |
| 82. | 092009 | 3209 Grand Avenue, Laramie, WY 82070 |
| 83. | 092046 | 201 S. Hermitage Road, Hermitage, PA 16148 |
| 84. | 092050 | 2230 W. Ina Road, Tucson, AZ 85741 |
| 85. | 092057 | 909 E. Broadway, Tempe, AZ 85282 |
| 86. | 092075 | 9660 Mason-Montgomery Road, Mason, OH 45040 |
| 87. | 092098 | 6525 Lima Road, Ft. Wayne, IN 46818 |
| 88. | 093010 | 2531 Tiffin Ave, Findlay, OH 45840 |
| 89. | 093024 | 1150 Ireland Road, South Bend, IN 46614 |
| 90. | 093030 | 330 Ridge Road, Munster, IN 46321 |
| 91. | 093050 | 5561 Westchester Woods Blvd, Hilliard, OH 43026 |
| 92. | 093081 | 1856 Alysheba Way, Lexington, KY 40509 |
| 93. | 093087 | 2621 E. Center Street, Warsaw, IN 46580 |
| 94. | 093097 | 2901 Eaglecrest Drive, Emporia, KS 66801 |
| 95. | 094003 | 1807 Reith Blvd, Goshen, IN 46526 |
| 96. | 094005 | 1143 N. Higley Road, Mesa, AZ 85205 |
| 97. | 094010 | 2680 W. Broadway, Ardmore, OK 73401 |
| 98. | 094016 | 6691 South Avenue, Boardman, OH 44512 |
| 99. | 094021 | 6242 Wilmington Pike, Dayton, OH 45459 |
| 100. | 094057 | 3951 North 27th Street, Lincoln, NE 68521 |
| 101. | 094058 | 346 Hauenstein Road, Huntington, IN 46750 |
| 102. | 094062 | 359 Miracle Rd, Evansville, WY 82636 |

| 103. | 094070 | 3703 Portage Road, South Bend, IN 46628 |
| 104. | 094074 | 2409 S. McKenzie Street, Foley, AL 36535 |
| 105. | 094077 | 8565 Winton Road, Cincinnati, OH 45231 |
| 106. | 094079 | 2225 N Oak Road, Plymouth, IN 46563 |
| 107. | 094084 | 6211 US Highway 6, Portage, IN 46368 |
| 108. | 094085 | 721 Diers Ave., Grand Island, NE 68803 |
| 109. | 095004 | 1161 Polaris Parkway, Columbus, OH 43240 |
| 110. | 095009 | 4625 E. Grant Road, Tucson, AZ 85712 |
| 111. | 095026 | 6691 S. Padre Island Dr., Corpus Christi, TX 78412 |
| 112. | 095029 | 113 N. Plaza Drive, Nicholasville, KY 40356 |
| 113. | 095034 | 1590 Georgesville Square Drive, Columbus, OH 43228 |
| 114. | 095045 | 2200 N. State Rt. 53, Fremont, OH 43420 |
| 115. | 095053 | 602 Fairview Blvd., Kendallville, IN 46755 |
| 116. | 095055 | 6084 Mulhauser, West Chester, OH 45069 |
| 117. | 095061 | 690 N. Maysville Road, Mt. Sterling, KY 40353 |
| 118. | 095071 | 13832 W. McDowell Road, Goodyear, AZ 85338 |
| 119. | 095074 | 507 Ley Dr, Auburn, IN 46706 |
| 120. | 095075 | 1601 Bienville Blvd, Ocean Springs, MS 39564 |
| 121. | 095079 | 215 Rasberry Road, Crestview, FL 32536 |
| 122. | 095080 | 2810 Alexandria Pike, Highland Heights, KY 41076 |
| 123. | 095090 | 1003 N. Clinton Street, Defiance, OH 43512 |
| 124. | 095097 | 2020 Stringtown Road, Grove City, OH 43123 |
| 125. | 096012 | 4619 S. Lincoln Ave., York, NE 68467 |
| 126. | 096028 | 13756 W. Bell Road, Surprise, AZ 85374 |
| 127. | 096039 | 1500 Oxford Drive, Georgetown, KY 40324 |
| 128. | 096041 | 1927 Cliff Davis Avenue, Gillette, WY 82716 |
| 129. | 096065 | 820 N. Bridge Street, Chillicothe, OH 45601 |
| 130. | 096092 | 5331 Pleasant Ave., Fairfield, OH 45014 |
| 131. | 096093 | 202 E. Jacob Ave., Angola, IN 46703 |
| 132. | 097002 | 7340 Central Ave., Toledo, OH 43617 |
| 133. | 097009 | 5605 2nd Ave., Kearney, NE 68848 |
| 134. | 097020 | 7920 Beechmont Ave., Cincinnati, OH 45230 |
| 135. | 097025 | 5414 Meijer Drive, Ft. Wayne, IN 46835 |
| 136. | 097035 | 881 W. Central Ave., Springboro, OH 45066 |
| 137. | 097040 | 3007 Curtice Road, Northwood, OH 43619 |
| 138. | 097050 | 328 E. 23rd. Street, Columbus, NE 68601 |
| 139. | 097072 | 300 Skywatch Dr., Danville, KY 40422 |
| 140. | 097096 | 3899 El Mercado Loop, Sierra Vista, AZ 85635 |
| 141. | 098007 | 221 N Vandemark Road, Sidney, OH 45365 |
| 142. | 098030 | 2919 S. Main Street, Maryville, MO 64468 |
| 143. | 098050 | 2491 Foothill Blvd., Rock Springs, WY 82901 |
| 144. | 098063 | 2180 E. Baseline Road, Phoenix, AZ 85042 |
| 145. | 098069 | 1761 Sharkey Way, Lexington, KY 40511 |
| 146. | 098071 | 9330 W. Northern Ave., Glendale, AZ 85305 |
| 147. | 098077 | 5630 W. Amarillo Blvd, Amarillo, TX 79106 |
| 148. | 099005 | 6501 4th Street, Lubbock, TX 79416 |
| 149. | 099012 | 1795 Delco Park Dr., Kettering, OH 45420 |
| 150. | 099032 | 1925 Roschman Ave., Lima, OH 45804 |
| 151. | 099034 | 175 Wal-Mart Way, Maysville, KY 41056 |
| 152. | 099039 | 4712 E. Ray Rd., Higley, AZ 85236 |
| 153. | 099056 | 3501 North Main, Altus, OK 73521 |
| 154. | 099063 | 2501 W. Happy Valley Road, Suite 48, Phoenix, AZ 85085 |
| 155. | 099099 | 1220 N. Mississippi, Ada, OK 74820 |

**RMH ILLINOIS, LLC**

|     | Restaurant No. | Address |
|-----|----------------|---------|
| 1.  | 075002 | 7519 S. Cicero, Chicago, IL 60652 |
| 2.  | 075037 | 4029 W. 167th Street, Country Club Hills, IL 60478 |
| 3.  | 088038 | 9380 Joliet Road, Hodgkins, IL 60525 |
| 4.  | 090044 | 4937 Cal Sag Road, Crestwood, IL 60445 |
| 5.  | 090067 | 1040 N. Kinzie Ave., Bradley, IL 60915 |
| 6.  | 091001 | 2411 Sycamore Road, DeKalb, IL 60115 |
| 7.  | 091022 | 125 South Randall Road, Elgin, IL 60123 |
| 8.  | 091058 | 2795 Plainfield Road, Joliet, IL 60431 |
| 9.  | 092033 | 1700 N. Richmond Road, McHenry, IL 60050 |
| 10. | 093034 | 6656 W. Grand Avenue, Chicago, IL 60707 |
| 11. | 096000 | 1507 36th Street, Peru, IL 61354 |
| 12. | 096056 | 2015 Sheridan Road, Zion, IL 60099 |
| 13. | 098015 | 2401 W. 95th Street, Evergreen Park, IL 60805 |
| 14. | 098055 | 1719 River Oaks Drive, Calumet City, IL 60409 |
| 15. | 099096 | 2400 W. Jefferson Street, Joliet, IL 60435 |

## SCHEDULE B

### Temporary Increased Rate

Minimum Rate + (Positive Comparable Sales x .25) = Temporary Increased Rate

| Minimum Rate Starting 1/1/2018 | Positive Comparable Sales | Factor | Increased Rate | Temporary Increased Rate |
|---|---|---|---|---|
| 3.50% | ≤ 0.0% | .25 | 0.00% | N/A Minimum Rate of 3.50% applies |
| 3.50% | +1.0% | .25 | .25% | 3.75% |
| 3.50% | +2.0% | .25 | .50% | 4.00% |
| 3.50% | +3.0% | .25 | .75% | 4.25% |
| 3.50% | +4.0% | .25 | 1.00% | 4.25% CAP |

* This Schedule serves an illustrative purpose only to show examples of the calculation of the Temporary Increased Rate