## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RMH FRANCHISE HOLDINGS, INC., *et al.*,[1] | Case No. 18-11092 (BLS) |
| Debtors. | (Jointly Administered) |
| DINE BRANDS GLOBAL, INC., APPLEBEE'S RESTAURANTS LLC, and APPLEBEE'S FRANCHISOR LLC | Adv. Pro. No. 18-50481 (BLS) |
| Plaintiffs, | |
| v. | |
| RMH FRANCHISE HOLDINGS, INC., NULNK, INC., RMH ILLINOIS, LLC, RMH FRANCHISE CORP., and CONTEX RESTAURANTS, INC., | **BRIEF IN SUPPORT OF THE DEBTORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE FRANCHISOR'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |
| -and- | |
| BANK OF AMERICA, N.A., as Administrative Agent, Collateral Agent and L/C Issuer, and THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Intervenors. | |
| RMH FRANCHISE HOLDINGS, INC., NULNK, INC., RMH ILLINOIS, LLC, RMH FRANCHISE CORP., and CONTEX RESTAURANTS, INC., | |
| Counterclaim Plaintiffs, | |
| v. | |
| DINE BRANDS GLOBAL, INC., APPLEBEE'S RESTAURANTS LLC, and APPLEBEE'S FRANCHISOR LLC | |
| Counterclaim Defendants. | |

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: RMH Franchise Holdings, Inc. (7150); NuLnk, Inc. (7381); RMH Illinois, LLC (0696); RMH Franchise Corporation (1807); and Contex Restaurants, Inc. (0710).  The headquarters for the above-captioned Debtors is located at One Concourse Parkway, N.E. Suite 600, Atlanta, GA 30328.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

NATURE AND STAGE OF PROCEEDING ...................................................... 5

SUMMARY OF ARGUMENT ........................................................................... 6

STATEMENT OF FACTS ................................................................................. 8

    I.     The Debtors' Franchise Agreements Provide for Termination Only "Upon Written Notice." ...................................................................................... 8

    II.    The Franchisor Did Not Send the Notice of Termination Required Under the Franchise Agreements Until After the Petition Date. .................................... 9

    III.   The Franchisor's Course of Dealing and Interactions with the Debtors Foreclose the Argument That the Franchise Agreements Terminated Prepetition. ............................................................................................... 14

ARGUMENT ..................................................................................................... 18

    I.     The Franchisor Cannot Carry Its Burden To Demonstrate That It Clearly And Unambiguously Terminated The Franchise Agreements, And Thus The Debtors Are Entitled to Summary Judgment. ................................................ 18

         A.    Applicable Standards .......................................................................... 18

         B.    The Purported Prepetition Termination Did Not Provide Clear and Unambiguous Notice of Termination as Required by Kansas Law And the Plain Terms of the Franchise Agreements. ..................................... 20

         C.    The April 25 Forbearance Letter Precludes a Finding That the Franchise Agreements Were Terminated Prepetition .......................... 27

         D.    The Franchisor's Postpetition Statements and Conduct Demonstrate That the Franchise Agreements Were Not Terminated Prepetition ........... 29

         E.    The Franchisor Is Equitably Estopped from Asserting That the Franchise Agreements Terminated on April 27, 2018. ...................... 31

         F.    The Franchisor's Attempted Postpetition Termination Was Void *Ab Initio* as a Willful Violation of the Automatic Stay. ....................... 34

    II.    The Franchisor's Material Breaches of the Franchise Agreements and the Implied Covenant of Good Faith and Fair Dealing Preclude the Entry of Summary Judgment in the Franchisor's Favor. .......................................... 35

CONCLUSION .................................................................................................. 39

# TABLE OF AUTHORITIES

Page(s)

CASES

*AECOM Tech. Servs. Inc. v. Mallinckrodt LLC*,
117 F. Supp. 3d 98 (D. Mass. 2015) ...................................................36

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................18, 19

*Burger King Corp. v. Hall* ,
770 F. Supp. 633 (S.D. Fl. 1991) ........................................................38

*Cal. Sun Tanning USA, Inc. v. Elec. Beach, Inc.*,
369 F. App'x 340 (3d Cir. 2010) .........................................................38

*In re Delta Mills, Inc.*,
404 B.R. 95 (Bankr. D. Del. 2009) ......................................................19

*In re Estate of Moe*,
240 Kan. 242 (1986) ............................................................................35

*Fred Mosher Grain v. Kansas Co-op. Wheat Mktg. Ass'n*,
15 P.2d 421 (Kan. 1932) ......................................................................19

*Intel Corp. v. Broadcom Corp.*,
173 F. Supp. 2d 201 (D. Del. 2001) .....................................................18

*In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*,
142 F.3d 631 (3d Cir. 1998) .................................................................34

*Lassiter v. Topeka Unified Sch. Dist. No. 401*,
347 F. Supp. 2d 1033 (D. Kan. 2004) ..................................................35

*Macke Laundry Serv. Ltd. Partnership v. Mission Assocs., Ltd.*,
873 P.2d 219 (Kan. Ct. App. 1994) .....................................................19

*Mackey v. IBP, Inc.*,
167 F.R.D. 186 (D. Kan. 1996) ............................................................25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................18

*Mazza v. Quicken Loans, Inc.*,
No. 1:12 CV 142, 2013 WL 2296657 (N.D.W. Va. May 24, 2013) ......................25

*McAnaney v. Astoria Fin. Corp.*,
665 F. Supp. 2d 132 (E.D.N.Y. 2009) ...................................................19

*Moody v. Amoco Oil Co.*,
734 F.2d 1200 (7th Cir. 1984) .............................................................23

*Nw. Wholesale Lumber, Inc. v. Anderson*,
528 N.W.2d 502 (Wisc. Ct. App. 1995) .................................................26

*Old Colony Ventures I, Inc. v. SMWNPF Holdings, Inc.*,
918 F. Supp. 343 (D. Kan. 1996) .....................................................35, 36

*Old Colony Ventures I, Inc. v. SMWNPF Holdings, Inc.*,
No. 95-2050-JWL, 1996 WL707025 (D. Kan. Oct. 2, 1996) ....................36

*Onal v. BP Amoco Corp.*,
275 F. Supp. 2d 650 (E.D. Pa. 2003), *aff'd*, 134 F. App'x 515 (3d Cir. 2005) .....................37

*Prime Aid Pharmacy Corp. v. Express Scripts, Inc.*,
No. 4:16-CV-1237 (CEJ), 2017 WL 67526 (E.D. Mo. Jan. 6, 2017).....................25

*R.H. Stearns Co. of Boston, Mass. v. United States*,
291 U.S. 54 (1934)...............................................................................37

*Red Roof Franchising, LLC v. Patel*,
564 F. App'x 685 (3d Cir. 2014) .....................................................36, 38

*Schultz v. Pet Food Giant, Inc.*,
No. CIV.A. 96-4457, 1998 WL 24339 (E.D. Pa. Jan. 26, 1998)..................36

*In re Siciliano*,
13 F.3d 748 (3d Cir. 1994)...................................................................34

*Simon v. Nat'l Farmers Org., Inc.*,
829 P.2d 884 (Kan. 1992) ....................................................................26

*Steckline Commc'ns Inc. v. Journal Broad. Grp. of Kan., Inc.*,
388 P.3d 84 (Kan. 2017) ......................................................................31

*In re Tornado Pizza, LLC*,
431 B.R. 503 (Bankr. D. Kan. 2010) .................................................23, 24

*Travelodge Hotels, Inc. v. Honeysuckle Enters.*,
357 F. Supp. 2d 788 (D.N.J. 2005) .......................................................38

*United States v. Peck*,
102 U.S. 64 (1880).............................................................................36

*In re Velo Holdings Inc.*,
  475 B.R. 367 (Bankr. S.D.N.Y. 2012) ..................................................................20

*Warrick v. McKnab's Estate*,
  187 P.2d 502 (Kan. 1947) ..............................................................................19, 26

**RULES**

Fed. R. Bank. Proc. 7056 ...................................................................................18

Fed. R. Civ. Proc. 56 ....................................................................................18, 37

**OTHER AUTHORITIES**

*Garner's Dictionary of Legal Usage* (3d ed. 2011) ...........................................26

RMH Franchise Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), by their undersigned attorneys, hereby submit this brief (1) in support of the Debtors' cross-motion for (a) summary judgment on (i) the *Complaint* [Adv. Docket No. 1] (the "Complaint") filed by Dine Brands Global, Inc. ("Dine Brands"), Applebee's Restaurants LLC, and Applebee's Franchisor LLC (collectively, the "Franchisor")[2] and (ii) Counts V, VI, VII, and VIII of the counterclaims (the "Counterclaims") in the *Debtors' Answer and Counterclaims to Applebee's Complaint* [Adv. Docket No. 7] (the "Answer and Counterclaims")[3] and (b) reasonable attorneys' fees and expenses incurred by the Debtors in connection with this Adversary Proceeding and (2) in opposition to the Franchisor's motion for summary judgment [Adv. Docket No. 38] (the "Franchisor's Motion for Summary Judgment").  In further support of the Debtors' cross-motion for summary judgment and opposition to the Franchisor's Motion for Summary Judgment (collectively, the "Cross-Motion"), the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

The undisputed facts demonstrate that the Franchisor did not terminate the Franchise Agreements prior to the Debtors' bankruptcy filing in accordance with controlling Kansas law and the plain terms of the Franchise Agreements, and the Debtors therefore are entitled to summary judgment.  Under well-settled Kansas law, the termination of a franchise agreement

---

[2]  For ease of reference, and due to the difficulty differentiating between the web of entities associated with Dine Brands and/or Applebee's that interacted with the Debtors, the plaintiffs-counterclaim defendants often are referred to herein, collectively, as "Franchisor."  Where possible, the Debtors have attempted to differentiate between the entities, but the use of the term "Franchisor" should not be construed as an admission by the Debtors as to the activities of one entity or another or otherwise used against the Debtors for any purpose.

[3]  All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Answer and Counterclaims.

must be clear and unambiguous in order to be effective.  The Franchisor's prepetition correspondence falls far short of meeting this high bar.

The Franchise Agreements provide the starting point.  Section 19.1 of the Franchise Agreements states that the "Franchisor shall have the right to terminate this Agreement immediately upon written notice to Franchisee stating the reason for such termination . . . ."  Thus, a termination upon an event of default was not self-effectuating.  Instead, the Franchise Agreements expressly required the Franchisor to provide written notice of a termination, and further provided that the termination would be effective "upon written notice."

It is beyond dispute that the Franchisor did not send the Debtors a "written notice" that stated, in substance, "the Franchise Agreements are terminated" until May 8, 2018—hours after the Debtors' bankruptcy filing.  That should be the end of the inquiry.  Faced with this inescapable reality, the Franchisor attempts to rewrite its written correspondence with the Debtors in an effort to inject clarity and precision that clearly is lacking.  Specifically, the Debtors rely on a September 20, 2017 letter declaring a default and stating that, unless the Debtors paid overdue royalty fees within 90 days, the Franchise Agreements would terminate without the notice required under the Franchise Agreements.  This "Notice of Default" (as the Franchisor has repeatedly characterized the letter in its filings here and elsewhere) advised the Debtors of *the potential for termination* of the various Franchise Agreements but plainly did not itself constitute a termination.  The Franchisor thereafter repeatedly extended the cure period, for a period of 7 months, without ever again asserting that the Franchise Agreements would terminate upon the expiration of the cure period.

Then, on April 25, 2018, the Franchisor sent a letter (the "April 25 Forbearance Letter") that inaccurately stated that the cure period had expired (it had not), but also indicating that the

Franchisor would "forbear from taking any further actions . . . to enforce our rights or remedies . . . in connection with the franchise agreements, until May 8, 2018." Although the April 25 Forbearance Letter did not in any way state that the Franchise Agreements were terminated, nor refer back to a "prior termination" as the Franchisor urges in its brief, the Franchisor contends that the April 25 Forbearance Letter somehow constitutes a clear and unambiguous termination because the Franchise Agreements terminated "automatically" upon the expiration of the cure period. The Franchisor's "automatic termination" theory does not pass muster under the Franchise Agreements, but even accepting this fanciful re-creation of the record, there is no basis to conclude that the April 25 Forbearance Letter provided a clear and unambiguous termination in accordance with Kansas law. Indeed, the Franchisor's forbearance of "any further actions," by its plain terms, would encompass a forbearance of termination. Simply stated, if the Franchisor intended to terminate, it easily could have said so, as it later did so with respect to the Development Agreements. It did not send such a written notice of termination until hours after the Debtors' bankruptcy filing.

Indeed, the Franchisor's postpetition words and conduct (including its attempt to rewrite the record in its summary judgment brief) amply demonstrate that the Franchisor knew how to terminate the Franchise Agreements if it wanted to, but failed to prior to May 8, when it sent two letters, one of which was a plainly worded termination letter to the Debtors, purporting (in violation of the automatic stay) to terminate 33 of the Debtors' highest performing franchises, but not others. The Franchisor's strained attempt to characterize this May 8 letter as clarifying the circumstances is fatal to its position that it clearly and unambiguously provided notice of termination in the April 25 Forbearance Letter. Indeed, the Franchisor also candidly stated in a complaint filed in Kansas district court that it had informed the Debtors prepetition that it "*would*

*be* exercising certain termination rights *on May 8, 2018*," and "*intended* to exercise its termination rights *on May 8, 2018*," and that it ultimately notified the Debtors of the purported termination "*by letter dated May 8, 2018*." These statements leave little doubt that the Franchisor did not terminate the Franchise Agreements weeks earlier, as it argues here. Moreover, two weeks of further negotiations followed the April 25 Forbearance Letter, and the Franchisor never once took the position that the Franchise Agreements had been terminated. The Franchisor is thus estopped from arguing that the Franchise Agreements were terminated prepetition. Accordingly, for these reasons and the additional reasons set forth herein, the Debtors respectfully submit that they are entitled to summary judgment that the Franchise Agreements were not terminated and are property of the Debtors' estates.[4]

Finally, even accepting *arguendo* the Franchisor's counter-factual rewriting of the record, the Franchisor's summary judgment motion nonetheless must fail because, as a matter of Kansas law, the Franchisor's material breaches of the Franchise Agreements and the implied covenant of good faith and fair dealing excuse the Debtors' royalty payments. Contrary to the Franchisor's version of events, the Debtors' deteriorating financial condition, which eventually prevented the payment of royalties and culminated in this bankruptcy case, flows directly from the Franchisor's mismanagement and bad faith breaches. Under these circumstances, Kansas courts have denied summary judgment motions, finding that the question whether a material breach excused performance was a genuine issue that precluded summary judgment. Thus, at the very least, there are genuine issues of material fact that must be resolved through discovery that preclude summary judgment in the Franchisor's favor.

---

[4] For the avoidance of doubt, the Debtors' request for partial summary judgment is not a concession that the Franchisor misconduct underlying the Debtors' Counterclaims is unrelated to the purported termination of the Franchise Agreements.

## NATURE AND STAGE OF PROCEEDING

1.      On May 8, 2018 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An official committee of unsecured creditors (the "Committee") was appointed on May 24, 2018. No request has been made for the appointment of a trustee or an examiner.

2.      On May 16, 2018, the Franchisor filed *Applebee's Motion to Modify the Automatic Stay* [Docket No. 91] (the "Lift Stay Motion"), seeking a declaratory judgment that the Franchise Agreements terminated prepetition.

3.      On May 23, 2018, the Court held a telephonic hearing on the Lift Stay Motion and ruled that the relief requested by the Franchisor was properly presented by way of an adversary proceeding.

4.      On May 25, 2018, the Franchisor commenced this adversary proceeding (the "Adversary Proceeding") by filing the Complaint. *See* Adv. Docket No. 1. In the Complaint, the Franchisor alleged that it had terminated the Franchise Agreements prior to the Petition Date.

5.      On June 15, 2018, the Court entered an order [Adv. Docket No. 6], approving a stipulation between the Debtors, the Franchisor, the Committee, and Bank of America, N.A. ("BOA"), providing that the automatic stay would remain in full force and effect until further order of the Court and that the Committee and BOA would be permitted to intervene in the Adversary Proceeding, with all responses to the Complaint due June 22, 2018.

6.      On June 19, 2018, the Debtors filed their Answer and Counterclaims. *See* Adv. Docket No. 7. In the Counterclaims, the Debtors alleged, among other things, that the Franchisor's purported termination of the Franchise Agreements was improper and ineffective.

7.     On June 21, 2018, BOA filed an answer to the Franchisor's complaint and cross-claims against the Franchisor and the Debtors (the "BOA Cross-Claims"). *See* Adv. Docket No. 9. In the BOA Cross-Claims, BOA alleged that its first-priority security interests were superior to any rights the Franchisor may have in the Debtors' assets and that the Franchisor had contractually subordinated its interests in the Debtors' leases and business assets to BOA's interests.

8.     On June 22, 2018, the Committee filed an answer to the Franchisor's Complaint and incorporated by reference the Debtors' Counterclaims against the Franchisor. *See* Adv. Docket No. 12.

9.     On July 13, 2018, the Franchisor filed answers to the Committee's counterclaims [Adv. Docket No. 31], the Debtors' Counterclaims [Adv. Docket No. 32], and the BOA Cross-Claims [Adv. Docket No. 33].

10.     Also on July 13, 2018, the Debtors filed an answer to the BOA Cross-Claims [Adv. Docket No. 35].

11.     On July 16, 2018, the Court entered an order [Adv. Docket No. 36], approving a stipulation between the Committee and BOA providing that the Committee's answer to the BOA Cross-Claims would be due July 23, 2018. The Committee filed an answer to the BOA Cross-Claims on July 23, 2018, as required by the stipulation. [Adv. Docket No. 46].

## SUMMARY OF ARGUMENT

12.     The Debtors are entitled to summary judgment because the undisputed facts establish that the Franchisor never provided a clear and unambiguous written notice of termination prior to the Petition Date in compliance with the plain terms of the Franchise Agreements and the requirements of Kansas law. **First**, the Franchisor cannot meet its burden to establish that it provided the Debtors with a clear and unambiguous notice of termination prior to

the Petition Date because it is beyond reasonable dispute that the Franchisor never stated in writing that the Franchise Agreements were terminated until after the Petition Date, and the Franchisor's contention that the Franchise Agreements terminated automatically upon the expiration of the cure period is unsupported by the record, fails to provide the clear and unambiguous notice required by Kansas law and does not comport with the requirements of the Franchise Agreements. **Second**, the Franchisor's forbearance from taking *any further action* by its plain terms states the opposite of a termination, and the Franchisor's attempt to rewrite the April 25 Forbearance Letter to be merely a forbearance of post-termination remedies does not withstand scrutiny. **Third**, the Franchisor's postpetition actions and conduct—including the letters it sent on May 8, which for the first time expressly purported to terminate certain of the Franchise Agreements, and the complaint it filed in the United States District Court for the District of Kansas (the "Kansas Complaint"),[5] which clearly states that the Franchisor *intended* to terminate as of May 7—eviscerate its position that it provided notice of termination in the April 25 Forbearance Letter. **Fourth**, the Franchisor is equitably estopped from claiming that the Franchise Agreements were terminated prior to the Petition Date on account of its statements and course of dealing upon which the Debtors' reasonably relied. **And lastly**, the Franchisor's postpetition attempt to terminate retroactively was void *ab initio* as a violation of the automatic stay.

13.    In addition, the Franchisor is not entitled to summary judgment because its material breaches, as alleged in the Counterclaims, excused the Debtors' payment obligations as a matter of Kansas law, and thus, at the very least, disputed factual issues regarding the

---

[5] Complaint for Damages, a Temporary-Restraining Order, and Preliminary and Permanent Injunctive Relief, *Applebee's Restaurants LLC v. RMH Franchise Corp.*, Case No. 18-cv-02226-JAR-GLR (D. Kan. May 8, 2018). The Kansas Complaint is included at tab 32 in the Neiburg Declaration (defined below) filed concurrently herewith.

Franchisor's materials breaches of the Franchise Agreements and the implied covenant of good faith and fair dealing preclude the entry of summary judgment in the Franchisor's favor.

## STATEMENT OF FACTS

14.     In support of their Cross-Motion for summary judgment, the Debtors set forth below the following statement of the undisputed material facts as to which there is no genuine issue to be tried:[6]

### I.     The Debtors' Franchise Agreements Provide for Termination Only "Upon Written Notice."

15.     The Debtors are in the business of operating Applebee's Neighborhood Grill & Bar restaurants pursuant to the individual Franchise Agreements.[7]

16.     Section 19.1 of the Franchise Agreements provides that the Franchisor may terminate the agreement for failure to pay royalty fees only upon providing the franchisee with written notice of termination:  "Franchisor shall have the right to terminate this Agreement immediately *upon written notice* to Franchisee stating the reason for such termination . . . in the event of any breach or default of any of the provisions of Section 9.1 . . . ."  Franchise Agreements § 19.1 (emphasis added).[8]

---

[6]  Although the Franchisor may dispute the characterizations of the facts as they are alleged, the existence and content of the parties' communications are not in dispute.  The *Declaration of Michael S. Neiburg in Support of the Debtors' Cross-Motion for Summary Judgment and Opposition to the Franchisor's Motion for Summary Judgment* (the "<u>Neiburg Declaration</u>") is being filed concurrently herewith containing the documents identified in this *Brief in Support of the Debtors' Cross-Motion for Summary Judgment and in Opposition to the Franchisor's Motion for Summary Judgment*.  Except with respect to certain exhibits to filings made on the docket, cited materials from the docket are not included in the Neiburg Declaration.

[7]  *See Declaration of Mitchell S. Blocher in Support of Debtors' Chapter 11 Petitions and Requests for First Day Relief* ¶ 4 [Docket No. 24] (the "<u>First Day Declaration</u>").

[8]  A sample Franchise Agreement is included at tab 1 in the Neiburg Declaration.

17.     Section 19.3 of the Franchise Agreements provides that the prevailing party is entitled to reasonable attorneys' fees in connection with any legal proceeding to construe or enforce the terms of the agreement.  Franchise Agreements § 19.3.

18.     Section 21.2 of the Franchise Agreements provides that Kansas law shall apply to the construction of the Franchise Agreements and shall govern all questions that arise with respect to the Franchise Agreements.  Franchise Agreements § 21.2.

19.     The Debtors and the Franchisor also entered into a number of "Development Agreements" providing that the Debtors would have the right to develop additional restaurant units in a defined geographic area.[9]  The termination provision of the Development Agreements is virtually identical to that of the Franchise Agreements:  "Franchisor shall have the right to terminate this Agreement immediately *upon written notice* to Developer stating the reason for such termination" in the event of a default under any Franchise Agreement executed pursuant to the Development Agreement.  Development Agreements § 9.2 (emphasis added).

## II.     The Franchisor Did Not Send the Notice of Termination Required Under the Franchise Agreements Until After the Petition Date.

20.     On September 20, 2017, the Franchisor sent a notice of default (the "Notice of Default") for failure to pay monthly royalty fees.[10]  The Franchisor demanded that the Debtors pay the overdue amount within 90 days of receipt of the letter and stated that the Franchise Agreements would terminate thereafter without the written notice of termination required under

---

[9]  A sample Development Agreement is included at tab 33 in the Neiburg Declaration.

[10]  The Notice of Default is included at tab 4 in the Neiburg Declaration.  In all of its previous filings, the Franchisor has defined its letter dated September 20, 2017, as the "Notice of Default."  *See, e.g.*, Complaint ¶ 23; Lift Stay Motion ¶ 14; Kansas Complaint ¶ 49.  Now, after the Debtors' Answer and Counterclaims pointed out that not even the Franchisor referred to the Notice of Default as an actual notice of termination, the Franchisor's Motion for Summary Judgment conveniently redefines the Notice of Default for the first time as the "Notice of Default and Termination."  But that verbal sleight of hand does not change the nature of the Notice of Default.  Moreover, the Franchisor's previous characterization of the Notice of Default is still a statement of record and a statement against the Franchisor's interest.

the agreements: "For restaurants for which RMH does not cure the default, the franchise agreements for the restaurants will terminate on the 91st day *without further notice . . . .*" Notice of Default (emphasis added).

21.     Nothing in the Franchise Agreements states that the Franchisor can effect termination without providing actual notice of termination. In fact, where the Franchise Agreements do provide for termination after a cure period (under circumstances not applicable here), the Franchisor is expressly required to give further, actual notice of termination upon expiration of the cure period. *See* Franchise Agreements § 19.1 ("If Franchisee defaults in the performance or observance of any of its other obligations hereunder, and such default continues for a period of sixty (60) days after written notice to Franchisee specifying such default, Franchisor shall have *the right to terminate this Agreement upon thirty (30) days written notice to Franchisee*." (emphasis added)).

22.     On December 18, 2017, the Franchisor sent a letter stating that the Debtors' supposed "cure period" was extended to January 22, 2018: "In light of our scheduled call this week with respect to the restaurants in your portfolio, and without waiver of any of our rights and remedies, we are amenable to extend your cure period for the restaurants listed on the attached schedule by an additional 30 days to **January 22, 2018**. We reserve our right to revisit the extension at any time."[11] All of the Debtors' restaurants were listed on the schedule attached to the Franchisor's letter. Nothing in the Franchisor's letter dated December 18, 2017, made any mention of the Notice of Default or termination of the Franchise Agreements.

---

[11] The Franchisor's letter dated December 18, 2017, is included at tab 5 in the Neiburg Declaration.

23.     On January 17, 2018, the Franchisor sent a "Notice of Termination of Development Agreements."[12] Specifically referring back to the Notice of Default, the Franchisor's Notice of Termination of Development Agreements stated: "*Please be advised that each of Development Agreements . . . terminated. . . .* To date, RMH has not cured any of the arrearages, and has not paid royalties and/or advertising fees since receiving that Notice. *Each Development Agreement . . . has terminated.*" Notice of Termination of Development Agreements (emphasis added).

24.     On January 19, 2018, the Franchisor sent a letter stating that the Debtors' supposed "cure period" for the Franchise Agreements was extended to February 15, 2018: "Without waiver of any of our rights and remedies, we are extending your cure period for the restaurants listed on the attached schedule to February 15, 2018. We reserve our right to revisit the extension at any time."[13] Nothing in the Franchisor's letter dated January 19, 2018, made any mention of the Notice of Default or termination of the Franchise Agreements.

25.     On February 8, 2018, the Franchisor sent a letter stating that the Debtors' supposed "cure period" was extended to March 1, 2018.[14] Nothing in the Franchisor's letter dated February 8, 2018, made any mention of the Notice of Default or termination of the Franchise Agreements.

26.     On February 26, 2018, the Franchisor sent a letter stating that the Debtors' supposed "cure period" was extended to March 15, 2018.[15] Nothing in the Franchisor's letter

---

[12] The Notice of Termination of Development Agreements is included at tab 8 in the Neiburg Declaration.

[13] The Franchisor's letter dated January 19, 2018, is included at tab 9 in the Neiburg Declaration.

[14] The Franchisor's letter dated February 8, 2018, is included at tab 14 in the Neiburg Declaration.

[15] The Franchisor's letter dated February 26, 2018, is included at tab 15 in the Neiburg Declaration.

dated February 26, 2018, made any mention of the Notice of Default or termination of the Franchise Agreements.

27.     Also on March 12, 2018, the Franchisor sent a letter stating that the Debtors' supposed "cure period" was extended to April 12, 2018.[16] Nothing in the Franchisor's letter dated March 12, 2018, made any mention of the Notice of Default or termination of the Franchise Agreements.

28.     On April 9, 2018, the Franchisor sent a letter stating that the Debtors' supposed "cure period" was extended to April 19, 2018.[17] Nothing in the Franchisor's letter dated April 9, 2018, made any mention of the Notice of Default or termination of the Franchise Agreements.

29.     On April 16, 2018, the Franchisor sent a letter stating that the Debtors' supposed "cure period" was extended to April 26, 2018.[18] Nothing in the Franchisor's letter dated April 16, 2018, made any mention of the Notice of Default or termination of the Franchise Agreements.

30.     On April 25, 2018, Lucy Cheong, Dine Brands' Vice President, Finance, sent the April 25 Forbearance Letter claiming that the Debtors' supposed "cure period" had expired (even though her April 16 letter had extended that cure period to April 26), and that the Franchisor was now forbearing "from taking any further actions . . . to enforce [its] rights and remedies" under the Franchise Agreements. The April 25 Forbearance Letter made absolutely no mention of the termination that the Franchisor now alleges occurred at that time:

> Without waiver of any of our rights and remedies under the applicable franchise agreements for the Applebee's restaurants listed on the attached schedule (the

---

[16]  The Franchisor's letter dated March 12, 2018, is included at tab 18 in the Neiburg Declaration.

[17]  The Franchisor's letter dated April 9, 2018, is included at tab 20 in the Neiburg Declaration.

[18] The Franchisor's letters dated April 16, 2018, are included at tabs 23 and 24 in the Neiburg Declaration, respectively.

"Franchise Restaurants"), Applebee's agrees that it will forbear from taking any further actions against you or the Franchise Restaurants, whether at law or in equity, to enforce our rights and remedies against you or the Franchise Restaurants, under or in connection with the franchise agreements, until May 8, 2018. This agreement to forbear is not an extension of the cure periods referred to in prior Notices, which have already expired.[19]

31.     According to the Franchisor, the purpose of the forbearance was "to allow the parties time to see if an amicable resolution was possible."[20]

32.     On May 8, 2018—approximately 4.5 hours after the Debtors filed bankruptcy—the Franchisor hand-delivered a letter (the "Postpetition Termination Notice") with subject line "Re: Termination of Franchise Agreements for Restaurants in Arizona and Texas," stating that the Franchisor was purporting to terminate the Franchise Agreements for the Debtors' 41 restaurants located in Arizona and Texas, with such termination supposedly retroactive to April 27, 2018.[21]

33.     Concurrently with the Postpetition Termination Notice for the Debtors' 41 Arizona and Texas locations, the Franchisor sent the Debtors a further letter (the "Postpetition Forbearance Letter") stating that the Franchisor agreed that it would "forbear from enforcing its termination rights . . . until May 20, 2018" for the Debtors' 133 franchises not located in Arizona or Texas.[22]   The Franchisor's letter further stated:  "This agreement to forbear is not an extension or a restarting of the cure period referred to in prior Notice, which has already expired, nor is it a new cure period."

---

[19]  The April 25 Forbearance Letter is included at tab 27 in the Neiburg Declaration.

[20]  Kansas Complaint ¶ 56.

[21]  The Postpetition Termination Notice is included at tab 30 in the Neiburg Declaration.

[22]  The Postpetition Forbearance Letter is included at tab 31 in the Neiburg Declaration.

34.     In addition, after the bankruptcy filing on May 8, 2018, the Franchisor filed its

Kansas Complaint in the United States District Court for the District of Kansas.  In the Kansas

Complaint, the Franchisor asserted the following facts:

- "On May 7, 2018, during a telephone call among multiple representatives of Applebee's and RMH, Applebee's notified RMH that Applebee's *would be exercising certain termination rights on May 8, 2018* with respect to the Arizona and Texas franchises . . . ." Kansas Complaint ¶ 9 (emphasis added).

- "*On May 8, 2018 . . . , Applebee's gave notice to RMH* that the franchise agreements for the Arizona and Texas franchises terminated on April 27, 2018 . . . ." Kansas Complaint ¶ 10 (emphasis added).

- "[O]n April 25, 2018, Applebee's notified RMH that Applebee's agreed to forebear from taking any further actions against RMH until May 8, 2018, *to allow the parties time to see if an amicable resolution was possible*." Kansas Complaint ¶ 56 (emphasis added).

- "In the afternoon of May 7, 2018, Applebee's representatives called RMH and informed RMH that Applebee's *intended to exercise its termination rights on May 8, 2018* for the Arizona and Texas franchises . . . ." Kansas Complaint ¶ 58 (emphasis added).

- "Based on RMH's stated position on the May 7, 2018 telephone call, *by letter dated May 8, 2018, Applebee's notified RMH that the Franchise Agreements for the Arizona and Texas franchises terminated* on April 27, 2018 . . . ." Kansas Complaint ¶ 59 (emphasis added).

## III.     The Franchisor's Course of Dealing and Interactions with the Debtors Foreclose the Argument That the Franchise Agreements Terminated Prepetition.

35.     For approximately 16 months following implementation of the Franchisor's ill-

fated System Change, the Debtors' representatives and the Franchisor's representatives were in

constant contact negotiating the terms of a workout.[23]  The parties exchanged restructuring

proposals in December 2017, January 2018, and February 2018.

36.     On March 1, 2018, Robert Hersch, a Senior Managing Director at Mastodon

Ventures Inc., conferred with the Franchisor's representatives, and began incorporating their

---

[23] *Declaration of Mike Muldoon in Support of the Debtors' Cross-Motion for Summary Judgment and Opposition to the Franchisor's Motion for Summary Judgment* ¶ 6 (the "Muldoon Decl.").  Email correspondence evidencing the parties' negotiations is included in the Neiburg Declaration at tabs 6–7, 10–13, 16–17, 19, 21–22, 25–26, and 28–29.

comments and the Senior Lenders' feedback to the Debtors' latest proposal, urging that the parties "try to wrap this up in [M]arch so that the company can resume royalty and marketing payments according to the new agreement effective April 1."[24]

37. On March 27, 2018, the Franchisor sent its written response to the Debtors' February proposal, and on April 23, 2018, Mr. Hersch sent the Franchisor a further proposal.[25]

38. On April 25, 2018, two days after receiving the Debtors' latest proposal, Ms. Cheong sent the April 25 Forbearance Letter, as discussed above, claiming that the Debtors' supposed "cure period" had expired and that the Franchisor was now forbearing "from taking any further actions . . . to enforce [its] rights and remedies" under the Franchise Agreements.

39. Despite the April 25 Forbearance Letter, the Debtors and the Franchisor continued to work together on an operational level in the ordinary course of business.[26] From April 30, 2018, through May 3, 2018, the Debtors held their annual General Manager Conference, with every restaurant general manager, director of operations, regional vice president, and department head in attendance. The Franchisor had six representatives in attendance. Five of the Franchisor's field operators attended the entire event, and four participated in the Debtors' training breakout sessions in front of every general manager and director of operations. Kevin Carroll, the Franchisor's Chief Operations Officer, attended for two days and presented in a general session for approximately 50 minutes on May 2, 2018. In his presentation, Mr. Carroll made multiple references to working with the Debtors in the future—even leading some 230 of the Debtors' key leaders in chanting the company's "we are RMH" slogan.

---

[24] Mr. Hersch's email dated March 6, 2018, is included at tab 16 in the Neiburg Declaration.

[25] Mr. Hersch's email dated April 23, 2018, is included at tab 26 in the Neiburg Declaration.

[26] Muldoon Decl. ¶ 8.

40.     On May 1, 2018, Mr. Hersch emailed the Franchisor's general counsel regarding their workout negotiations as follows: "Do you have any feedback for me.  I am trying hard to wrap this up."[27]

41.     On May 1, 2018, the Franchisor's general counsel, Bryan Adel, responded that the April Proposal was not agreeable but gave no indication that he believed the Franchise Agreements had terminated five days previously.

42.     On May 2, 2018, Mr. Hersch responded to the Franchisor, inviting Franchisor's representatives to participate in a meeting with the Debtors' lenders on May 9, and otherwise inviting further discussion.

43.     On May 4, 2018, the chairman of AFH's board, Daniel Jinich, and the Franchisor's CEO, Stephen Joyce, arranged a call for May 7, 2018.  Mr. Joyce gave no indication that he believed the Franchise Agreements had terminated 8 days previously.[28]

44.     During that call on May 7, 2018, none of the Franchisor's representatives gave any indication that they believed the Franchise Agreements had terminated 11 days previously.[29]

45.     To the contrary, the Franchisor expressly stated it intended to terminate the Arizona and Texas franchise agreements unless the Debtors paid $12 million by the end of the day.[30]  The Franchisor's threat came from out of the blue and represented a still-unexplained reversal of what had been an extended and good-faith negotiation process, particularly given the Franchisor's responsibility for the financial difficulty inflicted on the Debtors by the System

---

[27] Mr. Hersch's and Mr. Adel's email exchange dated May 1–2, 2018, is included at tab 28 in the Neiburg Declaration.

[28] *Declaration of Daniel Jinich in Support of the Debtors' Cross-Motion for Summary Judgment and Opposition to the Franchisor's Motion for Summary Judgment* ¶ 3 (the "<u>Jinich Decl.</u>").

[29] Jinich Decl. ¶¶ 4–5.

[30] Jinich Decl. ¶ 5.

Change, which the Franchisor itself described as a "tactical misstep[]" and a "self-inflicted wound[]."[31]

46.     On May 8, 2018, at approximately 3:30 a.m. (ET), the Debtors filed their chapter 11 bankruptcy cases—halting, and rendering void *ab initio*, any efforts by the Franchisor to exercise its right to terminate the Franchise Agreements.[32]

47.     Even after the Debtors' bankruptcy filing, however, the Franchisor's President John Cywinksi called Jeff Neumann, the Debtors' founder and currently a board member of AFH, to state that the Franchisor would continue to support the Debtors as it always had and expected the same from the Debtors.

48.     At approximately 5:59 a.m. (ET) on the Petition Date, Mr. Hersch emailed the Franchisor's representatives, informing them of the bankruptcy filing.[33]

49.     Approximately two hours later after Mr. Hersch's email, the Franchisor hand-delivered the Postpetition Termination Notice, purporting to terminate the Franchise Agreements for the Debtors' restaurants in Arizona and Texas, with such termination supposedly retroactive to April 27, 2018.

50.     The Franchisor attempted to cherry-pick the Debtors' best-performing stores by targeting the Arizona and Texas markets, which, through April 2018, were generating 2018 store-level EBITDA margins of 11.2%, as compared to store-level EBITDA margins of 9.3% for

---

[31] Brand Overview at 3, 6.  Excerpts of the relevant pages of the Brand Overview are included at tab 34 in the Neiburg Declaration.

[32] *See Voluntary Petition for Non-Individuals Filing for Bankruptcy* [Docket No. 1]

[33] Mr. Hersch's email dated May 8, 2018, is included at tab 29 in the Neiburg Declaration.

the remaining markets.[34]  In addition, the Franchisor specifically excluded two underperforming stores in Arizona and Texas, which it tried to leave for the Debtors to de-image and close.[35]

51.     The Franchisor generally has the ability to obtain the Debtors' sales figures on a daily basis.[36]  After dragging out the workout negotiations for 16 months, the Franchisor attempted to grab the Debtors' restaurants at nearly the precise moment that the Debtors' business was starting to improve—which it did in the first quarter of 2018.

## ARGUMENT

I.      **The Franchisor Cannot Carry Its Burden To Demonstrate That It Clearly And Unambiguously Terminated The Franchise Agreements, And Thus The Debtors Are Entitled to Summary Judgment.**

### A.      Applicable Standards

52.     Federal Rule of Civil Procedure 56(a) (made applicable by Federal Rule of Bankruptcy Procedure 7056) provides that summary judgment may be granted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as matter of law."  The moving party "may satisfy its burden on summary judgment by demonstrating that there is an absence of evidence to support the case of the nonmoving party." *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 222 (D. Del. 2001).

53.     The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[T]he mere existence of *some* alleged factual dispute between the parties" cannot defeat a properly supported motion for motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The dispute must relate to a genuine issue

---

[34]  Muldoon Decl. ¶ 11.

[35]  Muldoon Decl. ¶ 11.

[36]  Muldoon Decl. ¶ 12.

of material fact. *Id.*; *see also In re Delta Mills, Inc.*, 404 B.R. 95, 104–05 (Bankr. D. Del. 2009). Thus, a non-moving party cannot defeat summary judgment based on "mere conclusory allegations or denials, but must set forth 'concrete particulars' showing that a trial is needed." *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 141 (E.D.N.Y. 2009) (quoting *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984)). "Accordingly, it is insufficient for a party opposing summary judgment 'merely to assert a conclusion without supplying supporting arguments or facts.'" *Id.* (quoting *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996). And if the non-moving party's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

54.     In addition, in order to obtain summary judgment, the Franchisor has the burden to establish that it clearly and unambiguously terminated the Franchise Agreements prepetition. Kansas law requires that "a notice of 'cancellation' of a contract . . . be *clear and unambiguous* and *convey an unmistakable purpose to rescind* or forfeit the agreement." *Warrick v. McKnab's Estate,* 187 P.2d 502, 506 (Kan. 1947) (citing authority). Moreover, under Kansas law, contractual termination provisions must be strictly construed. *See Fred Mosher Grain v. Kansas Co-op. Wheat Mktg. Ass'n*, 15 P.2d 421, 424–25 (Kan. 1932) (holding that termination provisions, which are in nature of forfeiture, must be "strictly construed" and that "notice to terminate, to be effective, must be given at the stipulated time."); *Macke Laundry Serv. Ltd. Partnership v. Mission Assocs., Ltd.*, 873 P.2d 219 (Kan. Ct. App. 1994) (finding that non-compliance with the termination provisions of a contract was grounds for voiding the termination thereof as ineffective).

55.     As set forth below, the Franchisor cannot meet this high burden.  As such, the Franchisor's purported termination was ineffective as a matter of law and the Debtors' Cross-Motion for Summary Judgment should be granted.

**B.      The Purported Prepetition Termination Did Not Provide Clear and Unambiguous Notice of Termination as Required by Kansas Law And the Plain Terms of the Franchise Agreements.**

56.     The Franchisor cannot meet its burden of demonstrating that it clearly and unambiguously terminated the Franchise Agreements prepetition because the Franchisor failed to provide the Debtors with a written notice of termination until *after* the bankruptcy petitions were filed on May 8, 2018.

57.     Pursuant to the express terms of the Franchise Agreements, in order for a termination to be effective, written notice must be provided.  Specifically, Section 19.1(a) of the Franchise Agreements states that the "Franchisor shall have the *right* to terminate this Agreement immediately upon written notice to Franchisee stating the reason for such termination[.]"  Importantly, because the Franchisor has the right to terminate (but may elect not to in its discretion), Section 19.1(a) by its plain terms is not self-effectuating.  In other words, a termination does not occur merely because a default exists; to effectuate a termination under Section 19.1(a), the Franchisor must take the affirmative step of providing the Debtors with a written notice of termination.  *See In re Velo Holdings Inc.,* 475 B.R. 367, 382 (Bankr. S.D.N.Y. 2012) (holding that where a party has the option to terminate the contract upon the occurrence of an event, the termination is "not automatic and the party seeking to do so must take some affirmative action after the designated event occurs").

58.     It is beyond reasonable dispute that the first time that the Franchisor expressly stated that it was terminating the Franchise Agreements was on May 8, 2018, in the Postpetition Termination Letter.  This should be the end of the inquiry.

59.     Unable to point to a clear statement of termination, the Franchisor contends that its correspondence established that the Franchise Agreements "would terminate automatically on the first day after the cure period if the default was not cured."  Franchisor's Brief in Support of its Motion for Summary Judgment ¶ 3 [Adv. Docket No. 39] (the "Franchisor Brief").  This contention fails on multiple grounds.  Indeed, as a threshold matter, the Franchisor's original Notice of Default – sent in September 2017 – did not state that the Franchise Agreements were terminated.  Rather, the Notice of Default merely stated that the Franchise Agreements *would terminate* on the 91st day thereafter if the Debtors' purported defaults were not cured.  However, before this 90 day cure period expired, and thereafter, the Franchisor sent a total of seven letters extending the cure period (collectively, the "Extension Letters").[37]  Fatal to the Franchisor's current litigation position, none of the Extension Letters incorporated, or even referenced the Notice of Default, much less stated that there would be an "automatic" termination upon the expiration of the cure period.  Rather, each of the Extension Letters merely included a broad reservation of rights, which is irrelevant here because the Debtors are not arguing that the Extension Letters constitute a *waiver* of the Franchisor's right to terminate, but rather that the Franchisor did not clearly and unambiguously terminate the Franchise Agreements prepetition.[38]

60.     The Franchisor's final Extension Letter, dated April 16, 2018, purported to extend the cure period to April 26, 2018.  However, on April 25, 2018, before the expiration of the cure

---

[37]  Certain of the Franchisor's various notices were not sent to the address specified in the Franchise Agreements. However, for purposes of the competing motions for summary judgment, the Debtors assume but do not concede that those notices were proper.  In addition, the Debtors reserve their right to challenge whether the Franchisor's notices were properly given in light of further information.

[38]  The Franchisor's argument that it did not "waive" termination is a pure straw-man argument.  That argument presupposes that there was a "termination" for the Franchisor to waive.  But as demonstrated above, the undisputed facts amply demonstrate that there was not.

Similarly, the Franchisor is not entitled to summary judgment that it has post-termination right or that it timely exercised those rights for the simple reason that argument presupposes that there was an actual "termination," which there plainly was not.  *See* Franchisor Brief ¶¶ 82–88.

period, the Franchisor sent Debtors the April 25 Forbearance Letter, which incorrectly stated that the Debtors' supposed "cure period" had expired, but more importantly, *did not state that the Franchise Agreements were terminated.* To the contrary, as further discussed below, the April 25 Forbearance Letter merely stated that the cure period expired—without conveying in any way that the supposed significance of the expiration of the cure period was a termination. Indeed, to the contrary, the April 25 Forbearance Letter stated that the Franchisor was forbearing from exercising any further rights, which by definition would include its right to terminate absent clarification.

61.     Recognizing that the plain terms of the Default Notice, Extension Letters, and April 25 Forbearance Letter completely eviscerate its theory of the case, the Franchisor attempts to distort the record. For example, the Franchisor states that "[e]ach of the Cure Extension Letters tied back to the Notice of Default . . ; so, the Franchise Agreements would expire automatically and without further notice at the end of the extended cure period." Franchisor Brief ¶ 39. This is objectively false. None of the Extension Letters make a single mention of the Notice of Default. Similarly, the Franchisor argues in its brief that "[e]ach forbearance notice expressly stated that it did not waive the prior termination of the Franchise Agreements." Franchisor Brief ¶ 17. This statement likewise is clearly false. There is no "prior termination" to speak of, much less an express statement in the Forbearance Letters that the "prior termination" was not waived.

62.     The Franchisor's attempt to re-write the record only serves to underscore that it did not clearly and unambiguously terminate the Franchise Agreements prepetition. Indeed, the Franchisor has essentially conceded this point by expressly stating on the record on numerous occasions that it sent the Postpetition Termination Notice to "*make clear*" that the Franchise

Agreements were terminated.[39]  Plainly then, the Franchisor never provided the "clear and unambiguous" notice or conveyed the "unmistakable purpose" necessary to terminate the Franchise Agreements under Kansas law.

63.     The cases that the Franchisor itself relies on, in which courts have found notice of termination in the franchise context to be effective, serve only to reinforce the Franchisor's failure, as the franchisors in those cases did precisely what the Franchisor neglected to do here— i.e., provide unambiguous written notice of termination.  *See, e.g.*, *In re Tornado Pizza, LLC*, 431 B.R. 503, 508 (Bankr. D. Kan. 2010); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1206 (7th Cir. 1984) (finding termination effective where notice stated: "Please consider this our notice to cancel [the Oakdale dealership] per Paragraph 15h of said lease.  Said cancellation is to become effective ninety-days from the date of this letter.").

64.     The Franchisor's *Tornado* case is illuminating on this point.  In that case, the debtor was a franchisee of Domino's Pizza Stores and defaulted in paying royalty fees on twelve occasions between November 2008 and June 2009.  The franchisor sent notices of the accumulated defaults on three occasions, the last in April 2009, advising the debtor that it had 10 days to cure, which the debtor did not do.[40]  The franchise agreements permitted the franchisor

---

[39]  Franchisor Brief ¶ 51 (emphasis added); *see also* Declaration of Lucy Cheong in Support of Applebee's Motion for Summary Judgment ¶ 56 [Adv. Docket No. 40] (the "Cheong Summary Judgment Declaration") (declaring under penalty of perjury that the Franchisor sent the Postpetition Termination Notice to "make clear" that Franchise Agreements were terminated); Complaint ¶ 44 (stating that the Franchisor sent the Postpetition Termination Notice to "make clear" that Franchise Agreements were terminated); Lift Stay Motion ¶ 34 (same).

By contrast, in the Kansas Complaint, the Franchisor, before adopting its current litigation posture, stated candidly, pursuant to Rule 11 of the Federal Rules of Civil Procedure, that its Postpetition Termination Notice actually "*gave notice* to RMH that the franchise agreements for the Arizona and Texas franchises terminated . . . ."  Kansas Complaint ¶ 10 (emphasis added); ¶ 59 ("[B]y letter dated May 8, 2018, Applebee's notified" the Debtors of termination).  The Franchisor's assertion that it "gave notice" on May 8, 2018, is materially inconsistent with its current assertion that the Postpetition Termination Notice was merely "making clear" a notice of termination that had supposedly already been given.

[40]  The Franchisor will undoubtedly seek to distinguish *Tornado* on the ground that the cure notices in that case stated that the franchisor may terminate upon expiration of the cure period, in contrast to the Franchisor's Notice of

"to immediately terminate the Franchise Agreements, effective upon delivery of a notice of termination . . . ."[41]  Accordingly, on November 20, 2009, well after the cure periods had expired, the franchisor sent the debtor "official notification of termination," stating:  "This letter shall serve as official notification of termination of the Standard Franchise Agreement dated October 10, 2005 between Domino's Pizza LLC and Tornado Pizza, LLC for the Store located as 2940 SW Wanamaker, Suite 108, Topeka, KS 66614.  **The termination of the Franchise Agreement is effective November 23, 2009**."[42]  The franchisor's notice of termination further stated that the franchisor agreed "**to stay legal proceedings to enforce the termination, until December 23, 2009**" specifically to allow the debtor time to sell the stores.[43]  The debtor filed chapter 11 on December 22, 2009.  The franchisor sought relief from stay to enforce its post-termination rights, but the debtor argued that the franchise agreements were unfair contracts of adhesion because the termination provision did not give the debtor an opportunity to cure.  After a non-evidentiary hearing, the court ruled for the franchisor, holding that the official notification of termination it sent prepetition on November 20, 2009, had properly terminated the franchise

---

Default, which stated that the Franchise Agreements would terminate without further notice.  But this does not help the Franchisor's position.  If anything, the cure notices in *Tornado* demonstrate the recognition by the franchisor in that case that it could not do away with the requirement for termination upon written notice, which the Franchisor seeks to do here.

[41]  *Id.* at 512.  Specifically, section 18.2.1(l) provided that the franchisor "shall have the right to terminate this Agreement effective upon delivery of notice of termination to you, if . . . you fail on three (3) or more occasions during any twelve (12) month period to comply with any one or more provisions of this Agreement without limitation, your obligation . . . to pay when due the royalty fees, advertising contributions or other payments . . . whether or not such failure to comply is corrected after notice is delivered to you."  *Id.*

[42]  *Id.* at 508 (emphasis in original).

[43]  *Id.* at 509 (emphasis in original).  Note that the *Tornado* franchisor sent an effective notice of termination and was explicit that it was forbearing only on remedies designed to enforce that termination.  This stands in stark contrast to the Franchisor's April 25 Forbearance Letter, which was not coupled with a written notice of termination and which stated that the Franchisor was forbearing from "any further actions" to enforce it rights, which would have included termination.

agreements in accordance with their terms. Thus, the Franchisor's own case demonstrates what the Franchisor needed to do—and failed to do—to terminate the Franchise Agreements here.

65. Likewise, the Franchisor's treatment of the Development Agreements demonstrates that the Franchisor knows exactly what sort of notice was required, but failed to give it. The requirement under the Development Agreements for termination "immediately upon written notice" is identical to the requirement under the Franchise Agreements. And the Development Agreements are terminable due to a payment default under the Franchise Agreements. Accordingly, the Development Agreements are terminable in the same way and for the same reasons as the Franchise Agreements. And when the Franchisor sought to terminate the Development Agreements it sent the actual, present, unambiguous notice of termination that the Franchisor claims was unnecessary for the Franchise Agreements: "*Please be advised that each of Development Agreements . . . terminated. . . . Each Development Agreement . . . has terminated.*" Notice of Termination of Development Agreements (emphasis added).[44]

66. Moreover, even if the Franchisor's rewriting of the record were credited such that the Extension Letters could be said to put the Debtors on notice that the Franchisor intended to

---

[44] The Debtors were denied discovery into the Franchisor's communications with other franchisees regarding defaults, cures, forbearances, and terminations, which would have informed what the Franchisor meant by the notices it sent to the Debtors and what the Franchisor itself objectively understood those notices to mean. The Debtors assert that they are entitled to test whether the Franchisor's current position regarding termination is consistent with its past conduct or is a posture adopted purely for purposes of this litigation. For instance, the Debtors are entitled to know whether the Franchisor terminated other franchisee agreements with the formal notice of termination of the type that the Franchisor claims was unnecessary here. Courts have recognized on numerous occasions and in numerous contexts that when a defendant's intent is at issue, a plaintiff is entitled to discovery concerning the defendant's conduct towards others similarly situated to the plaintiff. *See, e.g.*, *Prime Aid Pharmacy Corp. v. Express Scripts, Inc.*, No. 4:16-CV-1237 (CEJ), 2017 WL 67526, at *4 (E.D. Mo. Jan. 6, 2017) (distinguishing Original Great American Chocolate Chip Cookie Co. and holding that plaintiff was entitled to discovery into defendant's contractual relationships with other pharmacies when "the question of defendant's good faith is very much at issue"); *Mackey v. IBP, Inc.*, 167 F.R.D. 186, 201 (D. Kan. 1996) ("If the motive or intent of a former employer is at issue, such as it is in this action for retaliatory discharge, plaintiff may obtain discovery concerning its conduct towards other employees."); *Mazza v. Quicken Loans, Inc.*, No. 1:12 CV 142, 2013 WL 2296657, at *4 (N.D.W. Va. May 24, 2013) (allowing discovery concerning other individuals who applied for a loan from Quicken because the "the information could supply evidence of intent by similar acts against other borrowers by Quicken"). The Debtors reserve their rights to argue that denial of this discovery was prejudicial error.

deem the Franchise Agreements as terminated "automatically" upon the expiration of the cure period, this position nonetheless is unavailing because such an "automatic" termination contravenes the termination procedure set forth in § 19.1 of the Franchise Agreements. Section 19.1(a) of the Franchise Agreements requires written notice of actual *termination*, not of the potential for termination at a future date. Indeed, the Franchise Agreements are clear that termination occurs "*immediately upon* written notice." [45] The Franchisor cannot unilaterally modify or amend the Franchise Agreements to provide for future termination "*without* further notice" rather than present termination "*immediately upon* written notice." *See Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884 (Kan. 1992) (finding that, in interpreting an agreement, if the language "is clear and can be carried out as written, there is no room for rules of construction."); *Warrick v. McKnab's Estate*, 187 P.2d 502, 506 (Kan. 1947) ("'If the notice be equivocal or not indicative of a present cancellation, but a mere intention or desire to cancel in the future, a cancellation will not be effected.'" (quoting *Pomerantz v. Mut. Fire Ins. Co. of Chester Cty.*, 124 A. 139, 140 (Pa. 1924))).[46] Indeed, Section 25.6 of the Franchise Agreements expressly states that "no amendment or modification shall be binding *unless executed in writing both by*

---

[45] As Bryan Garner explains in his Dictionary of Legal Usage, the word "upon" is used to "introduce[] a condition or event—e.g.: '*Upon* a proper showing, a permanent or temporary injunction, decree or restraining order shall be granted without bond.' / '*Upon* consideration of plaintiffs' motion for depositions regarding destruction of government computer property, plaintiffs' motion is denied.' **The sense 'with little or no interval after' is often an important nuance.**" *Garner's Dictionary of Legal Usage* (3d ed. 2011) (citations omitted; bold emphasis added); *see also Nw. Wholesale Lumber, Inc. v. Anderson*, 528 N.W.2d 502, 505 n.4 (Wisc. Ct. App. 1995) (explaining that "the 'ordinary meaning' of the word 'upon' . . . is one of contemporaneity"). That "important nuance" of contemporaneity is emphasized here by the langue of the Franchise Agreements, which state that the Franchisor has the right to terminate "*immediately upon* written notice."

[46] Tellingly, the Franchisor does not cite a single case that interprets a contract requiring termination "upon written notice" as permitting termination sometime in the future "without further notice." In fact, the only cases the Franchisor cites in support of its contention that it "fully complied" with the termination provision in the Franchise Agreements stand for the unremarkable proposition that a contract terminated prepetition is not estate property. *See* Franchisor Brief ¶ 57. But that is irrelevant to the question of whether the Franchisor "fully complied" with the Franchise Agreements' termination provision. As discussed in more detail below, the Franchisor's own case law demonstrates that it did not.

*Franchisor and by Franchisee and Principal Shareholders.*"  Likewise, as a matter of contract interpretation, it bears note that Section 19.1 does address termination after a cure period, albeit for others types of defaults not applicable here, and makes clear in that circumstance that the Franchisor may terminate after expiration of the cure period *only upon further written notice*. *See* Franchise Agreements § 19.1.  Thus, it is clear that the Franchisor was not permitted to modify the Franchise Agreements to provide for automatic termination upon expiration of a cure period, as they argue here.

### C. The April 25 Forbearance Letter Precludes a Finding That the Franchise Agreements Were Terminated Prepetition

67.     There can be no dispute that at the time of the delivery of April 25 Forbearance Letter, the Franchise Agreements had not terminated.  Indeed, even according to the Franchisor, the Franchise Agreements did not terminate until April 27, 2018.  Franchisor Brief ¶ 43.  Yet nowhere in the April 25 Forbearance Letter does it state that the Franchise Agreements were being terminated.  To the contrary, the April 25 Forbearance Letter stated that "Applebee's agrees that it will forbear from taking any further actions against you or the Franchise Restaurants, whether at law or in equity, to enforce our rights and remedies against you or the Franchise Restaurants, under or in connection with the franchise agreements, until May 8, 2018."  Based on the plain meaning of the phrase "any further actions," the only logical interpretation of the foregoing statement is that the Franchisor decided to forbear from exercising *all rights*, including the right to terminate the Franchise Agreements.  Thus, the Franchisor's statement that it was forbearing from taking "any further actions" until May 8, in and of itself, precludes a finding that the April 25 Forbearance Letter provided clear and unambiguous notice of termination.

68.     The Franchisor attempts to sidestep the plain language of the April 25 Forbearance Letter by arguing that the April 25 Forbearance Letter was only a forbearance of its post-termination rights.  Franchisor Brief ¶ 61.  But this position finds zero support in the actual content of the letter.  Indeed, the April 25 Forbearance Letter never mentions termination, let alone the forbearance of post-termination rights.  If the Franchisor truly intended to terminate the Franchise Agreements and forbear from pursuing its post-termination rights, it easily could have stated so.  Instead, the Franchisor never sent an express notice terminating the Franchise Agreements, and did not state that it was forbearing from enforcing post-termination rights; rather, it stated that it was forbearing from taking *any* further actions to enforce its rights.

69.     Moreover, the Franchisor's "automatic" termination argument cannot salvage its position.   To accept Franchisor's argument, the Court would need to read new language into the April 25 Forbearance Letter stating that termination would automatically be effective upon the expiration of the cure period.  But even if this language somehow were read into the April 25 Forbearance Letter (and one were to ignore that such an automatic termination is impermissible under the Franchise Agreements), the April 25 Forbearance Letter also states that Applebee's was forbearing from taking "any further actions."  These two statements cannot be reconciled – that is, it is difficult to understand how a termination could occur during a period of forbearance from the exercise of all rights.  Thus, even accepting *arguendo* the Franchisor's attempt to rewrite the April 25 Forbearance Letter, the April 25 Forbearance Letter is, at best, ambiguous regarding its consequences, and surely cannot meet the high standard under Kansas law requiring any termination of a contract to be clear and unambiguous.

**D.** **The Franchisor's Postpetition Statements and Conduct Demonstrate That the Franchise Agreements Were Not Terminated Prepetition**

70. On May 8, 2018, just hours after the Debtors had filed for bankruptcy, the Franchisor hand-delivered the Postpetition Termination Notice, which expressly stated that "Applebee's hereby notifies you that the franchise agreements for the Applebee's restaurants located in Arizona and Texas . . . terminated on April 27, 2018." This language clearly concedes that the Debtors had not previously been notified of the Franchisor's purported termination of the Franchise Agreements on April 27, 2018, or, at the very least, that such purported termination was not clear and unambiguous.

71. Relatedly, the Postpetition Termination Notice states that "[Debtors] [are] expected to fully comply with the post-termination obligations under the franchise agreements." However, per the terms of the Franchise Agreements, the Debtors had obligations that went into effect "immediately" after termination, such as their obligation to discontinue their use of the system. *See* Section 19.2(a) of the Franchise Agreements. As such, if the Franchise Agreements actually terminated on April 27, 2018, the Debtors would have had to immediately discontinue their use of the system. But until the Postpetition Termination Notice, the Franchisor never requested or notified the Debtors that they needed to discontinue their use of the system. Indeed, the evidence shows that the Franchisor knew full well that the Debtors were continuing to operate all of the Applebee's stores using the Franchisor's System. *See* section I.E *infra*. Thus, the Franchisor's current litigation position that "[a]s of April 27, 2018, the Debtors had no right or authorization, under the Franchise Agreements or otherwise, to continue to operate the RMH Restaurants and use Applebee's Marks and trade name" is belied by both the Franchisor's conduct after April 27, 2018 and the Postpetition Termination Notice. Franchisor Brief ¶ 45.

72.     Moreover, the Postpetition Termination Notice and the Postpetition Forbearance Letter (together, the "<u>May 8 Letters</u>") treat the various Applebee's restaurants differently, in sharp contrast to all prepetition correspondence, which had treated all of the restaurants in the same exact manner.  The Postpetition Termination Notice claims that only the Arizona and Texas restaurants were terminated on April 27, 2018.  In contrast, the Postpetition Forbearance Letter does *not* state that any of the other restaurants were terminated on April 27, 2018; to the contrary, it states that "Applebee's will forbear from enforcing its *termination rights* under the franchise agreements . . . ."  While the Franchisor strains to characterize the Postpetition Forbearance Letter as a forbearance of only post-termination rights, that is not what it says.  Rather, the plain language indicates that the Franchisor was choosing not to terminate the Franchise Agreements for the restaurants located outside of Arizona and Texas as of May 8, 2018.  Thus, the May 8 Letters cannot be squared with the Franchisor's litigation position that the Franchise Agreements all terminated on April 27, 2018.  Franchisor Brief ¶ 43.

73.     In addition, before the Franchisor conveniently adopted its current litigation posture, its own filing in the Kansas Complaint candidly stated that the Franchisor informed the Debtors prepetition (i) that it "*would be* exercising certain termination rights *on May 8, 2018,*"[47] (ii) that it was forbearing from taking action until May 8, 2018, "to allow the parties time to see if an amicable resolution was possible,"[48] and finally (iii) that it "*intended* to exercise its termination rights *on May 8, 2018.*"[49]  The allegations that the Franchisor made in its Kansas Complaint thus flatly contradict its allegations before the Court in this matter.  Similarly, in her declaration in support of the Lift Stay Motion, Ms. Cheong stated under penalty of perjury that

---

[47] Kansas Complaint ¶ 9 (emphasis added).

[48] Kansas Complaint ¶ 56.

[49] Kansas Complaint ¶ 58 (emphasis added).

she participated in the parties' teleconference on May 7, 2018, in which the Franchisor "notified" the Debtors that it "*intended* to enforce its termination rights."[50]  But in her declaration in support of the Franchisor's Motion for Summary Judgment, Ms. Cheong conveniently omits any mention of the parties May 7 teleconference.[51]

74.     In sum, the Franchisor's various representations in the May 8 Letters and the Kansas Complaint only serve to further demonstrate that the Franchisor is relying on revisionist history to support its claim and that it did not clearly and unambiguously terminate the Franchise Agreements prepetition.

**E.     The Franchisor Is Equitably Estopped from Asserting That the Franchise Agreements Terminated on April 27, 2018.**

75.     The Franchisor is estopped from claiming that it terminated the Franchise Agreements prepetition based on its numerous statements and indications to the contrary.  To establish equitable estoppel, a party need only show "that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed" and that the party asserting estoppel "rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts."  *Steckline Commc'ns Inc. v. Journal Broad. Grp. of Kan., Inc.,* 388 P.3d 84, 91 (Kan. 2017).

76.     As set forth above, the Notice of Default was a notice of *potential* termination, allegedly set to occur without further notice if the purported defaults were not cured by a certain date.  After the Notice of Default was delivered, however, the Franchisor engaged in nearly 8 months of good-faith workout negotiations with the Debtors.  In connection therewith, the

---

[50]   Declaration of Lucy Cheong ¶ 37 [Docket No. 92].

[51]   *See generally* Cheong Summary Judgment Declaration [Adv. Docket No. 40].

Franchisor extended the initial purported "cure period" on no fewer than seven separate occasions and, importantly, did not indicate when granting those extensions that a failure to cure by the extended deadline would result in a termination "without further notice."

77.     As discussed, in the April 25 Forbearance Letter, the Franchisor not only failed to state that the Franchise Agreements were terminated, but the letter expressly stated that the Franchisor was forbearing from exercising any further rights.  The clear import of the April 25 Forbearance Letter was that the Franchise Agreements were not terminated.

78.     Between expiration of the supposed "cure period" and the Petition Date, the Franchisor continued to work with the Debtors in the ordinary course and to participate in workout negotiations without any indication that it believed the Franchise Agreements had terminated.  Among other things, the Franchisor's representatives participated in the Debtors' annual General Manager Conference from April 30, 2018, through May 3, 2018.  On May 1, 2018, the Franchisor's *general counsel*, Bryan Adel, emailed the Debtors' representative regarding workout negotiations and gave no indication that he believed the Franchise Agreements had terminated five days previously.  On May 4, 2018, the chairman of AFH's board, Daniel Jinich, and the Franchisor's CEO, Stephen Joyce, arranged a call for May 7, 2018—with Mr. Joyce giving no indication that he believed the Franchise Agreements had terminated 8 days previously.  And during that call on May 7, 2018, none of the Franchisor's representatives gave any indication that they believed the Franchise Agreements had terminated 11 days previously.  To the contrary, the Franchisor expressly stated it *would* terminate the Arizona and Texas franchise agreements unless the Debtors paid $12 million by the end of the day.  Thus, none of the communications between the Franchisor and the Debtors during this time gave any indication that the Franchisor believed it had previously terminated the Franchise

Agreements—all of the Franchisor's communications in fact suggested the exact opposite. To be sure, if anybody believed the April 25 Forbearance Letter was a termination, additional discussions of this nature never would have happened.

79.     The Debtors relied to their detriment on, among other things, (i) the Franchisor's failure to indicate, in any manner, that the Franchise Agreements would be terminated on any particular date after repeatedly extending the purported "cure period"; (ii) the Franchisor's statements that it was interested in reaching a consensual resolution; (iii) the Franchisor's statements, in the various notices and elsewhere, that they were refraining from "exercising their rights and remedies" under the Franchise Agreements; and (iv) numerous statements and actions indicating that the Franchise Agreements were in full force and effect notwithstanding statements by the Franchisor's representatives after the purported terminations are alleged to have occurred. Prior to the Petition Date, the Debtors took numerous steps to their ultimate detriment in direct reliance on the Franchisor's words and actions regarding the continuation of the franchise relationship. Among other things, the Debtors refrained from filing bankruptcy to protect their interests under the Franchise Agreements and spent significant time, effort, and money—despite their dire financial straits—negotiating with the Franchisor when all along the Franchisor was merely leading the Debtors on and awaiting an opportune time to attempt to seize their most valuable restaurants.

80.     The Debtors are thus entitled to summary judgment because the undisputed facts demonstrate that the Franchisor is estopped from asserting the Franchise Agreements terminated prepetition.

**F.** **The Franchisor's Attempted Postpetition Termination Was Void *Ab Initio* as a Willful Violation of the Automatic Stay.**

81.     The Franchisor also cannot rely on the Postpetition Termination Notice as the notice required under the Franchise Agreements to effect a valid termination because it was delivered to the Debtors after the Petition Date in violation of the automatic stay.  *See In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994) (stating general rule that any creditor action taken in violation of an automatic stay is "void *ab initio*.").

82.     Further, the Debtors may have affirmative claims against the Franchisor for willful violation of the automatic stay not only on account of the Kansas Complaint and the Postpetition Termination Notice, but also for its repeated objections and other actions in the Debtors' chapter 11 cases.  *See In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631, 637 (3d Cir. 1998) (finding that a franchisor's actions, namely "objecting to the Trustee's Motion to Sell the Debtor's Assets and the Motion to Assume and Assign as well as to the Debtor's Plan of Reorganization, on the basis that . . . the franchise agreement had been terminated . . . constituted acts to take possession or control of property of the bankruptcy estate" in violation of the automatic stay).  The Franchisor's insistence that the Franchise Agreements were terminated prepetition and therefore are not property of the Debtors' estates, the Debtors believe, are calculated to wrest control of valuable assets from the Debtors' estates and have cost the Debtors significantly in terms of fees and other resources.  Accordingly, the undisputed facts establish that the Franchisor willfully violated the automatic stay, and the Debtors are entitled to summary judgment.

## II. The Franchisor's Material Breaches of the Franchise Agreements and the Implied Covenant of Good Faith and Fair Dealing Preclude the Entry of Summary Judgment in the Franchisor's Favor.

83.     Even if the Court declines to grant the Debtors' Cross-Motion, material factual disputes exist that preclude summary judgment for the Franchisor.  It is well settled under Kansas law that a material breach of contract suspends and then terminates the non-breaching party's performance.  *See Lassiter v. Topeka Unified Sch. Dist. No. 401*, 347 F. Supp. 2d 1033, 1041 (D. Kan. 2004) ("A party's uncured material breach of a contract can suspend or discharge the other party's obligation to perform."); *Old Colony Ventures I, Inc. v. SMWNPF Holdings, Inc.*, 918 F. Supp. 343, 349 (D. Kan. 1996) ("A sufficiently material, uncured breach of the covenant of good faith and fair dealing term will suspend and then terminate the nonbreaching party's performance."); *In re Estate of Moe*, 240 Kan. 242, 245 (1986) ("General contract law provides that once performance has begun and prevention of further performance takes place by repudiation or otherwise, there is an actual breach and further performance is excused.").  Whether a breach rises to the level of "material" under Kansas law is a question of fact.  *Lassiter*, 347 F. Supp. 2d at 1041.

84.     *Old Colony Ventures I, Inc. v. SMWNPF Holdings, Inc.* is instructive.  The non-breaching party in *Old Colony Ventures I, Inc.* sought to justify its failure to make payments due under a loan agreement by arguing that the other party's inequitable conduct prevented it from meeting its payment obligations.  *Id.* at 346-47.  The District Court of Kansas held that because material questions of fact existed regarding whether payment under the loan agreement was excused, summary judgment was precluded.  *See id.* at 349 (citing E. Allan Farnsworth, Contracts § 7.17 (2d ed. 1990)).  In so holding, the court relied on Kansas Supreme Court precedent that "[e]quity will not permit a litigant to rely on his own wrongful conduct to recover."  In a subsequent opinion regarding the same dispute, the District Court of Kansas

noted, "the relevant inquiry is whether [the other party's breach] is material; if it was . . . , the entire performance was excused . . . ." *Old Colony Ventures I, Inc. v. SMWNPF Holdings, Inc.*, No. 95-2050-JWL, 1996 WL707025, at *5 n.3 (D. Kan. Oct. 2, 1996). Thus, Kansas law supports the proposition that a material breach may excuse payment obligations.

85. Indeed, this proposition should apply with particular weight here given that it was the Franchisor's material breaches of the Franchise Agreements and the implied covenant of good faith and fair dealing that destroyed the Debtors' financial position to the point that it eventually could not pay the fees. *See Old Colony Ventures I, Inc.*, 918 F. Supp. at 349; *Old Colony Ventures I, Inc.*, 1996 WL707025, at *5 n.3; *see also AECOM Tech. Servs. Inc. v. Mallinckrodt LLC*, 117 F. Supp. 3d 98, 115 (D. Mass. 2015) (finding that evidence presented of material breach "arguably justif[ies] and excuse[s] . . . failure to pay"); *cf. Red Roof Franchising, LLC v. Patel*, 564 F. App'x 685, 688–89 (3d Cir. 2014) (assuming for purposes of summary judgment "that a material breach by [the franchisor], if proved, could give rise to an affirmative defense against [the franchisor's] own breach-of-contract claims").

86. The Franchisor's contention that its material breach of the Franchise Agreements did not preclude it from terminating those agreements also fails because it was the Franchisor's breach that occasioned the Debtors' inability to perform in the first place. It is a longstanding principle of contract law that "the conduct of one party to a contract which prevents the other from performing his part is an excuse for non-performance . . . . It is a sound principle that he who prevents a thing being done shall not avail himself of the non-performance he has occasioned." *United States v. Peck*, 102 U.S. 64, 65 (1880). That is, a "party may not, in fact, take advantage of an insurmountable obstacle placed, by himself, in the path of the other party's adherence to an agreement. By preventing performance he also excuses it." *Schultz v. Pet Food*

*Giant, Inc.*, No. CIV.A. 96-4457, 1998 WL 24339, at *4 (E.D. Pa. Jan. 26, 1998) (citations and internal quotation marks omitted); *see also Onal v. BP Amoco Corp.*, 275 F. Supp. 2d 650, 665–66 (E.D. Pa. 2003) ("[C]onduct of one party that prevents the other from performing is an excuse for nonperformance."), *aff'd*, 134 F. App'x 515 (3d Cir. 2005). This longstanding principle is consistent with Kansas law.

87.     As the Supreme Court has explained, "[t]he applicable principle is fundamental and unquestioned. He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned, for the law says to him, in effect: This is your own act, and therefore you are not damnified." *R.H. Stearns Co. of Boston, Mass. v. United States*, 291 U.S. 54, 61–62 (1934). Here, it was the Franchisor's material breach of the Franchise Agreements that prevented the Debtors from having sufficient liquidity to timely pay royalty fees and maintain operations. By preventing the Debtors' performance, the Franchisor also excused it.[52]

88.     The Franchisor cites to a number of cases that purportedly support the proposition that the Franchisor's material breaches do not excuse the Debtors' payment of royalties. None of these cases, however, apply Kansas law. Moreover, each of the cases is irrelevant and cannot be reconciled with controlling Kansas law recognizing that a material breach excuses performance, including contractual payment obligations.

89.     The majority of the Franchisor's cases involve a franchisor seeking a preliminary injunction on a trademark infringement claim after it had terminated the franchise agreement.

---

[52] At the very least, the question of whether the Franchisor's material breach of the Franchise Agreements caused, and thus excused, the Debtors' inability to perform involves material factual disputes that preclude summary judgment for the Franchisor. Moreover, to the extent that the existence or materiality of the Franchisor's breach is contested, Rule 56(d) of the Federal Rules of Civil Procedures entitles the Debtors to discovery that has not yet proceeded.

The primary focus of these cases is whether the franchisor was entitled to preliminary injunctive relief on the trademark claim. In that procedural posture, the courts have declined to consider whether the franchisees may have defenses to the validity of the purported termination, such as those advanced by the Debtors. *Travelodge Hotels, Inc. v. Honeysuckle Enters.*, 357 F. Supp. 2d 788, 798 (D.N.J. 2005) ("pre-termination complaints are *not relevant to infringement under the Lanham Act*"). Indeed, as noted in the *Burger King Corp. v. Hall* case that the Franchisor relies on, the Lanham Act provides an exclusive list of statutory defenses to a trademark infringement action – and a material breach by the Franchisor is not one of them. *See* 770 F. Supp. 633, 639 (S.D. Fl. 1991). Thus, an affirmative defense premised on the Franchisor's material breaches would not be considered in an action under the Lanham Act. As such, these cases are entirely irrelevant.

90.     In the remainder of the Franchisor's cases, the breaches at issue (if any) were not material and thus could not excuse performance. *See, e.g.*, *Red Roof Franchising, LLC v. Patel*, 564 F. App'x 685, 688–89 (3d Cir. 2014) (assuming for purposes of summary judgment "that a material breach by [the franchisor], if proved, could give rise to an affirmative defense against [the franchisor's] own breach-of-contract claims" but concluding that the appellants had not produced sufficient evidence regarding the franchisor's breach to create a genuine issue of material fact); *Cal. Sun Tanning USA, Inc. v. Elec. Beach, Inc.*, 369 F. App'x 340, 348 (3d Cir. 2010) (rejecting the franchisor's argument that the franchisee was not entitled to specific performance of a settlement agreement, finding that the franchisee had not breached the agreement).

91.     Thus, at the very least, there are unresolved factual issues regarding whether the Franchisor's material breach excused the Debtors' performance. Given that the Court is required

to view the facts in the light most favorable to the Debtors and to draw all inferences and resolve all factual doubts in the Debtors' favor, summary judgment for the Franchisor therefore is inappropriate.

## **CONCLUSION**

Based on the foregoing, the Debtors respectfully request that the Court (1) grant the Debtors' Cross-Motion and (a) enter summary judgment for the Debtors and against the Franchisor on (i) all Counts in the Franchisor's Complaint and (ii) Counts V, VI, VII, and VIII of the Debtors' Counterclaims and (b) award the Debtors reasonable attorneys' fees and expenses incurred in connection with this Adversary Proceeding, and (2) deny the Franchisor's Motion for Summary Judgment.

Dated:   July 27, 2018          YOUNG CONAWAY STARGATT & TAYLOR, LLP
       Wilmington, Delaware

*/s/ M. Blake Cleary*

James L. Patton, Jr. (No. 2202)
M. Blake Cleary (No. 3614)
John T. Dorsey (No. 2988)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1256

-and-

WITMER, KARP, WARNER & RYAN LLP
Eric H. Karp
22 Batterymarch Street
Boston, Massachusetts 02109
Telephone:     (617) 423-7250
Facsimile:     (617) 423-7251

*Counsel for the Debtors and Debtors in Possession*